No. 04-0083C
Senior Judge Bruggink

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DOMINION RESOURCES, INC.,

and

DOMINION NUCLEAR CONNECTICUT, INC.

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

---

# PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS AND DEFENSES BASED UPON THE "ONE-TIME FEE"

---

Brad Fagg
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 Telephone
(202) 739-3001 Facsimile
COUNSEL OF RECORD FOR
DOMINION RESOURCES, INC. and
DOMINION NUCLEAR CONNECTICUT, INC.

January 29, 2007

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................................ 2

A. The Millstone Units. ........................................................................................ 2

B. The Nuclear Waste Fund and Standard Contracts. ........................................ 3

C. The One-time Fee Options for Millstone 1 and 2. ......................................... 5

D. Dominion's Acquisition of Millstone. ............................................................ 6

E. The DOE's Suspension of the "DCS" Process. ............................................... 7

F. The Government's One-time Fee Counterclaims and Defenses. .................... 8

DISCUSSION ........................................................................................................ 8

A. Standards On a Motion to Strike Or Dismiss. ................................................ 8

B. Payment Of The One-time Fee Is Not Yet Due. ............................................. 9

C. The One-time Fee Provides No Legal Defenses to the Government ............. 11

1. *Payment of the one-time fee is not a "condition precedent."* ........................ 11

2. *Even if payment of the one-time fee were a "condition precedent," such payment is excused.* ........................................................................ 13

D. As a Matter of Law, The Government Is Not Legally Entitled to Any Setoff, Recoupment, or Reduction In Damages Due to The One-time Fee .................... 14

1. *Because payment of the one-time fee is not yet due, the government is not at present entitled to recovery of the fee through an award of damages or setoff in this action* .................................................................. 14

2. *The government's proposed setoff would not be legal.* ................................ 16

3. *The government may not legally pursue damage reductions due to the deferred payment of the one-time fee* ......................................................... 18

CONCLUSION ...................................................................................................... 24

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Alabama Power Company v. United States Department of Energy*, 307 F.3d 1300 (11th Cir. 2002)........................................................................................ 3, 16

*American Heritage Bancorp v. United States*, 56 Fed. Cl. 596 (2003) ............................ 9

*Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed. Cir. 2003) ..15, 18

*Boston Edison Company v. United States*, 64 Fed. Cl. 167 (2004) .................................. 7

*Boyle v. United States*, 200 F.3d 1369 (Fed. Cir. 2000) .................................................. 9

*Charron v. United States*, 200 F.3d 785 (Fed. Cir. 1999)............................................... 12

*Commonwealth Edison Company v. United States*, 56 Fed. Cl. 652 (2003)...................... 4

*Consumers Energy Company v. United States*, 65 Fed. Cl. 364 (2005) ...................passim

*Devito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969) .................................................. 14

*Favell v. United States*, 16 Cl. Ct. 700, 712 (1989)....................................................... 12

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) .............21, 22

*Hercules, Inc. v. United States*, 292 F.3d 1378 (Fed. Cir. 2002) .................................. 10

*Hughes Communications Galaxy, Inc. v. United States*, 38 Fed. Cl. 478 (1997), *aff'd*, 271 F.3d 1060 (Fed. Cir. 2002).........................................................passim

*Indiana Michigan*, 422 F.3d 1369, 1374 (Fed. Cir. 2005)............................................. 19

*International Audiotext Network, Inc. v. American Telephone and Telegraph Company*, 62 F.3d 69 (2d Cir. 1995) .......................................................... 2

*Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336 (Fed. Cir. 2000)........................................................................................... 2, 17

*Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993 ............................................................................................ 2

*Moyer v. United States*, 190 F.3d 1314 (Fed. Cir. 1999) ................................................. 9

*New York Life Insurance Co. v. United States*, 190 F.3d 1372 (Fed. Cir. 1999) ............... 9

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Northern States Power Company v. United States*, 224 F.3d 1361 (Fed. Cir. 2002) ......... 3

*Perez v. United States*, 156 F.3d 1366 (Fed. Cir. 1998) ................................................. 9

*Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005)........... 7

*Sebastian v. United States*, 185 F.3d 1368 (Fed. Cir. 1999) ............................................ 2

*Southeastern Airways Corporation v. United States*, 673 F.2d 368 (Ct. Cl. 1982).......... 14

*Southern Pacific Co. v. Darnell-Taennzer Lumber Co.*, 245 U.S. 531 (1918) ...........20, 22

*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) ....................................passim

*System Fuels, Inc. v. United States*, 73 Fed. Cl. 206 (2006) .......................................... 15

*United International Investigative Serv. v. United States*, 109 F.3d 734 (Fed. Cir. 1997)........................................................................................................ 10

*United States v. Munsey Trust Company*, 332 U.S. 234 (1947)................................14, 15

*United States v. Schaeffer*, 319 F.2d 907 (9th Cir. 1963) ............................................. 12

*Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236 (2006) ..........................................................................................................passim

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996) ....................... 20

*Yankee Atomic Electric Company v. United States*, 73 Fed. Cl. 249 (2006) ............passim

**FEDERAL STATUTES AND REGULATIONS**

42 U.S.C. § 10131(a)(4)................................................................................................ 18

42 U.S.C. § 10131(b)(1).................................................................................................. 3

42 U.S.C. § 10131(b)(2).................................................................................................. 3

42 U.S.C. § 10222(a)(1).................................................................................................. 3

42 U.S.C. § 10222(c)(1)-(3) ....................................................................................... 3, 17

**TABLE OF AUTHORITIES**
(continued)

**Page**

42 U.S.C. § 10222(d) ........................................................................................ 3

10 C.F.R. § 961.11 ........................................................................................passim

**MISCELLANEOUS**

2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.4 at 359 (1990)............................ 12

