# In the United States Court of Federal Claims

No. 04-83C
(Filed: June 27, 2007)

* * * * * * * * * * * * * * * * * * * * * *

DOMINION RESOURCES, INC. and DOMINION NUCLEAR CONNECTICUT, INC.,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * *

Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, RCFC 12(b)(6); Spent Nuclear Fuel; Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270; One-Time Fee; Recoupment or Setoff.

*Brad Fagg,* Washington, DC, for plaintiffs.

*Lisa L. Donahue*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, for defendant.

OPINION

BRUGGINK, *Judge.*

This is one of a number of cases before the court involving contracts for the disposal by the United States of commercially-generated spent nuclear fuel ("SNF"). Pending now is Plaintiffs' Motion to Dismiss and/or Strike Defendant's Counterclaims and Defenses Based upon the "One-Time Fee." Plaintiffs seek to dismiss defendant's affirmative defenses of 1) failure to

satisfy a condition precedent; 2) recoupment or setoff; and 3) offset or reduction. Plaintiffs also seek to dismiss defendant's First Counterclaim and the Counterclaim for Offset or Recoupment under Rule 12 of the Rules of the United States Court of Federal Claims ("RCFC"). The matter is fully briefed. Oral argument was heard on June 7, 2007. No material facts are in dispute. For the reasons set out below, we grant plaintiffs' motion.

## BACKGROUND

At issue here is the Millstone Power Station ("Millstone"), a three-unit nuclear power generating facility located near New London, Connecticut. In 1983, Northeast Utilities Service Company, plaintiffs' predecessor, executed three Standard Contracts for Disposal of Spent Nuclear Fuel and/or High Level Waste ("Standard Contract"), for each Millstone Unit under the Nuclear Waste Policy Act ("NWPA"), codified as amended at 42 U.S.C. §§ 10101-10270 (2000). The material terms of the Standard Contracts are set out in 10 C.F.R. § 961.11. The contracts were assigned to plaintiffs by sale of the units in 2001. Plaintiff Dominion Nuclear Connecticut, Inc. is a wholly-owned indirect subsidiary of plaintiff Dominion Resources, Inc., and is the current holder of the Standard Contracts for the Millstone Units. Millstone Unit One, which began commercial operation in 1970, was permanently shut down in 1995. Millstone Units Two and Three began commercial operation in 1975 and 1986, respectively, and are currently in operation.

Congress enacted the NWPA in 1982, reaffirming federal responsibility "to provide for the permanent disposal of high-level radioactive waste . . . in order to protect the public health and safety." 42 U.S.C. § 10131(a)(4); *see Indiana Michigan Power Co. v. U.S. Dep't. of Energy*, 422 F.3d 1369, 1372 (Fed. Cir. 2005) (*Indiana Michigan II*); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000). The cost of the disposal, however, would be the responsibility of the "generators and owners" of the waste. 42 U.S.C. § 10131(a)(4) and (5); *Maine Yankee*, 225 F.3d at 1337. The NWPA "authorized the Secretary of the Department of Energy ("DOE") to enter into contracts with utilities for the disposal of spent nuclear fuel," and "made entry into such contracts mandatory for the utilities" as a condition for issuance of licenses to operate. *Maine Yankee*, 225 F.3d at 1337. DOE promulgated the Standard Contract to implement this requirement. Under the Standard Contract, DOE is required to accept delivery of SNF starting no later than January 31, 1998.

The Standard Contract sets out how the utilities are to pay for the disposal of SNF. For electricity generated and sold after April 7, 1983, utilities are charged a fee in the amount of 1.0 mill per kilowatt hour. Standard Contract, art. VIII.A.1. For the disposal of SNF used to generate electricity prior to April 7, 1983, the Standard Contract provides that DOE is to charge the utilities a "one-time fee" within two years of contract execution. *Id*. art. VIII.A.2. The Standard Contract further provides for a method for calculating the amount of the one-time fee as specified in paragraph B of article VIII. Pursuant to article VIII.B, utilities were given three options for payment of the one-time fee:

> (a) Option 1--The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee balance. . . .
>
> (b) Option 2--The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance. . . .
>
> (c) Option 3--The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

*Id*. art. VIII.B.2.

Millstone Unit Three is not subject to the one-time fee as it did not generate any electricity prior to April 17, 1983. For Millstone Units One and Two, plaintiffs' predecessor selected Option 2, or, the deferred payment option, which makes payment due anytime "prior to the first delivery, as reflected in the DOE approved delivery commitment schedule." *Id*. art. VIII.B.2.b. Interest on the deferred payment began to accrue as of April 17, 1983, and accumulates until the date of payment, compounded quarterly by the

13-week Treasury bill rate. *Id*. The combined one-time fees for these two units were originally calculated to be approximately $82.1 million, and had grown to approximately $277.3 million as of September 30, 2006. These fees have not been paid to date.

Under a procedure established in the Standard Contract, DOE was to issue an annual capacity report ("ACR") reflecting the projected annual receiving capacity for DOE facilities and the annual acceptance priority ranking ("APR") for the disposal of waste, beginning, at the latest, July 1, 1987. Standard Contract, art. IV.B.5(b). Based on the ACRs, utilities could begin to submit delivery commitment schedules ("DCSs") to DOE starting January 1, 1992, identifying the amount of waste they wished to deliver to DOE "beginning sixty-three (63) months thereafter." *Id*. art. V.B.1. DOE could approve or disapprove the DCSs within three months of receipt. *Id*. Final delivery schedules had to be submitted "not less than twelve (12) months prior to the delivery date specified therein." *Id*. art. V.C.

In 1993, plaintiffs' predecessor submitted a DCS for Millstone Unit One for purported first delivery in 1998. DOE approved the DCS on March 10, 1993. The approved DCS, however, only noted the year, and not a specific date, as the "Proposed Delivery Date." Def.'s Opp'n App. A2. In the approved DCS, a date was not entered in the line for "DOE Assigned Delivery Commitment Date," but instead, the line remained as "(Not Required) (Assigned by DOE)." *Id*.

On May 25, 1994, DOE published a Notice of Inquiry stating its preliminary view that it had no statutory obligation to accept SNF by the 1998 deadline in the absence of an operational repository constructed under the Act. On May 3, 1995, DOE issued its "Final Interpretation" that "it does not have a legal obligation under . . . the Act . . . to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the [NWPA]." Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,794 (May 3, 1995).

Several utilities filed petitions for review of the Final Interpretation in the United States Court of Appeals for the District of Columbia. That court ruled that DOE had an unconditional obligation to begin accepting SNF by January 31, 1998 under the NWPA. *See Indiana Michigan Power Co. v. U.S. Dep't. of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) (*Indiana Michigan I*). In response to the ruling, DOE issued a letter to Standard Contract holders on

December 17, 1996, stating that it would not be able to begin acceptance of SNF for disposal by January 31, 1998. DOE also stated in the same letter that such delay was due to unavoidable circumstances within the meaning of article IX of the Standard Contract. On June 3, 1997, DOE issued a Preliminary Determination that its delay in accepting SNF was unavoidable. This action was also challenged by the utilities. The D.C. Circuit rejected DOE's 1997 Preliminary Determination and refused to accept DOE's defense of unavoidability in its decision in *Northern States Power Co. v. U.S. Dep't. of Energy*, 128 F.3d 754 (D.C. Cir. 1997).

Previously, on September 30, 1996, plaintiffs' predecessor had submitted DCSs for Millstone Units One and Two, setting the delivery date as 2002, based on the 1995 APR and ACR. In March 13, 1997, DOE sent a letter to plaintiffs' predecessor notifying it that DOE "is not able at this time to approve [its] DCS submittal." Letter from Beth A. Tomasoni, Contracting Officer, DOE, to Lee O. Hill, Supervisor, Northeast Utilities Serv. Co. (Mar. 13, 1997). Defendant has since suspended the DCS process.[1] In the same letter, DOE reminded plaintiffs' predecessor that responses to DOE's "letter of December 17, 1996, [inviting] submission of views by all contract holders on how the anticipated delay can best be accommodated," was due by March 14, 1997. *Id.* DOE did not begin accepting SNF in 1998 and has not yet done so.

On August 31, 2000, the Federal Circuit issued companion decisions in *Maine Yankee* and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), holding that DOE is liable for breach of the Standard Contracts and that claims for damages should be brought in the Court of Federal Claims. In a separate decision, the Federal Circuit also held that a claim against the government for the breach of the Standard Contract was one for partial breach of contract, because the government did not absolutely refuse to perform the contract, and, pursuant to the terms of the contract and the NWPA, it must still fulfil its contractual obligation. *Indiana Michigan II,* 422

[1]As noted in other decisions in this court, it is undisputed that DOE suspended the DCS process prior to January 31, 1998, the contractually specified date for DOE to begin acceptance and disposal of SNF. *See Vermont Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 243, n.7 (2006); *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 370 (2005); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 172 (2004).

F.3d at 1374.

Plaintiffs initiated this action on January 23, 2004. The case was stayed shortly thereafter. The stay was lifted on August 2, 2006, and the government filed its answer to the complaint on January 10, 2007. In its answer, defendant raises three types of defenses and counterclaims related to the one-time fee. First, defendant claims that payment of the one-time fee is a condition precedent to defendant's liability, thus the failure to pay is an absolute bar to any damages or claims. Second, in its "First Counterclaim" and affirmative defense, defendant asserts that it is entitled to judgment for immediate payment of the one-time fee with interest because plaintiffs are seeking damages for partial breach of contract. Third, as its counterclaim and affirmative defense, defendant asserts, in the alternative, that it is entitled to setoff or recoupment of the one-time fee against any future judgment awarded in plaintiffs' favor. On January 29, 2007, plaintiffs filed their motion to dismiss and/or strike these counterclaims and defenses pursuant to the RCFC 12(b)(6), 12© and 12(f).

## DISCUSSION

All of the affirmative defenses and counterclaims plaintiffs seek to dismiss are based on the same predicate – namely, that the one-time fee is now due and owing. For reasons set out below, that underlying assumption fails.

The Standard Contract provides that the fee "shall be paid . . . anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . . ." Standard Contract, art. VIII.B.2(b). In other words, prior to any payment of the one-time fee, a date for delivery must be set through an approved DCS. This court has already noted in other decisions that there is currently no valid DOE-approved commitment schedule in place. *See, e.g., System Fuels Inc. v. United States*, 65 Fed. Cl. 163, 173-74 (2005) ("because of the suspension of the DCS process it's impossible for a utility to have a DCS approved"). Defendant concedes that "[c]urrently, DOE is not approving DCSs." Tr. at 9. Defendant also concedes that there is no approved DCS for Millstone Unit Two. It claims, however, that the DCS approved by DOE in 1993 for Millstone Unit One is a "valid, approved DCS" which set the first delivery of SNF to take place in 1998, and this DCS was not eliminated by the suspension of the DCS process. Def.'s Opp'n at 16. Defendant claims that, to the extent plaintiffs argue that DOE had a duty to perform in 1998 according to the DCS approved in 1993, it must abide by the same DCS with respect to payment of the fee. Defendant argues, therefore, that the one-time

fee is now overdue.

Plaintiffs, however, are not suing for a total breach. If they were, we would simultaneously account for all of the parties' outstanding obligations. If plaintiffs were arguing total breach, or, if defendant was arguing that plaintiffs would not have been ready, willing and able to perform prior to 1998, then the one-time fee would be relevant. But those are not the facts. Instead, in this partial breach suit, the obligations each party owes to the other remain intact, in that defendant still must accept the delivery of SNF at some point in the future and plaintiffs must also pay the one-time fee, some time prior to the time of delivery.

It became apparent, prior to the 1998 delivery date specified in the DCS approved in 1993, that the government would not perform according to that schedule. The DCSs submitted by plaintiffs in connection with Millstone Units One and Two in 1996 setting the delivery date as 2002 were not approved. The 1998 delivery date, as reflected on the once-approved DCS for Millstone Unit One, passed without the delivery occurring. When DOE resumes its DCS process, plaintiffs will need to submit a new DCS for all three units, setting proposed delivery dates. The one-time fee will then become due prior to those future dates. But that time has not yet come.

Option 2 for payment of the one-time fee differs from the other two options in that it allows utilities to defer making a single lump sum payment to a later date, "anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule." Standard Contract, art. VIII.B.2. The purpose behind choosing Option 2, then, is to defer the payment "until the point when delivery of SNF was imminent." *Vermont Yankee*, 73 Fed. Cl. at 244 (citing *System Fuels*, 65 Fed. Cl. at 174). Holding plaintiffs to a duty to pay the one-time fee before delivery of SNF is imminent would render Option 2 meaningless. The government is, in effect, attempting to use its own refusal to timely perform as a basis for accelerating plaintiffs' performance obligations. As this court held in *Vermont Yankee*, plaintiffs' "obligation to pay the one-time fee is not to be accelerated on account of a once-valid DCS being superceded or invalidated." *Id.*

There exists no valid approved DCS setting out a delivery date. As this court stated in *Consumers Energy*, "the setting of the delivery date was itself a condition of [plaintiffs'] payment obligation." 65 Fed. Cl. at 371. The previously-approved DCS for Millstone Unit One having been invalidated, and

the DCS process having been suspended, the prior schedule becomes a fantasy. Plaintiffs' obligation to pay, as "keyed to the first delivery of SNF/HLW to DOE under an approved schedule," is simply not yet due. *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 325 (2006). *See Vermont Yankee*, 73 Fed. Cl. at 244; *System Fuels*, 65 Fed. Cl. at 174; *Consumers Energy*, 65 Fed. Cl. at 369-70.

An alternative way to view the effect of defendant's conduct is that defendant's suspension of the DCS process temporarily excuses plaintiffs' duty to pay until defendant resumes the process and the date of first delivery is specified in a valid, DOE-approved DCS. In *Vermont Yankee* and *System Fuels*, the court agreed that the utilities' purpose for selecting the deferral option for payment of the one-time fee was frustrated by defendant's suspension of the DCS process, temporarily excusing the duty to pay the fee. In *System Fuels*, the court stated that:

> the government's delay in disposing of SNF and HLW has temporarily frustrated the purpose behind [the plaintiffs'] selection of the deferral option. As a result, the condition has been temporarily excused pending the beginning of the disposal process, and [plaintiffs] may proceed with [their] claim of partial breach of contract notwithstanding [their] deferral of the one-time fee.

65 Fed. Cl. at 173. Similarly, in *Vermont Yankee*, the court stated that the government's suspension of the DCS process temporarily frustrated the purpose behind plaintiffs' election of payment option 2, which is "to delay payment until the point when delivery of SNF was imminent." 73 Fed. Cl. at 244 (citing *System Fuels*, 65 Fed. Cl. at 174).

We agree with these decisions that defendant's suspension of the DCS process frustrated plaintiffs' purpose in selecting Option 2. However one characterizes the effect of defendant's conduct on plaintiffs' duties, the result is the same: the one-time fee is not due. Plaintiffs' failure to pay the fee, therefore, does not bar their claims for interim costs due to partial breach.

This same analysis dooms the government's alternative effort to recoup the unpaid one-time fee and interest from any partial breach damages awarded to plaintiffs. Defendant supports its argument by citing the principle that a "non-breaching party should not be placed in a better position through the

award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing *White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002)). Defendant claims that plaintiffs would have been required to pay the one-time fee before DOE began accepting SNF, "[r]egardless of the actual deadline for payment of the one-time fee." Def.'s Opp'n at 19. That observation is true, but irrelevant, because it ignores what actually happened. Plaintiffs still have the SNF, the government still has the obligation to pick it up, and plaintiffs still have to pay the one-time fee when it becomes due. The only thing that is different from the contract scenario is that plaintiffs claim to have been forced to absorb unnecessary interim storage costs. If the government reimburses such costs, it hardly puts plaintiffs in a better position.

Allowing defendant to recoup or setoff the fee is predicated on the assumption that the one-time fee is now overdue. *See Vermont Yankee*, 73 Fed. Cl. at 244 ("Because payment of the one-time fee is not yet due, Defendant is not at present entitled to recovery of the fee through an award of damages or setoff in this action."). We have already found to the contrary.

Recoupment or setoff would, in any event, contravene the terms of the NWPA which provides that the Nuclear Waste Fund ("NWF") shall consist of:

> (1) all receipts, proceeds, and recoveries realized by the Secretary under subsections (a), (b), and (e) of this section, which shall be deposited in the Waste Fund immediately upon their realization;
>
> (2) any appropriations made by the Congress to the Waste Fund; and
>
> (3) any unexpended balances available on January 7, 1983, for functions or activities necessary or incident to the disposal of civilian high-level radioactive waste or civilian spent nuclear fuel, which shall automatically be transferred to the Waste Fund on such date.

42 U.S.C. § 10222©. In *Alabama Power Co. v. U.S. Dep't. of Energy*, 307 F.3d 1300, 1312 (11th Cir. 2002), the Eleventh Circuit held that an arrangement whereby the utility's quarterly payments into the NWF would be reduced by the interim storage costs prompted by the government's breach

violates the NWPA. There, the court found that such an arrangement would be tantamount to spending NWF monies to fund the utility's interim storage costs incurred on account of the government's breach. *Id.* Because the statute permits expenditures from the NWF only for purposes of SNF disposal activities, the court found the expenditure for interim storage costs to violate the statute. *See id*.

Defendant responds that *Alabama Power* does not apply because the offset is not an expenditure and the NWF will not be deprived of any payment. This is accomplished, according to defendant, by depositing the amount of plaintiffs' damage award, paid out of the Judgment Fund, into the NWF, thereby reducing plaintiffs' one-time fee payment obligation by that amount. Defendant cites 31 U.S.C. § 3728 (2000) as authority to withhold an amount plaintiffs owe to the government from a judgment to be paid from the Judgment Fund. The NWPA, however, does not permit a deposit from the Judgment Fund into the NWF. The Judgment Fund is not among the enumerated sources of funds for the NWF. There could be no assurance, then, that the NWF would not be affected. The statutory authority defendant relies on, furthermore, would only be relevant if the amount to be offset from the judgment is currently owed. But plaintiffs do not yet owe the one-time fee to the government.

Defendant's last argument is that damages should be offset by any benefit accrued to plaintiffs through deferral of the one-time fee payment. Defendant argues that, by withholding the one-time fee, plaintiffs have been reaping a benefit because they could have invested the money to get a higher return than the interest accumulating to the government's account under the NWPA. In making its argument, defendant equates the situation to plaintiffs making a windfall through a substitute transaction, citing *LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003). Defendant maintains that it needs discovery to "determine what benefits (or profits) Dominion gained from retaining a substantial one-time fee, and whether these benefits are direct consequences of DOE's delay." Def.'s Opp'n at 27.

As plaintiffs correctly state, however, there exists no "substitute transaction" from which plaintiffs are reaping a benefit involving the one-time fee. Def.'s Opp'n at 26. The one-time fee is simply not yet due under the Standard Contract, and the parties have contracted for how much interest accrues in the interim. Until the one-time fee becomes due, the government does not have a claim for early payment.

## CONCLUSION

For the reasons set forth herein, we grant plaintiffs' motion and dismiss defendant's affirmative defenses and counterclaims based on the one-time fee.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge