IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC. and<br>DOMINION NUCLEAR CONNECTICUT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0083<br>(Judge Bruggink) |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT REGARDING PRE-ACQUISITION CLAIMS

Pursuant to Rule 56(b) of the Rules of the Court of Federal Claims, defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its motion for summary judgment on pre-acquisition claims by plaintiffs, Dominion Resources, Inc. and Dominion Nuclear Connecticut, Inc. (collectively "Dominion").

1. On or about March 31, 2001, Dominion acquired the Millstone Power Station ("Millstone") from the Connecticut Light and Power Company ("CL&P") and Western Massachusetts Electric Company ("WMECO"), subsidiaries of the Northeast Utilities Service Company ("Northeast Utilities").[1] Complaint ¶ 7.

2. Neither CL&P, WMECO, nor Northeast Utilities are parties to this action. Complaint ¶¶ 5-8.

3. Located in Waterford, Connecticut, Millstone consists of three nuclear reactors. Complaint ¶ 7. The first of these, Unit 1, was permanently shutdown in July 1998, while Units 2

[1] "Complaint" refers to Dominion's Complaint in this action, filed January 23, 2004. "P's Mem." denotes Plaintiffs' Memorandum of Contentions of Fact and Law, filed February 8, 2008. "App." denotes the appendix to this document, filed concurrently herewith.

and 3 remain in operation. Id. at ¶ 10. Millstone Unit 3 houses a 1,150 MWe Westinghouse pressurized water reactor that commenced commercial use in 1986. P's Mem. 12. Since that time, assemblies containing irradiated spent fuel pellets have been discharged to the Unit 3 spent fuel pool. Id. at 13; Complaint ¶ 10.

4. The Unit 3 pool is large compared to others in the industry. App. 4 (Lico Tr. 83:3-5). However, knowing that future rack additions would be required as the plant discharged assemblies over time in order to refuel, Millstone's owners initially installed only 21 storage rack modules. P's Mem. 13; App. 19 (Scace Tr. 92:1-6).

5. By the mid-1990s, Northeast Utilities and/or its subsidiaries, CL&P and WMECO, had decided to add 14 racks to the Unit 3 pool. P's Mem. 13; App. 4-5 (Lico Tr. 82:20-83:7, 87:12-13); 13 (Whitaker Tr. 126:6-9, 128:6-12). Over the course of the next several years, these entities conducted preliminary studies of the project, contracted for engineering analyses and design, prepared necessary safety evaluations as well as a license amendment to the Nuclear Regulatory Commission, supervised fabrication of a new rack, and oversaw the rack's installation. App. 2, 6-7 (Lico Tr. 74:1-5, 91:11-94:1); 14 (Whitaker Tr. 130:20-131:8). This work is most appropriately referred to as a "rack" project because of the nature of the installation performed. Id. at 18-19 (Scace Tr. 89:21-90:11).

6. The Unit 3 rack project was completed in 2000, prior to Dominion's acquisition of Millstone. Id. at 8 (Lico Tr. 111:16-18) (stating project "was complete once they – at the end of 2000 when they moved the fuel from the old racks to the new racks . . . ."); 23 (Wakeman 30(b)(6) Tr, 156:8) (agreeing that rack project was undertaken and completed prior to November 2000); 15 (Whitaker Tr. 137:7-8) ("I believe [the rack project] was completed prior to

Dominion's ownership."). Paid for by Millstone's prior owners, Dominion had no involvement in the project. Id. at 3 (Lico Tr. 81:9-15); 16 (Whitaker Tr. 141:5-8).

7. Prior to the Millstone acquisition, its prior owners also undertook an "inter-unit transfer project," which was intended to increase the capacity of the Unit 2 spent fuel pool by transferring SNF from that pool to the one at Unit 3. Id. at 10-11 (Lico Tr. 138:5-7, 143:13-15). The project never made it beyond the study phase, and neither Dominion nor Millstone's prior owners have ever transferred SNF between Units 2 and 3. Id. at 11 (Lico Tr. 144; 10).

8. Through the March 31, 2001 Millstone acquisition and the parties' purchase and sale agreement ("PSA"), CL&P and WMECO endeavored to convey to Dominion "all rights of the Sellers under . . . the DOE Standard Contracts (including all rights to any claims of Sellers related to DOE defaults thereunder) . . . ." Id. at 57 (PSA ¶ 2.1(f)).

9. Excluded from the assets conveyed to Dominion were: (1) "any claims of CL&P and WMECO in connection with Pre-1983 Spent Nuclear Fuel . . . ."; (2) contractual rights under certain pre-acquisition contracts other than the Standard Contract; and (3) rights to payments under a "Transmission Support Agreement. Id. at 60 (PSA ¶ 2.2(e), (f), (g)).

10. The PSA also contains a limited power of attorney provision. Id. at 61 (PSA ¶ 5.18). Appearing under the heading "Cost of Disposal of Pre-1983 Spent Nuclear Fuel," this provision reads as follows:

> Each of the Lead Participants [defined at PSA ¶ 1 as CL&P and WMECO] hereby appoints the Buyer [defined at PSA ¶ 1 as Dominion] as its agent and attorney-in-fact to represent it in all matters involving the Pre-1983 Spent Nuclear Fuel and to prosecute such claims or negotiate on their behalf a settlement of such claims by and against DOE . . . .

Id.

11. On April 26, 2001, Northeast Utilities sent DOE a letter notifying it of the Millstone transaction and representing that "Dominion has also been appointed to act as agent and attorney-in-fact to prosecute or settle any claims against the Department of Energy in connection with the [Standard] Contract." Id. at 65.

12. Dominion now maintains that it "has authority to prosecute all claims against DOE in connection with the Standard Contracts for Millstone Units 1, 2, and 3." Complaint ¶ 7; see also id. at 1 (captioning case "on behalf of itself and" CL&P, WEMCO, and Northeast Utilities).

13. Dominion seeks $11,769,950 in costs allegedly incurred by Millstone's prior owners for the installation of storage racks in the Millstone Unit 3 spent fuel pool. App. 95 (Johnson Decl. ¶ 4). Dominion also seeks $296,661 in costs allegedly incurred by these entities as a result of the inter-unit transfer project. Id. (Johnson Decl. ¶ 5.)

14. On September 7, 2007, the Department of Justice ("DOJ") requested in writing that Dominion's counsel explain the basis for Dominion's maintenance of pre-acquisition claims. Id. at 63-64. We further asked that counsel inform us whether they represented Millstone's prior owners, whether and how these entities were to be bound by the results of this litigation, and, assuming some recovery on the per-acquisition claims, which of the entities were to receive the proceeds. Id.

15. On September 24, 2007, Dominion's counsel responded to DOJ's inquiry by referencing "the attorney-in-fact arrangement" set forth in the parties' PSA. Id. at 67. Counsel also stated that, "with respect to representation and party status, the government should consider

the 'Northeast Entities' as being represented by Dominion's counsel, *i.e.*, Morgan Lewis, for purposes of the pending Millstone claims, including, for example, for purposes of any contacts with current or former employees of those entities relating to the Millstone claims, under applicable ethical guidelines." Id. Counsel did not explain how Millstone's prior owners were to be bound by the outcome of this action or clarify which of the entities was to receive the proceeds of any potential recovery of pre-acquisition costs. Id.

16. On July 30, 2007, DOJ propounded upon Dominion a RCFC 30(b)(6) deposition notice encompassing subjects particular to its predecessors' management of SNF and their accounting for pre-acquisition costs at Millstone. Id. at 69-76 (Consolidated Notice 2-9).

17. In response to the Government's RCFC 30(b)(6) notice, Dominion produced no corporate representatives for CL&P, WMECO, and/or Northeast Utilities. Instead, the individual proffered to provide RCFC 30(b)(6) testimony, Brian Wakeman, a Dominion engineer, offered no testimony binding upon these entities. Id. at 21 (Wakeman RCFC 30(b)(6) Tr. 12:12-16) ("Mr. Wakeman is here to testify on behalf of the people who filed this lawsuit, which is Dominion Resources, Dominion Nuclear Connecticut, and Dominion Virginia Electric Power Company."); see also id. at 22 (Wakeman RCFC 30(b)(6) Tr. 51:6-7) ("Mr. Wakeman is testifying on behalf of Dominion.").

18. Dominion produced Lou Nunez, Jr., to explain and verify the costs associated with the spent fuel projects at Millstone included in Dominion's claims. Id. at 28 (Nunez Tr. 22:6-8) ("I would say my purpose here is to stand ready to answer questions on Millstone's specific questions."). A Dominion accountant, Mr. Nunez never worked for CL&P, WMECO, or Northeast Utilities, and he arrived at Millstone only after Dominion's acquisition of the plant. Id.

at 25, 30 (Nunez Tr. 11:7-18:19, 30:18-20). Mr. Nunez had no contemporaneous role in accounting for the pre-acquisition claims that Dominion now asserts, no knowledge of whether Dominion's external auditor tested whether the pre-acquisition costs sought by Dominion are properly part of its claim, and virtually no ability to explain Millstone's prior owners' accounting for these costs. Id. at 30, 34 (Nunez Tr. 30:18-31:21, 49:18-23). To assemble Dominion's Millstone claims, Mr. Nunez conceded that he essentially just pushed a button, generating a report encompassing certain project codes designated by other individuals. Id. at 33 (Nunez Tr. 42:4-8, 44:19-22).

19. On September 12, 2007, DOJ issued an amended RCFC 30(b)(6) deposition notice, which included an even more precise request for corporate testimony concerning costs incurred by Milstone's prior owners before Dominion's acquisition of the plant. Id. at 91 (Amended Consolidated Notice ¶ 18).

20. In response to the Government's amended RCFC 30(b)(6) notice, Dominion produced Wesley Jenkins, another Dominion accountant who never worked for CL&P, WMECO, or Northeast Utilities. Id. at 36-40 (Jenkins Tr. 10:22-27:16). Mr. Jenkins admitted that he had not "worked directly with" these entities' accounting system. Id. at 45 (Jenkins 30(b)(6) Tr. 137:1-2). In response to inquiries concerning pre-acquisition costs claimed by Dominion, he was frequently forced to speculate or decline knowledge. Id. at 42 (Tr. 125:17) ("Again, I don't know specifically . . . ."); 43 (Tr. 128:13-14) ("I don't know if that was the way they did it."), (Tr. 129:12-13) ("And, again, my guess would be . . . ."); 44 (Tr. 131:17-18) ("I would suspect that . . . ."), (Tr. 132:4) ("That's my suspicion . . . ."); 47 (Tr. 143:3-4) ("Again, I don't know the specific [overhead] pools."), (Tr. 144:20-145:2) ("I haven't – don't have access

to, haven't seen any of [Northeast Utilities'] specific policies on governing this, but it would be – I would suspect, again, based on my experience, my professional judgment . . . .").

21. Dominion anchors its claims for pre-acquisition damages on the PSA's assignment clause. P's Mem. 54.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ANDREW AVERBACH
CHRISTOPHER J. CARNEY
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

s/Lisa L. Donahue by s/Scott Slater
LISA L. DONAHUE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 353-9498
Fax: (202) 307-2503

March 17, 2008

Attorneys for Defendant