Docket No. 99-09-12RE01
Exhibit RAS/RMK-2.

# PURCHASE AND SALE AGREEMENT

for the

MILLSTONE NUCLEAR POWER STATION

by and among

THE CONNECTICUT LIGHT AND POWER COMPANY,

WESTERN MASSACHUSETTS ELECTRIC COMPANY,

THE UNITED ILLUMINATING COMPANY,

CENTRAL MAINE POWER COMPANY,

CHICOPEE MUNICIPAL LIGHTING PLANT,

FITCHBURG GAS AND ELECTRIC LIGHT COMPANY,

VILLAGE OF LYNDONVILLE ELECTRIC DEPARTMENT,

NEW ENGLAND POWER COMPANY,

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE,

VERMONT ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE

and

NORTHEAST NUCLEAR ENERGY COMPANY

as Sellers

and

DOMINION RESOURCES, INC.

as Buyer

dated

August 7, 2000

new york 636717 v11 [41151588.1]

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1. | *Preamble* | 1 |
| 2. | *Acquisition of Assets by Buyer.* | 2 |
| 2.1. | *Purchase and Sale of Assets.* | 2 |
| 2.2. | *Excluded Assets.* | 5 |
| 2.3. | *Assumption of Liabilities.* | 7 |
| 2.4. | *Liabilities Not Assumed.* | 8 |
| 2.5. | *Consideration for Acquired Assets.* | 12 |
| 2.6. | *Adjustment to Facilities Purchase Price and Fuel Purchase Price* | 13 |
| 2.7. | *Payment of Purchase Price Adjustments.* | 16 |
| 2.8. | *Allocation of Consideration.* | 17 |
| 2.9. | *Proration.* | 17 |
| 2.10. | *The Closings.* | 18 |
| 2.11. | *Deliveries by the Sellers at the Closings.* | 19 |
| 2.12. | *Deliveries by the Buyer at the Closing Date.* | 24 |
| 3. | *Representations, Warranties and Disclaimers.* | 26 |
| 3.1. | *Representations and Warranties of Each Seller.* | 26 |
| 3.2. | *Representations and Warranties of Lead Participants.* | 29 |
| 3.3. | *Disclaimers Regarding Acquired Assets.* | 40 |
| 4. | *Representations and Warranties of the Buyer.* | 41 |
| 4.1. | *Organization of the Buyer.* | 41 |
| 4.2. | *Authority, Execution and Enforceability of Transactions* | 42 |
| 4.3. | *Noncontravention.* | 42 |
| 4.4. | *Consents and Approvals.* | 42 |
| 4.5. | *Brokers' Fees.* | 43 |
| 4.6. | *Litigation.* | 43 |
| 4.7. | *Qualified Buyer.* | 43 |
| 4.8. | *WARN Act.* | 43 |
| 4.9. | *No Implied Warranties.* | 43 |
| 4.10. | *Absence of Certain Events.* | 44 |
| 5. | *Covenants.* | 44 |
| 5.1. | *General.* | 44 |
| 5.2. | *Notices, Consents and Approvals.* | 44 |
| 5.3. | *Operation of Business During Interim Period.* | 47 |
| 5.4. | *Access and Investigations During Interim Period.* | 50 |

Page

5.5. *Certain Notices.* ....53
5.6. *Further Assurances.* ....54
5.7. *Employee Matters.* ....56
5.8. *Cooperation after Initial Closing Date.* ....58
5.9. *NEPOOL.* ....62
5.10. *Funding of the Decommissioning Trusts.* ....62
5.11. *Risk of Loss.* ....65
5.12. *Connecticut Transfer Act.* ....67
5.13. *Discharge of Environmental Liabilities.* ....67
5.14. *Nuclear Insurance.* ....68
5.15. *Nonwaiver of Third Party Environmental Liabilities.* ....68
5.16. *Control of Litigation.* ....68
5.17. *Availability of Funds.* ....69
5.18. *Cost of Disposal of Pre-1983 Spent Nuclear Fuel* ....69
5.19. *Department of Energy Decontamination and Decommissioning Fees.* ....70
5.20. *Cooperation Relating to Insurance and Price-Anderson Act.* ....70
5.21. *Acceptable Credit Support.* ....71
5.22. *Private Letter Ruling Requests.* ....71
5.23. *Credit Rating of Acceptable Guarantor.* ....72
5.24. *NRC Commitments.* ....72
5.25. *Exclusivity.* ....72
5.26. *Outages.* ....72
5.27 *Nuclear Fuel.* ....72

6. *Conditions Precedent to Obligation to Close.* ....73

6.1. *Conditions Precedent to Obligation of the Buyer to Close.* ....73
6.2. *Conditions Precedent to Obligation of the Sellers to Close.* ....76
6.3. *Initial and Subsequent Closings.* ....78

7. *Confidentiality.* ....79

8. *Taxes.* ....80

9. *Non-Survival; Effect of Closing and Indemnification.* ....82

9.1. *Survival of Representation and Warranties; Survival Covenants and Agreements.* ....82
9.2. *Effect of Closing.* ....82
9.3. *Indemnity by Lead Participants.* ....82
9.4. *Indemnity by Buyer.* ....83
9.5. *Exclusive and Limited Remedies.* ....84
9.6. *Notice; Defense of Claims.* ....85
9.7. *Net of Taxes and Insurance.* ....86
9.8. *Release.* ....87
9.9. *No Recourse.* ....87

Page

10. *Termination* ..... 87

10.1. *Termination of Agreement* ..... 87
10.2. *Effect of Termination* ..... 91

11. *Miscellaneous* ..... 92

11.1. *Press Releases and Public Announcements* ..... 92
11.2. *No Third Party Beneficiaries* ..... 92
11.3. *No Joint Venture* ..... 92
11.4. *Entire Agreement* ..... 92
11.5. *Succession and Assignment* ..... 92
11.6. *Counterparts* ..... 93
11.7. *Headings* ..... 93
11.8. *Notices* ..... 94
11.9. *Governing Law* ..... 95
11.10. *Change in Law* ..... 95
11.11. *Consent to Jurisdiction and Venue* ..... 95
11.12. *Amendments and Waivers* ..... 95
11.13. *Severability* ..... 95
11.14. *Expenses* ..... 96
11.15. *Construction* ..... 96
11.16. *Incorporation of Exhibits and Schedules* ..... 96
11.17. *Specific Performance* ..... 96
11.18. *Dispute Negotiation* ..... 96
11.19. *Good Faith Covenant* ..... 96
11.20. *Set-Off* ..... 96
11.21. *Bulk Transfer Act* ..... 96
11.22. *Release and Settlement Agreements* ..... 97

12. *Dispute Resolution and Arbitration* ..... 97

12.1. *Dispute Resolution* ..... 97
12.2. *Arbitration* ..... 97

13. *Definitions* ..... 98

Page

Exhibits

A - Form of Deed

B - Form of Bill of Sale

C - Form of Asset Demarcation Agreement

D - Form of Assignment and Assumption Agreement

E - Form of Interconnection Agreement

F - Form of Release of Mortgage Indenture

G - Form of FIRPTA Affidavit

H - Form of Acceptable Guaranty

I - [RESERVED]

J - Form of Lead Participant Rights Agreement

K - Form of Estoppel Certificate

L - Form of Interim Services Agreement

M - Form of DOE Acceptable Guaranty

Schedules

Schedule 1 - Sellers Ownership Shares

Schedule 2.1 - NNECO Assets

Schedule 2.1(a)(i) - Real Property

Schedule 2.1(a)(ii) - Permitted Encumbrances

Schedule 2.1(b) - Spent Nuclear Fuel and Low Level Nuclear Waste

Schedule 2.1(c) - Personal Property

Schedule 2.1(d) - Leases

Schedule 2.1(e) - Transferable Permits

Schedule 2.1(f) - Material Contracts

Page


| | | |
|---|---|---|
| Schedule 2.1(m)(i) | - | Emergency Preparedness Assets |
| Schedule 2.1(m)(ii) | - | Emergency Preparedness Agreements |
| Schedule 2.1(n) | - | Vehicles |
| Schedule 2.1(p) | - | Owned Intellectual Property |
| Schedule 2.1(q) | - | Nuclear Insurance Policies |
| Schedule 2.1(r) | - | Agreements for the Sale of Capacity or Energy |
| Schedule 2.1(u) | - | Other Related Assets |
| Schedule 2.1(v) | - | Emission Reduction Credits |
| Schedule 2.1(w) | - | Licensed Intellectual Property |
| Schedule 2.2(a) | - | T&D Assets |
| Schedule 2.2(d) | - | Rights to Sellers' Names |
| Schedule 2.2(j) | - | Seller Reserved Easements |
| Schedule 2.2(k) | - | Non-Assigned Contracts |
| Schedule 2.3(c) | - | Certain Assumed Liabilities |
| Schedule 2.4(r) | - | Pollution Control Bonds |
| Schedule 2.11(a)(xi) | - | Consents, Waivers and Approvals |
| Schedule 2.11(a)(xv) | - | Matters for Opinion from Counsel to Seller |
| Schedule 2.12(a) | - | Matters for Opinion from Counsel to Buyer |
| Schedule 3.1(c) | - | Matters of Contravention |
| Schedule 3.1(f)(i) | - | Regulation as a Utility |
| Schedule 3.1(f)(ii) | - | Regulation under PUHCA |
| Schedule 3.2(a) | - | Physical Condition of Improvements |
| Schedule 3.2(b) | - | Certain Changes or Events |
| Schedule 3.2(c)(i) | - | Compliance with Laws |
| Schedule 3.2(c)(ii) | - | Other Permits |

Page

Schedule 3.2(c)(iii) - Reporting Compliance

Schedule 3.2(f) - Insurance

Schedule 3.2(g) - Litigation

Schedule 3.2(h) - Labor Matters

Schedule 3.2(i) - Environmental

Schedule 3.2(j) - Condemnation

Schedule 3.2(k) - Intellectual Property

Schedule 3.2(q) - Plant and Equipment

Schedule 3.2(r) - Title Commitments

Schedule 3.2(t) - Tax

Schedule 3.2(v) - Qualified Decommissioning Funds

Schedule 3.2(w) - Nonqualified Decommissioning Funds

Schedule 4.3 - Matters of Contravention

Schedule 5.3 - Pre-Approved Capital Expenditures

Schedule 5.7(b)(i) - Plant Employees

Schedule 5.7(b)(ii) - Certain Acquired Assets Employee Benefits and Severance

Schedule 5.7(c)(iv) - Pension Benefits

Schedule 5.7(d) - Employee Benefits Packages

Schedule 5.8(d) - Pollution Control Facilities

Schedule 5.10(b) - Decommissioning Trust Closing Amount

Schedule 6.1(c) - Buyer Regulatory Approvals

Schedule 6.2(c) - Seller Regulatory Approvals

Schedule X - Example of Calculation of Relevant Percentage of the Facilities Purchase Price and the Fuel Purchase Price

PURCHASE AND SALE AGREEMENT

1. *Preamble*

This Purchase and Sale Agreement (the "*Agreement*") is entered into on August 7, 2000, by and among Dominion Resources, Inc., a Virginia corporation (the "*Buyer*"), and The Connecticut Light and Power Company, a Connecticut corporation ("*CL&P*"), Western Massachusetts Electric Company, a Massachusetts corporation ("*WMECO*"), The United Illuminating Company, a Connecticut corporation ("*UI*"), Central Maine Power Company, a Maine corporation ("*CMP*"), Chicopee Municipal Lighting Plant, a Massachusetts municipal utility ("*CMLP*"), Fitchburg Gas and Electric Light Company, a Massachusetts corporation ("*Fitchburg*"), Village of Lyndonville Electric Department, a Vermont municipal utility ("*Lyndonville*"), New England Power Company, a Massachusetts corporation and successor by merger to Montaup Electric Company ("*NEP*"), Public Service Company of New Hampshire, a New Hampshire corporation ("*PSNH*"), Vermont Electric Generation and Transmission Cooperative, a liquidated cooperative utility acting by and through its bankruptcy trustee ("*VEG&T*"), and Northeast Nuclear Energy Company, a Connecticut corporation ("*NNECO*") (CL&P, WMECO, UI, CMP, CMLP, Fitchburg, Lyndonville, NEP, PSNH, VEG&T, and NNECO are each individually referred to herein as a "*Seller*" and are referred to collectively herein as "*Sellers*"). Each of the Sellers and the Buyer are referred to herein as a "*Party*" or, collectively, as the "*Parties*". Terms used herein in capitalized form shall have the meanings ascribed in Section 13 hereof or as otherwise set forth in this Agreement.

WHEREAS, each Seller owns, as a tenant-in-common, in the percentage set forth on Schedule 1 hereto, an undivided fee simple ownership interest in one or more of the Facilities (as hereinafter defined) located at Millstone Nuclear Power Station, in Waterford, Connecticut ("*Millstone*"), and certain other facilities and assets associated therewith and ancillary thereto, excepting the portion thereof consisting of the real property, improvements thereon and appurtenances thereto described in Schedule A-7 to Schedule 2.1(a)(i) hereto, all of which is owned in fee simple solely by CL&P; and for the avoidance of doubt, except for CL&P, WMECO and NNECO, all other Sellers (including UI) own an Ownership Share in Millstone Unit 3 only;

WHEREAS, CL&P and WMECO, as the sole owners of Millstone Units 1 and 2 and as the "*Lead Participants*" under the Sharing Agreement (as hereinafter defined) for Millstone Unit 3 (CL&P and WMECO are referred to collectively herein as the "*Lead Participants*") have appointed NNECO as operator to be responsible for the operation, maintenance and management of Millstone;

WHEREAS, the Sellers (other than the Lead Participants and UI) have appointed the Lead Participants to act as their agents under the Authorization Agreements for purposes of the transactions contemplated by this Agreement and, to the extent a party thereto, the Related Agreements (as hereinafter defined);

WHEREAS, UI has authorized the Lead Participants to (a) act as its agent under the Sharing Agreement with respect to decommissioning funding matters in connection with

Millstone Unit 3 and (b) act as its agent under that certain agreement dated the date hereof between the Lead Participants and UI for purposes of the performance of certain agreements and covenants by the Lead Participants on its behalf in connection with the transactions contemplated by this Agreement (including, without limitation, the covenants made by the Lead Participants on its behalf (as a Seller) under Section 5 hereof) and, to the extent a party thereto, the Related Agreements;

WHEREAS, the Buyer desires to purchase and assume, and the Sellers desire to sell and assign the Acquired Assets (as defined in Section 2.1 below) and certain associated liabilities upon the Initial Closing and each Subsequent Closing as more fully described herein, upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

2. *Acquisition of Assets by Buyer.*

2.1. *Purchase and Sale of Assets.* Upon the terms and subject to the satisfaction of the conditions contained in this Agreement at the Initial Closing and each Subsequent Closing, each of the Required Sellers or the Remaining Sellers, as the case may be, shall sell, assign, convey, transfer and deliver or cause to be sold, assigned, conveyed, transferred and delivered, to the Buyer, and the Buyer shall purchase, assume and acquire from such Sellers, free and clear of any Lien (except for Permitted Encumbrances), such Seller's Ownership Share of the properties and assets constituting, related to, used or held for use in the operation of the Facilities, including, but not limited to the following (collectively, together with the assets of NNECO set forth in Schedule 2.1, the "*Acquired Assets*"):

(a) the real property, Improvements thereon, easements and other rights in real property described in Schedule 2.1(a)(i), and all rights arising out of the ownership thereof or appurtenant thereto, including, without limitation, all related rights of ingress and egress, subject only to the Permitted Encumbrances, including the matters set forth in Schedule 2.1(a)(ii) (the "*Real Property*");

(b) all Spent Nuclear Fuel, in the quantity set forth in Schedule 2.1(b), and all High Level Waste at the Sites on such Closing Date, and all Low Level Waste, in the quantity set forth in Schedule 2.1(b), at the Sites on such Closing Date;

(c) all machinery, mobile or otherwise, equipment, computer hardware and software, communications equipment, tools, spare parts, fixtures, furniture, furnishings, work in process, and other personal property owned by the Sellers and which is used in or relates to the operation or maintenance of the Facilities, and the Inventories owned by the Sellers which are

held at or are in transit from or to the Facilities and the Sites, including, without limitation, the items of personal property set forth in Schedule 2.1(c), as well as all applicable warranties and guaranties from Third Parties relating thereto to the extent such warranties and guaranties are transferable to the Buyer, or to the extent any such items are leased, an assignment of the applicable leases for such items (as well as all applicable warranties and guaranties from Third Parties relating thereto to the extent transferable to the Buyer);

(d) all of the Sellers' rights with respect to leasehold interests and subleases and rights thereunder relating to the Real Property, including, without limitation, with respect to the leases set forth in Schedule 2.1(d) (the "*Leases*");

(e) all Permits, which are transferable by the Sellers to the Buyer by assignment or otherwise (including, without limitation, upon request or application to a Governmental Authority, or which will pass to the Buyer as successor in title to the Acquired Assets by operation of Law), including, without limitation, those Permits set forth in Schedule 2.1(e) (the "*Transferable Permits*");

(f) except as specifically provided in Sections 2.2(e), 2.2(f) and 2.2(g), all rights of the Sellers under the contracts, agreements, the Sharing Agreement, the Transmission Support Agreement, the DOE Standard Contracts (including all rights to any claims of Sellers related to DOE defaults thereunder), the Nuclear Fuel Contracts, software and other Intellectual Property licenses and personal property leases which relate to the operation of the Facilities set forth in Schedule 2.1(f) and all warranties and guaranties relating to the Acquired Assets (the "*Material Contracts*");

(g) to the extent permitted by applicable Law, all documents, correspondence, books, records, medical records, operating, safety and maintenance manuals, inspection reports, drawings, models, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports, quality assurance records, purchasing records and equipment repair, data, safety, maintenance or service records of the Sellers relating to the design, construction, licensing, regulation, operation or Decommissioning of the Facilities and the other Acquired Assets, which documents are in the possession or control of the Lead Participants or NNECO, wherever located and whether existing in hard copy or magnetic or electronic form, including, without limitation, all Sellers' rights in and license or other right to use (in the case of those not owned by Sellers) any drawings, designs, specifications and other documents owned by Third Parties and licensed to Sellers which are used in or necessary to the licensing, operation or Decommissioning of the Facilities;

(h) to the extent permitted by applicable Law, all Acquired Assets Employee Records;

(i) all rights of the Sellers in and to the words "*Millstone Nuclear Power Station*" and any related or similar tradename, trademark, service mark, copyright, corporate name, logo or any part, derivative or combination;

(j) all assignable right, title and interest of the Sellers to the NRC Licenses;

(k) all right, title and interest of the Sellers in Nuclear Fuel wherever located;

(l) the assets comprising the Decommissioning Funds, including all income, interest and earnings accrued thereon, together with all related tax accounting, decommissioning studies and cost estimates, and all other books and records related thereto;

(m) without limiting the generality of Sections 2.1(a) and 2.1(c), all rights of the Sellers in the property and assets used or usable in providing emergency warning or associated with emergency preparedness as set forth in Schedule 2.1(m)(i) (the "*Emergency Preparedness Assets*") and all rights of the Sellers under the contracts and agreements associated with such emergency preparedness as set forth in Schedule 2.1(m)(ii) (the "*Emergency Preparedness Agreements*");

(n) all right, title and interest of the Sellers in the vehicles set forth in Schedule 2.1(n) (the "*Vehicles*");

(o) all assignable rights, benefits and interest of the Sellers under purchase orders, licenses or contracts that are not Emergency Preparedness Agreements, Material Contracts or Leases but that (i) relate to the operation of the Facilities, (ii) are identified in writing by the Parties during the Interim Period, and (iii) are set forth in a schedule to be attached to the Assignment and Assumption Agreement at such Closing (the "*Other Assigned Contracts*");

(p) all Owned Intellectual Property; provided that the Sellers shall retain an irrevocable, perpetual, non-exclusive and fully paid-up license to use such Intellectual Property; provided, further, that each Party shall have no obligation after the relevant Closing Date to provide the other Parties with any updates, maintenance or technical support with respect to such Intellectual Property;

(q) to the extent transferable, all Nuclear Insurance Policies set forth in Schedule 2.1(q) and the rights to proceeds from insurance policies for coverage of Acquired Assets and Assumed Liabilities, including all rights to collect premium refunds made after the relevant Closing Date pursuant to the ANI nuclear industry credit rating plan (other than refunds that relate to premiums paid on or prior to such Closing Date);

(r) all contracts, instruments or other agreements set forth in Schedule 2.1(r) relating to the sale by the Lead Participants of electric capacity, energy or ancillary products or services from the Facilities under wholesale rates or otherwise subject to regulation by the FERC;

(s) the Sellers' claims, rights or causes of actions against any Third Parties arising out of or relating to Sellers' right, title and interest in and to any of the Acquired Assets or the Assumed Liabilities, or any portion thereof, whether received as a payment or credit against future liabilities, including, without limitation, insurance proceeds, condemnation awards and cash payments under warranties covering the Acquired Assets to the extent such payments relate to Assumed Liabilities or Acquired Assets;

(t) all Sellers' memoranda, reports, information, technology and specifications existing on such Closing Date relating to plans for Year 2000 Compliance with respect to the Acquired Assets;

(u) all other assets of the Sellers constituting, used or held for use in the operation of, the Facilities, as set forth on Schedule 2.1(u), as amended by the Parties during the Interim Period pursuant to Section 5.6 (the "*Other Related Assets*");

(v) all emission reduction credits owned by the Sellers that relate to the operation of the Facilities, as set forth in Schedule 2.1(v); and

(w) an assignment of all licenses for the Licensed Intellectual Property (to the extent transferable to the Buyer), including any related maintenance agreements for such Licensed Intellectual Property; provided, however, that to the extent any licenses for the Licensed Intellectual Property may not be assignable to the Buyer on commercially reasonable terms the Lead Participants shall take Commercially Reasonable Efforts consistent with the terms and conditions of such licenses to make such Licensed Intellectual Property available for use by the Buyer.

2.2. *Excluded Assets*. Notwithstanding anything to the contrary in this Agreement, there shall be excluded from the Acquired Assets to be sold, assigned, transferred, conveyed or delivered to the Buyer hereunder, and there shall be retained by the Sellers, any and all right, title and interest to the following assets, properties and rights (collectively, the "*Excluded Assets*"):

(a) the property comprising or constituting any or all of the T&D Assets located at any Site (whether or not regarded as a "transmission," "distribution," "general plant" or "generation" asset for regulatory or accounting purposes and whether such assets are real or personal property), including the 345-kV switchyard facilities and support equipment, certain telecommunications equipment, all four 345-kV transmission lines and portions of 23-kV distribution lines, as well as all Permits and contracts, to the extent relating to the T&D Assets,

all as set forth in Schedule 2.2(a), all of which shall be retained by CL&P, but not including the real property on which such T&D Assets are located;

(b) all Cash, accounts and notes receivable, checkbooks and canceled checks, bank deposits and property or income tax receivables (except for any property tax abatements to be apportioned) or any other Tax refunds to the extent allocable to a period ending on or prior to the Initial Closing Date (including, without limitation, the Sellers' account balances with NEIL and any future annual distributions from NEIL that relate to premiums paid by the Sellers on or prior to such Closing Date), except the assets comprising the Decommissioning Funds;

(c) all rights of the Sellers in and to any causes of action, claims and defenses against Third Parties arising out of or relating to any of the Excluded Assets or Excluded Liabilities, whether payable in Cash or as a credit against future liabilities, including, without limitation, insurance proceeds and condemnation awards claims for contribution or indemnity, tort claims, causes of action, contract rights and refunds accrued and owing;

(d) all rights of the Sellers to the words set forth in Schedule 2.2(d) and any related or similar tradename, trademark, service mark, copyright, corporate name, logo or any part, derivative or combination;

(e) any claims of CL&P and WMECO in connection with Pre-1983 Spent Nuclear Fuel related or pertaining to the DOE's defaults under the DOE Standard Contracts accrued as of the Initial Closing Date;

(f) (i) all rights of the Sellers for indemnity, defense or exculpation under any Material Contract, Lease or Other Assigned Contract expressly providing the Sellers with continued indemnity, defense or exculpation rights for occurrences on or prior to the Initial Closing Date or any claims for which the Sellers remain liable under Section 9 and (ii) all rights and obligations of the Sellers under the Authorization Agreements and the Release and Settlement Agreements;

(g) all rights (but not the Liabilities) of the Lead Participants to receive payments under the Transmission Support Agreement;

(h) all rights of CL&P and WMECO under the Fuel Trust;

(i) any and all of the Sellers' rights in any contract representing an intercompany transaction between a Seller and an Affiliate of such Seller, whether or not such transaction relates to the provision of goods and services, payment arrangements, intercompany charges or balances, or the like;

5.18. *Cost of Disposal of Pre-1983 Spent Nuclear Fuel.*

(a)(i) Each of the Lead Participants hereby appoints the Buyer as its agent and attorney-in-fact to represent it in all matters involving the Pre-1983 Spent Nuclear Fuel and to prosecute such claims or negotiate on their behalf a settlement of such claims by and against DOE; provided that no such settlement shall be entered into by the Buyer without the prior written consent of the Lead Participants (such consent not to be unreasonably withheld), and the Buyer shall inform the Lead Participants in writing of any material developments regarding any such matter involving the Pre-1983 Spent Nuclear Fuel; and provided further, that the Lead Participants shall indemnify and hold the Buyer harmless from any claims, costs or damages arising from the Buyer's acts as the Lead Participants' agent and attorney-in-fact under this paragraph.

(ii) The Lead Participants shall, within sixty days after the occurrence of an ACS Trigger Event, provide the Buyer a DOE Acceptable Credit Support.

(b) Prior to the Initial Closing Date, the Lead Participants have reserved certain amounts against future payment of Pre-1983 Spent Nuclear Fuel disposal charges in an amount equal to the "one-time fee" amount provided under Article VIII(A)(2) of the DOE Standard Contracts, together with accrued interest at the rate provided in Article VIII(B)(2)(b) thereof (the *"DOE Contract Amount"*). The Parties agree as follows with respect to such matters:

(i) At such time as the Buyer may be lawfully required to pay to DOE the fee for disposal of Pre-1983 Spent Nuclear Fuel under Article VIII of the DOE Standard Contracts (the *"DOE Payment Date"*), subject to any reduction as provided in Section 5.18(b)(ii), the Lead Participants shall, upon not less than thirty (30) days' prior notice from the Buyer, pay or cause to be paid to the Buyer in immediately available funds a sum equal to the amount of such payment (the *"DOE Payment Amount"*) pursuant to wire transfer instructions to be furnished by the Buyer to the Lead Participants at least five (5) days prior to the DOE Payment Date. Upon payment of the DOE Payment Amount, the DOE Acceptable Credit Support shall be terminated and the Buyer shall return such DOE Acceptable Credit Support to the Lead Participants. In the event the Lead Participants fail to reimburse the Buyer in full of the DOE Payment Amount, the Buyer shall have the right to exercise its remedies under the DOE Acceptable Credit Support to the extent necessary to cover any deficiency in the reimbursement of the payment by Buyer of the DOE Payment Amount.

(ii) In the event any pending claims of the Lead Participants with respect to the DOE Standard Contracts for disposal of Pre-1983 Spent Nuclear Fuel are adjudicated, settled by the Buyer or otherwise liquidated pursuant to the terms hereof at any time prior to the DOE Payment Date, and as a result of such adjudication, settlement or liquidation, the DOE Payment Amount is reduced, or a credit is available against such

amount, such credit shall be used by the Buyer to reduce the obligations of the Lead Participants under Section 5.18(b)(i), on a *pro rata* basis, by the amount of any such credit. In the event that upon such adjudication, settlement or liquidation of any such claims of the Lead Participants with respect to the DOE Standard Contracts, the Lead Participants shall be entitled to receive any cash payment from DOE, the Lead Participants shall retain such cash and no portion thereof shall be applied to reduce the DOE Payment Amount.

(iii) The Parties shall provide the DOE with notice of assignment of the DOE Standard Contracts to the Buyer pursuant to Article XIV thereof and the appointment of the Buyer to act as the agent and attorney-in-fact of CL&P and WMECO in prosecuting or settling any claims against DOE

5.19. *Department of Energy Decontamination and Decommissioning Fees*. Each Seller will continue to pay its Ownership Share of all DOE decontamination and decommissioning fund fees relating to Nuclear Fuel purchased and consumed at the Facilities on or prior to the Initial Closing Date or any Subsequent Closing Date, as the case may be, including but not limited to all annual special assessment invoices to be issued after the Initial Closing Date, by the DOE, as contemplated by its regulations at 10 C.F.R. Part 766 implementing Sections 1801, 1802, and 1803 of the Atomic Energy Act. After the Initial Closing and each Subsequent Closing, the Buyer will pay such DOE decontamination and decommissioning fund fees relating to Nuclear Fuel purchased or consumed at each Unit after the relevant Closing for the appropriate Relevant Percentage acquired by the Buyer.

5.20. *Cooperation Relating to Insurance and Price-Anderson Act*. Until the Initial Closing, the Sellers will maintain in effect the same level of property damage and liability insurance for the Facilities as in effect on the Effective Date. The Lead Participants shall cooperate with the Buyer's efforts to obtain insurance, including insurance required under the Price Anderson Act or other Nuclear Laws with respect to the Acquired Assets. Subject to Section 9.4, the Sellers agree to use Commercially Reasonable Efforts to assist the Buyer in making any claims against pre-Closing insurance policies of the Sellers that may provide coverage related to Assumed Liabilities. The Buyer agrees to indemnify the Sellers for their reasonable out of pocket expenses incurred in providing such assistance and cooperation and not to take any action which shall adversely affect any residual rights of the Sellers in such insurance policies.

5.21. *Acceptable Credit Support*.

At the Initial Closing the Buyer shall deliver to CL&P, on behalf of the Remaining Sellers an Acceptable Guaranty and at all times thereafter until the earlier of (x) the termination date of the Agreement pursuant to Section 10.1(c)(ii)(B) or Section 10.1(e)(ii) and (y) the payment in full of the Facilities Purchase Price and the Fuel Purchase Price, the Buyer

U.S. Department of Justice
Civil Division

FILE

PDK:DMC:HDL:SSlater
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

Telephone: (202) 616-0467
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

September 7, 2007

**VIA FACSIMILE AND UNITED STATES MAIL**

Brad Fagg, Esq.
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Re: *Dominion Resources, Inc. & Dominion Nuclear Connecticut, Inc. v. United States*, Fed. Cl. No. 04-0083C (Bruggink, J.)
*Dominion Resources, Inc. & Virginia Electric and Power Co. v. United States*, Fed. Cl. No. 04-0084C (Bruggink, J.)

Dear Mr. Fagg:

As you are aware, both of the complaints that Dominion Resources, Inc. ("Dominion") filed in these two actions include at Count III claims for "Taking Without Just Compensation of Real Property." These takings claims are neither referenced in, nor supported by, Dominion's Initial Disclosure of Claimed Damages, and, to date, the parties have engaged in no discovery on this issue. We understand these omissions to mean that Dominion does not intend to pursue takings claims against the Government. If true, please confirm this fact in writing. If, on the other hand, Dominion intends to seek redress for alleged takings of real property, we ask that you promptly amend Dominion's Initial Disclosures so that the Government may obtain necessary discovery on these undeveloped claims.

Additionally, according to the face of the complaint in the Connecticut case, Fed. Cl. No. 04-0083C, Dominion is proceeding "on behalf of itself and the Connecticut Light and Power Company and Western Massachusetts Electric Company and Northeast Utilities Service Company[]" (collectively "Northeast Entities"). In the complaint, Dominion further represents that Northeast Entities, former owner of the Millstone Power Station, granted Dominion the "authority to prosecute all claims against DOE . . . ." (Complaint ¶ 7.) By letter dated April 26, 2001, John B. Keane, Northeast Utilities, informed the Department of Energy that "Dominion has also been appointed to act as agent and attorney-in-fact to prosecute or settle any claims against the [agency] in connection with the [Standard] Contract." (Letter of 4/26/01 from L. Hill to H. Watkins, attached hereto.)

Please explain in writing how Dominion purports to represent the former owners of Millstone in this litigation, especially in view of the provisions of the Anti-Assignment Act, 31 U.S.C. § 3727. We request also that you inform us whether Northeast Entities is a party to the proceeding, whether it is represented by Morgan, Lewis & Bockius or other counsel, and whether and how it is to be bound by the results of this litigation. Regarding claims for damages accrued prior to Dominion's acquisition of Millstone, please advise us which entity is to recover any proceeds stemming from such claims, and whether Dominion is to obtain any portion of these proceeds. Lastly, please provide us a copy of the executed power of attorney referenced in Mr. Hill's letter, dated April 26, 2001.

Thank you for your prompt attention to these matters, through which we hope to avoid unnecessary motions practice and enlargements of discovery.

Sincerely,

Scott Slater
Trial Attorney
Commercial Litigation Branch

Attachment

Jan 08 2007 3:27PM HP LASERJET 3330 202 479 2137 p. 27 4

-8-07; 2:50PM;

Northeast Utilities System

107 Selden Street, Berlin, CT 06037

Northeast Utilities Service Company
P.O. Box 270
Hartford, CT 06141-0270
(860) 665-8541
FAX: (860) 665-5800
keanejb@nu.com

John B. Keane
Vice President - Administration

VIA REGISTERED MAIL

April 26, 2001

Mr. Herbert D. Watkins
Contracting Officer
Office of Headquarters Procurement Services
U. S. Department of Energy
Washington, DC 20585

Re: Standard Contract No. DE-CR01-83NE44399.000

Dear Mr. Watkins:

Pursuant to Article XIV of the above-referenced contract ("Contract"), this is to provide notice to the Department of Energy that the title interest in the spent fuel at the Millstone Point Unit 1 civilian nuclear power reactor has been transferred to Dominion Nuclear Connecticut, Inc. ("Dominion") on March 31, 2001. Northeast Utilities Service Company ("NUSCO"), as former Purchaser under the Contract and on behalf of the prior owners of Millstone Point Unit 1, has also assigned to Dominion the rights and duties of "Purchaser," as specified in the Contract. Dominion has also been appointed to act as agent and attorney-in-fact to prosecute or settle any claims against the Department of Energy in connection with the Contract. In this regard, notice is hereby given pursuant to Article XII that all future notices and communications pertaining to the Contract should be sent to:

Lee O. Hill, Jr.
Team Leader - Nuclear Fuel Supply
Dominion Nuclear Connecticut, Inc.
Millstone Power Station
Rope Ferry Road
Waterford, CT 06385

Sincerely,

J. B. Keane

John B. Keane
Vice President - Administration
Northeast Utilities Service Company

cc: Christine M. Schwab

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: 202.739.3000
Fax: 202.739.3001
www.morganlewis.com

Morgan Lewis
COUNSELORS AT LAW

Brad Fagg
Partner
202.739.5191
bfagg@morganlewis.com

September 24, 2007

**BY E-MAIL AND U.S. MAIL**

Scott Slater, Esq.
Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530

Re: *Dominion Resources, Inc. & Dominion Nuclear Connecticut, Inc. v. United States*, Fed. Cl. No. 04-0083 (Bruggink, J.)
*Dominion Resources, Inc. & Virginia Electric and Power Co. v. United States*, Fed. Cl. No. 04-0084 (Bruggink, J.)

Dear Mr. Slater:

This responds to your letter dated September 7, 2007.

1. With respect to takings claims, you are correct that Dominion did not, in its pre-trial disclosures dated October 31, 2006, identify separate "takings" damages or evidence. The government has of course had sufficient opportunity to review, audit, and take discovery regarding the damages and evidence that Dominion did identify. Dominion recognizes that, should Dominion determine to pursue recovery under a "takings" theory that involves factual damages evidence different from that already disclosed to the government, it would be reasonable for the government to have an opportunity to pursue discovery regarding such matters. At the current time, however, Dominion does not intend to produce or rely upon such different damages evidence at trial. Dominion nevertheless continues to reserve all rights in this regard.

2. With regard to your questions regarding what you identify as the "Northeast Entities," Dominion has previously represented in this action that "Dominion, as the current 'Purchaser' under the Standard Contract, is authorized to pursue all damages incurred in connection with the Millstone units as a result of DOE's failures." *See Plaintiffs' Motion To Dismiss, etc.*, dated January 29, 2007, at 7 (Docket item 33). We have also noted that the relevant Purchase and Sale Agreement was filed with the Connecticut Department of Public Utility Control (DPUC) under Docket 99-09-12RE01 on September 8, 2000, and is available on the DPUC website at:

1-WA/2824888.1

Morgan Lewis
COUNSELORS AT LAW



http://www.dpuc.state.ct.us/dockhist.nsf/Web%20Main%20View/Search%20Electric?OpenView&Start=25.1.28. *Id.*, p. 6 n.2. That Purchase and Sale Agreement documents the attorney-in-fact arrangement referenced in the correspondence attached to your letter. The fact that Dominion is properly pursuing all Millstone claims, including for costs originally incurred by the "Northeast Entities" prior to the sale of the plant, is not called into question by your citation to the Anti-Assignment Act, 31 U.S.C. § 3727. Even if it might otherwise be implicated, that Act quite clearly has no application to matters under the Nuclear Waste Policy Act or the Standard Contracts. *E.g.*, *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 240 (2006); *Rochester Gas and Electric Corp. v. United States*, 65 Fed. Cl. 431, 439-40 (2005). Finally, with respect to representation and party status, the government should consider the "Northeast Entities" as being represented by Dominion's counsel, *i.e.*, Morgan Lewis, for purposes of the pending Millstone claims, including, for example, for purposes of any contacts with current or former employees of those entities relating to the Millstone claims, under applicable ethical guidelines.

We trust this addresses the matters raised in your letter. We do not agree that any motions practice or enlargements of discovery are warranted.

Please call with any questions.

Sincerely,

Brad Fagg

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DOMINION RESOURCES, INC., and<br>VIRGINIA ELECTRIC & POWER COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-0084<br>(Judge Bruggink) |

CONSOLIDATED NOTICE OF DEPOSITION PURSUANT TO RULE 30(B)(6)

Please take notice that, pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims, defendant, the United States, will take the deposition of Dominion Resources Inc., and Virginia Electric & Power Company ("VEPCO") (collectively, "plaintiffs"), or a person or persons designated by plaintiffs, upon oral examination before an officer authorized by law to administer oaths, commencing on August 27, 2007, or at a date to be agreed upon by the parties, at 1100 L Street, NW, Washington, DC, 20530, commencing at 9:00 a.m., and continuing from day to day until completed.

Pursuant to Rule 30(b)(6), plaintiffs shall designate the most knowledgeable person or persons to testify upon its behalf as to the following subject matters:

EXHIBIT
30(b)(6) 2
10-4-07 [illegible]

1. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, as to the rate of acceptance at which DOE was obligated to accept spent nuclear fuel and/or high-level radioactive waste pursuant to the Standard Contracts between DOE and VEPCO beginning in 1998, including:

   a. the aggregate annual acceptance rate (in Metric Tons of Uranium ("MTUs")) for all Standard Contract holders, including any consideration of the "ramp-up" acceptance rates in the initial years of acceptance; and

   b. the identity of each and every analysis, study, model or other source of information upon which you rely to support VEPCO's understanding with regard to the rate of acceptance at which DOE was obligated to accept SNF from Standard Contract holders.

2. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, with regard to the schedule of SNF and HLW acceptance which DOE was required to follow for the acceptance of VEPCO's SNF assuming that DOE had begun performance under the Standard Contract in 1998, including:

   a. the date upon which DOE would have first accepted fuel from VEPCO's facilities;

   b. the amounts of SNF that DOE would have removed from VEPCO's facility (in MTUs) on an annual basis thereafter;

   c. the identity of each and every analysis, study, model, or other source of information upon which you rely to support VEPCO's understanding with regard to this schedule.

3. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, as to the rate of acceptance at which DOE was obligated to accept spent nuclear fuel and/or high level radioactive waste pursuant to the Standard Contract which was "generally sufficient to eliminate expenditures and to eliminate the need to increase the capacity for [plaintiffs'] on-site spent fuel storage after January 31, 1998," and the identity of each and every analysis, study, model, or other source of information upon which you rely to support plaintiffs' understanding with regard to this obligation. Initial Disclosure of Claimed Damages, submitted October 31, 2006.

4. The identity of all documents, including documents submitted to the Federal Energy Regulatory Commission ("FERC"), the Nuclear Regulatory Commission ("NRC"), or any other Federal, state, or municipal regulatory body, other utilities, industry organizations,

and research groups, that were prepared by VEPCO or upon VEPCO's behalf relating to the details of all spent fuel acceptance schedules or acceptance scenarios that VEPCO has used for any purpose and/or upon which VEPCO has relied for any purpose, as well as each and every draft thereof.

5. Plaintiffs' understanding at the time VEPCO provided comments in response to the draft Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Attachment A), of the rate and/or sequence of SNF and/or HLW acceptance that DOE was to be obligated to maintain pursuant to the Standard Contract and the differences, if any, between that understanding and the understanding of such rate and/or sequence set forth in the Standard Contracts executed by VEPCO.

6. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | (steady state rate thereafter) |

7. To the extent different than topic (6), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations, for the Surry and North Anna plants, respectively:

| Year | MTU Surry | MTU North Anna | |
|---|---|---|---|
| 1998 | - | - | |
| 1999 | 8.2 | - | |
| 2000 | 68.5 | - | |
| 2001 | 44.7 | - | |
| 2002 | 54.7 | - | |
| 2003 | 20.1 | - | |
| 2004 | - | 23.4 | |
| 2005 | 32.9 | - | |
| 2006 | - | 29.0 | |
| 2007 | 5.9 | 49.1 | |
| 2008 | 28.3 | - | |
| 2009 | 24.3 | 25.3 | |
| 2010 | - | 56.5 | |
| 2011 | 32.9 | - | |
| 2012 | 24.7 | 19.3 | |
| 2013 | 26.5 | 18.0 | |
| 2014 | 11.5 | - | |
| 2015 | - | 48.0 | |
| 2016 | - | - | (for years after 2016, assume application of 900 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

8. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | |
| 2001 | 900 | |
| 2002 | 900 | |
| 2003 | 900 | |
| 2004 | 900 | |
| 2005 | 900 | |
| 2006 | 900. | |
| 2007 | 900 | |
| 2008 | 900 | |
| 2009 | 900 | |
| 2010 | 900 | |
| 2011 | 900 | |
| 2012 | 900 | |
| 2013 | 900 | |
| 2014 | 900 | |
| 2015 | 2100 | (steady state rate thereafter) |

9. To the extent different than topic (8), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations, for the Surry and North Anna plants, respectively:

| Year | MTU Surry | MTU North Anna | |
|---|---|---|---|
| 1998 | - | - | |
| 1999 | 8.2 | - | |
| 2000 | 45.7 | - | |
| 2001 | 67.5 | - | |
| 2002 | 54.7 | - | |
| 2003 | 20.1 | - | |
| 2004 | - | 23.4 | |
| 2005 | 32.9 | - | |
| 2006 | - | 29.0 | |
| 2007 | 5.9 | 49.1 | |
| 2008 | 28.3 | - | |
| 2009 | 24.3 | 25.3 | |
| 2010 | - | 56.5 | |
| 2011 | 32.9 | - | |
| 2012 | 24.7 | 19.3 | |
| 2013 | 26.5 | 18.0 | |
| 2014 | 11.5 | - | |
| 2015 | 23.8 | 48.0 | |
| 2016 | 31.6 | 53.1 | (for years after 2016, assume application of 2100 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

10. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | |
| 2001 | 900 | |
| 2002 | 900 | |
| 2003 | 900 | |
| 2004 | 900 | |
| 2005 | 900 | |
| 2006 | 900 | |
| 2007 | 900 | |
| 2008 | 900 | |
| 2009 | 900 | |
| 2010 | 1800 | |
| 2011 | 1800 | |
| 2012 | 1800 | |
| 2013 | 1800 | |
| 2014 | 1800 | |
| 2015 | 3000 | (steady state rate thereafter) |

11. To the extent different than topic (10), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations, for the Surry and North Anna plants, respectively:

| Year | MTU | | |
|---|---|---|---|
| | Surry | North Anna | |
| 1998 | - | - | |
| 1999 | 8.2 | - | |
| 2000 | 68.5 | - | |
| 2001 | 44.7 | - | |
| 2002 | 54.7 | - | |
| 2003 | 20.1 | - | |
| 2004 | - | 23.4 | |
| 2005 | 32.9 | - | |
| 2006 | - | 29.0 | |
| 2007 | 5.9 | 49.1 | |
| 2008 | 28.3 | - | |
| 2009 | 24.3 | 25.3 | |
| 2010 | 32.9 | 56.5 | |
| 2011 | 51.2 | 37.2 | |
| 2012 | 11.5 | 48.0 | |
| 2013 | 55.5 | - | |
| 2014 | - | 53.1 | |
| 2015 | 25.3 | 60.6 | |
| 2016 | 66.7 | 34.3 | (for years after 2016, assume application of 3000 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

12. The process employed by plaintiffs to apply indirect overhead charges to projects (for SAP, CAFR or NFA), including the accounting codes used to allocate such costs, the composition of the indirect overheads (by cost pools or otherwise), any increases or decreases to indirect overhead costs incurred as a result of the breach for which plaintiffs seek damages in this lawsuit, and the effect of staffing level changes upon indirect overhead charges.

13. The process employed by plaintiffs to staff projects identified by plaintiffs as breach-related, including the effect of the existence of such projects upon staffing at plaintiffs' sites and/or the hiring or utilization of backfill contractor labor to staff such projects, and the manner in which employees who work on such projects are compensated.

14. The manner in which plaintiffs' accounting system calculates overtime and the eligibility (by type of employee) for additional overtime compensation.

15. The costs that are reflected in plaintiffs' accounting system for labor rates, including whether labor rates are "loaded" with benefits, taxes, pension, and paid absence, and how such costs are calculated in plaintiffs' accounting system.

16. The manner in which non-productive time (time not spent on a discrete activity/project) is accounted for in plaintiffs' accounting systems, and whether any such time is allocated to projects that plaintiffs have identified as being breach-related.

17. The calculation of the allowance for funds used during construction ("AFUDC") and capitalized interest included in plaintiffs' damage claim, including the components of that calculation; any actual borrowings or increased borrowings necessitated by expenditures made by plaintiffs upon projects that plaintiffs identified as being breach-related; and the allocation of AFUDC or capitalized interest to projects that plaintiffs identified as being breach-related.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

LISA L. DONAHUE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-9498
Fax: (202) 305-2118

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

July 20, 2007

# ATTACHMENT A

83-1-64

VIRGINIA ELECTRIC AND POWER COMPANY
RICHMOND, VIRGINIA 23261

March 7, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
U. S. Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Dear Mr. Morgan:

COMMENTS ON THE DRAFT DOE CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

In accordance with the Federal Register notice of February 4, 1983, Virginia Electric and Power Company (Vepco) is pleased to offer the following comments on the draft Department of Energy (DOE) Contract For Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste.

Vepco endorses the comments also being submitted on March 7, 1983 by the Edison Electric Institute (EEI). In particular, Vepco strongly concurs with the following EEI comments:

1. The scope of services to be provided by DOE needs to be more clearly defined to include delivery, acceptance of title, transportation and disposal of spent nuclear fuel and/or high level radioactive waste. (Articles II and V.B.1)

2. The specific classifications for spent nuclear fuel should not be established at this time since the types and condition of fuel at the time of disposal cannot now be accurately predicted. Also, detailed inspection requirements for spent nuclear fuel should not be specified at this time, and leak testing of spent nuclear fuel is not required to determine its condition. Only two classifications of spent nuclear fuel are necessary: fuel that has to be canned and fuel that does not. (Article VI.A.4 and Appendices E and F)

3. Provisions need to be added to the contract which would allow Purchasers to exchange allocated disposal services. (Article IV.B)

4. DOE must provide nuclear hazards indemnity to Purchasers if it does not use contractors for transportation of spent nuclear fuel or operation of the disposal facility. (Article XIV)

ADM002.0516

ARC001 0571

5. DOE must provide protection for Purchasers against non-nuclear risks and should agree to indemnify Purchasers against any such liability. An appropriate contract clause is being suggested by EEI.

6. The contract needs to provide that neither DOE nor Purchasers are liable for consequential damages. An appropriate contract clause is being suggested by EEI.

Further, Vepco offers the additional comments in the Attachment hereto. These comments address specific Vepco concerns related to:

1. The extent of required DOE verification of spent nuclear fuel packaging. (Article VI.B.1)

2. The fee and payment method for in-core fuel as of April 7, 1983 and irradiated fuel in storage which will be reinserted into the core. (Article VIII.A.4)

3. Purchaser should receive credits from DOE to the extent that significant identifiable costs savings are accrued by DOE as the result of specific actions taken by Purchaser, at Purchaser's expense.

If you have any questions, please contact me at (804) 771-6775.

Very truly yours,

R. H. Leasburg
Vice President
Power Station Construction

Attachment

cc: Mr. Jeff Hill, Office of Management and Budget

ADM002.0517

ARC001 0572

ATTACHMENT

1. The requirement for DOE verification of spent nuclear fuel packaging prior to acceptance by DOE should allow for packaging well in advance of DOE acceptance. For instance, Purchaser may be using dry storage casks for interim storage of spent nuclear fuel and may be able to deliver these casks to DOE for transportation and disposal of the spent nuclear fuel. DOE and Purchaser should not be required to open storage casks to physically verify the condition of the spent nuclear fuel if they can sufficiently document that its condition is acceptable. (Article VI.B.1).

2. The fee for in-core fuel (and irradiated fuel in storage that will be reinserted into the core) should be equivalent to 1 Mill/KwHr as calculated against the actual burnup of individual assemblies as of April 7, 1983. (See the formula provided as Alternative 2 on pages 5459 and 5460 of the Federal Register dated February 4, 1983.) The total liability for this fee should then be fixed, and the provisions governing escalation and payment for this fee should be the same as those established for permanently discharged fuel. (See also EEI comments on fee escalation and payment method for fuel discharged as of April 7, 1983.) (Article VIII.A.4)

3. DOE should be permitted, at their discretion, to award credits to a Purchaser to the extent that Purchaser, at its expense, takes specific actions that provide significant identifiable cost savings to be accrued to DOE. The contract should contain a provision that permits DOE to award such credits should they elect to do so. For instance, DOE may be able to transport Purchaser's spent nuclear fuel in Purchaser's dry storage casks, thereby saving the cost of using a transportation cask. Also, Purchaser may provide DOE with consolidated spent nuclear fuel, thereby reducing the volume of Purchaser's spent nuclear fuel that DOE has to transport and dispose.

ADM002.0518

ARC001 0573

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 31st day of July, 2007, I caused to be served by facsimile and by United States mail (first-class, postage paid) "CONSOLIDATED NOTICE OF DEPOSITION PURSUANT TO RULE 30(B)(6)" addressed as follows:

Brad Fagg, Esq.
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Ave., N.W.
Washington D.C. 20004

[signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>DOMINION NUCLEAR CONNECTICUT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0083<br>(Judge Bruggink) |

AMENDED CONSOLIDATED NOTICE OF DEPOSITION PURSUANT TO RULE 30(B)(6)

Please take notice that, pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims, defendant, the United States, will take the deposition of Dominion Resources Inc. and Dominion Nuclear Connecticut ("DNC") (collectively, "plaintiffs"), or a person or persons designated by plaintiffs, upon oral examination before an officer authorized by law to administer oaths, commencing on August 29, 2007, at 1100 L Street, NW, Washington, DC, 20530, commencing at 9:00 a.m., and continuing from day to day until completed.

Pursuant to Rule 30(b)(6), plaintiffs shall designate the most knowledgeable person or persons to testify upon its behalf as to the following subject matters:

EXHIBIT
30(b)(6) 1
10-4-07

1. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, as to the rate of acceptance at which DOE was obligated to accept spent nuclear fuel and/or high-level radioactive waste pursuant to the Standard Contracts between DOE and Northeast Utilities beginning in 1998, including:

   a. the aggregate annual acceptance rate (in Metric Tons of Uranium ("MTUs")) for all Standard Contract holders, including any consideration of the "ramp-up" acceptance rates in the initial years of acceptance; and

   b. the identity of each and every analysis, study, model or other source of information upon which you rely to support plaintiffs' understanding with regard to the rate of acceptance at which DOE was obligated to accept SNF from Standard Contract holders.

2. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, with regard to the schedule of SNF and HLW acceptance which DOE was required to follow for the acceptance of plaintiffs' SNF assuming that DOE had begun performance under the Standard Contract in 1998, including:

   a. the date upon which DOE would have first accepted fuel from plaintiffs' facilities;

   b. the amounts of SNF that DOE would have removed from plaintiffs' facility (in MTUs) on an annual basis thereafter;

   c. the identity of each and every analysis, study, model, or other source of information upon which you rely to support plaintiffs' understanding with regard to this schedule.

3. Plaintiffs' understanding at the time it signed the contract, and at any subsequent point in time at which that understanding changed, as to the rate of acceptance at which DOE was obligated to accept spent nuclear fuel and/or high level radioactive waste pursuant to the Standard Contract which was "generally sufficient to eliminate expenditures and to eliminate the need to increase the capacity for [plaintiffs'] on-site spent fuel storage after January 31, 1998," and the identity of each and every analysis, study, model, or other source of information upon which you rely to support plaintiffs' understanding with regard to this obligation. Initial Disclosure of Claimed Damages, submitted October 31, 2006.

4. The identity of all documents, including documents submitted to the Federal Energy Regulatory Commission ("FERC"), the Nuclear Regulatory Commission ("NRC"), or any other Federal, state, or municipal regulatory body, other utilities, industry organizations, and research groups, that were prepared by plaintiffs or upon plaintiffs' behalf relating to

the details of all spent fuel acceptance schedules or acceptance scenarios that plaintiffs have used for any purpose and/or upon which plaintiffs have relied for any purpose, as well as each and every draft thereof.

5. Plaintiffs' understanding at the time Northeast Utilities provided comments in response to the draft Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Attachment A), of the rate and/or sequence of SNF and/or HLW acceptance that DOE was to be obligated to maintain pursuant to the Standard Contract, and the differences, if any, between that understanding and the understanding of such rate and/or sequence set forth in the Standard Contracts executed by Northeast Utilities.

6. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | (steady state rate thereafter) |

7. To the extent different than topic (6), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations:

| Year | MTU | |
|---|---|---|
| 1998 | 5.4 | |
| 1999 | 40.6 | |
| 2000 | 28.2 | |
| 2001 | 24.3 | |
| 2002 | 41.9 | |
| 2003 | 26.5 | |
| 2004 | 28.1 | |
| 2005 | 59.1 | |
| 2006 | - | |
| 2007 | 28.3 | |
| 2008 | 35.4 | |
| 2009 | 29.6 | |
| 2010 | 35.7 | |
| 2011 | 32.3 | |
| 2012 | 35.6 | |
| 2013 | - | |
| 2014 | 23.1 | |
| 2015 | 34.7 | |
| 2016 | 65.9 | (for years after 2016, assume application of 900 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

8. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | |
| 2001 | 900 | |
| 2002 | 900 | |
| 2003 | 900 | |
| 2004 | 900 | |
| 2005 | 900 | |
| 2006 | 900 | |
| 2007 | 900 | |
| 2008 | 900 | |
| 2009 | 900 | |
| 2010 | 900 | |
| 2011 | 900 | |
| 2012 | 900 | |
| 2013 | 900 | |
| 2014 | 900 | |
| 2015 | 2100 | (steady state rate thereafter) |

9. To the extent different than topic (8), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations:

| Year | MTU | |
|---|---|---|
| 1998 | 5.4 | |
| 1999 | 40.6 | |
| 2000 | 28.2 | |
| 2001 | 24.3 | |
| 2002 | 41.9 | |
| 2003 | 26.5 | |
| 2004 | 28.1 | |
| 2005 | 59.1 | |
| 2006 | - | |
| 2007 | 28.3 | |
| 2008 | 35.4 | |
| 2009 | 29.6 | |
| 2010 | 35.7 | |
| 2011 | 32.3 | |
| 2012 | 35.6 | |
| 2013 | - | |
| 2014 | 23.1 | |
| 2015 | 100.5 | |
| 2016 | 103.9 | (for years after 2016, assume application of 2100 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

10. Actions that plaintiffs would have undertaken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted spent fuel from the commercial nuclear power industry beginning on January 31, 1998, in accordance with the following schedule:

| Year | MTU | |
|---|---|---|
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 900 | |
| 2001 | 900 | |
| 2002 | 900 | |
| 2003 | 900 | |
| 2004 | 900 | |
| 2005 | 900 | |
| 2006 | 900 | |
| 2007 | 900 | |
| 2008 | 900 | |
| 2009 | 900 | |
| 2010 | 1800 | |
| 2011 | 1800 | |
| 2012 | 1800 | |
| 2013 | 1800 | |
| 2014 | 1800 | |
| 2015 | 3000 | (steady state rate thereafter) |

11. To the extent different than topic (10), actions that plaintiffs would have taken with respect to spent fuel management (and the approximate cost of such actions) to ensure the continued operation of their nuclear generation facilities had the Department of Energy accepted from plaintiffs the amounts of spent fuel set forth in the following annual allocations:

| Year | MTU |
|---|---|
| 1998 | 5.4 |
| 1999 | 40.6 |
| 2000 | 28.2 |
| 2001 | 24.3 |
| 2002 | 41.9 |
| 2003 | 26.5 |
| 2004 | 28.1 |
| 2005 | 59.1 |
| 2006 | - |
| 2007 | 28.3 |
| 2008 | 35.4 |
| 2009 | 29.6 |
| 2010 | 68.0 |
| 2011 | 35.6 |
| 2012 | 57.8 |
| 2013 | 65.9 |
| 2014 | 103.9 |
| 2015 | 71.2 |
| 2016 | 63.2 (for years after 2016, assume application of 3000 MTU annual rate to information provided by utilities in 2002 RW-859 submissions, as set forth in 2004 Annual Priority Ranking) |

12. The process employed by plaintiffs to apply indirect overhead charges to projects (for SAP or MIBS), including the accounting codes used to allocate such costs, the composition of the indirect overheads (by cost pools or otherwise), any increases or decreases to indirect overhead costs incurred as a result of the breach for which plaintiffs seek damages in this lawsuit, and the effect of staffing level changes upon indirect overhead charges.

13. The process employed by plaintiffs to staff projects identified by plaintiffs as breach-related, including the effect of the existence of such projects upon staffing at plaintiffs' sites and/or the hiring or utilization of backfill contractor labor to staff such projects, and the manner in which employees who work on such projects are compensated.

14. The manner in which plaintiffs' accounting system calculates overtime and the eligibility (by type of employee) for additional overtime compensation.

15. The costs that are reflected in plaintiffs' accounting system for labor rates, including whether labor rates are "loaded" with benefits, taxes, pension, and paid absence, and how such costs are calculated in plaintiffs' accounting system.

16. The manner in which non-productive time (time not spent on a discrete activity/project) is accounted for in plaintiffs' accounting systems, and whether any such time is allocated to projects that plaintiffs have identified as being breach-related.

17. The calculation of the allowance for funds used during construction ("AFUDC") and capitalized interest included in plaintiffs' damage claim, including the components of that calculation; any actual borrowings or increased borrowings necessitated by expenditures made by plaintiffs upon projects that plaintiffs identified as being breach-related; and the allocation of AFUDC or capitalized interest to projects that plaintiffs identified as being breach-related.

18. The scope of work and costs associated with projects included in claimed damages that were recorded in the MIBS system, including, but not limited to, (a) the scope of work and costs associated with the purchase orders and invoices put forth by plaintiffs to support the "Millstone Unit 3 Storage Pool Racks" project, M395022, (b) the budgeting process for the "Millstone Unit 3 Storage Pool Racks" project, M395022, and (c) the scope of work and costs associated with the "Inter-Unit Transfer" project, MP-091, originally recorded in the MIBS system as the "Inter-Unit Fuel Transfer" project, M295033.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

LISA L. DONAHUE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 353-9498
Fax: (202) 305-2118

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

September 12, 2007

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 12th day of September, 2007, I caused to be served by facsimile and by United States mail (first class, postage paid) "AMENDED CONSOLIDATED NOTICE OF DEPOSITION PURSUANT TO RULE 30(B)(6)" addressed as follows:

Paul Bessette, Esq.
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Ave., N.W.
Washington D.C. 20004

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC. and DOMINION NUCLEAR CONNECTICUT, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 04-0083 (Judge Bruggink) |

DECLARATION OF R. LARRY JOHNSON, CPA, IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PRE-ACQUISITION CLAIMS

I, R. LARRY JOHNSON, CPA, declare as follows:

1. My name is R. Larry Johnson, and I have been retained by the United States Department of Justice to review, analyze, and express my opinions regarding claims for damages made by Dominion Resources, Inc. and Dominion Nuclear Connecticut (collectively "Dominion") in this case.

2. On October 31, 2006, Dominion submitted its Initial Disclosure of Claimed Damages ("Initial Disclosure"), which includes all damages claimed by Dominion in this case through June 30, 2006.

3. Dominion's Initial Disclosure includes costs associated with the Millstone Power Station ("Millstone"), located in Waterford, Connecticut.

4. As this case has progressed, Dominion has made certain adjustments to some of the damages claims set forth in its Initial Disclosure, including claims associated with Millstone.

5. As I noted in my expert report in this matter, Dominion's damages claims presently include $11,769,950 for a "rack project" completed at Millstone. These costs were incurred prior to March 31, 2001.

6. As I further noted in my expert report, Dominion's claims presently include $296,661 in costs associated with an "inter-unit transfer project" that also were incurred prior to March 31, 2001.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 17, 2008, in Reston, VA.

R. Larry Johnson

R. LARRY JOHNSON, CPA
11710 Plaza America Dr.
Suite 300
Reston, VA 20190
(703) 654-1400

CERTIFICATE OF FILING

I hereby certify that on this 17th day of March 2008, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT REGARDING PRE-ACQUISITION CLAIMS" with attached "APPENDIX" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Scott Slater