Page 2618

litigation has delayed the submittal for more than a year. Since the planned submittal date, the DOE's Civilian Radioactive Waste Management Program, CRWM, has progressed and undergone various changes.

These changes range from the programmatic changes and proposals outlined in the January 1987 draft mission plan to further refinements of the program's analytical database." Then it goes on, there's a sentence starting with, "the programmatic change." Do you see that?

A. I was following you up to a point. Okay.

Q. And if you could just –

A. I see it, yes.

Q. Through 1998, if you could just read that sentence through the phrase that says, "the first quarter of 1998," could you read that into the record, please?

A. "The programmatic change that most affects the DOE's planning for the MRS facility is an extension of the date for the start of operations at the first repository. This date is extended from January 31, 1998 to 2003 to

Page 2619

allow time to carry out necessary technical program activities and to provide additional opportunity for consultation and cooperation with affected states and Indian tribes.

The revised schedule shows that the DOE expects to receive from the Nuclear Regulatory Commission a construction authorization for the repository by the first quarter of 1998."

Q. Mr. Kouts, what do these sentences that you just read into the record, what does this describe?

A. In the time frame from the point that we were ready to submit the proposal in, I believe, February of 1986, the program had come to the conclusion that we could no longer have the repository operational in 1998, and the repository was going to be delayed five years. So this essentially reflects the fact that the repository will be delayed five years from the point of operations. Nonetheless, we expected at that point to just – still to receive a construction authorization for the repository from the Nuclear Regulatory Commission by the first quarter of 1998.

Page 2620

Q. Now, the last sentence here says, "Thus, the MRS facility would be critical to DOE's ability to accept waste for disposal in 1998." What does that mean?

A. If you'll remember the previous waste acceptance schedules for the authorized system, our primary mechanism of meeting the contractual obligation was to have a repository operation. At this point in time, the Department was acknowledging the fact that the only way that we were going to be able to do that now was going to be with an MRS facility.

Q. Now, I did pass over one thing that I read. There's a reference to the top of this paragraph to litigation. What is that referring to?

A. In the first sentence, basically, that refers to the fact that the state of Tennessee essentially went to court and obtained from a district judge a temporary restraining order, which was later turned into an injunction against the Department from submitting the proposal to Congress. Subsequent to that, it took essentially a year to appeal that decision by

Page 2621

that district court through circuit court, and in the, I believe in the January time frame of 1987, the Supreme Court denied cert on the last appeal by the state of Tennessee, and therefore, the Department was allowed to submit the proposal to Congress.

Q. Now, if you turn to page 315 of the Bates number page of this document, which is also page five of the document?

A. Yes.

Q There's a paragraph starting with, "some potential adverse." Do you see that?

A Yes, I do.

Q. That paragraph in the middle of that paragraph, starting with, "to allay such concerns," do you see that?

A. Yes, I do.

Q. Would you read that into the record?

A. Okay. "To allay such concerns and to reinforce this country's unwavering commitment to the geologic repository program, the DOE proposes that the Congress link the start-up of the MRS facility to the schedule of the repository.

No waste may be accepted at the MRS

Page 2622

facility until a construction authorization for the first repository is received from the Nuclear Regulatory Commission. Furthermore, the DOE proposes that the Congress limit the MRS storage capacity to 15,000 metric tons of uranium."

Q. What does that sentence or sentences mean?

A. As we were working with the local governments within the state of Tennessee at the time where the MRS was proposed to be cited by the Department, specifically, at the former Clinch River Breeder reactor site near Oak Ridge, Tennessee, there was great concern that the MRS, if deployed, would essentially become a de facto repository if the Department was unable to implement a repository.

So in order to address those concerns, as the sentence indicates, the highlighted sentence, what the Department proposed to Congress was that we link the start-up of the MRS facility, in other words, the start of operations, to the point at which the Nuclear Regulatory Commission has authorized the construction of the repository.

Page 2623

At that point in time, the Nuclear Regulatory Commission would have reviewed all the technical information of the Departments and made a determination that, yes, this was a repository, and you can go ahead and construct it, so therefore, that would have provided a clear signal that the repository was going to be implemented.

And therefore, if the MRS was linked to that, that should allay the concerns, so that was essentially the linkage that was submitted to Congress and proposed to Congress in the proposal, as well as limiting another consideration here, was the amount of spent fuel that would be stored at the MRS and whether or not it would become all the spent fuel would go there.

Here, the Department in terms of trying the address that issue, also limited the storage capacity of the MRS to only 15,000 metric tons of uranium.

Q. Thank you. Now, Mr. Kouts, at the time that this proposal was submitted to Congress, how did OCRWM envision the way the MRS would work vis-a-vis the standard contract,

Page 2624

the obligations under the standard contract?

A. It would essentially be the primary mechanism until the repository was operational for us to accept spent fuel by 1998. It would be the only mechanism, instead of the primary.

Q. Now, Mr. Kouts, I'd like to show you what's been marked as – I'm going to show you DX-114.

MR. LO RE: This document, Your Honor, has been admitted as PX-97. May I approach, Your Honor?

THE COURT: Do you want to put DX-107 in for the ability to read?

MR. LO RE: Thank you, Your Honor.

THE COURT: DX-107 is admitted.

(Defendant Exhibit Number 107 was received in evidence.)

MR. LO RE: I will check. Counsel asked if this is PX-97.

MR. STOUCK: No, I'm sorry. I misspoke.

MR. LO RE: Oh, thank you. We're checking to see if this is in evidence.

MR. STOUCK: The amendment, I don't think so.

Page 2625

THE COURT: It's in.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. This is a document dated June 1987, entitled, "OCRWM Mission Plan Amendment." Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

A. It's a draft mission. It's, excuse me, a final mission plan amendment that was issued to essentially inform those who followed the program through to Congress, that we had adjusted our thinking, if you will, from the June 1985 mission plan, which we were talking about earlier.

So this reflected changes in the program that had occurred since the issuance of the June 1985 mission plan.

Q. And were you involved in the development of this mission plan amendment, sir?

A. The development and the review, yes.

Q. I'd like to turn to – I'll go with the top Bates numbers, 5810. It's also page six of this document, under extension of the

Page 2626

schedule for the first repository. I'd like to look at the third paragraph down, starting with, "as already mentioned."

A. Yes.

Q. Okay. And it says, "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see table one). The new schedule shows an extension of the date for waste acceptance at the first repository from 1998 to 2003(As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility)." What was your understanding of those sentences I just read?

A. Going back in the context of the program at this time, we had three repository sites that we were developing. We had requested – I believe the footnote at the

Page 2627

bottom of that page indicates 710 million dollars from the Congress We had received close to 500 million dollars due to that budget reduction and other issues that were coming to light in terms of the challenges in implementing repositories. We essentially acknowledged at this point that the repository, the first repository was not going to be operational until 2003 and, as the last sentence indicates, that we could still nonetheless begin accepting waste if we had an MRS in the system by 1998.

MR. LO RE: Your Honor, I understand that we were to quit at 5:45. I still have more on this document, in fact probably quite a bit. I can quit now or go another two minutes, whatever you prefer.

THE COURT: Why don't you take your two minutes?

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Let's look at page 11 of this exhibit, which is also Bates number 5815, and it says, "waste acceptance strategy." Do you see that?

A. Yes, I do.

Page 2628

Q. That second paragraph says, "Without approval of the MRS proposal, the five-year extension of the schedule for the first repository would require a change in the waste acceptance schedule." What does that mean?

A. It essentially means that unless we have an MRS in the system, there was going to be a five-year delay in terms of us being able to receive fuel at a repository.

Q. Let's look at one more part of this, if you were to go to page 144, and this is under the heading, "The MRS Facility." Do you see that?

A. Yes, I do.

Q. Under the second page in, which is 44, it says, "Accelerated waste acceptance from the utilities," there's a reference there to starting in 1998?

A. Yes.

Q. Could you read that into the record, please?

A. "Accelerated waste acceptance from the utilities. By starting in 1998, the MRS facility would allow the system to begin receiving spent fuel five years sooner than the

Page 2629

system described in this amendment without an MRS facility. This would significantly reduce the need for new temporary storage capacity at reactor sites and the attendant fuel handling operations, licensing efforts, and costs. It would also provide assurance that the federal waste management system will begin operations by 1998."

Q. Mr. Kouts, why was the DOE interested in providing assurance that the federal waste management system would begin operations by 1998?

A. Essentially, because the Department was very sensitive to its direction that it needed to open a facility by 1998 in compliance with the standard contract.

MR. LO RE: Thank you.

THE COURT: I'll take your motion now on putting 114 into evidence.

MR. LO RE: Thank you, Your Honor.

MR. STOUCK: Your Honor, our records do show it's the same as Plaintiff's 97, so maybe we could clear that up at the conference this afternoon.

THE COURT: That would be agreeable to

**Pacific Gas & Electric Company v. U.S No. 04-74C June 14, 2006**

**Heritage Reporting Corporation**

**Page 2633 to Page 2985**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

PACIFIC GAS & ELECTRIC :
COMPANY, No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant :

-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a m.

BEFORE THE HONORABLE EMILY C. HEWITT



APPEARANCES.

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D C 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ
HEIDE HERRMANN, ESQ
SCOTT R. DAMELIN ESQ
SHARON A SNYDER, ESQ
JOSHUA E GARDNER, ESQ.
MARIAN SULLIVAN ESQ
U S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000



APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



P R O C E E D I N G S

- - - - -

THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Mr. Lo Re to continue direct examination.

MR. LO RE: Good morning, Your Honor.

THE COURT: Good morning.

Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION(continued)

BY MR. LO RE:

Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.

MR. LO RE: Which is admitted as PX-97, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, do you have that document

Page 2637

in front of you?
A. Yes, I do.
Q. Mr. Kouts, I'd like you to turn, please, to page 60 of this document and just to refresh us after hopefully a good night's sleep, what is this document that we're looking at?
A. This was a draft mission plan amendment, excuse me, a final mission plan amendment that was issued in June of 1987, which was a document that updated the mission plan that was issued in 1985 with the latest perspective of the program as to how it was going to be implemented.
Q. And, again, why was the Department issuing this document?
A. There had been major changes in the program since the issuance of the mission plan amendment in 1985, and it was felt this was the best way to communicate those changes to the Congress and to the country, if you will, as to how the program is going to be implemented.
Q. When you say the country, did that include the standard contract holders?
A. Yes, it did.

Page 2638

Q. Mr. Kouts, could you turn your attention to page 60 that I just mentioned? This page is entitled, "Waste Acceptance Schedule, Appendix F." Do you see that?
A. Yes, I do.
Q. Now, the second paragraph, first sentence says, "Like the schedule in the 1985 mission plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system operating and waste acceptance parameters as the program progresses." Mr. Kouts, why did the Department include that language?
A. It included this language essentially to indicate to the Congress and to other parties that the Department was still trying to figure out exactly how the system was going to operate, that we understood that there were a variety of uncertainties as to how the program would be implemented and that this was our best estimate at the time, but that estimate could change.

Page 2639

Q. Now, below this, the next paragraph down, there's a paragraph starting with, "under the terms of the contract." Do you see that?
A. Yes, I do.
Q. Would you read that into the record, please?
A. "Under the terms of the contract that has been signed between the DOE and owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987.
In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings.
These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates."
Q. Now, Mr. Kouts, why did the Department include that language as you just read into the

Page 2640

record in this document?
A. The Department included this language in my view, essentially, because we were notifying contract holders and the Congress that we would essentially begin the contractual planning process, if you will, as specified in the contracts, beginning in 1991, by issuing an annual, an APR, an acceptance priority ranking and an annual capacity report from which the utilities would then provide information to us, which we would then have to evaluate and approve, which would then form a basis for a commitment for what the Department would be taking from the utility.
Q. Now, below here, excuse me, at the bottom, there is a heading that says, "F.2, key changes to the waste acceptance schedule." Do you see that?
A. Yes, I do.
Q. And then the sentence reads, "The key changes in F-1 from the corresponding table in the 1985 mission plan (table 2-3) are as follows," and then we'll flip past the actual chart, and there is a list on the next page, which is page 62, there is a number, number of

Page 2641

numbered paragraphs there.
Before we talk about those numbered paragraphs, Mr. Kouts, why was the Department making a comparison between the F-1 schedule in this mission plan amendment we're looking at and the 2-3 schedule from the 1985 mission plan that we talked about yesterday?
A. Well, essentially, there were major changes to the program at this time and that had to do with the fact that the first repository schedule had changed and that the MRS, again, was a primary, was the primary, the only mechanism that we would have to accept fuel, and we needed to reflect that in this document.
Q. And along those lines, let's just look at the first bullet there or first numbered paragraph. It says, "The acceptance of spent fuel begins at an MRS in 1998. The MRS facility is shown as starting operations in 1998 rather than 1996, consistent with the revised estimate for the start of MRS operations (linked to the receipt from the NRC, Nuclear Regulatory Commission, of a construction authorization for the first

Page 2642

repository) as described in the document."
THE COURT: Could you stop for just a second?
MR. LO RE: Certainly, Your Honor.
THE COURT: If you can inquire of this witness, if this is the right witness.
MR. LO RE: Absolutely.
THE COURT: To remind me of the statutory framework, in other words, had the linkage been created by that time in the statute, if this witness knows?
MR. LO RE: Absolutely.
THE COURT: Just so I have it in my mind.
MR. LO RE: Sure.
BY MR. LO RE:
Q. Mr. Kouts, this is a reference here to this linkage that we talked about a little bit yesterday. Can you describe for the Court what the status of that linkage was from the standpoint of Congressional action?
A. Well, as I testified yesterday, in, I believe, in February of 1987, the Department made its proposal to Congress.
THE COURT: I remember you sought this

Page 2643

authority.
THE WITNESS: And essentially, what this document does is reflect that the proposal that the Department had made to Congress regarding the statutory linkages, the Congress had not yet acted on the linkages, and essentially, the Amendments Act was not passed until later this year, later this year, so this was, again –
THE COURT: "This year," meaning '87?
THE WITNESS: '87, right.
THE COURT: Okay.
THE WITNESS: So essentially, this linkage was still a proposal by the Department to the Congress, which the Congress had not yet acted on, but the document reflected what the intent was of the Department and the Department's perspective as to what those linkages should be.
THE COURT: Thank you. I'm with you.
THE WITNESS: Okay.
BY MR. LO RE:
Q. Now, there's a reference in that first sentence that says, "Acceptance of spent fuel begins at the MRS facility in 1998." Why was

Page 2644

that important in this, context of this document?
A. Well, essentially, in the mission plan, if you might remember, when I was testifying yesterday, there was a perspective that the MRS could start as early as 1996 in operations, and consistent with the Department's perspective of the linkages between the MRS and the repository, the Department's view was that in order to satisfy stakeholder concerns in the Oak Ridge area, that we would not operate the MRS until we had received a construction authorization for the repository.
And at that point, the schedule for the construction authorization of the repository was in 1998. Therefore, we could not open the MRS until, according to the Department's perspective and proposal, until after we received that, so therefore, the acceptance date for the MRS was then moved to 1998.
Q. And what was the significance of performance at the MRS in 1998?
A. The significance was that that was the

Page 2645

only facility that the Department felt that it could have to satisfy the contracts.
Q. Mr. Kouts, this document is pretty weighty and pretty long. I would like you to turn to page 163 of this, please. I'm sorry. Before we do that, could we just look very briefly at that F-1 that we've been talking about, which is on page 61? Thank you. And this is the F-1 chart we've been talking about that's described in the pages we just read. It says, "Illustrative waste acceptance schedule." Do you see that?
A. Yes, I do.
Q. Why was this schedule included?
A. This showed essentially, based on our planning and our estimates in, in this time period, which was in, you know, June of 1987, assuming that the MRS was authorized, how the amounts that we would plan to accept the spent fuel and in relation to the repository, et cetera. It also reflected new dates for the second repository, as I remember.
Q. And, again, that illustrative language was included why?
A. Illustrative to indicate that, again,

Page 2646

this was our estimate at the time this document was issued, and given the uncertainties of the program, this could change in the future.
Q. Mr. Kouts, could you turn to page 163 of this document?
A. Okay.
Q. And it says, "Part III, comments on the draft mission plan amendment." Before we talk about these comments, do you recall that there were comments included in this document?
A. Yes, we issued the document for public comment, and this part III of the document essentially is response to comments that we had from the various parties who were interested in the program.
THE COURT: Just for reference, how was this published? Was this in the Federal Register or some other type of publication, if you know?
BY MR. LO RE:
Q. Mr. Kouts?
A. We might have put a notice in the Federal Register about the availability of the document. However, we issued the document as a DOE document and sent it out usually in a mass

Page 2647

mailing, with a letter requesting comments by a certain date.
THE COURT: Thanks.
BY MR. LO RE:
Q. And, Mr. Kouts, what did the Department do upon receipt of those comments?
A. Typically, what we do with a document like this is we go through the comments, identify each of the comments and each of the letters and then make sure we respond to each of those comments in a structured manner.
Q. Now, Mr. Kouts, I'd like to turn your attention now to page 411 of this document. Okay?
A. Yes. Thank you.
Q. Now, this is a letter dated April 3rd, 1987 from the Edison Electric Institute, Mr. Ben Rusche, director of the Office of Civilian Radioactive Waste Management. Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?
A. This is essentially comments from the Edison Electric Institute, which is a trade organization that was in town, in town at that

Page 2648

time, that represented a variety of contract holders to the Department.
Q. I'd like to turn, if you could, please, to page 414, and there's a heading there that says, "Monitored Retrievable Storage." Do you see that?
A. Yes, I do.
Q. And if you could go to the first paragraph under that heading, "DOE has a statutory"?
A. Yes.
Q. And could you read that paragraph into the record, please?
A. "Monitored retrievable storage. DOE has a statutory and contractual obligation to take spent fuel starting in January 1998. The five-year delay in first repository operation to 2003 obviously means the repository will not be available to meet this obligation. The DMPA, draft mission plan amendment, recommends handling this dilemma through use of the MRS. The MRS, if authorized by Congress, can be available to begin accepting spent fuel by 1998, if not earlier. Previously, EEI/UNWMG/NTG indicated strong support for the

Page 2649

MRS concept for numerous, and still valid, reasons. Now, the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligations."

Q. Now, Mr. Kouts, first, there's a reference there to EEI, then it's "/UNWMG/NTG." Do you know who that is or what that is?

A. Yes, they were various groups, industry related groups that were under the auspices of EEI at that time. I don't remember the exact designation or the acronyms, but that's essentially what that reflects.

Q. Thank you. Now, Mr. Kouts, how did the Department of Energy interpret that paragraph that you just read into the record?

MR. STOUCK: Objection, Your Honor, on a couple of grounds. First, there have been a number of questions about how the Department interpreted, and I don't think that's fair testimony from this witness, but more specifically, Mr. Kouts was asked how did the Department respond to these comments, and his answer was typically –

THE COURT: Hold on, please.

Page 2650

Continue.

MR. STOUCK: So the first point is if we're getting Mr. Kouts' reading of these documents, I just want the record to be clear on that, that that's all we're getting. But my second objection is Mr. Kouts was asked how did the Department respond to these comments, and his answer started with typically, typically, we respond by X, Y, Z. So I don't know that we have any indication in the record that Mr. Kouts knows anything about how the Department responded to these comments. That's my second objection.

THE COURT: I guess I don't see anything objectionable to – provided it's established that this is a percipient witness in DOE. You can certainly ask if he knows.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Mr. Kouts, do you know how DOE interpreted these comments? And I'm specifically talking about that paragraph you just read into the record.

A. The comment reflected the fact –

THE COURT: The question is, do you

Page 2651

know, and that's yes or no.

THE WITNESS: Yes.

THE COURT: That's the question.

MR. LO RE: And how would – I'm sorry, Your Honor.

THE COURT: That's a question, just to establish that this is a matter within your knowledge and that was what the objection was about, so that's an important question to answer. You may continue.

THE WITNESS: Thank you. The Department agreed with this comment.

BY MR. LO RE:

Q. How did you interpret – how did the Department interpret what DOE was – what EEI was saying in this comment?

A. The Department interpreted this comment that the MRS was going to be the only feasible way that DOE can meet its 1998 statutory and contractual obligation, and the Department agreed with that.

Q. Now, Mr. Kouts, the next paragraph down starts with, "one aspect." It says, "One aspect of DOE's MRS strategy is that" – I'll start again.

Page 2652

"One aspect of DOE's MRS strategy that EEI/UNWMG/NTG cannot agree with is the so-called linkage between an MRS operation and receipt of the NRC construction authorization for the first repository." Do you see that?

A. Yes, I do.

Q. Now, what was your understanding of what EEI was getting at in this comment?

A. I believe the industry was concerned that linking the MRS to the repository and especially construction authorization of the repository in 1998 was, in their mind, an inappropriate thing to do because their perspective was that the first repository would be delayed beyond 1998 for a construction authorization.

And therefore, they were concerned that an MRS then could not operate, and therefore, we could not meet our contractual obligations in 1998.

Q. The paragraph below starts on that page and rolls over to the next page. It says, the very last sentence says, "Spent fuel storage and disposal cannot be left for the last minute." It goes on to say, "Utilities

Page 2653

need to plan years in advance, since the linkage concept advanced by DOE could well leave open to doubt DOE's ability to receive spent fuel by the 1998 deadline. Utilities would be forced to assume that the MRS would not be available to take deliveries of spent fuel starting in January 1998 and that DOE would therefore be likely to breach its commitment to take delivery of spent fuel starting in January 1998." Do you see that?

A. Yes, I do.

Q. How did the DOE interpret what EEI was saying in that phrase?

A. The planning basis for utilities to plan for spent fuel storage on-site essentially has a long lead time, and without more certainty in the availability of the MRS, in a sense that being linked to the repository that potentially could be delayed, this would force the utilities to make decisions in anticipation of the fact that DOE may not have that MRS available.

And essentially, this comment was putting the Department on notice that the

Page 2654

utilities would have to make their own decisions based on their view on whether or not the MRS is likely to be there, which they're indicating here, if it is tied to the repository, in their view, it would not be.

Q. Mr. Kouts, how do you view the importance of planning for utilities with respect to the acceptance of spent nuclear fuel?

A. I think it's important for them to plan, but my own view is that they have to make their own decisions in terms of what they need to do on their sites. The Department is not involved in that, and that's totally a utility decision.

Q. Now, Mr. Kouts, the bottom of this paragraph, the last sentence reads, "In revising the DMPA for formal submission to Congress, DOE, to demonstrate its commitment to the 1998 date, should delete the linkage between MRS start-up and first repository construction authorization." How did DOE interpret what EEI was saying in that comment?

A. Well, again, this gets to the point that there was concern from EEI that the

Page 2655

linkage would essentially delay MRS start-up, and there comment was that the Department should delete the linkage and not pursue the linkage between MRS start-up and first repository construction authorization.

Q. Now, subsequent to this, what actions, if any, did DOE take with respect to the schedule linkage between the repository and the MRS?

A. The Department did not change its view on the linkage of the MRS to the repository.

Q. Did the Department ever take any action to address that linkage after the statute was passed, the amendments to the Nuclear Waste Policy Act was passed?

A. Yes, it did. In relation to – this gets into another evolution of the program. However, after the Amendments Act was passed, the Amendments Act did a variety of things. It essentially authorized an MRS facility, but it put a variety of linkages in-between the MRS and the repository.

And I can go through those, if you want, but effectively, it set up the office of the Nuclear Waste Negotiator to help the

Page 2656

Department find a site for an MRS or a repository. And basically, in the next several years, the Department took the strategy that we would use the Nuclear Waste Negotiator to help us find a site.

And if we found the site and a willing host and an agreement was reached between the Nuclear Waste Negotiator and that host, which would have to be approved by Congress, that part of that agreement would be to address the linkages and to change the linkages between the MRS and the repository.

So that was a strategy that the Department took subsequent to this document, in terms of how we were going to address those linkages.

Q. Now, we've talked about the linkages – or strike that.

We've talked about the schedule linkage between the MRS and the repository. You also talked yesterday about the capacity limit. Do you recall in this document that we're looking at the EEI comments, that EEI commented on the capacity limit that DOE was proposing for the MRS?

Page 2657

A. I don't believe they addressed that issue in this comment.

Q. Now, Mr. Kouts, I'd like to turn two pages forward in this same EEI comment that we're looking at, to the paragraph that says, "spent fuel acceptance rate."

MR. STOUCK: I'm sorry. What page are we on?

MR. LO RE: Page 417.

BY MR. LO RE:

Q. Do you see that, sir?

A. Yes, I do.

Q. This starts with, "A significant change between the mission plan and the DMPA occurs in the magnitude, time of, and the rate at which DOE will accept spent fuel," then it goes on. The last sentence or three-quarters of the way down starts with, "the much lower rate."

A. Yes.

Q. Do you see that? "The much lower rate," why don't you read from where it says, "the much lower rate," into the record?

A. All right. "The much lower acceptance rate now proposed will require greater

Page 2658

at-reactor inventories and will adversely impact the ability to dispose of spent fuel from reactors being decommissioned. DOE should ensure that the repository and MRS receiving rates are set such that the original mission plan acceptance rate is retained."

Q. Now, Mr. Kouts, how did the Department of Energy interpret what EEI was saying in these several sentences that we just read?

A. Essentially, that from the comment that EEI liked the higher acceptance rates that we issued in the mission plan a few years earlier a lot better than the ones we were projecting at this point.

Q. Now, you talked a little bit with Judge Hewitt about this. After the issuance of this document, the mission plan amendment with comments, what happened with respect to the MRS and the overall program?

A. Well, after this document was issued and later that year, Congress passed the amendments to the Nuclear Waste Policy Act and, at that point in time, restructured the program substantially, where we were carrying three repository sites for characterization and for

Page 2659

ultimate determination as to whether or not they would be selected.

Congress directed us to focus only on Yucca Mountain as the repository for characterization, the repository site for characterization. As I testified earlier, also, Congress annulled and voided the siting of the MRS facility that the Department had proposed. Nonetheless, it authorized an MRS facility with various linkages over and above what the Department had originally intended.

In addition to that, it created the office of Nuclear Waste Negotiator, as I testified earlier, which was an office intended to assist the Department in finding sites, since the Department was unsuccessful at finding a site for Congress.

It also set up the Nuclear Waste Review Board, which was a review body that still exists today that reviews the technical work of the Department across the board in this program. And essentially, that's kind of the highlights of what the Amendments Act did.

Q. Thank you. You mentioned that there were linkages over and above what DOE had

Page 2660

requested. Could you describe those, please?

A. Yes. Those linkages indicated that the Department could not site an MRS facility until a repository site was recommended to the President and approved. We could not build the MRS facility until the repository had received a construction authorization from the Nuclear Regulatory Commission.

We could not receive more than 10,000 tons of spent fuel from utilities until a repository was operational in and of itself and no more than 15,000 tons total, and the Department was directed that we could not site an MRS facility within the state of Nevada.

Q. Now, Mr. Kouts, let's look at DX-142, please.

MR. LO RE: May I approach, Your Honor?

THE COURT. Yes.

BY MR. LO RE:

Q. Now, Mr. Kouts, it's a little tough to read this on the screen, but this says, "Report to Congress on assessment of Civilian Radioactive Waste Management Program, November 1989." Mr. Kouts, are you familiar with this

Page 2661

document, sir?
A. Yes, I am.
Q. What is it?
MR. STOUCK: This also has been entered as a PX. Sorry to interrupt.
THE COURT: And what number is that?
MR. STOUCK: 125, Your Honor.
THE COURT: Thank you.
MR. LO RE: Thank you.
BY MR. LO RE.
Q. Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?
A. This was a report issued by the Department that reflected the review of Secretary Watkins, James Watkins, who was Secretary at that time of the program and the strategies that the Department was going to implement in relation to this program based on the Amendments Act and other issues.
Q. Were you involved in the development of this document?
A. Yes, I was.
Q. Mr. Kouts, I'd like to turn your

Page 2662

attention to the executive summary of this document, which is at VII, do you see that?
A. Yes, I do.
Q. And if you go down to the fourth paragraph down, starting with, "several months ago"?
A. Yes.
Q. There's a reference to a new schedule, and it says, "This schedule shows a significant slip for the expected start of repository operations from the year 2003 to approximately 2010." Do you see that?
A. Yes, I did.
Q. Why was that language included?
A. Based on the Secretary's review of the program, his view of it and the program's view was the availability of the repository in 2003 was no longer viable and that the new schedule estimate for the opening of the first repository was at that point 2010.
Q. Now, did this change in the schedule of the repository from 2003 to 2010 have any impact on the way DOE planned to commence operations using the MRS?
A. Yes, this did have an impact. The

Page 2663

Department's strategy, if you may remember, the Department's strategy was to link the start-up of the MRS to the construction authorization of the repository, and the assumption was that the construction authorization would be available in 1998 to support a 2003 operation of the repository, a five-year construction period. What you see here is that the – now, the viability of – the Department did not think it was still viable to get a construction authorization in 1998, and that was going to take several more years of time. As a result, the linkages to the MRS needed to be addressed and removed, if you will, if the Department was going to have an MRS facility available in 1998.
Q. How did the Department plan to remove those linkages?
A. As I testified earlier, this document will reflect the strategy of the Department to utilize the Nuclear Waste Negotiator to help find a site, a willing host state, if you will, and a site, and part of the agreement, the benefits agreement associated for that state would address the linkages and remove the

Page 2664

linkages so an MRS facility could be operational in 1998 timeframe.
Q. Okay.
THE COURT: Let me just ask you a question. Your testimony a couple of answers back is the Department did not think it was still viable to get a construction authorization in 1998 and that was going to take several more years of time. Okay. Now, looking at the document, this schedule shows a significant slip for the expected start. Is the several years of time the significant slip, which is seven years?
THE WITNESS: Yes.
THE COURT: Thank you.
BY MR. LO RE:
Q. And just so the record is clear, and I think you said this, the construction authorization we're talking about here is for the repository, is that right?
A. First repository, yes.
THE COURT: Which let me just slow down here a second, was the link to when you could build the MRS.?
THE WITNESS: Right.

Page 2665

THE COURT: You couldn't build the MRS until – you could site the MRS when the repository site was recommended, but you couldn't build it?
THE WITNESS. We could not, well, we could not construct it until we received the construction authorization for the repository. We could not site it until the repository was sited, and we could not operate it. We could go ahead and license it, I believe, under the Act.
We could not construct it, however, and basically, we could construct it after a repository received a construction authorization.
THE COURT: Thank you.
BY MR. LO RE:
Q. Now, if you could proceed to IX of this document, and the bottom heading says, "Monitored retrievable storage system."
A. Yes.
Q. And then there's a long paragraph that starts with, "linkages to repository," and then rolls over to the next page, and it says, "Furthermore, the current linkages between the

Page 2666

repository and the MRS program make it impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository.
Therefore, the DOE plans to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel. The DOE believes that if the linkages are modified, it is likely that waste acceptance in an MRS facility can begin by 1998 or soon thereafter."
What was the sentiment that was being set forth there, sir?
A. Essentially, that the Department still wanted to meet its 1998 obligation or direction under the Act and obligation under the contracts to begin accepting in 1998. The MRS facility was the only mechanism to do that. With the existing linkages, that would not be possible.
Therefore, the Department was signaling here that it intended to work with Congress to modify those linkages so we could still meet our obligation in 1998.

Page 2667

Q. And one more reference in that vein, if you could turn to page 11?
A. Yes.
Q. And under the heading, "Schedule for the MRS facility," it says, "As indicated in figure 1, the reference schedule for the MRS facility assumes that (1) a site will be obtained through the efforts of the Nuclear Waste Negotiator, and (2) the statutory linkages specified in the Nuclear Waste Policy Amendments Act between the MRS facility and the repository (see Section 4) are modified.
Under these assumptions, it is estimated that waste acceptance at an MRS site could begin on a limited basis as early as January 1998." Do you see that?
A. Yes, I do.
Q. And, again, just to close the loop on this, what was DOE signaling in this statement?
A. Essentially, we were going to work through the office of the Nuclear Waste Negotiator to attempt to find an MRS site and that we needed the statutory linkages changed in order to have an MRS facility operational in January 1998.

Page 2668

Q. And then I said that was the last one, but I'm going to ask you one more on this. If you just turn to the next page?
A. Sure.
Q. There's a heading 2.8 that says, "Nuclear Waste Negotiator." Would you read that into the record, please?
A. "2.8, Nuclear Waste Negotiator. The Secretary is working in close cooperation with the White House to facilitate the appointment of the Nuclear Waste Negotiator, as provided for in the Amendments Act. The negotiator is expected to provide valuable assistance in siting the MRS facility and facilitating the repository program."
Q. And does that comport with your understanding as how DOE viewed the Nuclear Waste Negotiator as of this time?
THE COURT: Is that a Presidential appointment?
THE WITNESS: Yes, it is.
THE COURT: I'm referring to the Nuclear Waste Negotiator.
THE WITNESS: Yes, it was.
BY MR. LO RE:

Page 2669

Q. Mr. Kouts, what happened with respect to the Nuclear Waste Negotiator after the issuance of the document we just looked at, which is admitted as PX-125?

A. The Nuclear Waste Negotiator was recommended, Mr. David Leroy, I believe, was the first one, and the White House recommended his name, and subsequently, he was approved by the Senate, and he became a Nuclear Waste Negotiator. And that office began embarking on trying to find an MRS site and also trying to work with the state of Nevada to develop a consultation agreement, as required by the Act, with that state.

Q. Now, let's look at another document. This is DX-183.

MR. LO RE: And, again, Your Honor, since Mr. Stouck represented that the document we just looked at was PX-125, we will not move DX-183 into evidence – excuse me, DX-142 into evidence. If I may approach, Your Honor?

THE COURT: Yes. Does the Plaintiff's table know whether this came in as a PX?

MR. STOUCK: Your Honor, I believe it did, although we should check this at a break

Page 2670

because the cover looks different to me, even though the title is the same.

THE COURT: For the moment, we're looking at DX-183.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. This is a document, Mr. Kouts, entitled, "Draft Mission Plan Amendment," dated September 1991. Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it?

A. It's a mission plan amendment that was issued in draft in September of 1991. Again, the concept is to indicate to the Congress and other parties as to what the intent of the Department was at that point in implementing the program.

Q. Were you involved in the development of this document?

A. Yes, I was.

Q. There's a letter here signed by Mr. Bartlett. It's on the second page of this document, starting at the Bates number 4975, do you see that?

Page 2671

A. Yes, I do.

Q. Now, the first paragraph of this letter, second sentence says, "The report," a reference to the report to Congress, it says, "The report established an action plan that included initiatives to provide waste acceptance in 1998 at a facility for monitored retrievable storage and waste disposal, starting in 2010 in a geologic repository. This report stated that further details on the Secretary's action plan would be provided in a revised mission plan." Do you see that?

A. Revised mission plan, yes.

Q. Excuse me, revised mission plan. Why were you including that language there?

A. To show the connection between the Secretary of Energy's report, which we talked about earlier, to this draft mission plan amendment.

Q. Now, if you turn to – it's marked, as I believe, page 18 of the document. It's also, 5001 is the end Bates number in this document – on this page, rather.

THE COURT: If the Plaintiff's table

Page 2672

happens to find out there was a cross-reference, pop up with it.

MR. STOUCK: Yes, Your Honor. The cover is the same. It's PX-155.

MR. LO RE: Thank you, counsel.

THE COURT: Thank you.

BY MR. LO RE:

Q. Okay. Mr. Kouts, there is a heading here a third of the way down the paragraph. It says, "Strategy for the MRS facility." Do you see that?

A. Yes, I do.

Q. Could you read that first paragraph into the record, please?

A. "To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the national energy strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Act amendments of 1987 (Amendments Act). This could also be achieved by Congressional enactment of a negotiated siting

Page 2673

agreement reached through the efforts of the Nuclear Waste Negotiator."

Q. Now, I'd like to talk about those two concepts introduced. First is the legislative package. What does that mean?

A. That was a legislative package that was a comprehensive package to address energy issues at that time that was being proposed by that administration, and the other option here was to also receive Congressional enactment of a negotiated siting agreement and address the linkages in that manner.

Q. And this was the Bush administration, Bush 41, is that right?

A. I believe so, yes.

Q. Now, the next concept is the Congressional engagement of a negotiated siting agreement. What does that mean?

A. I referred to this earlier. The concept was that the Nuclear Waste Negotiator would find a willing host state and develop a negotiated siting agreement, which essentially was the package of benefits that the host state would receive, and part of that had to be ratified by Congress.

Page 2674

Part of that package would address the linkages to allow the MRS to operate in the 1998 timeframe.

Q. Now, if you could turn to page 205 of this document, which is also the Bates number ending in 5176, and there's a heading here at the bottom of the page saying, "Waste Acceptance Schedule." Do you see that?

A. Yes, I do.

Q. And it says, "Table B-3 presents a preliminary schedule for waste acceptance by the waste management system. The schedule shows the MRS facility starting to accept spent fuel in 1998 and is based on the statutory limits on MRS capacity (10,000 MTU before the start of operations at the repository and 15,000 MTU thereafter). The first 10 years of the waste acceptance schedule (1998-2007) correspond to the lower bound schedule published in the annual capacity report." Mr. Kouts, there are limits, there's a reference to statutory limits. Could you describe exactly what those limits are at this point in time, which is September of 1991?

Page 2675

A. Yes. Well, those limits still exist today. The limits as put in by the Nuclear Waste Policy Act amendments are that you could receive no more than 10,000 metric tons of spent nuclear fuel from utilities until the repository was operational, so this was between the period of time that the construction authorization was issued for the repository and up until the point that the repository was operational.

THE COURT: And then there was a limit thereafter of the total amount of 15,000?

THE WITNESS: That's correct.

BY MR. LO RE:

Q. Let's look at the schedule, which is 205. And before we talk about the schedule specifically, does the schedule make any assumptions with respect to the schedule linkages that we've been talking about between the MRS and the repository?

A. Yes. It makes the assumption that the linkage on the construction authorization for the repository is removed by legislation or some mechanism, like approval of a negotiated agreement with the negotiator, so therefore,

Page 2676

the repository could operate -- excuse me, the MRS could operate starting in 1998 and receive spent fuel up to the 10,000-ton limit, which the repository would then be operational in 2002.

Q. Now, Mr. Kouts, if we look at B-3, on the column that says, "MRS facility," you'll see a series of acceptance rates there. What were those acceptance rates based on? And I'm looking specifically at the column that says, "Spent fuel received under MRS facility."

A. Those acceptance rates were based on a slow steady ramp-up to a steady state acceptance rate of 875 metric tons, and as you can see from the chart, the total amount would not have exceeded 10,000 metric tons until the repository was operational at that point projected in 2010.

Q. Now, there is a, on that previous page that we looked at a moment ago that refers to the chart we're looking at, there's a reference to the first 10 years of waste acceptance schedule that were published in the ACR report. Why is it only the first 10 years that were published in the ACR report, if you know?

Page 2677

A. That essentially was to provide a 10-year planning basis. I believe the amounts may have gone beyond that, but we were effectively looking for – we were signaling this is what our first 10 years would look like in the operation of the system.

Q. Now, speaking of the –

THE COURT: Signaling to whom?

THE WITNESS: Essentially, the Congress and other, and that report was specifically informed – to inform contract holders at that point.

BY MR. LO RE:

Q. Thank you. Now, subsequent to this, after September of 1991, did DOE issue an annual capacity report or ACR?

A. Yes, it did.

Q. Let's take a look at that.

MR. LO RE: May I approach, Your Honor?

THE COURT: Certainly.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Mr. Kouts, you have in front of you what's been marked as, it's DX-187.

Page 2678

MR. LO RE. However, I understand that this document, Your Honor, has been admitted as PX-158.

THE COURT: Thank you. That's what we'll be looking at, at the bench.

BY MR. LO RE:

Q. Now, Mr. Kouts this document is entitled, "Annual Capacity Report, December 1991." Are you familiar with this document, sir?

A. Yes, I am.

Q. And what is it?

A. It's a contractual related document where we are signaling to the industry and to contract holders, if you will, providing them the Department's perspective of what the annual capacity of acceptance would be for the first 10 years of operation of the system, which at this point was projected to be 1998 with an MRS facility.

Q. Now, in the context of the standard contract, is there any significance attached to the 1991 ACR?

A. Yes, there is. There's a time period identified in the contract where the Department

Page 2679

is to provide this, and I believe it's some 63 months in advance of the year of projected waste acceptance and that this report was intended to provide information to the contract holders so they could develop delivery commitment schedules in terms of what waste they were planning on providing to the Department in the first year of operations.

THE COURT: By 63 months in advance, is that 63 months in advance of the year of pickup?

THE WITNESS: Of 1998, that's correct.

BY MR. LO RE:

Q. Now, Mr. Kouts, were you involved in the development of this document?

A. I was aware of it, but, no, I was not involved in the development of it.

Q. Mr. Kouts, when you say you were aware of it, why did you become aware of it?

A. Well, this, typically, any document that went through and was issued by the Department had to be reviewed by various areas of the program, so although I was not working in the waste acceptance area at this point, I did review this document as part of my other

Page 2680

responsibilities that I had at the time.

Q. Now, if you turn to V of this document, under summary, the first paragraph, second to last sentence, it says, "The 1991 ACR applies the waste acceptance rates in table 2-1 to the 1991 APR, resulting in individual purchaser allocations." Then it says, "These allocations are listed in Appendix A and summarized in table 3-1." Can you describe for the Court, Mr. Kouts, your understanding of the interplay between the 1991 ACR and the 1991 APR?

A. Yes, I believe it was table 3-1, not table 3-2.

Q. Thank you.

A. Essentially, the interplay is that the acceptance priority ranking is a listing essentially of the fuel that – the time at which fuel was discharged from a reactor for the various contract holders, so if you look at that list and the amount of fuel that was discharged at that point.

So essentially, to determine who would receive an allocation in the first year of operation, you would go down the list of the

Page 2681

acceptance priority ranking for the first 400 tons and identify those contract holders who had allocations available in that specific year.

Q. And do you know how that analysis that you just performed interacts with the DCS or delivery commitment schedule process?

A. Yes, each of the contract holders who has an allocation then is to provide a schedule, if you will, as to when they could accept that, when they could provide that fuel to the Department for acceptance purposes and for what reactor they would take it.

Q. Now, Mr. Kouts, just below there, just below that sentence we just read, there's a paragraph that starts with, "the projected waste acceptance rates."

A. Yes.

Q. It says, "The projected waste acceptance rates for SNF presented in table 2-1 assume: A site for a monitored retrievable storage (MRS) facility will be obtained, and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in

Page 2682

the Nuclear Waste Policy Act of 1982 as amended (NWPA) will be modified." Do you see that?

A. Yes, I do.

Q. And what was your understanding of what was being set forth in that sentence?

A. That this document and the planning process was making the assumption that we would have an MRS available in 1998, and therefore, the statutory schedule linkages would be removed, so we could operate that facility and have it available in that timeframe.

Q. Now, Mr. Kouts, if you turn to page four of this document? There's a heading, 2.0, which is, "Waste Acceptance Reprojections," and then there's a paragraph in the middle of the page that says, "the acceptance rates in table 2-1." Do you see that.

A. Yes.

Q. And there's a reference there to some of the things we talked about a minute ago just now, and then there's a sentence that starts with, "if," do you see that, "if the"?

A. Yes.

Q. Would you read that sentence into the record, please?

Page 2683

A. "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of spent nuclear fuel by DOE could not start until at least 2007."

Q. Now, what, if anything, is the significance with respect to the MRS program to that sentence?

A. This provided the perspective of the Department at that time that if the linkages were not removed, then essentially, we could not operate the MRS facility to accept materials until 2007 because, at that point, that was the projected date where we anticipated receiving the repository construction authorization from the Nuclear Regulatory Commission.

Q. Let's take a look at that table 2-1 we've been talking about, and that's on the next page, which is page five, table 2-1, "Projected waste acceptance rate for spent nuclear fuel." Mr. Kouts, do you know how these rates were derived?

Page 2684

A. Yes, I do.

Q. And how is that?

A. These were derived on the basis that, assuming the linkages were removed and we had an operation on an MRS facility, that we would ramp-up to a steady state of 900 metric tons in a period of about two to three years, and that maximum amount would be 900 metric tons that we would receive in any one year. And the reason for that was that if you project this out, we would therefore not exceed the 10,000 metric ton limit that was contained in the conditions under which an MRS could operate as imposed by the Nuclear Waste Policy Act Amendments.

Q. Now, if you turn to page seven –

THE COURT: Before you go, could you go back to the sheet? Assuming a 2007 construction authorization for a repository, could you have accepted more and stayed within the Nuclear Waste Policy Act Amendments?

THE WITNESS: Assuming that we were – I just want to make sure I understand the question.

THE COURT: Assuming you're good to go

Page 2685

with the repository construction authorization in 2007, could you have added up to 1,800 MTUs in compliance with the then, the linkage scheme that was then in the statutes?

THE WITNESS: We could certainly go beyond up to the point of repository operations, up to the 10,000 metric ton limit.

THE COURT: Right.

THE WITNESS: Yes, we could do that.

THE COURT: I'm just trying to make sure I understand the way the statute worked in your view.

THE WITNESS: Right. This document was just giving a projection of the first 10 years of operation

THE COURT: Right.

THE WITNESS: And the intent of the Department would be if the repository had been available in 2010, that we would receive, again, 900 metric tons in 2008, 900 metric tons in 2009, and that would bring us essentially to the 10,000 metric ton limits.

THE COURT: Then things could go to the repository?

THE WITNESS: Right, or we could

Page 2686

accept up to 15,000 tons.

THE COURT: Then they could receive up to 15,000 metric tons if the repository were also then opened?

THE WITNESS: That's right. And the repository would also then be accepting fuel for disposal purposes, so we would have two facilities receiving fuel at that point.

THE COURT: Thank you. Thank you.

BY MR. LO RE:

Q. Now, Mr. Kouts, if you could turn to page seven of this document, this is the title, 3.2, entitled, "Delivery Commitment Schedules," which you mentioned a moment ago. The first sentence there says, "The standard contract provides that beginning January 1, 1992, purchasers shall submit to DOE DCSes that identify all SNF the purchasers plan to deliver to DOE beginning 63 months thereafter." I believe that you referenced that 63 months. What is the significance of that, in your mind?

A. That time period is specified in the standard contract.

Q. Now, with respect, after the issuance

Page 2687

of this ACR, do you know whether or not DCSes were actually submitted by the utilities?

A. Yes, they were.

Q. And do you know whether DOE took any actions on those DCSes?

A. I believe we had approved some of them, but I'm not intimately familiar with that. I did not follow.

Q. Thank you. Now, after the issuance, subsequent to the issuance of the 1991 ACR, can you tell us what happened with respect to the Waste Negotiator and the attempts to break the linkages?

A. I'll try to be brief and just summarize essentially the history of the Nuclear Waste Negotiator. The Negotiator went out and tried to solicit interest for an MRS facility and also interacted with the state of Nevada to try to develop a consultation and cooperation agreement as required by the Act. The Negotiator identified a variety of Indian tribes that were interested and had some state interest, but ultimately, the Negotiator – and several grants were issued, feasibility grants to study the feasibility of

Page 2688

siting an MRS in a specific Indian reservation or state, and several grants, several follow-on grants were issued.

But ultimately, the Negotiator was unsuccessful in finding a host site for the MRS facility.

THE COURT: Counsel, could I go back a screen, at least to the waste, to page four of the document? That's it, and I want to draw the witness' attention to the first sentence in the second paragraph. The sentence makes an assumption that there was a 10,000 MTU storage limit.

THE WITNESS: That's correct.

THE COURT: But it also makes an assumption that the linkages had been broken apart to some degree.

THE WITNESS: Right.

THE COURT: Tell me how the Department decided to choose one, to retain one piece of the '87 amendments, but not the other.

THE WITNESS: This goes along with the historical perspective of the Department, that whenever you site an MRS facility, you don't want to leave the impression with that host

Page 2689

state that this is going to be a de facto repository, that you're going to limit the amount of materials that that facility accepts until the repository is in operation.

And essentially, the Department's view was that the 10,000 limit, until the repository was operational, was a reasonable one, and the 15,000-ton cap total was also a reasonable one, which is why we essentially wanted to hold on to those and only change the linkage between the repository construction authorization and the MRS.

THE COURT: Thank you for going back over that with me.

THE WITNESS: Okay.

BY MR. LO RE:

Q. Thank you. Mr. Kouts, I'd like to look at another document now. DX-308.

MR. STOUCK: DX-308?

MR. LO RE: Yes.

MR. STOUCK: Is this 2004?

MR. LO RE: No, this is '94.

MR. STOUCK: Could I get a copy? Thank you.

BY MR. LO RE:

Page 2690

Q. Mr. Kouts, I've just handed you apparently an excerpt of DX-308. We have a full copy, if you'd like to look at it, but apparently, for brevity, we just have the excerpt here. This is a document that says –

THE COURT: We also need a copy at the bench. Our book goes from 307 to 311.

MR. LO RE: Oh, certainly, Your Honor.

THE COURT: It's interesting, 307 also appears to be March 1995. It doesn't have that little Post-It.

MR. STOUCK: It's PX-221, Your Honor.

THE COURT: This is also PX-221, is that –

MR. STOUCK: It's not in evidence.

THE COURT: Okay. PX-221, whatever comes up first is fine.

MR. LO RE: Your Honor, if I may make a suggestion?

THE COURT: Yes.

MR. LO RE: Since these are duplicates, what I suggest is that we work with DX-307.

THE COURT: We're with you.

MR. LO RE: And then we'll move

Page 2691

that –

THE COURT: The witness has the right thing, that's not a problem, it's the same document.

MR. LO RE: I have in my hand a full copy of DX-307 that I would like to provide to the witness, in case we need to go outside the excerpts that I provided, and then we will just work with that.

MR. STOUCK: 307.

MR. LO RE: 307, thank you, Your Honor.

BY MR. LO RE:

Q. Now, Mr. Kouts, the document in front of you, DX-307, is a document entitled, "Acceptance Priority Ranking and Annual Capacity Report," with a date of March 1995. Are you familiar with this document, sir?

A. Yes, I am.

Q. And what is your familiarity with it, the basis of your familiarity?

A. I reviewed this document before it was issued – I reviewed this document prior to the time it was issued.

Q. The document was issued in March of

Page 2692

1995. Do you know what the date of the data upon which this document is based, when that is from?

A. That would have been based on the previous year's data in 1994, I believe.

Q. Now, if you would turn to page three of this document, under heading 1.2, "Basis For the Annual Capacity Report"?

A. Yes.

Q. The second sentence starts, "in the previous ACR." Do you see that?

A. Yes, I do.

Q. It says, "In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored retrievable storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system, rather," turn to the next page, "than by specific calendar years." Do you see that?

A. Yes, I do.

Page 2693

Q. Why did the Department include that language?

A. At this point in time, the Department had come to the conclusion that it was infeasible to have an MRS facility available over the 1998 timeframe, and that although it still was going to pursue it, it was unclear at this point when that could be implemented. And therefore, you're seeing projected rates without an initial date of operation of the facility.

Q. Now, when you say, "infeasible to have the MRS facility available" in '98, what was your understanding as to the chances that an MRS would be available in '98?

A. We did not have a site, we did not have the hope of a site in the near future. The Nuclear Waste Negotiator, I believe his office had sunsetted, I believe, at seven years. It ended somewhere around this timeframe or slightly before. And there were, at that point, no prospects for having an MRS site or implementing it and all the things that we needed to do in order to have that site

Page 2694

available and facility available in the 1998 timeframe.

Q. Now, the next page is table 1. The rates of acceptance here are the same that we saw in the 1991 ACR, is that right?

A. That's correct.

Q. And why did the Department include those rates?

A. It was, again, consistent with the Department's view that if we did receive authorization for an MRS facility or received the site, if you will, since the facility was already authorized, that we would still follow the 10,000 metric ton limitation up until the point of repository operations. So if it was slipping a little bit, we would still nonetheless try to keep to those same acceptance rates that we had projected earlier.

Q. Now, Mr. Kouts, did there come a time that DOE changed its assumption from beginning operation with an MRS to beginning operation with a repository?

A. In the 1995 timeframe, we were coming to the conclusion that for a variety of

Page 2695

reasons, that it was unlikely that we were going to obtain an MRS site, given our experience in identifying a volunteer site, et cetera, and that we were beginning to focus all our efforts on just trying to implement the repository without trying, again, to have an MRS facility in the system. So slowly, the strategy of the program was changing at this point. I wouldn't say slowly, but we were coming to the conclusion that it probably wasn't going to happen.

Q. And when you made that conclusion that it probably wasn't going to happen, what happened to the programmatic assumptions?

A. Well, therefore, the initial year of waste acceptance would have been 2010, which was our projected date at that time for the operation of the first repository.

Q. And beginning in 2010, just to close the loop on this, what would be the facility that would be operating?

A. It would be the first repository, and at that point, the only repository site we had was Yucca Mountain, and it exists today, the same one.

Page 2696

THE COURT: Does DOE have any official position today on when a repository will open? And if it doesn't have an official position, does it have an unofficial position?

THE WITNESS: I think the best way for me to answer that is that the Secretary of Energy testified, as well as the Deputy Secretary earlier this year, that we would have a schedule for the license application for the repository this summer. And that schedule will, again, identify the date which we intend to submit a license application. What the Secretary has testified in the past, that until we have funding reform for the program, funding reform, in other words, a clear mechanism such that the program is going to receive the monetary resources that it needs in order to implement it and, in addition, until we get a final EPA standard, which was remanded by the Courts in the 2002 – the 2004 timeframe, until we had those two items, he was unwilling to commit to providing a schedule for operation of the repository.

THE COURT: Who has to provide the final standard?

Page 2697

THE WITNESS: The Environmental Protection Agency. There is a proposed rule that was issued last year. Essentially, the – just to explain to the Court what I'm referring to is that the – the Environmental Protection Agency came out with a final rule on a standard for Yucca Mountain based on the recommendations of the National Academy of Sciences back in the 2002 timeframe.

There were various challenges to that standard, and in 2004, Circuit Court here in the District of Columbia remanded the 10,000-year portion of the standard, meaning that the – again, to explain perhaps more than the Court would like, the National Academy of Sciences had essentially indicated in their report that was commissioned by Congress, essentially in the 1992 Energy Policy Act, that you could potentially set a standard for Yucca Mountain to protect the health and safety up to a million years, a million years in the future.

When the EPA issued its standard in 2002, its standard was only for a 10,000-year period into the future, a health and safety standard, if you will.

Page 2698

THE COURT: Right.

THE WITNESS: The Court looked at the EPA standard and felt that it was not based upon and consistent with, as the Act required, with the National Academy of Sciences' recommendations and essentially requested that the Environmental Protection Agency either go back and revise the standard or Congress intervene and interpret the Act differently.

So the course of events were that the Environmental Protection Agency decided to go back and revise its standard, and they issued a proposed rule last year which essentially would provide a standard up to 10,000 years and 10,000 years and beyond.

It's a two-tiered standard that, again, was proposed, and the Environmental Protection Agency now is reviewing public comments on it and has indicated that they will potentially have a new standard in place by the end of this year.

THE COURT: Thank you.

THE WITNESS: I'm sorry if that's more –

THE COURT: No, no, it's interesting

Page 2699

to know what the current state of play is.

THE WITNESS: Okay.

THE COURT: And the bottom line to your answer is that there's not a date, is it fair to say, that 2010 is not the date?

THE WITNESS: That's fair to say, yes.

THE COURT: Whatever it is, it's beyond 2010.

THE WITNESS: That's correct.

BY MR. LO RE:

Q. Mr. Kouts, speaking of more contemporary times, why don't we take a look at PX-377?

MR. LO RE: Before we do that, Your Honor –

THE COURT: Do you want to move in DX-307?

MR. LO RE: Exactly, Your Honor. Thank you.

THE COURT: DX-307 is admitted.

(Defendant Exhibit Number 307 was received in evidence.)

BY MR. LO RE:

Q. Now, Mr. Kouts, you have in front of you a document that is marked, "Acceptance

Page 2700

Priority Ranking and Annual Capacity Report, U.S. Department of Energy," dated July 2004. Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. And what is it, sir?

A. It's the document the Department issued in anticipation of the 2010 date for the operation of the repository. Again, the 63-month period, if you will, that we referred to in the standard contract, where the Department is providing to the contract holders acceptance priority rankings and its annual capacity report projections for repository opening in 2010.

Q. Now, Mr. Kouts, if you could turn to page two of this document?

MR. STOUCK: Excuse me, Counsel, just for one second. I don't have the material, but this is not an exact copy of Plaintiff's 377, which has a front cover on it, in case there's some confusion.

MR. LO RE: That's fine, Counsel. Thank you for pointing that out. Your Honor, counsel points out there's a cover page on PX-377. For our purposes, it's fine just to go