Page 2701

with the exhibit that's in evidence.

MR. STOUCK: This is fine too, as long as it's the same document. I mean, it looks like the same document, except for the cover. I just didn't want there to be any confusion about that.

MR. LO RE: And we will check that, Your Honor, and confer with counsel to make sure it's the same.

THE COURT: Right now, the Court is looking at PX-307 and at page 18.

MR. STOUCK: 377.

THE COURT: Let me just point out that the screen has got PX-307. Thank you.

MR. LO RE: We had the cover page for a moment.

THE COURT: You were doing well there for a second, but there's a header that rides along with it.

MR. LO RE: Right, right, and that's – it's on the screen now, I believe.

THE COURT: Your header now is correct.

MR. STOUCK: That is not PX-377. It's not the one that was admitted, I don't think,

Page 2702

because it's got the cover page. I mean, the rest of it may be the same.

MR. LO RE: I understand. Okay. I'm sorry. I'm looking at the copy that we received. Yeah, apparently, Your Honor –

MR. STOUCK: This was substituted, subsequently, I believe, because of copying.

MR LO RE: Apparently, there was a change, the copy that the government received includes a cover page that apparently is not in what is currently PX-377 that's been admitted.

THE COURT: Okay. We'll consider that over recess for the morning. Please continue.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Mr. Kouts, are you familiar with this 2004 ACR?

A. Yes, it was prepared under my direction.

Q. And you talked a little bit about why it was prepared. I'd like to turn to page two of this exhibit now, which is 1.2, "Basis for the annual capacity report."

A. Yes.

Q. That first paragraph, second sentence

Page 2703

says, "The projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain geologic repository." Do you see that?

A. Yes, I do.

Q. What does that reflect with respect to the programmatic assumptions that DOE was making at this time?

A. That the mechanism the Department was going to receive fuel in and the facility the Department was going to receive fuel at, commercial spent fuel consistent with the contracts, would be at a repository at Yucca Mountain Nevada.

Q. And at this point, 2004, what is the status, what was the status of commencing performance at an MRS facility?

A. The Department was not pursuing an MRS facility at this point in time.

Q. Now, there's a table, and then below the table, it says, "The Department will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the purchasers accordingly." Why did DOE include that

Page 2704

language in the 2004 ACR?

A. Again, this was our projection of what we anticipated the capabilities of Yucca Mountain would be at this point in time, and we were signaling that if there were any changes, we would inform the purchasers accordingly.

MR. LO RE: Your Honor, I have two, potentially two more topics, relatively discrete. I can move on, or we can take a break.

(Whereupon, a short recess was taken.)

THE COURT: We continue with the direct examination of Mr. Kouts. The witness continues under oath. Mr. Lo Re.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, the exhibit we were just looking at, PX-377, page two of that document says this is the basis for the annual capacity report, and there's the chart that we referenced. On this chart, what is the steady state rate at the repository?

A. 3,000 metric tons per year.

Q. And I see that there's a ramp-up period to 3,000 metric tons, the 3,000 begins

in 2014, is that right?
A. Yes, that's correct.
Q. And why is that, if you know?
A. This reflects essentially, as I testified yesterday, that usually when you start nuclear facilities or any kind of facility from a technical standpoint, you walk before you run, so although the capacity of the facility may be 3,000 metric tons, we ramp-up to that capacity in this acceptance table over five years.
Q. In the introduction, there's a reference, second paragraph, contract requires.
A. Yes.
Q. There's a reference to the ACRs, and then it says, last paragraph, excuse me, last sentence says, "These capacity allocations form the basis for the purchasers' submittal of delivery commitment schedules." Do you see that?
A. Yes, I do.
Q. And why was that language included in this ACR?
A. Well, essentially, it was the Department's view, until we received a delivery



commitment schedule and approved that contractually, it's not a binding commitment on the part of the Department.
Q. Yesterday, Mr. Kouts, you talked about litigation in connection with the – I believe it was the draft mission plan amendment?
A. It was the MRS facility, the submission.
Q. MRS proposal?
A. MRS proposal.
Q. Thank you. Since you have been at OCRWM, has there been other litigation that has affected the way DOE has planned its program?
A. Yes. Another lawsuit which had a substantial impact on the program was essentially the remand of the EPA standard back in the late 1980s, whereupon a suit provided by the National Resource Defense Council essentially required – engendered a ruling, if you will, that remanded that standard. And it was not until about 14 years later that we actually got a final standard for the Yucca Mountain facility for a repository at Yucca Mountain. And then that was subsequently remanded, as I mentioned earlier, in earlier



testimony.
Q. Any other litigation you can think of that has affected your planning for the operation of either the MRS or the repository?
A. Those are the two, those are the major ones that come to mind at this point.
Q. How about other agency action, have there been other actions taken by – other actions other than DOE that have affected DOE's planning both for the, either for the MRS or the repository?
A. Well, let's say the speed upon which the Environmental Protection Agency has issued standards has certainly affected our planning. Without a standard in place for a repository, it's hard to develop a case to the Nuclear Regulatory Commission for a license application. So that's potentially had an impact, and also in terms of other agency actions, regulations issued by the Nuclear Regulatory Commission have an impact on the program, and the timing of those regulations also have an impact on the program.
Q. Mr. Kouts, how does OCRWM fund the



waste management program?
A The program is funded through appropriations from both the Nuclear Waste Fund and also from the Defense Disposal Fund. The Nuclear Waste Fund was set up by the Nuclear Waste Policy Act, where in concert with the contracts and response, in return for providing disposal facilities and disposal capability of commercial spent fuel, the utilities are to submit – the contract holders are to submit, if you will, 1 mil per kilowatt hour, of funds commensurate with 1 mil per kilowatt hour of energy produced and sold for nuclear energy.
THE COURT: May I ask, in regular money terms, what 1 mil is?
THE WITNESS: It's one-tenth of one cent per each kilowatt hour. And just to give a perspective as to how much that is in any one fiscal year, last year, I believe the projection and the receipts that were provided to the Treasury under the Nuclear Waste Fund were on the order of about 750 million dollars. And as the other component of the funding for the program comes from what we call

Page 2709

the 050 account, that's referred to in budget speak, and that's the Defense Nuclear Waste Fund, which essentially, when President Reagan made the decision to colocate the repository, in other words, use the same repository for defense materials as well as commercial materials, that set into motion a process where now we, since we're a full cost recovery program, have to also receive funding from defense accounts for the defense waste that we have to dispose of.
So those are the two primary funding sources of the program.
BY MR. LO RE:
Q. Can you describe for the Court, sir, the process by which the money that is put into the Nuclear Waste Fund makes its way to DOE for appropriations to the actual program?
A. The Department or the program follows, similar to any other program in the executive branch, we submit a budget that works through internally within the Department to the Office of Management and Budget.
And then that's included in the President's budget in any one fiscal year in

Page 2710

terms of what the program is requesting, and at that point, it's up to Congress to appropriate funds to the program based on their Congressional budget process.
THE COURT: I'm going to infer something, let me ask you if it's correct, that the Nuclear Waste Fund, although we talk about it as if it's a fund, is not, for example, held like a trust fund. It's simply covered in the Treasury, and it becomes part of the general funds of Treasury when it's paid?
THE WITNESS: It's a separate account that's held in Treasury, which we are allowed to invest in Treasury securities.
THE COURT: So it is something like a trust fund?
THE WITNESS: Yes, it is. However, the appropriations from that are essentially directed by Congress. We do not have direct access to that fund, except through the appropriations process.
THE COURT: Is it ever used for a non-Nuclear Waste Fund – activities that aren't associated with the bailiwick you've been talking about in the last day or two?

Page 2711

THE WITNESS: There are a couple of ways for me to answer that question.
THE COURT: Truthfully would be my start, only truthfully.
THE WITNESS: It exists in the Treasury. It's a fund that's directly attributable to this. There has been a view that the way the government works is that you look at all the receipts and you look at all the appropriations, and if the receipts don't necessarily match up to the appropriations for that program, potentially, those receipts can be used for other activities within the government.
The fund exists. It would require, however, given how the receipts are scored, and this gets into the budget world, it would require Congress to go into deficit spending in order to spend the money that's in the fund.
In other words, those receipts have already been categorized as receipts into the federal government, therefore –
THE COURT: In the prior year.
THE WITNESS: For the prior years.
THE COURT: So they're not scored as

Page 2712

trust money, they're not scored as trust money?
THE WITNESS: Right.
THE COURT: They're viewed as, in budget speak, an income for that year?
THE WITNESS: Right.
THE COURT: Okay.
THE WITNESS: To help you understand further, if I may?
THE COURT: Please.
THE WITNESS: This has been an issue and a concern about the funding of the program.
As I mentioned, the Secretary is concerned that you can't really get a schedule until you know whether or not the program has the resources to implement it. This administration has proposed legislation, and I don't speak for the administration, but the Bush administration has proposed legislation several years ago.
And it's also proposed legislation recently to Congress for a variety of issues associated with this program, including funding reform. And part of that legislation is to essentially reclassify the receipts that are coming into the waste fund from the mandatory to the discretionary side of the ledger.

Page 2713

What this effectively does is that it makes it easier for the committees in Congress to appropriate up to the level of receipts that come into the fund and essentially allows those funds to be used only for that purpose, up to that amount for that purpose.

So Congress has – it's easier for those committees, for instance, in the previous year, to fund the program up to the 750 million dollar level, and then whatever is not appropriated cannot be used for any other purpose. So that was the –

THE COURT: That would be the result of the change –

THE WITNESS: That would be the result of the legislative initiative that the administration has recently proposed in its proposal.

THE COURT: That would only work, I didn't mean to speak over you, that would only work, going forward, so that that initial payment, for example, just so I understand, there was a very large initial payment that was made, for example, with the shut-down facilities?

Page 2714

THE WITNESS: Right.

THE COURT: That was based on all their prior work?

THE WITNESS: That's correct.

THE COURT: And therefore, the fuel that they had at that point generated, that was spent, so that money, from the point of view of how we're talking about going forward, those horses are already out of the stable, in terms of this discretionary reform you're discussing?

THE WITNESS: That's correct. And there has been some concern in Congress that the legislation does not look far enough, and that you need to address not only the receipts, but also the corpus of the fund, and also the interest is that the fund generates every year based on the Treasury investments that we're allowed to make.

THE COURT: Is the interest technically still there, or has that been spent down year-by-year as –

THE WITNESS: No, there's roughly about 18 billion dollars that currently exists in the fund, and that includes the payment and the interest that has been generated up into

Page 2715

this point.

THE COURT: But that money – and tell me how that 18 billion has been treated for scoring purposes, how much is in the fund for scoring purposes?

THE WITNESS: I'm not a budgeteer. My sense is, as I indicated earlier, that Congress would have to essentially go into deficit spending in order to spend the money in the corpus, and also, that was generated by the interest in that.

THE COURT: So that the amount which is available without what would be in current funds, is more or less really just the current money?

THE WITNESS: That's correct.

THE COURT: Whatever is paid in the fiscal year, federal fiscal year we're in.

THE WITNESS: That's correct.

BY MR. LO RE:

Q. Mr. Kouts, I'd like to show you a chart now, DX-1229, please.

THE COURT: While I was moving paper around, there was a colloquy between counsel and the witness talking about legislation and

Page 2716

litigation, and the transcript came out the National Resources Defense Council, and I think there's another name for that natural, is what I think.

THE WITNESS: Natural.

THE COURT: Is that what you're thinking of?

THE WITNESS: Yes, I'm sorry, forgive me.

MR. LO RE: Thank you, Your Honor.

Excuse me, Your Honor, I think we have a technical glitch.

BY MR. LO RE:

Q. Mr. Kouts, you have before you a document that is marked as DX-1229, and it is entitled, "Nuclear Waste Fund and Defense Nuclear Waste Fund, requested funds and appropriated funds 1983 through 2005." Do you see that?

A. Yes.

Q. Are you familiar with this document, sir?

A. Yes, I am.

Q. What is that?

A. This is a graphical representation of

Page 2717

Congressional – Presidential request and Congressional appropriations of the history of the program from 1983 to 2005. It's a graph that I had one of our support services contractors develop using the historical information from Congressional appropriations and Presidential budgets to reflect the funding history of the program.
MR. LO RE: Your Honor, this document Mr. Kouts just described is a summary of a larger document, which is a binder I'm holding in my hand. This is a binder we provided to the Plaintiffs. I'd be happy to provide a copy to the Court at this time. Our intention is to move just the chart in under Federal Rule of Evidence 1006.
BY MR. LO RE:
Q. Now, I've handed you a copy of the binder that I've just described, Mr. Kouts. What is the relationship, if you will, between the binder that I handed you and the chart that's up on the screen?
A. This is a graphical representation of the data that's contained in the President's budget request and Congressional appropriations

Page 2718

that's identified in the binder.
Q. And this chart and the binder were put together at your direction, is that right?
A. That's correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-1229 as a summary.
MR. STOUCK: Your Honor, we don't have an objection to the summary nature of it. The witness seems to know about the information. I would like to just put on the record a relevance objection. The Court seams to be interested in these matters, but I don't understand the relevance of this to the issues.
THE COURT: Like most relevance objections, we'll wait and see what we end up having to focus on in the briefing as a result of the arguments that are raised, so that we will recognize the objection or the concern, but DX-1229 is admitted under Rule 1006.
(Defendant Exhibit Number 1229 was received in evidence.)
BY MR. LO RE:
Q. Mr. Kouts, looking at this chart that's on the screen now, what does this chart

Page 2719

indicate to you with respect to the overall funding versus the appropriations that have been made throughout the life of this program?
A. Well, it's fairly evident that the program, on very rare occasions, receives the amount of funding it requests and typically receives less than what it requests and, in certain instances, substantially much less than it requests in order to implement the program.
Q. Now, I'd like to focus your attention to the period on this chart prior to 1998 or leading up to 1998. What does this chart indicate to you, if anything, with respect to the funding versus the, funding request versus the actual appropriations for that period, that is, between 1983 through 1998?
A. Well, I think as I believe I testified yesterday, one of the driving forces to – or one of the issues in terms of the delay in the repository program back in the 1987 timeframe was the fact that we had requested close to 800 million dollars in funding and received approximately 500 million dollars in funding. That was at a time when we had three repository sites, and it became apparent that

Page 2720

we were not going to be receiving the kind of money that we needed in order to bring closure to having a repository available in 1998 at that time, and commensurate with that timeframe, the Department essentially delayed the opening of the first repository to the 2003 timeframe.
There were other years, as you can see, in the 1990 to '91 timeframe and also '96 to '97, where we received substantially less. I remember specifically in the 1996 timeframe, that reduction caused a substantial reduction in contractor staff and in federal staff also, subsequently, because of the reduction, substantial reduction in our expectation of funding. So it's over those years there were, as in the '91 timeframe, there were substantial reductions, and that certainly had an impact on our activities to implement the program.
Q. And how, if any way, did those reductions between funding, appropriation requests and actual appropriation, how did it affect your ability to meet your statutory and contractual obligations under the standard contract to begin performance as of January

Page 2721

31st, 1998?

A. Well, it certainly had an impact, and if I may just venture further, that if indeed we were going to be implementing an MRS facility in the 1998 timeframe, our budgets would have had to have been substantially higher in order to not only continue with the repository effort, but also site license and construct an MRS facility. So given the history of our budget, those kinds of funds were not in the offering.

Q. And at the time, I think you talked about the '91 timeframe, for instance, at that time, were you making budget requests that you believed, if fulfilled, would allow you to commence performance at the MRS in 1998?

A. That was the, essentially, strategy of the budget submissions that we requested, the amount of money that the Department needed to implement the program and make it effective, as it is today.

Q. Mr. Kouts, are you familiar with a material known as Greater-Than-Class-C or GTCC waste?

A. Yes, I am.

Page 2722

Q. What's your understanding of that?

A. That's a low-level waste that has a different regulatory regime associated with it. It's not something that the program deals with, since we only deal with high-level radioactive waste.

Q. In designing the repository at Yucca Mountain and also looking at the MRS that we looked at today, did DOE have any plans to accept GTCC into –

A. No, it did not.

Q. Into those facilities?

A. No, it did not. I will indicate that as part of the NEPA process, the National Environmental Policy Act process, and the issuance of Yucca Mountain environmental impact statement back in the 2002 timeframe, we evaluated, as a potential alternative, as a foreseeable alternative, the potential emplacement of Greater-Than-Class-C waste, as well as other waste streams into the repository from an environmental perspective.

But our plans for implementing the repository and our strategy for disposing of high-level radioactive waste materials does not

Page 2723

in any way address Greater-Than-Class-C waste.

Q. Now, is there a policy reason that DOE is not planning to put GTCC in the repository?

A. Well, essentially, besides the fact that the Act would prohibit that, since we're essentially a program under the Act that is to dispose of high-level waste radioactive waste and commercial spent nuclear fuel, from a policy perspective, the capacity of a repository is a very – shall we say precious commodity.

And certainly, my view, as well as the Department's view at this point, is that given the uncertainty as to how much spent fuel might be generated in the future from new reactors that are built and paid for, that it makes sense to husband the resource, husband the capacity of the repository and focus that capacity only on high-level radioactive waste and commercial spent fuel, since those materials require such substantial protection from the environment.

In addition to that, Greater-Than-Class-C waste, which is a type of low-level waste, could potentially be handled

Page 2724

in a facility that doesn't need the substantial environmental barriers in protecting that material from getting into the environment.

Q. Are you familiar with the term "backfill" in the context of a repository?

A. Yes, I am.

Q. And what is that?

A. That's essentially something that actually we're not pursuing right now, but there was a view at one time in the program that once the repository was loaded with all the commercial spent fuel and high-level radioactive waste in waste packages, that we would backfill the repository with essentially the mined rock, the pulverized rock that we took out of Yucca Mountain and essentially fill all the mining drifts.

That is not currently our plan. We are not planning on backfilling the repository at this point. We are going to emplace the waste, put in large waste packages that are located about, spaced about 10 centimeters or four inches apart, and we will also put drip shields over those waste packages.

But our plan at this point is not to

Page 2725

backfill the repository. There are a variety of technical issues that arise with the implementation of a backfill concept, and there are thermal issues and other issues that would have to be addressed, and at this point in time, we are not pursuing that as part of our disposal strategy for Yucca Mountain.

Q. Now, Mr. Kouts, we talked a little bit about the Nuclear Waste Fund and how the money comes in. To your knowledge, does the Nuclear Waste Fund receive money for the disposal or emplacement of GTCC?

A. No, it does not.

MR. LO RE: One moment, Your Honor. Your Honor, I have no further questions.

THE COURT: Thank you. Let me just ask about – you talked about the view of how things look inside Yucca Mountain, drip shields over waste packages, what does the waste packaging look like, to the extent you now know?

THE WITNESS: The waste package is essentially a, as we currently view it, it would hold approximately 10 tons of materials, 10 tons of – let's talk about pressurized

Page 2726

water reactor assemblies, 21 assemblies. It has to be configured to preclude the fact that if water ever got close to the waste package, that you could not have a – and I'm getting a little technical here – a criticality event, which means that you could not have a self-dampening chain reaction that would cause – from the radioactive materials. In addition to that, the criticality controls and the fuel would be contained in a approximately four-inch thick steel container. The outer barrier would be of a nickel alloy, very highly corrosive resistant alloy, and the inner barrier would be stainless steel. So it's a very massive package, if you will, of metal that encases the spent fuel. And the inside of it has to be treated with what we call radionuclide poisons to ensure the fact that if water ever got in, which we don't project it will, that no chain reaction could occur many, many thousands and hundreds of thousands of years into the future. On top of that, the drip shield is emplaced, and that's what we call defense in-depth. That's to assure ourselves further

Page 2727

that if there is leakage into the drift, water leakage into the drifts, that that water leakage, if it does decide to drip, would drip on the drip shield and be shielded from the package itself, so the package would not see water which, again, would be the main corrosion mechanism for the materials.

THE COURT: I gather that the MRS or the things that are talked about as dry storage in this litigation that some of the utilities are now building have a metal piece inside that holds, these are smaller assemblies, holds these assemblies and that – and then it's encased in concrete in these outdoor storage areas. Is concrete a feature of the interior of Yucca Mountain or not, or does it just go metal, 10 centimeters metal? I'm just trying to see what we're changing from to –

THE WITNESS: Okay. Well, let's try to parse your question down.

THE COURT: Okay.

THE WITNESS: The storage devices that the utilities currently use, many of them use canisters –

Page 2728

THE COURT: Right.

THE WITNESS: – that are placed in concrete storage devices. The metal canisters that the utilities currently use for criticality control, because they have to make sure, similarly as Yucca Mountain does, that a criticality event could not occur within that canister also for either storage or for transport purposes, those canisters do not have the kind of criticality controls that we will need in the underground to demonstrate that we will not have a problem in the future. And the reason why the criticality controls are different are that we're using a fairly exotic poison in the Yucca Mountain waste package, if you will, that we anticipate will still be there tens to hundreds of thousands of years in the future and be in the vicinity of spent fuel, to ensure that the criticality event cannot occur. The utilities do not use devices that have that particular exotic material. It's basically gadolinium and usually most of the criticality controls are boron and boral, it's a borated aluminum that, again, we could not

Page 2729

demonstrate to the Nuclear Regulatory Commission that that material would still be there tens of hundreds of thousands of years in the future, which is why we've gone to the nickel gadolinium poison.

THE COURT: Gadolinium?

THE WITNESS: It's an element. It's, again, a fairly expensive, fairly exotic material, and our current designs look at that. We would need 11 millimeters of that around in a box, if you will, around each of the assemblies encased in stainless steel in order to meet our design requirements for the repository, and there are no storage devices out there that the utilities currently use that meet that requirement.

In addition, the utility devices are larger. They usually hold 32 assemblies of PWR fuel or 68 of boiling water reactor fuel. That is larger, much larger than the – it's about 50 percent larger than the ones that we are currently contemplating previously at Yucca Mountain.

So those devices, we could not use those devices for use in Yucca Mountain, unless

Page 2730

our disposal strategies changed, and we don't anticipate that in the near future.

THE COURT: Just to marry this up with the success of the program in the future, when Yucca Mountain, assuming you're going forward with the poison around these metal containers, what do you foresee, recognizing that you don't have a crystal ball, how do you foresee the spent nuclear fuel, which is stored in various devices around the country now with the reactors, how do you foresee the transition from the various things that people are using at basically ISFSIs, but some stuff is still wet pools or whatever, how do you see the transition into this, the latest generation packaging that you will be using at Yucca Mountain?

Do you see a site that's near Yucca Mountain in which these things are transferred from the existing interior container? How do you see that transition working.

THE WITNESS: Well, there are a couple of options. One is that the utilities would have to repackage the fuel.

THE COURT: Using your new –

Page 2731

THE WITNESS: Using what we call the TAD concept, the transport, aging, and disposal canister concept, that's one option.

THE COURT: Would that disposal, the TAD disposal canister have these features?

THE WITNESS: Yes, it would.

THE COURT: So there would be a manufacturer?

THE WITNESS: Yes. Hopefully, there would be multiple manufacturers, since we want competition and so forth to keep costs down.

THE COURT: Right.

THE WITNESS: But, yes, there would be multiple suppliers of that. The Department's vision is that those would be provided to the utilities, which they would then load those on their sites, if the contractual issue is dealt with, such that the government has taken the position, and I don't know whether it's been discussed here, but we've taken the position that the – at least our interpretation of the contract is that bare spent fuel is what we will accept.

The TAD concept is essentially a device that we would be providing to the

Page 2732

utilities, but –

THE COURT: So that they would, just to try to see the trouble with the actual interface, a TAD container would come out to the utility, and then they would find some mechanism?

THE WITNESS: They would use their pools essentially –

THE COURT: Put the TAD container in the pool and whatever container they're currently using into a pool?

THE WITNESS: To do the transfer.

THE COURT: And then do the transfer, they'd get a crane and whatever was required to do the transfer?

THE WITNESS: Now, the other option is that the Department has consistently maintained that, within its service facilities, it will have the capability, assuming the contractual issues are dealt with, to repackage the spent fuel from a canistered configuration that does not meet our requirements, but we were not planning on mass production capability. We will have some capability to do that, and we will, you know, we'll have to do

Page 2733

that over a very long period of time because, again, we're not planning on having major production facilities to do it, but we will have the capability on-site in order to do that, should we be unable to, you know, have the packages or utilities are unable to reach an agreement and assuming contractual issues are dealt with.

THE COURT: The contractual issues, just on the surface, being what?

THE WITNESS: That the Department's view is that we don't – we're under no obligation to receive canistered materials, only spent fuel materials, the bare spent fuel, if you will.

THE COURT: All right.

THE WITNESS: The other option is, which is one that the Department has not pursued, is to have a separate facility that's identified somewhere, which would do this repackaging. But, again, that's a technically feasible option, but it's not one the Department is currently pursuing

THE COURT: Thank you. Just trying to see how this works in the world in which

Page 2734

everything is going to work. Thank you.

MR. LO RE: Your Honor, may I ask one follow-up?

THE COURT: You may.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. You talked with Judge Hewitt a moment ago about contractual issues. What is your understanding as to what would have to happen contractually for DOE to be obligated to accept canistered fuel?

A. There would have to be a mutually agreeable contract amendment – canistered spent fuel is what you're referring to?

Q. Yes.

A. There would have to be a mutually agreeable amendment to the existing contract in order for that to occur.

Q. And the obvious question is, to-date, has such an amendment occurred?

A. No, there has not been.

MR. LO RE: Thank you.

THE COURT: The examination of Mr. Kouts continues, cross-examination, if you're good to go, Mr. Kouts.

Page 2735

THE WITNESS: Sure.

THE COURT: Thank you.

MR. STOUCK: Thank you, Your Honor, got a couple questions.

CROSS-EXAMINATION

BY MR. STOUCK:

Q. Just a couple of small things – oh, Mr. Kouts, I'm Jerry Stouck. We've met before. I represent PG&E in this litigation, which is one of your customers, is that right?

A. Yes.

Q. The TAD concept was first developed within the last two years, is that right? Prior to that, there was a different strategy, is that correct?

A. I'd say within the last year.

Q. And prior to that, there was a different strategy for the mechanics of accepting waste material at the Yucca Mountain site, is that right?

A. That's correct.

Q. And also, I was just curious about the Judge's questions about when Yucca Mountain will open. I have a news story here from the Las Vegas Sun, March 31, 2006. I can show it

Page 2736

to you. It says, "Yucca Mountain chief predicts application in 2008, dump by 2020." The Las Vegas paper uses the "dump" term, and I don't mean to comment on that one way or the other, but it says, "The official who oversees Yucca Mountain said Friday" –

MR. LO RE. Counsel, excuse me, Your Honor, I'm not exactly sure what Mr. Stouck is doing here. He hasn't asked a question. He seems to be reading from something that's obvious hearsay into the record, and we object on those grounds. If there's a question, certainly, but I don't see the helpfulness of reading newspaper articles into the record.

MR. STOUCK: I was going to ask him a question about the story, Your Honor.

THE COURT: You may proceed.

BY MR. STOUCK:

Q. It says, "The official" –

THE COURT: I'm not taking a newspaper article for the truth.

MR. LO RE: Thank you, Your Honor.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q. It says, "The official who oversees

Page 2881

delivery commitment schedules, took us right to page seven, got my note on it, not on this paragraph. I'll agree with that, but this is the adjacent paragraph. It seems to me pretty close.

MR. LO RE: Thank you, Your Honor.

THE COURT: Thank you.

(The reporter read the record as requested.)

BY MR. STOUCK:

Q. And just one more question about this and then a general question. If you could just take a look at the executive summary to this, Mr. Kouts? It's a couple of pages in. Oh, it has a number one on it at the bottom. I see that. Do you see that?

THE COURT: You're referring to PX-145?

MR. STOUCK: Yes, PX-145, thank you, Your Honor, page one.

THE WITNESS: Yeah.

BY MR. STOUCK:

Q. This is the executive summary, correct?

A. Yes.

Page 2882

Q. And at the bottom, it says, "This information," referring to the executive summary and, I guess, the report, "should provide guidance on what allocation rules can be established that will mutually benefit both the FWMS transportation system and the utilities." Do you see that?

A. Yes.

Q. And to your knowledge, was this concept of expanded allocations ever implemented?

A. No.

Q. But I guess, to your knowledge, it was further studied, is that your testimony?

A. Potentially, yes. Again, I can't answer that. I left this part of the program, and there may be other studies in the program that exists.

Q. Studies were done in the late '80s. Studies have been done over the course of time by OCRWM about waste acceptance issues such as this, correct?

A. Yes.

MR. STOUCK: I'm done, Your Honor, thank you. No further questions.

Page 2883

THE COURT: That concludes cross-examination. Are there any questions on redirect?

MR. LO RE: Yes, Your Honor.

THE COURT: Redirect will be within the scope of cross.

MR. STOUCK: May I move the admission of PX-145, Your Honor?

THE COURT: From your sitting position, you may.

MR. STOUCK: Thank you, Your Honor.

THE COURT: PX-145 is admitted.

(Plaintiff Exhibit Number 145 was received in evidence.)

REDIRECT EXAMINATION

BY MR. LO RE:

Q. We're in the homestretch here, Mr. Kouts?

A. That's good news.

Q. Mr. Kouts, on cross-examination, Mr. Stouck asked you about your understanding of DOE's contractual obligations under the standard contract, do you remember that?

A. Yes.

Q. Mr. Kouts, when did it become your

Page 2884

understanding that – when did you gain your understanding as to what DOE's contractual obligation was with respect to the commencement of the acceptance of spent nuclear fuel under the standard contract?

A. When I ascended to this position within the program, it started in an acting basis on October 2002 timeframe.

Q. When did you become aware of DOE's commitment to begin accepting fuel in 1998?

A. I was well aware of that when I first joined the program in 1985.

Q. Mr. Stouck asked you some questions about the Nuclear Waste Policy Act amendments of 1987 that rendered the MRS proposal that you discussed about today, I believe you used the term "null and void." Do you remember that?

A. Yeah.

Q. And I thought that you indicated that you wanted to explain what you meant by that. Could you do so?

A. Yes. The Congressional direction was that the siting was null and void. In other words, the site that the Department proposed in Oak Ridge, Tennessee or near Oak Ridge,

Page 2885

Tennessee was unacceptable to Congress.
Therefore, the Department was not to pursue
that site.
In addition, Congress was unclear, or
let's say unpersuaded by the Department's
proposal on the integrated MRS concept and
therefore set up an MRS review commission
which, again, held hearings and provided its
own perspective on the type of MRS, what the
linkages should be and implementation should be
in the waste management system.
Q. After the amendments were passed, what
was your understanding of DOE's understanding
of the likelihood of meeting the contractual
obligation to begin accepting spent nuclear
fuel as of January 31, 1998?
A. Well, the only mechanism that the
Department potentially had was through an MRS,
and in that regard, the MRS linkages had to be
modified legislatively in order for the
Department to meet its commitment by January
31, 1998, since the repository had moved
forward and the schedule for the repository
had, was no longer, not in the 1998 timeframe.
Q. And I know you testified about this,

Page 2886

did the Department take any actions to make
those linkages, to have those linkages removed?
A. Yes. As identified in the
reassessment reports that was submitted to
Congress in 1989 under Secretary Watkins'
tenure as Secretary of Energy, the Department
took an approach to legislatively address the
linkages in legislative initiative and also to
pursue them through changes in the nuclear
waste negotiators, under the auspices of that
office, should it be successful in developing
or identifying a site.
And as part of the approval of that
agreement with that site and that state
supposedly to have legislation that would be
passed, that would modify those linkages.
Q. Now, the linkages that came out of the
amendments, can you describe what they did with
respect to the capacity limit for the MRS?
A. Yes. I'll just go back in history.
The proposal of the Department with the MRS
proposal was to limit the capacity of the MRS
to 15,000 metric tons and to link the
operation, the initial operation of the MRS
facility to the acceptance, or to the receipt

Page 2887

of a construction authorization for the
repository.
Congress modified those linkages by
indicating that we could not build the MRS
until the repository construction authorization
was received. We could receive no more than
10,000 tons until the repository was
operational and no more than 15,000 tons in
total.
Q. Now, I'm going to show you just a few
documents, which I'm sure you're thrilled
about. Can we look at PX-187, please? This is
the, I believe it's the throughput rate
analysis. This is the Office of Civilian
Radioactive Waste Management throughput
analysis, I believe you testified on
cross-examination, do you recall that?
A. Yes, I did.
Q. And this is dated August 17th, 1983?
A. Yes.
Q. Who prepared this analysis?
A. TRW, our M&O contractor at the time.
Q. Now, Mr. Kouts, yesterday on direct
examination, we talked about the review of M&O
contractor work and the acceptance of that work

Page 2888

by DOE. Looking at this document, does it
reflect such a review of acceptances occurred?
A. We may have accepted it as a
deliverable from the contractor in fulfillment
of the need to perform a study, but it does not
have an RW symbol or a DOE stamp on it, which
indicates this is the contractor's view and not
necessarily the Department of Energy's view.
Q. Thank you. You also looked at the
1987 ACR, and I believe that's PX-96. Could we
take a look at that, please? Now, if you turn
to page two of this document and I believe you
testified about the rates as set forth in this
document, do you recall that?
A. Yes.
Q. And there is a paragraph, second
paragraph down, starting with, "beginning"?
A. Yes.
Q. Would you please read the first
sentence of that paragraph into the record?
A. "Beginning in 1991, the ACR acceptance
ranking will be converted into an annual
priority ranking for the receipt of SNF/HLW."
Q. If you could go on and read the next
sentence, please?

Page 2889

A. "In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE waste management system."
Q. Now, what is your understanding of those two sentences in conjunction with the rate of acceptance that's set forth in this document that you looked at on cross-examination?
A. That beginning in 1991, the Department was going to initiate the planning process within the contract, issue the APR/ACR, if you will, and then receive delivery commitment schedules from which it would then potentially approve those, which would be the Department's commitment to accept those materials into the waste management system in the year of operation of the facility that we'd have available at that time.
Q. And does that have any impact on your understanding of the nature of the schedule, the actual acceptance schedule that you looked at with Mr. Stouck on direct examination set forth in this document?

Page 2890

A. Yes, essentially, that we would be approving delivery commitment schedules based on the amount of fuel that we had in that document that we issued in 1991.
Q. Now, just before Mr. Stouck completed cross-examination, he showed you Exhibit PX-145, and this is the study that you discussed, do you remember that?
A. Yes.
Q. Now, there is a reference in this document, we don't need to go through it, to changing the fuel acceptance cycle from one year to three years, do you remember your testimony about that?
A. Yes.
Q. Mr. Kouts, is it your understanding that DOE was contractually obligated to make such a change?
A. No.
Q. What is your understanding as to what DOE's obligation was or is under the standard contract with respect to acceptance intervals?
A. It's what the Department approves in terms of delivery commitment schedules from the utilities for that specific year of operation.

Page 2891

Q. And specifically, what I mean – it wasn't a good question. What is your understanding as to the Department's obligations under the standard contract as to how often it is to visit a particular site?
A. As many times as it's necessary in order to implement, you know, in terms of implement that specific contractual allocation for that year.
Q. And with respect to the one or three-year interval?
A. Right now, it's a one-year planning interval.
Q. Can we look at PX-238, please? This is a document that you looked at with Mr. Stouck relating to GTCC, and just looking at the cover page, this says, "Greater-Than-Class-C Low-Level Waste Program Management Plan." Do you see that?
A. Yes, I do.
Q. What is your understanding as to the material that the Nuclear Waste Policy Act requires DOE to accept under the standard contract?

Page 2892

A. As I testified earlier, it's high-level waste or commercial spent fuel.
Q. How does that relate to the GTCC low-level waste that's discussed here?
A. It doesn't relate to it.
Q. Now, you talked about, I believe you used the term that the government, with respect to the linkages between the MRS and the repository and the capacity limit, you said that the DOE believed in those linkages, do you remember that testimony?
A. Yes.
Q. What did you mean by that?
A. Essentially that, as I testified earlier, in order to assure that the facility would not become a de facto repository or the only facility, if you will, that would accept these materials, a capacity limit was essential in order to assure the host of the MRS or the storage facility, if you will, that it would not be the recipient of all the material for the repository, the 70,000 metric tons that was identified for the first repository.
Q. Now, you looked with Mr. Stouck on cross-examination at PX-97, which is the

Page 2893

document that I asked you about earlier. It's the mission plan amendment from June of 1997. And you looked at –

THE COURT: 1987?

MR. LO RE: I'm sorry. Thank you, Your Honor, 1987.

BY MR. LO RE:

Q. And you looked specifically at page 411. Could we look at that, please? Thank you. And these were the EEI comments. Do you remember that testimony that you provided on cross-examination?

A. Yes.

Q. I'd like to turn, if I may, to another page of this document, and just so we're clear, if you see up on the upper right-hand corner, you see the numbers 044, do you see that? The first page of the document, first page of page 411?

A. 411, sorry.

Q. Which is the EEI comment, excuse me.

A. Yes.

Q. See that 044?

A. Yes.

Q. Okay. I'd like you to turn, if you

Page 2894

would, to page 110 of this document, and if you look at that first bullet there, and I believe this is under the heading of the – if you can go down, further down, from 4.2 down to 4.3, please. Thank you. And I believe this is in a section of the draft mission plan that is, draft mission plan amendment, that is the responses to the comments?

A. Yes.

Q. Do you remember, I think we may have talked about that a little bit?

A. Yes.

Q. I'd like to turn your attention to the first paragraph that says, "Synopsis of Comments." Do you see that?

A. Yes.

Q. And could you just read that first paragraph into the record, starting with, "the Edison Electric Institute"?

A. Yes. "The Edison Electric Institute (44-23) and the Florida Power & Light Company (27-4) had reservations about specific portions of the waste acceptance, the schedule. Edison urged that the acceptance rates in the draft amendment be increased to match the rates given

Page 2895

in the 1985 mission plan, while Florida Power & Light recommended increasing the proposed spent fuel acceptance rate to 6,000 metric tons of uranium per year, beginning in the year 2000."

Q. Now, I'd like to focus just on the Edison Electric Institute, and first, you see there's that 44-23. Do you see that?

A. Yes.

Q. Do you know what that indicates?

A. Yes, I do

Q. And what does it indicate, sir?

A. It refers to the number of the comment response, the comment letter that was provided, which would be in this case number 44, which would be the Edison Electric Institute letter, and 23 would be the 23rd identified comment within that specific letter.

Q. Now, with respect to the Edison Electric Institute comments and the interpretation of those comments, how does that, those sentences that you just read, how do they comport with your testimony earlier about EEI's comments on the rate of acceptance?

A. I believe when what I testified earlier was that they liked the acceptance

Page 2896

schedules in the original mission plan better than they liked it in the mission plan amendment.

Q. How does that comport with what you just read?

A. I think that what I said was just consistent with what their general comment was.

Q. Now, you see below that, it says, "response." Do you see that?

A. Yes.

Q. And then the second paragraph says, "the DOE is planning to start issuing beginning in 1987."

A. Yes.

Q. "Beginning in July 1987 an annual capacity report for planning purposes, as required by Article IV.B.5(b) of the contract of the utilities. The report will inform utilities of the projected annual receiving capacity and the annual acceptance rankings based on accepting the oldest fuel first the DOE intends to use beginning in 1998."

A. Yes.

Q. Why is that sentence in there?

A. To indicate that, again, in compliance

Page 2897

with the standard contract, we would begin issuing annual capacity reports for the utilities to use as planning purposes.

Q. And what was the significance of that?

A. It was a document to inform utilities about what the current plans of the Department were in terms of targets for waste acceptance beginning in 1998.

Q. Now, I'd like to direct your attention to PX-82, and I believe this is volume I of the mission plan.

MR. LO RE: And I must confess, Your Honor, at this point, I am not positive if DX-82 or DX-81 – I'm sorry, PX-82 or PX-81 is in.

MR. STOUCK: It's 82.

MR. LO RE: It's 82. Thank you. I believe this document is in evidence, Your Honor.

BY MR. LO RE:

Q. Now, on cross-examination, Mr. Stouck showed you page 596 of this document, which I believe is in volume III.

MR. STOUCK: Yeah, that's in volume III.

Page 2898

THE COURT: Same document, separate volume.

MR. LO RE: Thank you.

THE COURT: It was handed over the counter several times.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q Mr. Kouts, this is a document within PX-82 that you looked at with Mr. Stouck, and first, I'd like to draw your attention to the stamp in the upper right-hand corner. Do you see where it says 091?

A. Yes.

Q. Do you know what that means?

A. Yes, that's the number given to this comment letter from Pacific Gas & Electric, which is numbered 91, if you will, out of – I don't know how many comments that the Department – or comment letters that the Department received in response to the issuance of the draft mission plan.

Q. Just so we're clear, we're looking at PX-82. Is that the actual mission plan, the 1985 mission plan?

A. Yes, because I believe this is dated

Page 2899

July 24th, 1984, so it's a response to the draft mission plan that was issued prior to the final mission plan in 1985.

Q. So it's the 1985 draft mission plan that the comments related to?

A. 1984 draft mission plan.

Q. Thank you. Now, I'd like to draw your attention to the bottom paragraph here, starting with "notwithstanding." It says, "Notwithstanding the significant progress achieved to-date by DOE, we see an even greater challenge ahead. Of greatest concern to us is the apparent slippage in the schedule set by Congress for an operational storage facility by 1998.

Many utilities, including PG&E, have been counting on the availability of the repository in 1998 as mandated by Congress. It is for this commitment that the electric utilities are," and then it goes to the next page, "currently making payments to DOE of the 1 mil per kilowatt hour. If the repository is not available at that time, DOE will have to make alternate plans, since DOE is obligated to accept spent fuel after 1998." Do you see

Page 2900

that?

A. Yes.

Q. Mr. Kouts, what is your understanding, looking at this document, as to what PG&E was telling the Department of Energy that its contractual obligation was under the standard contract and the NWPA?

A. That the Department was, in PG&E's mind, obligated to accept spent fuel in 1998.

Q. At any particular rate?

A. I don't see a rate mentioned here.

Q. Mr. Kouts, I'd like to turn in that same document, if we could look at page 97?

MR. STOUCK: On volume III?

MR. LO RE: I'm sorry, it's volume II now. This is volume II of PX-82, page 97.

BY MR. LO RE:

Q. Are you with me, Mr. Kouts?

A. Yes, I am.

Q. Okay. I'd like to just focus on that first paragraph there, under synopsis of comments, it's 3.3.1, obligation. That's it, thank you. It says, 3.3.1, "Obligation to accept waste by 1998," and then under that, it says, "Synopsis, comments." It says,

Page 2901

"Approximately 20 percent of the comments about the repository schedule (see chapter 4) concerned the DOE's commitment to begin waste acceptance by 1998 as mandated by the Act." Then there's another sentence, then it says, "Those advocating that the DOE accept waste by 1998 included electric utility companies in 11 different states," then there's an open paren and a series of numbers with dashes. One of those is, the very last is 91-1, do you see that?

A. Yes, I do.

Q. Now, having looked at page 596 of volume III from PX-82, the comments from PG&E on this draft mission plan, do you have any understanding as to what 91-1 relates to?

A. Yes, it was referring to the first identified comment in that comment letter, which referred to the first comment, again, on that first page of the PG&E letter and comments in the draft mission plan.

Q. Is that the comment we looked at a moment ago?

A. Yes

Q. Now, Mr. Kouts, these two sentences

Page 2902

that I just read into the record, how does that comport with your understanding of what you just testified to as what your understanding was that PG&E was telling DOE about its statutory and contractual obligations as of April – July 1984?

A. That DOE had a commitment to begin to accept fuel from utilities by January 31, 1998.

Q. At any particular rate?

A. Doesn't indicate a rate, no.

MR. LO RE: Thank you. Your Honor, I have no further questions.

THE COURT: Are there any questions on recross?

MR. STOUCK: I have one question, Your Honor, it's just about the same document that's open. It might morph into two questions, but it's just one point.

RECROSS-EXAMINATION

BY MR. STOUCK:

Q. If you would look, Mr. Kouts, at – do you have the same letter here that you're looking at, which is part of volume II of Plaintiff's 82? It's on the screen. That's fine. Can we just see the whole page? This is

Page 2903

page 97 of volume II of PX-82 that you were just looking at, right? And then the response is shown at the bottom of the page, do you see that?

A. Yes.

Q. And it says in the first sentence, under response, "DOE is committed to accept waste from the signatories of the standard contract and so on, on a firm schedule beginning no later than January 31, 1998."

A. Yes.

Q. And then at the bottom of that page, there's a paragraph that starts, "in order to meet these objectives." Do you see that?

A. Yes.

Q. "The DOE is investigating several different arrangements of the waste management system and their optimization through an integrated systems approach," do you see that?

A. Yes.

Q. Now, let's turn to the next page, and it results in skipping a sentence, but the first new sentence on page 98, do you see that, "the DOE"?

A. Yes.

Page 2904

Q. "The DOE considers that its obligation to accept spent fuel in 1998 can be met if certain elements of the total integrated waste management system that would allow it to accept waste in 1998 are in place." Do you see that?

A. Yes.

Q. "In addition to the repositories, the integrated system would consist of a transportation network and facilities for monitored retrievable storage if the latter are authorized by Congress." Do you see that?

A. Yes.

Q. And doesn't that mean that DOE considered that its obligations could be met if elements of the program were put into place, including the monitored retrievable storage component, isn't that your understanding of what's being conveyed there?

A. I believe it says, in addition to the repository, so this, in addition to the repositories, these other facilities would also – well, certainly, the transportation network would be needed and an MRS is something that also the Department would want to have in the system also, if it's authorized by

**Sacramento Municipal v. U.S    No. 98-488C    March 29, 2005**

**Heritage Reporting Corporation**

**Page 1826 to Page 2214**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC  20005*
*Phone.  202-628-4888*
*FAX.  202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
NO 98-488C
Plaintiff
vs
UNITED STATES,
Defendant
--------------------------------
Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES
ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S
- - - - -
THE COURT Let's go
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR CAYNE
Q Good morning, Mr Zabransky
A Good morning
Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?
A Yes I see it
Q And is this document a memorandum from you to -- was this a memorandum from you, sir?
A It's an e-mail from me to Mr -- I believe it's Auke Piersma
Q And who is that person?
A Mr Piersma used to be with a group called Public Citizen
Q And there's also a CC?
A Yes

Page 2118

would be decommissioned and go back to its original state, where the repository –

THE COURT· What was the time period?

THE WITNESS I think we had it operating for 20, 25 years That would allow the repository to be filled to the statutory limit, which was 70,000 metric tons and still is today

BY MR DAMELIN

Q Now, you had just mentioned three repository sites at the time of this submission Were the three repository sites still under consideration or being reviewed by Department of Energy?

A. They were still – we had three active projects. We had the salt site, which was – that was in Texas. It was a bedded salt deposit. We had a basalt site, that's b-a-s-a-l-t site, in Hanford, and we had the Yucca Mountain tuff repository, tuff, that's in Nevada

Q. Now, the 15,000 metric ton storage capacity limit you just mentioned, where does that come from?

A That was what we felt was the maximum that we needed, and when we got the facility operational for surge issues, and if we wanted, and if for some reason the repository couldn't take materials, we

Page 2119

could have a surge capacity of the MRS and continue to accept fuel, even if the repository was not operational

Q Now, you just referenced the objections of Tennessee about the proposal Did the MRS proposal that's submitted in March of 1987 refer to any particular sites?

A Yes, it did We focused on three sites within the state of Tennessee, the former Clinch River Breeder Reactor site, which was the primary site; the Oak Ridge Reservation, which was right next to the Clinch River Breeder Reactor site; and also, there was the shutdown – not the shutdown, but the Hartsville Nuclear Station, which was never built by the Tennessee Valley Authority.

Q And you might have just answered this. Was one of the sites the primary site in this submission?

A And that was the Clinch River, the primary site was the Clinch River Breeder Reactor site, which was never built That was our, that was a facility that Congress withdrew funding from

Q And was that the same as –

THE COURT. What was to be built there exactly?

THE WITNESS. It's a breeder reactor,

Page 2120

essentially a reactor that can develop its own fuel in its own, in its own process, so that gets into somewhat of a technical area, but it was a state of the art nuclear facility, generating facility that Congress was interested in and then stopped funding, and since that site was fairly well-understood and excavated, we felt that would be a good site in order to build an MRS facility.

BY MR DAMELIN

Q Is that site part of or related to the Oak Ridge facility?

A It's right next to the Oak Ridge facility, Oak Ridge Reservation, in Oak Ridge, Tennessee

Q Now, what type of facility did DOE propose to build in this MRS submission?

A. That's what I more or less went through It was a central packaging facility that would take the fuel and then ship it to the repository site in a disposal-ready container.

Q Now, when this proposal was submitted to Congress in March 1987, what type of schedule did DOE propose for when the MRS was to become operational as part of the waste management system?

A. Well, our expectation was that the facility, if it was approved by Congress in an

Page 2121

expeditious manner, would be operating and available in the 1998 time frame

Q Now, once this proposal was actually submitted to Congress in March of 1987, what happened in response to the submission?

A Not very much. To my recollection, there were no Congressional hearings held on it The proposal was submitted to Congress, and then Congress essentially directed the Department, through the 1987 Amendments Act, as to what to do next with MRS.

Q So the 1987 Amendments Act followed the submission of this proposal?

A That's correct.

Q And what was the impact of the 1987 amendment to the Nuclear Waste Policy Act on DOE's, I guess, plan for an MRS facility?

A Well, the good news was that Congress authorized the facility. The not so good news was that they nullified the site and essentially put restrictions on how the facility would be deployed in the future, and those restrictions are that it could not be sited until we had a site for a repository, it could not be built until we had a construction authorization for a repository, and it also could not have more than 10,000 metric tons until the

Page 2122

repository was operational, and 15,000 metric tons in total
Q. And so when you say, "nullified," nullified this proposal, Plaintiff's Exhibit 113?
A Right And it also directed that the, that an MRS could not be in the same state as the repository, or within 50 miles of the repository.
Q. And did the, did the 1987 amendment address the procedures for potentially siting an MRS that was authorized by the amendments?
A Yes, it allowed the Department to, if it chose, to undertake a survey of sites, based on its own criteria, and then essentially follow the same process that a repository would be sited, where there would be a recommendation of the site, there was an opportunity for a notice of disapproval by the governor of the state, and then potential for a Congressional override with a majority vote in both houses, similar to what happened with the siting of Yucca Mountain, the Yucca Mountain repository in 2002.
Q. Did the 1987 amendment address any other options for siting of either MRS or a repository?
A Yes, it did, it created the office of the Nuclear Waste Negotiator, which was a separate entity

Page 2123

in the executive branch whose duty was to go out and try to find willing hosts It may be a state or an Indian tribe that would be, that either an MRS or a repository would be acceptable to, so it gave two approaches to the siting of these facilities One on a voluntary basis; the other on the survey basis that the Department would conduct, as I mentioned earlier.
Q. Now, the office of Nuclear Waste Negotiator, you also mentioned there was a DOE, I guess, procedure or potential siting of an MRS Did DOE express a preference for either one of these options?
A Basically, and this came down from the Secretary at the time, Secretary Watkins, given our success in the state of Tennessee, I think his view was that it would best – that the Department would put our efforts behind the Nuclear Waste Negotiator and support his efforts to the greatest extent possible, in the hope that he could find a willing host for the facility
Q And how, finding a host, can you explain how the amendments addressed that type of process that the Nuclear Waste Negotiator could potentially undertake to site a facility?
A The Negotiator was empowered to negotiate

Page 2124

an agreement with the host entity, the host state, or Indian tribe, and then that agreement would have to come to Congress for approval, and assuming that Congress approved that agreement, there would also be a siting declaration in that, in that approval by Congress
Q If I can direct your attention to, it should be the final exhibit in that binder, marked as PX-169
A Yes
Q. Do you see that document, sir?
A. Yes, I do
Q. And what is the document marked PX-169?
A. This was the reassessment report that Secretary Watkins, James Watkins, directed the program to develop under his guidance, in terms of how we were going to proceed with the program, based on his analysis of it.
Q. Now, if I can refer you, and there are some numbered pages in small letters, and then it goes to the numbered pages, and it's going to be numbered page 14 at the bottom, the Bates number is DB0001465, and it's going to be the second full paragraph from the top.
A Okay

Page 2125

Q. It reads, "When the Nuclear Waste Negotiator is appointed, the DOE is prepared to support initiatives developed by the Negotiator that could expedite issuance of the environmental permits necessary to gain access to the Yucca Mountain candidate site The Negotiator is to seek to enter into negotiations on behalf of the United States with the governor of any state in which a potential site is located or the governing body of any Indian tribe on whose reservation a potential site is located " A couple questions, Mr Kouts, you had referenced earlier that there were three sites prior to the 1987 amendments that were being considered for repositories What does this paragraph mean in reference to the "Yucca Mountain candidate site"? Had anything changed?
A No, it had not I think this was just another opportunity, if you will, if we could find a willing host for a repository, that that would be something that the Department would consider, but the Department was focusing its repository efforts on Yucca Mountain
Q Let me ask this question, did the 1987 amendments affect the sites that DOE could consider for a repository?

Page 2126

A It more or less nullified the siting in Tennessee, so it effectively removed that from the table Other than that, it didn't give any further direction on where an MRS would be located In the expectation that the Negotiator could find a state, it could be any other state except Tennessee and Nevada

Q Let me – I might have asked an imprecise question You had mentioned a couple other sites, I think, including a salt site?

A. Right, those were repository sites

Q Okay. What, what effect, if any –

A Oh

Q – did the 1987 amendments have on the repository sites that were being considered in addition to Yucca Mountain?

A It effectively directed the Department to terminate the site characterization efforts in the state of Washington and the state of Texas, and also, we had a second repository effort underway at that time, it also terminated those programs and told the Department effectively to focus on Yucca Mountain. Now, in relation to the second repository, it did direct us to submit a report to Congress in the 2007, 2010 time frame on the need for a second repository

Page 2127

THE COURT: I'm sure everybody here knows this but me, but who owns Yucca Mountain?

THE WITNESS: It's effectively owned by the federal government. There are three different types of land that it sits on. Part of the site is owned by the Bureau of Land Management, BLM Part of it's owned by the Nevada Test Site. And the other part of the site is owned by the Department of the Air Force It's the Nellis bombing range So it's all federally owned, but it's under different jurisdictions

THE COURT: It's remote?

THE WITNESS: Yes, it's about 100 miles northwest of Las Vegas and extremely remote and very arid.

BY MR. DAMELIN

Q. If I can turn your attention to page 17 of this document, Mr Kouts?

A Sure.

Q In the middle of the page, there is a section marked 4 3, titled, "DOE's Position on the MRS Facility " Now, I neglected to actually ask you, this document, the report to Congress on a reassessment of the OCRWM program, who is submitting this to Congress back in November 1989?

A I believe this was the Secretary's

Page 2128

document We – it was by the Secretary of Energy, as indicated, it's dated November 29th, 1989 It was his report to Congress.

Q Now, in this section, the last sentence of the first paragraph reads, "The DOE also expressed preference for an MRS facility sited through the efforts of the Negotiator, especially if these siting negotiations lead to modified linkages " What does that sentence mean to you, Mr. Kouts?

A Well, obviously, the preference to have a negotiated site with a volunteer state is kind of obvious "Modified linkages" refers to the restrictions in the Act that I mentioned earlier, on how we could deploy the facility I think that the Department's view then and now is that the value of such a facility is very limited with those restrictions in place. So that, basically, we were hopeful that if the Negotiator was going to negotiate a deal, that part of that deal would be that these linkages would be removed, and that we could deploy the facility as quickly as possible.

Q Now, was there any type of – let me ask this, at the time of this report, had there been a Nuclear Waste Negotiator actually appointed?

Page 2129

A I believe it was, it was a few years after the Amendments Act, but the first Negotiator, Mr. Leroy, was appointed, it might have been after this point that he was eventually appointed.

Q. And was there any type of relationship following the 1987 Amendments Act, and I guess the appointment of a Negotiator, between the DOE and the office of Nuclear Waste Negotiator?

A As I mentioned earlier, it was an independent entity from the Department and was his own – he had his own office in the executive branch of government with that specific role, so the Department and the Negotiator were definitely separate. We did, however, support his efforts through administering a grant program for him and also providing technical staff and, whenever he needed it, to go out and talk to people to explain what the Department's concept of an MRS was and to explain, for instance, issues that might be of interest to, to local governments about how much employment was going to be there, how much the facility was going to cost, et cetera, those kinds of issues

Q Now, you had referenced – I'm not sure if

Page 2130

you used the word "grants" or "money " Can you describe what DOE did in reference to either funding or providing financial support to the Negotiator?

A Well, as I mentioned earlier, we administered a grant process for him. The grants were to be issued in phases. A Phase I grant was essentially $100,000 to a local community to study the issue, the feasibility of the issue Phase II, Phase II was cut into two different pieces, a Phase IIA and a Phase IIB

Phase IIA was further feasibility, that was a couple of hundred thousand dollars. And then Phase IIB was a 2 8 million dollar grant, which was to be given to a party that was serious about negotiating, in the expectation that we would have a negotiated agreement with those expenditures of funds

Q Were any of the grants you described actually provided to parties that were engaged with the Nuclear Waste Negotiator?

A. As I remember There were about 14 or 15 requests for Phase I grants, about six of those were issued. Phase IIA grants, which were the $200,000 grants, I think there were eight applications, and we issued five grants along those lines, and there were two applications for the big grants, the 2.8 million

Page 2131

dollars grants, by two Indian tribes, the Goshutes and the Mescalero Apaches. The Goshutes are in Utah –

THE COURT. We've learned a little bit about that

THE WITNESS If you're familiar with the private fuel storage facility, which is a private facility funded by utilities, the Goshutes are the tribe that were interested in that, they were also involved back in the MRS days And the Mescalero Apaches in New Mexico were also interested in having an MRS, and they applied for a grant, but Congress essentially withdrew all funding for these grants prior to the time that they were issued.

BY MR. DAMELIN

Q. And do you, do you know the time period, when you're referencing these grants, approximately what period of time we're talking about?

A It was the '93 to '94 time frame, as I remember, that the grants were issued

Q And you had just mentioned that, I guess, Congress had discontinued or cut off funding for the later grants Was that in that same time frame?

A Yes, and this gets into the political world, but one of the tribes was in a state of a very

Page 2132

influential Senator who was not happy with the concept.

THE COURT· This is Bingaman?

THE WITNESS It might have been Bingaman or Senator Domenici at the time, from the state of New Mexico

BY MR DAMELIN:

Q Now. The office of Nuclear Waste Negotiator – let me ask this question, what was the outcome of the Nuclear Waste Negotiator's efforts to negotiate a site for a MRS facility?

A He was not successful.

Q. And when did that office or the Negotiator's efforts end?

A The Act Amendments basically formed the office for a period of seven years, and after those seven years were up, basically, the office was terminated.

Q. Now, during the 1990s, and in addition to the MRS we've spoken about, were there, were there any other efforts to provide interim storage for commercial spent nuclear fuel, apart from the permanent repository?

A What you'll find in the mid-'90 time frame is moving away from the words and the acronym MRS

Page 2133

because that seemed to carry a lot of bad baggage, and what you seem to see is the emergence of the term "interim storage " So in Congress, there were a variety of bills that were introduced, and at some point, they had hearings on them, where Congress was interested in trying to identify a site and basically authorize the Department to undertake the building of an interim storage facility, which is essentially just a storage facility a little different than the integrated MRS we were looking at back in the mid-'80s

But a storage facility in the sense of trying to get a facility available in the near term, to take materials away from utility sites

Q. And during, if we can just be specific as to the time frame, when you had referenced these interim storage facilities were being considered or bounced around in Congress, when was that?

A They started in – I don't remember exactly because there were various bills on the House and the Senate side I believe in the '93, '94 time frame, there were various pieces of legislation that were introduced, and they carried up through a bill that was eventually actually passed in the '99 to 2000 time frame, which was then vetoed by then President

**Southern Nuclear Operating Co. v. U.S. No. 98-614C October 26, 2005**

**Heritage Reporting Corporation**

**Page 1731 to Page 1933**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*