IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

VOLUME 8

--

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW



APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K. C. HAIRSTON, ESQ
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ
MARIAN SULLIVAN, ESQ
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **



P R O C E E D I N G S

JUDGE MEROW: Please be seated. Mr. Ekman, do you have a witness today, or --

MR. EKMAN: We do. We have a couple witnesses, Your Honor, but before we begin our case, or actually before we call our witnesses, at the start of our case there are a few administrative items to take care of.

First of all, there's still the issue of the government exhibits to which there are no objections. I have a list here which I provided the Plaintiffs last week. With the exception of DX329, which is still on this list, but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been. For instance, there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted.

JUDGE MEROW: Yes.

MR. BLANTON: No objection from us on that, Your Honor.

JUDGE MEROW: Okay, the exhibits where



there are no objections are admitted in evidence and as according to the list provided by the -- Mr. Ekman.

(DX Exhibits were received in evidence and the list filed electronically.)

MR. EKMAN: Should I provide this list to the court reporter? Or to Ms. Strandell?

JUDGE MEROW: Yes, they should -- we should get it for the record. So we don't have a list of those, do we?

MR. EKMAN: No. Did I -- I don't know if I provided these to Ms. Strandell or not.

JUDGE MEROW: We probably ought to file it.

MR. EKMAN: Okay. Do you want to file it electronically?

JUDGE MEROW: Yeah, you could just file the list. That would be fine.

MR. EKMAN: Sure, we can do that. Absolutely.

THE CLERK: Judge, do you want to have Southern's list electronically filed? Because I have a hard copy of Plaintiff's prior list.

JUDGE MEROW: If --

MR. BLANTON: I'm assuming we could file that electronically, Your Honor.

Page 1775

Plaintiff's Exhibit 23 – 823. No, sorry. Yeah, 823. I skipped ahead. Can you identify this document for the record?

A Yes. This is an acceptance priority ranking and annual capacity report that was issued by the department in March of 1995.

Q Can I direct your attention to page 4 of this document?

A Yes.

Q Bring up that table there in the middle of the page. Mr. Kouts, what is the basis for the rates set forth on that table?

A They were essentially – the assumption was we would begin operation at an MRS facility. At this time we're kind of hedging our bets it might not be in 1998. As a result, you're seeing year one, year two, year three, but we're still holding on to the 10,000-ton maximum limitation that an MRS would have.

Q Can we go back to page 3 and the paragraph that ends on that page and continues to the next page? Could you read the portion of that paragraph that's been highlighted?

A Okay. "In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

Page 1776

retrievable storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years."

Q Thank you. Why were the years – going back to the table there on page 4, why were the years not identified in this table?

A Again, because the department was, as indicated in that previous paragraph I read, was uncertain as to when we could deploy the facility. We were not encountering great success with interest in Congress for reducing the linkages or for identifying a site.

Q And what was the uncertainty with regard to the program performance at that time?

A That the time that we had to implement an MRS and have it available, the time period had shrunk to such a small amount that it was not feasible for us to anticipate that it could be operational in 1998.

Q Mr. Kouts, I've handed you, I believe, an excerpt of Plaintiff's Exhibit 23. Can we put that up on the screen? Could you identify this document for the record?

Page 1777

A This is an analysis of the total system life cycle cost of the Civilian Radioactive Waste Management Program. We also refer to the acronym as TSLCC. It was issued in September of 1995.

Q Can I direct your attention to page 2 of this document? And can I ask you to read that paragraph into the record, please?

A "Our national strategy maintains a clear focus on the long-term objective of waste disposal in a geologic repository. The immediate challenge is to provide for the timely acceptance and safe interim storage of spent nuclear fuel from the nation's commercial reactors. In order to accomplish these objectives, the program was restructured in 1994. The program is organized with two," quote-unquote, "business centers, the Yucca Mountain site characterization project and the waste acceptance, storage and transportation, WAST, project, along with a management center that provides integration and management support to the director of OCRWM and the projects.

"Program and project activities were reviewed and focused on near-term interim milestones leading to planned acceptance and in placement of SNF in a geologic repository beginning in 2010. The

Page 1778

program approach is described in detail in the Civilian Radioactive Waste Management plan, values 1 through 3, published on December 19, 1994. Reference is 1-3."

Q Mr. Kouts, at the time this document was issued in September of 1995, what were DOE's plans for performance?

A Primarily, to develop a geologic repository.

Q And when was the repository projected to begin operation?

A In 2010.

Q And can I direct your attention to page 8, table 1-2 on that page? What does this table indicate as to DOE's plans for performance?

A That we were – that our initial waste acceptance would begin in 2010 with the operation of the first repository.

Q Okay. Mr. Kouts, in your current position, do you have responsibility for preparing total system life cycle cost reports and fee adequacy studies?

A Yes, I do.

Q What is a TSLCC?

A It's essentially an analysis of the total

Page 1779

system costs of the program, the system life cycle costs of the program. That's done to support what we call a fee adequacy assessment, which is required by the Nuclear Waste Policy Act. In the act, the secretary is asked to review the adequacy of the fee that's provided by utilities into the Nuclear Waste Fund. As established by the act, that's 1 mill per kilowatt hour of energy produced and sold.

Essentially, what the TSLCC analysis does is in the year of dollars that it's developed, in this case it would be probably 1994 dollars, you look at the course of the program and the spending of the program up to its completion. Then the fee adequacy analysis takes that spending stream, if you will, and looks at the corpus of the Nuclear Waste Fund, the expected revenues, projections of economic growth in the future in terms of how the fund would grow with interest and makes an assessment as to whether or not the mill per kilowatt hour is still adequate, is more than adequate or less than adequate to meet the needs of the program.

By law, by the statute, the secretary is responsible for reporting to Congress if the need for the – there needs to be a change in the fee either up or down.

Page 1780

Q And do these reports contain assumptions regarding DOE's plans for performance?

A Yes, they do.

Q And why is that?

A Essentially, we have to be able to project how the program is going to be deployed, so we essentially look at the program baseline, whatever it is in that one year, and cost out the program based on the anticipated baseline that we have in place.

Q And what is the basis for the assumptions in any given TSLCC?

A Again, it's essentially the technical baseline that exists at the time that that analysis is undertaken.

Q Are there assumptions made regarding the acceptance rate in the TSLCC and fee adequacy studies?

A Yes, they are.

Q Why are those assumptions made?

A In order again, as I mentioned earlier, to look at how the program would spend its money over the years, so it's – and in order to lay that out, you have to understand what the program is accepting and how much waste the program is processing, etc., etc., into the future. And taking this out to the end of the program, whatever monitoring period we have for

Page 1781

the repository, we have to have enough money to make sure that we can pay for that monitoring period, etc., so that the analysis basically has to look at the entire life of the program from its expenditures in the past through where we are at the present when we deploy facilities, when we operate and when we actually shut the repository down at some time in the future.

And this is for both – I hasten to add this is for all the waste that's – that comes into the system, not just for the first repository. So however we would process all the projected waste materials, that also has to be taken into account in the total system life cycle cost analysis.

Q And the acceptance rates that are assumed in a TSLCC, how were those chosen?

A They are essentially taken from the program technical baseline in that specific year.

Q Plaintiff's Exhibit 17. Mr. Kouts, I've handed you an excerpt of Plaintiff's Exhibit 17. Can you identify this document for the record?

A Yes. This is an analysis of the total system life cycle cost for the program that was published in April 1985.

Q Could I direct your attention to page 2-3

Page 1782

of that document. And, Dawn, would you bring up paragraphs number 4 through number 6? Actually, through 7. Sorry. No, all the way.

Mr. Kouts, what were the program assumptions at the time this document was prepared in 1985?

A Well, from the highlighted area of that page, you can see that we have two repositories that – the first repository would have 70,000 metric tons; the second, 60,300, which matches up with the projected amount of spent fuel that was being projected at that time.

Item number 6 is the receipt rate at the first repository and the second repository under that and the startup dates for both facilities, which was in 1998 for the first repository and 2006 for the second repository.

Q And what acceptance rates were assumed for the purposes of this cost analysis?

A From number 6, the first repository receives 400 metric tons per year for the first three year, 900 metric tons per year for the fourth year, 1800 metric tons for the fifth year and 3,000 metric tons every year thereafter to closure.

And the second repository starts at 1800

Page 1783

metric tons per year for the first five years and then proceeds at a rate of 3,000 metric tons per year thereafter to closure.

Q Direct your attention to page –

JUDGE MEROW: Is this a program based on the assumption that it's just going to apply to the existing reactors at that period of time? In other words, do you stop generating electrical power after this waste is stored or what?

THE WITNESS: I'd have to go back and look specifically at this report, but at that period in time, we were still projecting that new reactors would be built and basically, we would use what we called Energy Information Administration range of nuclear growth, if you will. Then we would base our spent fuel projections on whether or not – on how many new reactors would be built.

At this point in time, we weren't looking at reactor life extensions. We were still thinking, at least the EIA, Energy Information Administration, was thinking there would be new reactors that would still be built, which of course hasn't happened up to the present day. So we've adjusted our estimates, if you will, of spent fuel generation but – from no new starts, but then we had to look – presently, we look

Page 1784

at how many reactors actually have extended operation, and many of them have gone in for that, so they want to operate their reactors for another 20 years or so.

JUDGE MEROW: If new reactors are now built in the future, would they be under the same program or –

THE WITNESS: Yes, they would, and depending on the company, we would have contracts with those individuals also. They would probably be built by the existing firm, so we'd have to look, but they'd probably be covered by the same standard contract that we have now with some adjustments.

BY MS. SULLIVAN:

Q Mr. Kouts, may I direct your attention to page 1-6 of this document, the table on that page. What were the estimated total costs of the program at the time this TSLCC was prepared?

A You know, at the time that this program was being prepared, it had – it ranged from roughly 24 or 23.8 to 29.7, so roughly between 24 and $30 billion in 1984 dollars.

Q And that's the last number entered in the far lower right-hand corner of that table?

A Correct.

Q Mr. Kouts, I've handed you an excerpt of

Page 1785

Defendant's Exhibit 330. Put that up on the screen. Can you identify this document for the record, please?

A Yes. This is a preliminary estimate of the total system cost of a restructured program. This was a – an addendum that was provided to external parties that basically showed how the program changed based on the redirection of the Secretary of Energy in the redirection report that we talked about earlier.

Q Let me direct your attention to table A-1, page A-1 of this document.

A Okay.

Q Mr. Kouts, what were the program assumptions or the DOE's planning assumptions at the time this document was prepared?

A For this, for a single repository system, number one, it indicates that since we didn't have a second repository, we were focusing on one repository that would essentially take all the fuel.

And it basically has an MRS facility available in 1998 and adheres to the statutory restrictions laid out in the Nuclear Waste Policy Act amendment so that it does not exceed 10,000 metric tons, capacity of MRS does not exceed 10,000 metric tons until the repository is operational in 2010.

Q And what acceptance rates were assumed in

Page 1786

the preparation of this document?

A This would have been the current baseline of the program, and again, it would accept spent fuel at 1998 at 400 metric tons for two years, 900 metric tons up until the year 2010.

Q And I direct your attention to page 4 of this document. Bring that table forward. And what were the estimated total costs of the program at the time this document was prepared in 1990?

A Okay. This – there are three cases given in this table. The first case, the first column indicates that we have a single repository that disposes of the entire quantity of waste and in that case, the total system cost is roughly about 25 and a half billion dollars.

For a two-repository case with no new orders, again, previous case was no new orders, no new reactor orders, we'd have a total of about $34 billion.

And in an upper reference case, which has some growth in the nuclear power industry with two repositories, you'd have basically about a 34-and-a-half-billion-dollar cost of the program.

Q I'd like to go back now to Plaintiff's Exhibit 23, which we've talked about already, but I'd

Page 1787

like to direct your attention to page 8. And the table on page 8, what does that show with regard to DOE's plan for performance at the time this document was issued?

A At the time that document was issued, we had essentially made the assumption that we were not going to have an MRS facility and that our first receipt would be in the 2010 time frame at a repository.

Q Okay. And what were the acceptance rate assumptions at the time this document was prepared?

A In 2010, 300 metric tons; 2011, 600; 2012, 1200; 2013 and 2014 until near closure, roughly 3,000 metric tons.

Q Can we go to page 3 of this document, please, table 1-1. Mr. Kouts, what were the estimated total costs of the program at the time this document was prepared?

A According to this chart, it was $33 billion.

Q I'd like to ask Dawn to put up the three cost tables from the three documents that we just reviewed from Plaintiff's Exhibit 13, Defendant's Exhibit 330 and Plaintiff's Exhibit 23.

MS. SULLIVAN: Your Honor, while she puts

Page 1788

this together, could we take a ten-minute break?

JUDGE MEROW: Sure.

MS. SULLIVAN: I don't have many more questions, but rather than us sit here and watch her put these tables together, can we take a break?

JUDGE MEROW: Return at half past.

MS. SULLIVAN: Very good. Thank you.

(A recess was taken from 11:30 AM through 11:30 AM)

JUDGE MEROW: Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor. I believe we've now worked or magic with the electronic documents.

BY MS. SULLIVAN:

Q Mr. Kouts, I've had put on the screen together the three cost tables that we had just looked at in those three documents, Plaintiff's Exhibit 17, table 1-1; Defendant's Exhibit 330, table 1-1; and Plaintiff's Exhibit 23, table 1-1.

Mr. Kouts, could you explain to the Court whether the costs of the program changed between these documents based upon the different program assumptions that we have seen?

A Well, yes. The – if you look back at the January 1998 analysis, you see you're in a range

Page 1789

between 24 and $30 billion. And that's basically dependent on where the repository is from the lower cost to the upper cost repository.

One of the difficulties in comparing these charts, as you can tell with the dollars, that they're done in different year dollars. 1984 dollars, you've got 1988 dollars and 1994 dollars, so the costs of the program are going to go up as you go into the future when you rewicker the dollars to whatever year you're doing the analysis, because the assumption of the analysis is that all the money is spent in that year, so all the costing is done based on that, the costs of the program, if you expended it all in that year.

So between these estimates, you're not seeing a wide variation in the overall cost of the program, given the different scenarios being run and given the variability in the dollars that are being considered.

Q And based upon the different cost tables that we have here, what is the effect of different acceptance rate assumptions on the cost of the program?

A They have a fairly minor effect. I didn't program these analyses or they weren't done under my direction, but certainly the ones that we do now,

Page 1790

roughly two-thirds of the cost of program are fixed costs and roughly a third are operational costs.

And when you look at an analysis of when the dollars are spent and so forth, it's actually, from an adequacy of the funds standpoint, it's better to spend dollars in the future than it is to spend dollars in the present because future dollars are worth less than present dollars.

So to the extent that you operate slower and push your operations off into the future, the costs – the adequacy of the fund is actually better and you have more confidence in the adequacy of the fund.

When you spend dollars sooner and faster, basically, the adequacy of the fund is lesser. So what these tables indicate to me, basically, is that the costs of the program haven't migrated very much depending on the assumptions, and the variability of acceptance rates really has a relatively minor effect on the overall cost of the program.

Q And, Mr. Kouts, did the fee that utilities have paid change as a result of these analyses over time?

A No, it did not.

Q Mr. Kouts, I'd like to go – let's go back

Page 1791

to Plaintiff's Exhibit 23. Dawn? And could we go to page 8 of that document?

Now, Mr. Kouts, at the time this document was issued in September 1995, DOE assumed operation of repository in 2010, as you previously testified. But are you familiar with other efforts that would have still allowed DOE to perform in 1998?

A Yes. There were still a variety of bills that were being considered in Congress that would have given the department interim storage authority and would have removed the linkages that existed between the MRS and the repository.

In fact, as I mentioned when I went through my history in the program, around this time frame, I was actually working on a topical safety analysis report that would have expedited the licensing of an interim storage facility, if you will, should Congress have given us the technical direction in order to proceed. So we were still expending resources on developing technical information that would have allowed us to implement new legislative direction from Congress if it was received.

Q Can I direct you back to Plaintiff's Exhibit 823? And pages 3 and 4 of that document, that paragraph that we highlighted.

Page 1792

A Yes.

Q At the time this document was issued, Plaintiff's Exhibit 823 in March of 1995, what was the status of DOE's program?

A Status of the program at that time is that we were still hopeful, I believe, that we would get some kind of legislative relief and get the opportunity to deploy a storage facility earlier.

Our – as this indicates, our perspective of our ability to do it by 1998 was such that there was more uncertainty being added to it, but as indicated here, we were still hopeful that it was going to happen in the near future.

If I could also correct something that I might have said earlier, if I remember, the negotiator – the negotiator's office went out of business in the 1994 time frame, so – and I think where I got confused was essentially that David Leroy, who was the initial negotiator, left at the beginning of the Clinton administration and then there was another gentleman that was appointed at that time, and he carried out until the end of the office, which I believe ended in 1994.

So just prior to this, I believe was toward the end of 1994, the negotiator had just gone

Page 1793

out of business. There was still some hope that there were some Indian tribes that were interested, and there were some discussions about whether or not an interim storage site could be identified in one of those sites that was still interested or Congress could pick another site.

So there was still possibilities and the department was still hopeful, although we admit here, I think, that there are uncertainties and 1998 was going to be a challenge, so therefore, we were putting the acceptance schedule in terms of year one, year two.

Q Thank you.

I'd like to change topics. Can we go to Defendant's Exhibit 332, please? Mr. Kouts, could you identify the chart that is Defendant's Exhibit 332, please?

A Yes. This is a summary history of the appropriations history, requested funds for the program versus appropriated funds for the program since its inception in 1983 continuing through this last fiscal year.

Q Did you direct that this chart be prepared?

A Yes, I did.

Page 1794

Q And what information does this chart convey regarding DOE's funding since the inception of the program?

A Well, first of all, it indicates that we did not always receive what we had requested of Congress, and there were certain years that had substantial impact on the program.

If you look back at 1987, basically, Congress took away a lot of our funds because they redirected the program in the sense of only having one repository site to characterize instead of three.

Another area that – and every year virtually you see we get less than we typically ask for. Probably one of the biggest dislocations was in 1996 where, although it shows we received $400 million, we actually received $315 million because 85 million of the appropriated 400 million was withheld and was not to be provided to the department unless interim storage legislation was passed by the Congress.

So this was another indication as late as 1996 that Congress was still indicating an interest in trying to pass interim storage legislation and we could not use those funds, nor were they ever released because that legislation was never passed.

# System Fuels, Inc., and Entergy Arkansas, Inc., v. US No. 03-2623C April 12, 2007

## Heritage Reporting Corporation

## Page 3339 to Page 3676

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3339

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
SYSTEM FUELS, INC , and ENTERGY :
ARKANSAS, INC ,
Plaintiffs, NO 03-2623C
vs.
THE UNITED STATES, :
Defendant.
-------------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C

Thursday, April 12, 2007

The parties met, pursuant to the notice of the Judge at 9 03 a m.

BEFORE THE HONORABLE CHARLES LETTOW

Page 3340

APPEARANCES
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N W
Washington, D C 20037
(202) 663-8000
and
L. JAGER SMITH, JR , ESQ.
Wise Carter Child & Caraway, P.A
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

Page 3341

APPEARANCES (Continued.)
ON BEHALF OF THE DEFENDANT
JOSHUA E GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
ALAN J. LO RÉ, ESQ
SCOTT DAMELIN, ESQ
U.S Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

***Index appears at end of transcript***

Page 3342

P R O C E E D I N G S
- - - - - (9 03 a.m )
THE COURT Welcome back The Court appreciates the organization and care with which the site visit was undertaken and successfully accomplished Is there anything preliminarily this morning before we begin, Mr Gardner?
MR GARDNER: Not from the government, Your Honor
THE COURT. Mr Tomaszczuk?
MR TOMASZCZUK Nor from Plaintiffs.
THE COURT All right. Yes?
MR. GARDNER: And the government would call its next witness, Christopher Kouts
THE COURT: Thank you very much. Mr. Kouts, you're familiar with the process, if you'd approach the bench and stop and raise your right hand to be sworn?
THE WITNESS: Yes, sir.
Whereupon--
CHRISTOPHER KOUTS
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you. Please be

Page 3387

purposes, recognizing that the MRS Review Commission is to provide an independent assessment of the need for an MRS facility before the DOE can start site surveys and evaluations."

Q. And, Mr. Kouts, were you involved in the work of the MRS Review Commission?

A. I provided information to the commission and the commission staff and essentially was involved in the development of this DOE position on it, but I did not work directly for the commission. I did provide information to them.

Q. Could I direct your attention to the next section on that page titled, "Statutory Conditions on the MRS Facility"? And in the interest of time, I won't have you read that into the record, but I just direct your attention to the first paragraph, paragraph numbered one on that page, there's a reference to, "The MRS Review Commission submits in November of '89 a report." Did the MRS Commission submit its report in November of 1989?

A. Yes, it did.

Page 3388

Q. Did you review that report at the time it was issued?

A. Yes, I did.

Q. And why was that?

A. Well, this was important information, since Congress essentially set up this commission to evaluate the need for the facility, and of course, the Department had a very special interest in an MRS facility since it was the only facility that we felt we could have available in the 1998 timeframe, since the repository program was delayed. So whatever findings that commission came up with and recommendations were of great interest to the Department.

Q. May I have Defendant's Exhibit 321, please?

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes.

BY MS. SULLIVAN:

Q. Mr. Kouts, would you identify Defendant's Exhibit 321?

A. Yes, this is the report of the Monitored Retrievable Storage Commission that I

Page 3389

mentioned earlier.

Q. And this is the document you would have reviewed?

A. Yes.

Q. About the time it was issued?

A. Yes.

MS. SULLIVAN: Your Honor, at this time, we'd move for admission of Defendant's Exhibit 321.

MR. SILBERG: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-321 was received in evidence.)

BY MS. SULLIVAN:

Q. I direct your attention, Mr. Kouts, to the page of the document with the Bates number ending 3994. It appears to be the cover letter transmitting the document.

A. Okay.

Q. And if we could bring up the last paragraph on that page, if you could read that into the record, please?

A. "The Commission notes that the Congress, for many years, has expressed concern that an unlinked MRS might be regarded as a de

Page 3390

facto repository and could reduce the impetus for proceeding with permanent geologic disposal. The Commission recognizes this expression of Congressional will, as well as similar sentiments voiced during the course of its hearings. Although the Commission does not believe there is a technical basis for the linkages, the Commission concludes that some linkages are justified."

Q. Mr. Kouts, did you understand this reference to the linkages to be the limits on the operation of the MRS that we've been discussing?

A. Yes.

Q. If we could turn to page XVI, the executive summary ending in Bates number 4006, if we could look at conclusion four, if we could, if you could read that conclusion four, please, into the record?

A. Okay. Conclusion number four, "An MRS linked, as provided in current law, would not be justified, especially in light of uncertainties in the completion time for the repository. Consequently, the Commission does not recommend a linked MRS as required by

Page 3391

current law and as proposed by DOE. The Commission notes that members of Congress, other public officials, environmental groups, and many private citizens for many years have expressed concern that an unlinked MRS might be regarded as a de facto repository and thereby would reduce the impetus for building the repository as expeditiously as possible. Although the Commission does not believe there is a technical basis for the linkages, the Commission agrees that, in light of Congressional and other concerns about a de facto repository, some linkages are justified. However, the schedule linkages presented in the NWPAA, MRS construction may not begin until the Nuclear Regulatory Commission issues a license for the construction of the repository, would make it impossible for an MRS to be operational for more than three years before the repository. Because of delays already experienced in the repository schedule and continued uncertainty surrounding the repository's location and date of operation, the value of

Page 3392

the MRS would be greatly diminished if its construction were tied to the schedule of the repository. Most of the need for an MRS would have disappeared, and that utilities would have had to make other arrangements for storage.

MR. SILBERG: Excuse me. I think when Mr. Kouts read that, he read, "is impossible for an MRS to be operational for more than three years," and I think the text says, "operational more than three years."

THE WITNESS: I'm sorry.

THE COURT: Thank you, Mr. Silberg. Ms. Sullivan, you may continue

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, how did DOE view this conclusion by the MRS Commission regarding the linkages proposed by the NWPA amendments?

A. Well, this perspective of the Commission is consistent with the Department's experience in the development of an MRS site in Tennessee and the other sites that we dealt with, so the Department was in agreement with the perspective of the Commission in this regard

Page 3393

Q. Mr. Kouts, I'd now like to show you Defendant's Exhibit 68, another document dated November '89.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes.

BY MS. SULLIVAN:

Q. Mr. Kouts, would you please identify this document for the record?

A. Yes, this is a report to Congress on the reassessment of the program that was essentially directed by the Secretary of Energy at that time, Admiral James Watkins. When he came into his position as Secretary, he directed that a reassessment of the program be undertaken, and this was eventually provided to Congress after he completed his assessment.

Q. Were you involved in the preparation of this document?

A. No, I was involved in a review of it prior to the time it went out.

Q. And what position did you occupy within the program at the time this document was issued?

A. At this point in time, I was still

Page 3394

head of a transportation program within the program.

MS. SULLIVAN: Your Honor, at this time, I would move for the admission of Defendant's Exhibit 68.

MR. SILBERG: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-68 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Kouts, to your knowledge, was this document provided to Congress?

A. Yes, it was.

Q. What were the results of the Secretary's reassessment of the program schedule?

A The major change was a change to the repository schedule and a delay in the first repository even further from 2003 to 2010, and at this point in time, the Secretary was also very mindful of our need to have a facility to meet our contract obligations available in 1998 and directed that, essentially, that we would support the Office of the Nuclear Waste Negotiator in trying to find a site, and we

**Boston Edison & Entergy Nuclear v. U.S Nos. 99-447C, 03-2626C June 18, 2007**

**Heritage Reporting Corporation**

**Page 3517 to Page 3844**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3517

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
-----------------------------------x
BOSTON EDISON COMPANY              .
         Plaintiff,                .
   and                             :NO. 99-447C
ENTERGY NUCLEAR GENERATION COMPANY :and
         Plaintiff                 :No. 03-2626C
    vs                             :
THE UNITED STATES,                 :
         Defendant                 :
-----------------------------------x
```

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C

Monday June 18 2007

VOLUME 11

The parties met, pursuant to the notice of the Judge at 10 00 a m.

BEFORE THE HONORABLE CHARLES F LETTOW

Page 3518

APPEARANCES

ON BEHALF OF PLAINTIFF ENTERGY:

ALEX D TOMASZCZUK, ESQ
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean Virginia 22102
(703) 770-7674

and

JAY E SILBERG ESQ
Pillsbury Winthrop Shaw Pittman
2300 N Street NW
Washington, D.C 20037
(202) 663-8000

and

L JAGER SMITH JR ESQ
Wise Carter Child & Caraway P A
1340 Echelon Parkway
Jackson Mississippi 39213
(601) 368-5572

Page 3519

APPEARANCES (Continued·)

ON BEHALF OF THE PLAINTIFF BOSTON EDISON

RICHARD J. CONWAY, ESQ.
BRADLEY D. WINE, ESQ.
BERNARD F. SHEEHAN, ESQ
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D C 20006-5403
(202) 420-2235

ON BEHALF OF THE DEFENDANT.

ALAN J. LO RE ESQ
SCOTT DAMELIN, ESQ
JOSHUA E GARDNER, ESQ
SONIA M ORFIELD ESQ.
PATRICK B BRYAN, ESQ.
STEVEN FINN, ESQ.
U S Department of Justice
1100 L Street, NW
Washington D.C. 20036

(Index appears at end of transcript)

Page 3520

P R O C E E D I N G S

(10:00 a.m.)

THE COURT: Good morning Mr. Lo Re

MR. LO RE Good morning, Your Honor

THE COURT. We understand there is a modest change in the proposed schedule.

MR LO RE. Yes, Your Honor, and I was just writing that down The proposed schedule is as follows, Your Honor We will start the testimony with the testimony of Mr Kouts this morning Then after Mr. Kouts has testified Mr Hintz is scheduled to testify

What we would like to do is have Entergy Nuclear present that witness as part of -- at the time of our case-in-chief. We would then examine Mr Hintz, and hopefully complete that examination before the lunch break

After that, Your Honor we have Mr Morgan scheduled to testify via videoconference at 1 p m local time If there is a gap there in other words, from the time Mr Hintz leaves until the time we put Mr Morgan on, we can fill that with -- we can begin the examination of our first expert Mr Brewer In other words rather than leave

Page 3537

A. Yes, these are the instructions that accompany the Annual Capacity Report and Acceptance Priority Ranking of the previous document, of the previous documents. I don't know which one this probably referred to, it is probably the 1992, as I see here from it, it is the 1992 – 1991 ACR, so it would have accompanied that.

Q. And is this a document that is generated by the Department?

A. Yes.

Q. And is this a document that you were aware of, relied upon, and reviewed as part of your work at DOE?

A I have reviewed it in the past, yes.

MR LO RE: Your Honor, at this time, the government would move for the admission of EX-246 into evidence.

Mr SILBERG: No objection, Your Honor

MR CONWAY. With the stipulation that this accompanied the 1991 ACS, we would have no objection.

THE COURT: ACR.

MR. CONWAY. I'm sorry, ACR

Page 3538

THE COURT. Admitted

(Entergy Exhibit Number EX-246 was received into evidence )

BY MR. LO RE:

Q. I would like to skip the next tab and if you can go to the last tab in this binder, which is BX-260. Mr. Kouts, this is a document entitled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program Mr. Kouts, are you familiar with this document?

A Yes.

Q. And what is it?

A It is a total system life cycle cost analysis of the program that was issued, I believe, in the 1995 time frame. There is no date, but essentially the letter from the director, it does indicate that attached is the document which is dated August 1995. So it would have been a fall document, an August or September issuance of the document. It has a DOE RW number which means it is a departmental document

Q. Is this a document you have reviewed,

Page 3539

relied upon or been aware of in your work at DOE?

A. Yes, I would have reviewed it.

MR. LO RE: Your Honor, at this time, the government would move for the admission of BX-260 into evidence.

Mr. SILBERG: No objection.

MR. CONWAY: No objection, Your Honor.

THE COURT: Admitted.

(Boston Edison Exhibit Number BX-260 was received into evidence.)

BY MR. LO RE:

Q. Okay. One down, one to go. There is a second binder, Mr. Kouts, that should be behind you on the stand. The first document on this, in this binder is marked EX-248. This is a document entitled Recommendations on the Proposed Monitored Retrievable Storage Facility dated October 1985. And it says Roane County/City of Oak Ridge Tennessee. Do you see that document, sir?

A. Yes, I do.

Q. Are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

Page 3540

A. It is a report of the Clinch River MRS task force that was submitted to the Department, and it provided recommendations from the local governments in and around the site that the Department was intending on proposing to Congress for a monitored retrievable storage facility.

It was given to the Department in, I believe it was referenced in the MRS proposal that was submitted to Congress in March of 1987.

Q. So this document was not generated by the Department; is that right?

A No, it was not.

Q. But it was a document that you received, that the Department received as part of the MRS siting proposal?

A. It was referenced in the MRS proposal It was – the Department had provided funding to local governments to study whether or not they wanted to accept an MRS. And part of that funding was used to develop this report and to provide their recommendations and perspectives on siting a facility at the former Clinch River Breeder Reactor site in Oak Ridge, Tennessee.

Page 3541

Q. And is this a document that you were aware of or reviewed as part of your work with DOE?
A. Yes.
Q. Is this a document that was kept in DOE's files, to your knowledge?
A. I believe so. It was probably in our record system. I see an NWTRB stamp up here, so it looks like it was also in the Nuclear Waste Technical Review Board's library, but yes.
MR. LO RE: Your Honor, at this time, the government moves for the admission of EX-248 into evidence
Mr. SILBERG· No objection, Your Honor.
MR. CONWAY: No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-248 was received into evidence.)
BY MR. LO RE:
Q. Now, if you turn to the next tab, Mr. Kouts, you will see a document marked EX-240. This is a document entitled Nuclear Waste Operation of Monitored Retrievable

Page 3542

Storage Facility is Unlikely by 1998. This is a document dated September 1991, issued by the GAO or General Accounting Office
Mr. Kouts, are you familiar with this document?
A Yes.
Q. What is it, sir?
A. It is a report providing the perspective of the GAO on whether or not an MRS facility could be operational in 1998.
Q. And this document was not generated by the Department of Energy?
A. No, it was not.
Q And did you review this document as part of your work at DOE?
A. After it came out, yes.
MR. LO RE: At this time, the government would move for the admission of EX-240 into evidence.
Mr SILBERG No objection, Your Honor.
MR. CONWAY. No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-240 was received into evidence.)

Page 3543

BY MR. LO RE:
Q. If we skip the next tab, the following tab is marked EX-251. This is a letter on the Department – from the Secretary of Energy dated December 17th, 1992 from Secretary James D. Watkins to the Honorable J. Bennett Johnston, chairman, Committee on Energy and Natural Resources.
Mr. Kouts, are you familiar with this document?
A. Yes.
Q. And what is it, sir?
A. It is a letter that was signed out by the Secretary to – in response to a letter from Senator Johnston requesting basically perhaps a new approach as to how the Department might have a facility operational in the 1998 time frame.
Q. And to your knowledge, was this a document actually issued by Secretary Watkins?
A. It has his signature on DOE letterhead and a date stamp, so my assumption is that this letter did go out and was received by the senator.
Q. And, Mr. Kouts, is this a document

Page 3544

that you were aware of during your time or aware of, reviewed, or relied upon during your work with the Department?
A. After the fact, I believe – I hadn't – actually I was shown this letter in trial and I didn't remember it, but the more I think about it, I think I did see this after it came out.
And it provided a perspective of the outgoing Secretary as to what – when I say outgoing, this was the end of Admiral Watkins' tour as Secretary, since there was a changeover in the administration, and this was his attempt to try to move the program forward from his perspective as he was leaving, as he was leaving the office.
MR. LO RE: Your Honor, at this time, the government moves for the admission of EX-251.
Mr. SILBERG: No objection, Your Honor.
MR. CONWAY: No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-251 was received into evidence.)

# Ronald Milner

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 26

MR. SHULTIS: Objection -- vague.
THE WITNESS: I don't know that I could call out any particular area.
BY MR. TOMASZCZUK:
Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?
MR. SHULTIS: The same objection.
THE WITNESS: Probably.
BY MR. TOMASZCZUK:
Q. Do you know what they are?
A. I would be hard pressed to call it out.
Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.
If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.
Are there any areas that you feel you have particular expertise or knowledge in?

Page 27

A. No, I wouldn't say so.
Q. In preparation for your deposition here today, did you review any documents?
A. No, I did not.
Q. Did you speak with anyone concerning your deposition?
A. Very briefly with the two Justice Department attorneys.
Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?
A. No, not concerning the deposition.
Q. Did you speak with anyone at OCRWM concerning their deposition?
A. No.
Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?
A. No.
MR. SHULTIS: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and

Page 28

high-level radioactive waste?
A. Yes.
Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?
A. No, I did not.
Q. It had already been executed at the time you became an OCRWM employee?
A. Correct.
Q. At the time you became an OCRWM employee, did you have occasion to read the contract?
A. Yes.
Q. At the time that you became an OCRWM employee, did you read any other documents?
A. I'm not sure I understand that question.
Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?
A. Um-hm.
Q. Right. And you have testified you have read the standard contract?
A. Um-hm.
Q. At or about that time, correct?
A. Um-hm.

Page 29

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.

Page 38

year, I believe it was 400 metric tons, second year, 600 metric tons, the third year, 900 metric tons, and I believe the following year, it went up to 1200.
Q. And any understanding beyond that?
MR. SHULTIS: Same objection.
THE WITNESS: I recall that peaks at 2000.
BY MR. TOMASZCZUK:
Q. Your understanding is that it peaks at 2000, and then does it stay at 2000 for a number of years?
A. I believe so.
MR. SHULTIS: Same objection.
THE WITNESS: I believe so.
BY MR. TOMASZCZUK:
Q. Do you know if that understanding is reflected in any documents?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe it is.
BY MR. TOMASZCZUK:
Q. Okay. Can you identify for me the documents -- when I say documents, I'm referring to DOE or OCRWM documents -- can you identify for me the documents that reflect the acceptance

Page 39

rates you just referred to?
A. I don't know that I can recall all of the documents that's reflected in.
Q. Any of them?
A. It's reflected in the ACR. It's reflected in the program plan.
Q. And in what year was the ACR that you just referred to in your last answer published, do you know?
A. I don't recall.
Q. Do you know when the last ACR was published by OCRWM?
A. No, I don't.
Q. If I said 1995, would that sound about right to you?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Roughly.
BY MR. TOMASZCZUK:
Q. With what, with which support contractors do you work most closely now in your role as COO?
A. Booz Allen Hamilton.
Q. Over the course of your career at OCRWM, have there been any personnel employed by

Page 40

contractors with whom you have worked particularly closely?
A. Yes.
Q. Can you state for me their names?
A. Not all of them.
Q. Okay. Those that come to mind?
A. Charles Metzger.
Q. Metzger you say?
A. Metzger; Richard Goffi, Robert Bauer, probably those would be the closest.
Q. Are those individuals employed by Booz Allen?
A. Robert Bauer is not.
Q. But Mr. Goffi and Mr. Metzger are?
A. Correct.
Q. And who is Mr. Bauer's employer?
A. He was employed by the former support service contractor at OCRWM -- Weston.
Q. Did you ever have occasion to work with a support contractor that I'll refer to as PNL?
A. Yes.
Q. And when was that?
A. That would have been in mid-'80s.
Q. Did you ever have occasion to work

Page 41

with or speak with Pat McDuffie?
A. No. I don't recall that name.
Q. What role have you had in DOE's administration or implementation of the standard contract?
MR. SHULTIS: Objection -- vague.
THE WITNESS: A variety of roles.
BY MR. TOMASZCZUK:
Q. Okay. Can you explain that for me or detail that for me?
A. At various positions or during various positions that I held, administration of the standard contract again was done by an element under my supervision.
Q. Is that one of your roles or duties today?
A. In a very rough sense, yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. When is the last time you had occasion to read the standard contract?
A. It's probably been several years since I have read it in its entirety.
Q. And when you last read it in its

Page 66

(Milner Exhibit No. 4 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Are you familiar with this document, Mr. Milner?

A. Very vaguely. This would appear, judging by the date, to be an early draft.

Q. Early draft of a Mission Plan?

A. Yes.

Q. And is this a document that you read at or about the time you became an employee of OCRWM?

A. I don't believe I would have reviewed this draft.

Q. You would have reviewed another draft?

A. Subsequent draft.

Q. A later draft do you think? And why do you say that?

A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.

Q. And why do you make that assumption?

A. Typically over that intervening period, the document would have been refined and

Page 67

further drafts produced.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?

A. I don't recall that being a goal.

Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?

A. Oh, 2-1.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. Do you see the last two sentences of the first paragraph on page 2-1?

A. Yes.

Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

Page 68

A. Um-hm.

Q. And you disagree that that was an intention of DOE at or about this time?

MR. SHULTIS: Objection. Mischaracterizes the prior testimony.

Calls for calls for a legal conclusion.

BY MR. TOMASZCZUK:

Q. I didn't mean to mischaracterize your testimony.

I understood it to be that you did not agree with that statement.

A. I did not recall that that was a goal at that time.

Q. Okay. Having read it, do you now recall that that was a goal?

A. I don't recall whether that language was in the final Mission Plan.

Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?

MR. SHULTIS: Objection -- asked and answered.

THE WITNESS: I don't recall it.

BY MR. TOMASZCZUK:

Q. The text of this paragraph goes on to

Page 69

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Also Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I didn't recall that.

BY MR. TOMASZCZUK:

Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.

This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Page 70

Q. Do you recall seeing this Table 2-1 before today?
A. I don't recall it, no.
Q. It shows under the column first repository acceptance, a spent nuclear fuel acceptance rate starting in 1998 of 1800 metric tons?
A. Correct.
Q. And maintaining at that 1800 metric ton rate for five years, correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons?
A. Correct.
Q. And then continuing at a steady-state rate of 3,000 metric tons for roughly 20 years I think?
A. Correct.
Q. And does that column accurately reflect DOE's intentions at this time with respect to spent nuclear fuel acceptance rate commencing in 1998?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6)

Page 71

witness.
MR. TOMASZCZUK: I don't want my silence to be construed as acquiescence in the notion that I can't ask him these questions because he is not a 30(b)(6) witness.
I don't know what --
MR. SHULTIS: You're asking about DOE's intention or position.
Mr. Milner has not been designated as a witness who is qualified to speak to DOE's position.
MR. TOMASZCZUK: Oh, I understand that Mr. Milner has been at OCRWM for 18 years and is the Chief Operating Officer, and if he is not qualified to answer these questions, I don't know who would be, but in any event, your objection is noted for the record.
MR. SHULTIS: The people we designated for those responses is qualified, but you can answer.
THE WITNESS: At the point this draft was prepared, December of 1983, I was not with the program.
I don't know what the department's intent was.

Page 72

BY MR. TOMASZCZUK:
Q. Did you have any understanding about the data reflected on this table at or about the time you read it?
MR. SHULTIS: Same objections.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Did you have any understanding as to what information was being conveyed by the data on this table at or about the time you became an OCRWM employee and looked at this document?
MR. SHULTIS: The same objections -- asked and answered.
The document speaks for itself.
THE WITNESS: I don't recall seeing this specific table.
I can look at it now and see what's on it.
BY MR. TOMASZCZUK:
Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?
A. Yes.
Q. In the right-hand side? It shows a

Page 73

pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Milner, I'm going

Page 130

speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)

Page 131

MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?

Page 132

A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my

Page 133

understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 298

BY MR. TOMASZCZUK:
Q. Is it possible that they would constitute GTCC from a technical standpoint?
A. It's possible.
MS. HERRMANN: Objection. Calls for a legal conclusion, speculation.
BY MR. TOMASZCZUK:
Q. Could I ask you to look at page 2 of your letter?
At the top of this page, there is the phrase as we proceed with final cask design, then you go on to request assistance from Mr. Zabransky in developing and implementing a plan to obtain data.
Was OCRWM at this point in the process of final cask design?
A. Yes, that's correct.
Q. Did that task get completed?
A. In one instance, it did, yes.
Q. And what instance is that?
A. There were essentially three cask designs that were being worked on.
Two of the designs were for a truck cask, and one was for PWR assemblies. One was for BWR assemblies, and at that point in time,

Page 299

another was rail cask.
My recollection was that as a result of these discussions indicated here, we dropped the rail cask design, and I believe, I can't recall for certain whether the department actually completed the final design or whether the contractor completed the design on their own because at some point in time, one of the appropriations acts, the Congress basically directed us to cease cask design work.
Q. Is cask design work ongoing today at OCRWM?
A. No, it's not.
Q. It's being held in abeyance for some reason?
A. It's not being accomplished. Congress directed us to stop cask design activity.
Q. Okay.
A. And we did, have continued to stop it.
Q. Do you know why Congress made that direction?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: I have no idea.
BY MR. TOMASZCZUK:

Page 300

Q. Would these assemblies with channels that you described in your testimony a few moments ago constitute non-fuel components at that time as used in the contract?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: They would, in my opinion.
MR. TOMASZCZUK: Let's mark as Milner Exhibit 37 a memorandum dated April 15th, 1991, signed by Mr. Milner concerning approval for issuance of a comment draft of the annual Acceptance Priority Ranking.
(Milner Exhibit No. 37 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recognize this document, Mr. Milner?
A. Offhand, I do not, no.
Q. That's your signature that appears at the second page of it, right?
A. That's correct.
Q. Is that also your handwriting that

Page 301

appears on this second page next to the third paragraph and in the third paragraph?
A. It does not appear to be my handwriting, no.
Q. You understand what I'm asking you about?
A. Yes.
Q. The marginalia there?
A. Yes.
Q. Turning back to the discussion set forth in the memo at the first page, second paragraph starts off by saying publication of the APR begins the contractually binding waste acceptance process system.
Is that a true statement in your view?
A. In my view, yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. The next sentence says the ACR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report as the basis for purchasers to submit Delivery Commitment Schedules beginning in January 1992 for the department's approval.

Page 302

Do you know who made the decision to use the 1991 ACR as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Did you make that decision?
MS. HERRMANN: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Did I just ask you that question? I'm sorry if I did.
I thought I asked you if you knew who did, but maybe I misspoke.
Do you know who made the decision to use the 1991 ACRs as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Would Mr. Brownstein have made that decision, or would that have been somebody higher up in the chain than him?
MS. HERRMANN: Objection -- asked and answered.
He told you he doesn't know.
MR. TOMASZCZUK: I asked him a different question.
THE WITNESS: I don't know who would

Page 303

have made the decision.
Could have been Mr. Brownstein. Could have been the director of the program. Could have been the deputy director of the program.
BY MR. TOMASZCZUK:
Q. You have absolutely no recollection?
A. I have no recollection.
Q. Could it have been a contractor?
A. No, sir.
MS. HERRMANN: Asked and answered.
BY MR. TOMASZCZUK:
Q. It would have had to have been somebody within DOE?
A. That's correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. The last sentence of that paragraph says in turn, purchasers will have the opportunity to exchange approved DCSs also subject to departmental approval.
Was that an accurate statement of the department's position at the time with respect to the exchange of DCSs?
MS. HERRMANN: Objection -- foundation.

Page 304

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: In my opinion, that was an accurate statement.
BY MR. TOMASZCZUK:
Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.
Why was that of the utmost importance?
A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.
MR. TOMASZCZUK: Want to take a break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.
Do you see that?

Page 305

A. Yes.
Q. What is your understanding of that term?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.
Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.
BY MR. TOMASZCZUK:
Q. Binding on both the government and the utility?
A. Correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?
A. It would have originally stemmed from my review of the contract, yes.
Q. And have you discussed that view with others at OCRWM?
A. I can't specifically recall, but yes,

Page 314

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility

Page 315

could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I

Page 316

was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

Page 317

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.
Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?
A. I don't know that there was an individual that made that decision.
It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.
The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.
Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information



in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.
Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?
A. No, I don't.
Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Standard contract is the best evidence of its contents.
THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.
BY MR. TOMASZCZUK:
Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?
MS. HERRMANN: Same objections.
THE WITNESS: Best of my recollection,



it does.
BY MR. TOMASZCZUK:
Q. It does?
A. It does.
Q. Could you identify for me where in the contract you find that language or direction?
A. I could try.
Q. Thank you.
MS. HERRMANN: Could you give him an exhibit number?
MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.
(The witness reviewed the document.)
MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --
A. Yes, that's where I'm looking.
(The witness reviewed the document.)
THE WITNESS: And I do not see ACRs



referenced there.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Have you finished your answer, Mr. Milner, or do you want more time?
A. Another minute.
Q. Sure.
(The witness reviewed the document.)
MS. HERRMANN: Could we have the question read back just so that I'm clear?
THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"
MS. HERRMANN: If it speeds things up at all, could I refer him to another section?
MR. TOMASZCZUK: Sure.
MS. HERRMANN: Or are we just hunting? Do you want him to hunt?
MR. TOMASZCZUK: No, I don't want him to hunt.
MS. HERRMANN: Okay -- right before Article V.
THE WITNESS: Yes. Actually I was just reading that paragraph 5.
Yes, it references both the ACR and