2 J. Moore, Moore's Federal Practice § 12.37[4] (3d ed. 2006)........................................ 9

*Restatement (Second) Contracts* § 227(2) (1981) ........................................................ 12

*Restatement (Second) Contracts* § 347 cmt. d (1981) .................................................... 19

5B C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).............................................................................................................. 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DOMINION RESOURCES, INC.,**<br><br>and<br><br>**DOMINION NUCLEAR CONNECTICUT, INC.**<br><br>Plaintiffs,<br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 04-0083C<br><br>Judge Bruggink |

**PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS AND DEFENSES BASED UPON THE "ONE-TIME FEE"**

Pursuant to RCFC 12(b)(6), 12(c), and 12(f), plaintiffs Dominion Resources, Inc. and Dominion Nuclear Connecticut, Inc. (collectively, for these purposes, "Dominion") move to dismiss and/or strike the government's affirmative defenses and counterclaims based upon the "one-time fee." In particular, Dominion requests dismissal of the affirmative defenses of failure to satisfy a condition precedent (Defendant's Answer ¶ 60, [Docket No. 30-2]); recoupment or setoff (Defendant's Answer ¶ 62); and offset or reduction (Defendant's Answer ¶ 63). Dominion also requests dismissal of the "First Counterclaim" (Defendant's Answer ¶¶ 64-67), and the "Counterclaim for Offset or Recoupment" (Defendant's Answer ¶¶ 68-70).

All of the government's one-time fee defenses and counterclaims suffer from a fatal, fundamental flaw, namely, the fact that the one-time fee payment is not, under the contracts, yet

due. For that reason, the contractually-allowed deferred payment of the one-time fee provides no defense to the government in this partial breach case, either by way of avoiding liability, or through effectively seeking accelerated payment of the fee, or a portion thereof, through a setoff or reduction of damages.

**STATEMENT OF FACTS**

The following statement of facts is drawn from allegations of Defendant's Answer to Plaintiff's Complaint, Affirmative Defenses, and Counterclaims ("Defendant's Answer"), together with materials, such as the contracts, that are deemed incorporated in the complaint or answer for these purposes, and publicly-filed, judicially noticeable matters that may be considered by the Court for purposes of this motion to dismiss under RCFC 12.[1]

A. *The Millstone Units.* This is a spent nuclear fuel damages case. *See generally, Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). This and a companion lawsuit, Nos. 04-83 and 04-84, involve seven nuclear reactors owned by Dominion at three sites (Millstone, North Anna, and Surry) in Connecticut and Virginia. The complaint in this action, No. 04-83, involves the Millstone Power Station, which is a three-unit site near New London, Connecticut. Millstone Unit 1 began commercial operation in 1970, and was permanently shut down in 1995. Millstone Unit 2 began commercial operation in 1975, and is currently operating. Millstone Unit 3 began commercial operation in 1986, and is also currently operating.

[1] *See,* 5B C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004) at 376. *See generally, Sebastian v. United States,* 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record.") (citations omitted); *International Audiotext Network, Inc. v. American Telephone and Telegraph Company*, 62 F.3d 69, 72 (2d Cir. 1995) (on motion to dismiss under Rule 12(b)(6), court may consider materials incorporated by reference in the complaint, as well as "integral" materials upon which the complaint "relies heavily"); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (under Rule 12(b)(6), courts may review matters of public record).

B. <u>*The Nuclear Waste Fund and Standard Contracts.*</u> The Nuclear Waste Policy Act ("NWPA") codified the Federal Government's long-standing responsibility for the acceptance and disposal of spent nuclear fuel and high level waste (for these purposes, "SNF/HLW"). *E.g.,* 42 U.S.C. §§ 10131(b)(1), (2). The NWPA created a "separate" Nuclear Waste Fund ("NWF") with specific identified permissible sources of receipts, 42 U.S.C. § 10222(c)(1)-(3), and with specific identified permissible uses related to disposal of SNF/HLW. 42 U.S.C. § 10222(d). *See generally, Alabama Power Company v. United States Department of Energy*, 307 F.3d 1300, 1312 (11th Cir. 2002). The NWPA required DOE and commercial nuclear utilities to enter into contracts for the disposal of SNF/HLW. 42 U.S.C. § 10222(a)(1). Pursuant to the NWPA, DOE established a "Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract"). 10 C.F.R. § 961.11. *See generally, Northern States Power Company v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2002).

There are three separate Standard Contracts, one for each Millstone unit, the material terms of which are reprinted at 10 C.F.R. § 961.11. The Standard Contracts for Millstone Power Station Units 1 and 2 (as well as Unit 3) were executed by a predecessor to Dominion in 1983, and assigned to Dominion upon sale of the units in 2001. Defendant's Answer ¶ 7 (admitting execution and assignment "to the extent supported by the contracts cited"). The Standard Contracts, in which the utility/holder of SNF/HLW is termed the "Purchaser," contain several terms that are relevant to the present motion.

The Standard Contract defines "delivery" as "the transfer of custody, f.o.b carrier, of spent nuclear fuel and/or high level radioactive waste from Purchaser to DOE at the Purchaser's nuclear power reactor or such other domestic site as may be designated by the Purchaser and

approved by DOE." Article I.7. The Standard Contract also prescribes forms and procedures for submission of "delivery commitment schedules" by the Purchaser, keyed to a DOE-generated planning document called an "acceptance priority ranking." Articles V.B and VI.B. Delivery commitment schedules, often referred to as "DCS's," were to be submitted sixty-three months in advance of the dates for delivery specified by DOE, and "final delivery schedules" submitted twelve months in advance of delivery dates. As described further below, DOE initiated the delivery commitment schedule process during the 1990's, based upon a unilaterally-determined pick-up rate unrelated to real world acceptance capabilities or to any actual anticipated deliveries. *See generally Commonwealth Edison Company v. United States*, 56 Fed. Cl. 652 (2003) (description of delivery commitment schedule process). DOE then suspended that delivery commitment schedule process in 1997, restarted it in 2004, and then soon thereafter suspended that process again.

Regarding fees, the Standard Contract provides, for electricity generated and sold after April 7, 1983, a charge in the amount of 1.0 mill per kilowatt hour. Article VIII.A.1. Such fees are not, at least directly, implicated by the government defenses and counterclaims that are the subject of this motion.

For SNF used to generate electricity prior to April 7, 1983, a "one-time fee" was imposed. It is this one-time fee that constitutes the purported grounds for the government defenses and counterclaims that are the subject of this motion. The Standard Contract specified the method for calculation of the amount of the one-time fee, and further provides that the one-time fee "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." Article VIII.A.2.

Pursuant to Article VIII.B., utilities were given three options regarding payment of the

one-time fee. The payment option had to be selected by the utility within two years of contract execution. "Option 1," chosen by only a very few utilities, provided for the financial obligation to be prorated over forty quarters, with the last payment to be made by the first scheduled delivery date as reflected in a DOE-approved delivery commitment schedule. The payment amounts were to include certain interest charges. Article VIII.B.2.a.

"Option 2," chosen by approximately a quarter of the industry, provided that "[t]he Purchaser's obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance." Article VIII.B.2.b. Interest is added from April 17, 1983 to the date of eventual payment, at the 13-week Treasury bill rate, and the amount due is compounded quarterly. *Id.*

"Option 3," chosen by the other approximately three quarters of the industry, provided for payment of the one-time fee in full, but without any interest, prior to June 30, 1985 or within two years of contract execution. Article VIII.B.2.c.

The Standard Contracts also include several provisions relating to non-payment, or late payment, of fees. For example, Article VII.C.1 provides that DOE "will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above," and goes on to specify a calculation formula and payment procedures for such late fees. Article VIII.E. provided for audit rights in favor of DOE, with regard to whether the "Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above."

C. *The One-time Fee Options for Millstone 1 and 2.* Dominion's predecessor, Northeast Utilities Service Company, selected, for Millstone Units 1 and 2, the deferred payment

Option 2 for the one-time fee, and that fee has therefore not been paid. *E.g.,* Defendant's Answer ¶¶ 15, 65 ("The predecessor to the standard contracts at issue in this case elected to satisfy its financial obligation pursuant to Article VIII.B.2 of the standard contracts."). The original calculated amount for the Millstone Unit 1 one-time fee was approximately $48,385,579, and had grown to $163,012,104 as of September 30, 2006. The original calculated amount for the Millstone Unit 2 one-time fee was approximately $33,722,126, and had grown to $114,252,872 as of September 30, 2006. *See* Defendant's Answer ¶ 67 ("the principal amount of the one-time fee is $82.1 million"). Millstone Unit 3, because it did not generate any electricity prior to April 17, 1983, was not subject to the one-time fee.

Also, since 1983, Dominion or its predecessors have paid approximately $51,740,440 in ongoing, per-kilowatt hour fees to DOE, for Millstone Unit 1 (until it shut down in 1995) and $101,199,402 for Unit 2 through September 30, 2006. Dominion continues to pay those quarterly fees for Millstone Unit 2, and for all of its other plants, today. *E.g.,* Defendant's Answer ¶ 15 ("admits" that "plaintiffs continue to pay approximately $15 million in fees under the contracts per year").

D. *Dominion's Acquisition of Millstone.* Dominion acquired Millstone Units 1 and 2, and the majority interests in Millstone 3, pursuant to an Purchase and Sale Agreement dated August 7, 2000. The sale closed on March 31, 2001. That Purchase and Sale Agreement, which is publicly available,[2] provided that the rights and duties under the Millstone Standard Contracts would be assigned to Dominion, and notice of that assignment pursuant to Article XIV of the Standard Contracts was provided to DOE on or about April 26, 2001. Defendant's Answer ¶ 7.

[2] The Purchase and Sale Agreement ("PSA") was filed with the Connecticut Department of Public Utility Control (DPUC) under Docket 99-09-12RE01 on September 8, 2000. The PSA is available in five parts on the DPUC website at: http://www.dpuc.state.ct.us/dockhist.nsf/Web%20Main%20View/Search%20Electric?OpenView&Start=25.1.28

Dominion, as the current "Purchaser" under the Standard Contract, is authorized to pursue all damages incurred in connection with the Millstone units as a result of DOE's failures.[3]

Under the terms of the transaction, the sellers of the Millstone units remained financially liable for payment of the one-time fee when due. Toward that end, those sellers agreed to provide certain financial guarantees to Dominion under certain circumstances.

E. *The DOE's Suspension of the "DCS" Process.* As the Court observed in *Vermont Yankee*, "[t]his Court has noted DOE's suspension of the DCS process in previous decisions." 73 Fed. Cl. at 243, n. 7, *citing Consumers Energy Company v. United* States, 65 Fed. Cl. 364, 370 (2005) ("Defendant plainly abandoned the DCS process prior to January 31, 1998, the date under the Contract for Defendant to begin fulfilling its obligations to accept title to, transport, and store the SNF.") At present, "there is no DOE-approved DCS in force." *Vermont Yankee*, 73 Fed. Cl. at 244. Indeed, it is "impossible for a utility to have a DCS approved." *Id.*, (citing testimony of DOE contracting officer). *See also, Boston Edison Company v. United States*, 64 Fed. Cl. 167, 172 (2004) ("In 1997, when it became manifestly evident that a repository would not be in place by 1998, DOE officials suspended the DCS process.") (citations omitted); *Consumers*, 65 Fed. Cl. at 370 ("DOE in 1997 began to decline to approve or disapprove DCS's from the industry.")

There is no valid DCS for Dominion despite the fact that, as in *Vermont Yankee* and other cases, Dominion's predecessor had—at some point prior to 1998—DCS's that were approved by

[3] The sellers appointed Dominion as their "attorney in fact" with regard to matters involving Pre-1983 Spent Nuclear Fuel. The government has asserted an affirmative defense of "assignment." Defendant's Answer ¶ 61. Dominion does not understand how such a defense might apply here, but notes that "assignment"-based defenses have been specifically and consistently rejected in the spent nuclear fuel claims context. *See Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005); *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 241-243 (2006). Any such defense would also be unavailing for a host of reasons in this case, but such defenses are not the subject of the present motion.

DOE for purported first delivery in 1998. The suspension of the DCS process in 1997, and the resumption and suspension of the process in 2004, confirm that no valid, approved DCS exists. *E.g., Consumers*, 65 Fed. Cl. at 370. DOE has never notified Dominion's predecessor, nor more recently Dominion, of any alleged non-payment or underpayment of the one-time fee as required under Article VIII.C.1. *See Consumers*, 65 Fed. Cl. at 370. DOE has not taken any other steps consistent with the notion that the one-time fee is, or was, actually due under the contracts.

F. *The Government's One-time Fee Counterclaims and Defenses.* The government asserts three different types of defenses and counterclaims related to the one-time fee. First, the government claims, in its "First Counterclaim," that because Dominion is seeking damages for partial breach of contract, the government is "entitled to judgment" for present payment of the full amount of the one-time fee, plus accrued contractual interest. Defendant's Answer ¶ 67. Second, the government asserts that any damages or claims are barred because payment of the one-time fee is a "condition precedent to defendant's liability," Defendant's Answer ¶ 60, and the failure to pay the fee therefore constitutes a complete defense. Third, the government asserts in its "Counterclaim for Offset or Recoupment" that it is entitled to "setoff or recoup the one-time fee that the contract holder owes . . . against any judgment awarded in plaintiff's favor." Defendant's Answer ¶ 70. The government pleads the same assertion as an affirmative defense of "recoupment or setoff," Defendant's Answer ¶ 62, and recites a similar affirmative defense to the effect that any recovery should be reduced by alleged benefits "that plaintiffs received in delaying the payment of the one-time fee." Defendant's Answer ¶ 63.

## DISCUSSION

### A. Standards On a Motion to Strike Or Dismiss.

Defenses and counterclaims that fail to state relief as a matter of law are subject to

dismissal pursuant to a motion to dismiss or strike. Such motions are determined under the same general standards as Rule 12(b)(6) motions to dismiss a plaintiff's claims. *E.g., American Heritage Bancorp v. United States*, 56 Fed. Cl. 596, 604 (2003). *See generally*, 2 J. Moore, *Moore's Federal Practice* § 12.37[4] at 12-100.5 (3d ed. 2006). Under these familiar standards, the court must accept the material allegations of the government as true and draw reasonable inferences in favor of the non-moving party, and dismissal is appropriate when the facts asserted by the non-moving party do not entitle it to a legal remedy. *E.g., Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000), *citing New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1377 (Fed. Cir. 1999), *Moyer v. United States*, 190 F.3d 1314, 1317-18 (Fed. Cir. 1999); *see also Perez v. United States,* 156 F.3d 1366, 1370 (Fed. Cir. 1998).

As noted above, the legal insufficiency of the government's defenses and counterclaims is established by the pleadings (including incorporated and judicially noticeable matters), applicable precedent, and statutes. Accordingly, although the RCFC 12(b) permits the Court to convert motions to dismiss into motions for summary judgment under RCFC 56, Dominion does not believe that to be necessary or warranted in these circumstances.

**B. Payment Of The One-time Fee Is Not Yet Due.**

As the plain language of the Standard Contract establishes, and as every judge of this Court that has addressed the issue to date has held, the payment of the one-time fee is not due until actual, real world "first delivery" of spent nuclear fuel to DOE is imminent. *See Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 244 (2006); *Yankee Atomic Electric Company v. United States*, 73 Fed. Cl. 249, 325 (2006); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 174 (2005); *Consumers Energy Company v. United States*, 65 Fed. Cl. 364, 369-370 (2005).

As noted above, Article VIII, Section A.1. requires the one-time fee to be paid "as specified in paragraph B of this Article VIII." The portion of Paragraph B relevant to the deferred Option 2 provides that the one-time fee "shall be paid . . . anytime prior to the first delivery, as reflected in the DOE-approved delivery commitment schedule[.]" "Delivery" is in turn defined in Article I as "transfer of custody . . . from the Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE." Article I.7.

In claiming that the fee is now or was previously due, the government focuses entirely upon the argued existence of a "DOE-approved delivery commitment schedule," and wholly ignores the "first delivery" term, thereby improperly rendering that term meaningless. *E.g., Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (contract must be construed to give "reasonable meaning to all parts of the contract."); *United Int'l Investigative Serv. v. United States,* 109 F.3d 734, 737 (Fed. Cir. 1997) (contract must be interpreted in manner that "gives reasonable meaning to all of its parts") (citations omitted). As the Court correctly held in *Vermont Yankee*, proper construction of the contract dictates that "to the extent that the actual date of the first delivery is a different date than the date 'as reflected in the DOE-approved delivery commitment schedule,' payment remains due anytime prior to ***actual*** first delivery." *Vermont Yankee*, 73 Fed. Cl. at 244 (emphasis in original). Moreover, as noted above, there is in any event no valid "DOE-approved delivery commitment schedule" for Dominion, or for any other utility in the country for that matter, and the government's arguments fail for this additional reason. *E.g., System Fuels*, 65 Fed. Cl. at 173 ("In fact, it is presently impossible for a utility to acquire a "DOE-approved commitment schedule' because DOE has ceased to approve any and all DCS's.") The flawed and abandoned DOE delivery commitment

schedule process from the mid-1990's—admittedly and obviously unrelated to "actual" first delivery—does not allow DOE to now claim that the one-time fee is, or was, due.

Given these terms and facts, the government "cannot credibly hold Plaintiff accountable for not paying the one-time fee (1) prior to a "first delivery" date never specified, (2) for SNF acceptance still not begun, and (3) in a process abandoned by the government itself." *Consumers*, 65 Fed. Cl. at 371. *See also Vermont Yankee*, 73 Fed. Cl. at 244 n.9 (government position that one-time fee is due would vitiate the spirit and purpose of the Standard Contract, because plaintiff "bargained for the disposal of SNF, not the privilege of negotiating a [delivery commitment schedule] with the Government."); *System Fuels*, 65 Fed. Cl. at 174 ("The one-time fee is not presently due.")

In short, nothing about DOE's partial breach of the Standard Contract, and its consequent liability for partial breach damages, would have the perverse effect of accelerating the payment obligations of a plaintiff who selected the deferred, "Option 2," for payment of the one-time fee. That fee is not due unless and until actual "first delivery" of SNF to DOE is imminent. And, of course, such delivery is not imminent.

**C. The One-time Fee Provides No Legal Defenses to the Government.**

1. *Payment of the one-time fee is not a "condition precedent."* The Federal Circuit has described the differences between a "condition," the failure of which can limit or modify a party's performance obligations, and a "promise," which imposes enforceable duties but the failure of which does not excuse performance:

> A condition creates no right or duty of and in itself, but is merely a limiting or modifying factor. If it is breached or does not occur, the promisee acquires no right to enforce the promise. A promise raises a duty to perform and its breach subjects the promisor to liability and damages, but does not necessarily excuse performance by the other party.

*Charron v. United States*, 200 F.3d 785, 790-91 (Fed. Cir. 1999), *citing United States v. Schaeffer,* 319 F.2d 907, 911 (9th Cir. 1963); *see also Consumers,* 65 Fed. Cl. at 372; *Favell v. United States*, 16 Cl. Ct. 700, 712 (1989). There is a well-established presumption in the law against finding that a contractual duty is a "condition." *E.g.,* 2 E. Allan Farnsworth, *Farnsworth on Contracts*s § 8.4 at 359 (1990); *see also* Restatement (Second) Contracts § 227(2) (1981).

Applying those principles to the one-time fee circumstances confirms that the one-time fee does not constitute a legal "condition" precedent, the failure of which could excuse DOE's non-performance. No unmistakable contractual language of condition, such as would overcome the presumption against such a condition, is present. In addition, separate interest-penalty provisions for non-payment are expressly included within the Standard Contract at Article VIII.C, paragraph 1, along with audit rights and other indicia of the separate and independent enforceability of the one-time fee provisions.[4] *See Consumers*, 65 Fed. Cl. at 372. Pursuant to the rule described in cases such as *Charron*, then, the duty to pay the one-time fee is independently enforceable, and therefore constitutes a promise rather than a "condition" of performance. Finally, such a determination is consistent with the public policy goals of the Nuclear Waste Policy Act, which would be frustrated if payment of the one-time fee were treated as an absolute condition to DOE acceptance of the SNF. *Consumers*, 65 Fed. Cl. at 372 ("Construing Plaintiff's fee obligation as a condition of the government's duty to accept its SNF

---

[4] Specifically, Articles VIII.E.1, VIII.E.2, and VIII.E. 3. *See generally, Consumers*, 65 Fed. Cl. at 372.

cannot be reconciled with the public policy goals of the Act.”).[5]

2. *Even if payment of the one-time fee were a “condition precedent,” such payment is excused.* Even if the payment of the one-time fee were assumed for argument’s sake to be a condition to DOE performance, any such condition was excused for purposes of Dominion’s present claims for partial breach damages. The Court correctly so ruled in *System Fuels,* 65 Fed Cl. at 173-74, *Yankee Atomic*, 73 Fed. Cl. at, 324, and *Vermont Yankee,* 73 Fed. Cl. at 244. A finding of temporary excuse is appropriate “based upon temporary frustration of purposes caused by the government’s suspension of the DCS process.” *System Fuels,* 65 Fed. Cl. at 173, *citing Restatement (Second) of Contracts* § 269. As the Court held in *System Fuels*:

> In the circumstances, the government’s delay in disposing of SNF and HLW has temporarily frustrated the purpose behind [the plaintiff’s] selection of the deferral option. As a result, the condition has been temporarily excused pending the beginning of the disposal process, and [plaintiff] may proceed with its claim of partial breach of contract notwithstanding its deferral of the one-time fee.

65 Fed Cl. at 173. *See also, Vermont Yankee,* 73 Fed. Cl. at 244 (“[P]ayment of the one-time fee, assumed for purposes of argument to be a condition precedent, is temporarily excused.”)

The contractual language, and the lack of any DOE action consistent with the one-time fee being presently due, further confirm that any obligation to pay was waived or excused. For example, the government never invoked the notice or interest penalty provisions of Article VIII.C., nor the rights regarding non-payment embodied in Article VIII.E. It is of course well

[5] In *System Fuels*, the Court did not address the distinctions drawn by *Charron*, nor the presumptions against holding a contractual duty to be a condition. Rather, the Court noted the mandatory nature of the contract language and held the fee obligation to be a condition, but a condition that was excused by the DOE’s frustration of the purpose of the Standard Contract. 65 Fed. CL. at 173. In *Vermont Yankee*, the Court did not decide whether the obligation was a condition, but held that, if it was such a condition, it was excused. 73 Fed. Cl. at 244.

settled that the government can waive alleged contractual requirements through its inaction. *Cf. Devito v. United States*, 413 F.2d 1147, 1154 (Ct. Cl. 1969).

**D. As a Matter of Law, The Government Is Not Legally Entitled to Any Setoff, Recoupment, or Reduction In Damages Due to The One-time Fee.**

1. *Because payment of the one-time fee is not yet due, the government is not at present entitled to recovery of the fee through an award of damages or setoff in this action.* As noted above, and as held by the Court in *Vermont Yankee,* "[b]ecause payment of the one-time fee is not yet due, Defendant is not at present entitled to recovery of the fee through an award of damages or setoff in this action." 73 Fed. Cl. at 244. The government's setoff arguments were also rejected by the Court in *Yankee Atomic*, 73 Fed. Cl. at 324, both because of the fact that the duty to pay is "keyed to the first delivery of SNF/HLW under and approved schedule," which "apparently will not occur for some time," and because of the illegality of the government's position, discussed further below.

The fact that the one-time fee clearly is not yet due under the Standard Contracts renders these circumstances unlike all of the traditional "offset" cases upon which the government may attempt to rely. In *United States v. Munsey Trust Company*, 332 U.S. 234 (1947), for example, the amount set off by the government against payments due on one contract was an "undisputed" amount of damages sustained by the government on other contracts. 332 U.S. at 237. While the debt upon which the setoff is based need not necessarily be "determined, liquidated, or assessed,"[6] the debt does need to be, in some sense and by definition, at least due and owing. It cannot be a debt that, by the very terms of the contract, is not yet due. *E.g., Vermont Yankee*, 73

[6] *Southeastern Airways Corporation v. United States,* 673 F.2d 368, 378 (Ct. Cl. 1982). In *Southeastern Airways*, the record established that debt invoked by the government in support of its setoff claim was presently owed, and exceeded the amounts withheld.

Fed. Cl. at 324. The government will be unable to cite any common law "offset" authorities to the contrary.

Nevertheless, in two other decisions, the Court has declined to dismiss the government's claims that it is entitled to "recoup" the amount of the one-time fee against any award of damages that might be made. In *Consumers*, the Court held that the plaintiff would have to "account for its obligation to pay the one time fee," relying in substantial part upon *Munsey Trust*, 332 U.S. 234, and *Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed. Cir. 2003). *Consumers,* 65 Fed. Cl. at 373. In *System Fuels*, the Court held, in a footnote, that the government's claims of "recoupment" were "best addressed" at trial. *System Fuels*, 65 Fed. Cl. at 174 n.11. In a subsequent discovery dispute in that *System Fuels* case, the Court stated that it "has its doubts about the viability of the government's economic-benefit defense," but determined that at that juncture it had "insufficient context" to dismiss the defense. *System Fuels, Inc. v. United States*, 73 Fed. Cl. 206, 216 (2006).

With all due respect, Dominion believes the determinations on this point in *Consumers* and *System Fuels* to be in error. Indeed, the subsequent *Vermont Yankee* and *Yankee Atomic* decisions correctly concluded that the fact that the one-time fee was not yet contractually due rendered the government's claims for accelerated *de facto* payment of the fee through "recoupment" or offset unavailing. And, the *Consumers* and *System Fuels* decisions are erroneous in this regard for additional reasons. Dominion respectfully suggests that the results would (and should) have been different in *Consumers* and *System Fuels*, if the below-described arguments had been presented to, and properly considered by, the Court in those cases. Specifically, the lack of merit to the government's position is confirmed by: (a) the illegality of the government's setoff position, and (b) the legal unavailability of purported damage reductions,

due to the remoteness of the government's claims.

2. *The government's proposed setoff would not be legal.* As this Court correctly held in *Yankee Atomic*, the offset position of the government would violate the statutory restrictions of the NWPA. *Yankee Atomic*, 73 Fed. Cl. at 324 n.74. The United States Court of Appeals for the Eleventh Circuit has stated unequivocally that the NWPA "clearly does not allow the Department to utilize NWF monies to pay for the interim storage costs of the Department's contract creditors." *Alabama Power Company v. United States Department of Energy*, 307 F.3d 1300, 1312 (11th Cir., 2002). In *Alabama Power*, the issue involved a settlement arrangement by a utility whereby the ongoing, quarterly per-kilowatt hour payments into by the utility the NWF pursuant to the Standard Contract would be reduced, or offset, by the damages incurred by the utility. The court held that "[w]hen the Department granted [the utility] an offset against the fees it would otherwise be required to pay into the NWF, this action was tantamount to an expenditure of NWF dollars on what the offset was effectively funding—namely, [the utility's] continued interim storage costs incurred as a result of the Department's breach." 307 F.3d at 1311-1312. The 11th Circuit described at length the permissible statutory uses of NWF monies, and ruled that the setoff at issue, for breach of contract damages, violated the NWPA. *Alabama Power*, 307 F.3d at 1312-1315.

And so it is here. As this Court correctly recognized in *Yankee Atomic*, the government's position with respect to the one-time fee is "the precise situation condemned in *Alabama Power.*" *Yankee Atomic*, 73 Fed. Cl. at 324 n.74. Whether the government is setting off quarterly per-kilowatt payments into the NWF, or the one-time fee payment that will go into the

NWF one day, the principle is the same, and the government's position is prohibited.[7] Indeed, if the government were to prevail upon its position, there is no logical reason to limit the argued setoff to the one-time fee. Operating nuclear utilities typically incur contractual debts to the NWF of millions of dollars per quarter. If the government is free simply to refuse to pay out breach damages in favor of credits for contractual debts, *Alabama Power* and the NWPA provisions upon which it turns would be rendered meaningless. The "ridiculous result" described by the Eleventh Circuit in *Alabama Power*, 307 F.3d at 1314, will have come to pass. That is not, and should not be, the rule.

The government may try to side-step the controlling principles as set forth in *Alabama Power* by arguing that it will "credit" the NWF with the amounts that it offsets from the Judgment Fund. Such an argued accounting gimmick, however, cannot succeed for reasons that include the fact that it also runs afoul of clear prohibitions of the NWPA—the government will not be able to demonstrate that its proposed hypothetical "credit" would be legal. In particular, the NWPA not only has very specific identified permissible uses for NWF monies as described in *Alabama Power*, it also has very specific identified permissible sources of funds that can go *into* the NWF. And those sources of funds do *not* include Judgment Fund "credits." Those permissible sources of funds are spelled out at 42 U.S.C. § 10222(c)(1)-(3), and are limited to: (i) actual payments from Standard Contract holders pursuant to those contracts, equivalent

[7] If anything, the language of the Standard Contract makes the illegality of the government's arguments even more plain with respect to the one-time fee, because the Standard Contract provides that the one-time fee "shall not be subject to adjustment." Article VIII.A.2, 4. The government's offset position, of course, is effectively just such an "adjustment," and is therefore also precluded by the plain terms of the Standard Contract. In another context, the Federal Circuit cited the potential contractual bar against adjustment of the one-time fee as a factor supporting the conclusion that equitable fee adjustments under the delays clauses of the Standard Contract need not be pursued prior to commencement of a breach action directly in this Court. *Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

payments for government-owned waste, and investment proceeds on NWF surpluses, (ii) any appropriations made by Congress "to the Waste Fund," and (iii) balances existing at the time of passage of the NWPA in 1983. These limitations are in furtherance of the more general congressional policy that "the costs of such [permanent] disposal should be the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. § 10131(a)(4). In short, the specific terms of the NWPA do not allow for the sort of adjustments or increases to the NWF that the government may suggest, and the government cannot therefore demonstrate that its proposed offset would be legal.

3. *The government may not legally pursue damage reductions due to the deferred payment of the one-time fee.* Finally, in support of a purported "offset" defense, the government actually has invoked a somewhat separate notion, namely the proposition that any recovery must be "offset or reduced" by any alleged "benefits" that plaintiffs may have received in delaying the payment of the one-time fee. Defendant's Answer ¶ 63. Presumably, the government intends to argue that alleged investment returns on unpaid one-time fee amounts exceeded the contractual interest charges that continue, today, to accrue in favor of the DOE. The government can be expected to rely upon cases like *Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed. Cir. 2003), and the generic and oft-recited proposition that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." 339 F.3d at 1345. Properly considered in the context of this case, however, that general proposition does not support the offset for the not-yet-due fee sought by the government here.

Every time a party fails to perform a contract under which payment is due upon performance, the non-breaching party has the ability to retain, and for a time use, the money that it would have spent if the contract were not breached. If the government's legal position in this

case were correct, then, there should be legions of reported decisions where recoveries by non-breaching parties were reduced due to the investment-based, time-value "benefit" of the retained funds. The government, however, will not be able to cite even one case that specifically supports its position here. Those general cases and authorities involving "cover"-type situations, where the non-breaching party procures substitute performance for its resources upon terms as favorable, or more favorable, than the original contract,[8] are wholly inapplicable—no "cover" is available for the acceptance and disposal of spent nuclear fuel. *See Indiana Michigan*, 422 F.3d at 1374 ("the NWPA provided that DOE was exclusively responsible for SNF collection and disposal in the United States, thereby prohibiting [plaintiff] or any other nuclear utility from seeking alternative disposal means.") Similarly, damage projections where the courts attempt to ascertain competing investment or other impacts in the "would have been" world (such as many *Winstar*-type cases, including *Bluebonnet Savings Bank*) are quite unlike this partial breach, actual-expenditure damages case.

The primary problem with the government's position here relates to the legal limitations on the "benefit conferred" arguments that the government seeks to pursue. The government's claims in these circumstances fall into that class of argued damage reductions "that, as a matter of law, the courts will find too remote." *Hughes Communications Galaxy, Inc. v. United States*, 38 Fed. Cl. 478, 582 (1997), *aff'd,* 271 F.3d 1060 (Fed. Cir. 2002). The applicable principle is that a defendant is not entitled to a reduction of damages on account of a benefit that is not caused by the wrongful act itself.

In *Hughes Communications*, the plaintiff claimed damages allegedly incurred as a result of the government's breach of a satellite launch services agreement. In response to the

[8] *E.g., Restatement (Second) Contracts* § 347 cmt. d.

government's breach, the plaintiff "made arrangements to launch its satellites using alternative means, and entered into separate contracts with customers to sell or lease the satellites." *Hughes Communications,* 38 Fed. Cl. at 580. The government sought to reduce the damages claimed by amounts that the plaintiff allegedly secured from the alternative contractual arrangements. There, as here, the government argued that a failure to so reduce claimed damages would violate the proposition that the plaintiff must only be put in the "same position as if the contract had been fully performed," *Hughes Communications*, 38 Fed. Cl. at 580 (*citing Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996), and the government argued that such a failure to reduce damages would represent an impermissible "double recovery." 38 Fed. Cl. at 580.

With regard to the argued reduction, this Court held that "such increases in revenue are not relevant to limit damages." *Hughes Communications*, 38 Fed. Cl. at 581. The Court noted, correctly, that "there are certain damages that, as a matter of law, the courts will find too remote—for example, profits lost on collateral business arrangements, or lost opportunity damages." *Id.* at 582. Here, of course, it is alleged profits gained, as opposed to lost, on "collateral business arrangements" that constitute the basis for the government's affirmative defense, but the operative principle is clearly the same: "the government is, in effect, trying to assert an equally remote theory to limit damages." *Id.* The Court in *Hughes Communications* properly noted the applicability of the Supreme Court's admonition in *Southern Pacific Co. v. Darnell-Taennzer Lumber Co.,* 245 U.S. 531, 533-34 (1918): "The general tendency in the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if the plaintiff has suffered a loss." Similarly, the applicability of market principles and intervening causes that preclude courts from inquiring

into subsidiary transactions in the antitrust context was observed by the Court to be applicable to breach of contract claims. *Hughes Communications*, 38 Fed. Cl. at 582 (*citing Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 493 (1968)). On a motion *in limine*, as a matter of law, the government was precluded from attempting to adduce evidence in support of its argued damages reduction.

The Federal Circuit affirmed. *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1072 (Fed. Cir. 2002). In addition to ratifying this Court's analysis and reliance upon *Southern Pacific* and *Hanover Shoe*, the Court of Appeals held that allowing the government's argued damage reduction "would destroy symmetry between reduction and escalation of damages." Consideration of this symmetry further underscores the incongruity of the government's position in this case. If a utility were to claim that market forces or serendipitous investment decisions resulted in a return of less than the contractual interest rate on a deferred one-time fee amount, and sought to claim such a difference as breach damages, the predictable response by the government would be to challenge the claims as too remote and too far removed from the breach. That argument would have some force. The necessary corollary, however, is that the government cannot benefit from an argued damage reduction based upon the precise mirror-image scenario.

While the particulars of the claims and argued reduction in damages here differ in some respects from those in *Hughes Communications*, the operative principles regarding alleged profits on "collateral business arrangements" are the same. Whether the alleged profits are from passed-on customer contracts as in *Hughes Communications*, or alleged investments in financial instruments or other uses of funds as here, the inquiry involves "collateral business arrangements" and is "too remote to consider." *Hughes Communications*, 271 F.3d at 1072.

Indeed, upon examination, any differences between these circumstances and *Hughes Communications* militate even more strongly in favor of refusing "to go beyond the first step" in this case. *Southern Pacific Co.,* 245 U.S. at 533-34. Rather than merely assessing a potentially discrete set of contractual arrangements as in *Hughes Communications*, here the inquiry would necessarily encompass entire risk portfolios, myriad investment vehicles, extraordinarily complicated tax implications and projections, innumerable individual financial determinations, the functioning of multiple debt and equity markets, diverse possible return strategies, and a host of additional complexities that would render the exercise even more a product of guesswork than the "highly speculative profit margin comparisons" correctly determined by the Court to be too remote to withstand legal challenge in *Hughes Communications. See Hanover Shoe*, 392 U.S. at 493 (refusing to reduce damages award based on "virtually unascertainable figures" that would "require additional long and complicated proceedings involving massive evidence and complicated theories"). Moreover, the inquiry could not be limited to just the utility's use of or return on so-called "one time fee" funds, even if that could be ascertained, but would have to account for costs associated with the deprived use of funds expended by a plaintiff to store SNF/HLW, and the government's own return upon funds not expended to construct a permanent repository. To accept the government's argument and allow argued reduction of any damages award by alleged return on the investment of the one-time fee amount without considering a utility's other lost investment opportunities would be to account for only one side of the ledger.[9]

Finally and importantly on this point, the Court in *Hughes Communications* held that it

[9] The legal position of the government is one-sided in other ways. The contractually-defined interest rate can be seen as reflecting the agreed-upon bargain that the risks and potential benefits of deferred payment (manifested as possible returns less than or greater than the defined interest rate, as compounded) would remain with the utility until actual payment. By seeking to appropriate only any alleged benefits through its purported damage-reduction defense—while eschewing the assumption of any additional risk or exposure—the government's position would effectively destroy that bargain.

would be "unfair, in addition, to penalize [plaintiff] for any incremental advantage it was able to obtain in negotiations in a competitive market." 38 Fed. Cl. at 582. Such "unfairness" is an additional, powerful reason for rejection of the government argued damages reduction here. The Standard Contracts, by their terms, allowed for different choices regarding payment options, and specified the financial implications (*i.e.,* interest) associated with those choices. Such implications did *not* include potential forfeiture of breach remedies. Those utilities who, for whatever reasons, were willing and able to pay the one-time fee up front may now pursue damages for DOE's breach with impunity. Pursuant to the government's argued defense here, however, a utility that exercised the plainly allowed deferred contractual payment option for the one-time fee would—potentially and depending upon its investment acumen and the performance of the markets generally—be rendered effectively without a remedy in this proceeding for already-incurred costs, merely due to its exercise of a permissible contractual right. If investment returns or market circumstances turned out to be less advantageous, however, such a utility would surely face causation defenses by the government upon seeking to recover reciprocal losses. Such a result is not fair or logical, and would not reasonably implement the Standard Contracts. Such a result is not, and should not be, the law.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests dismissal of the following affirmative defenses and counterclaims: (1) failure to satisfy a condition precedent, Defendant's Answer ¶ 60; (2) recoupment or setoff, Defendant's Answer ¶ 62; (3) offset or reduction, Defendant's Answer ¶ 63; (4) defendant's "First Counterclaim," Defendant's Answer ¶¶ 64-67; and (5) defendant's "Counterclaim for Offset or Recoupment," Defendant's Answer ¶¶ 68-70.

s/ Brad Fagg

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

January 29, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 29th day of January, 2007, a copy of the foregoing was served filed electronically with the Court. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg