Page 390

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for

Page 391

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

Page 392

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

Page 393

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :

Plaintiffs, :

v. :

UNITED STATES OF AMERICA, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821



APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 552

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the

Page 553

program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?

Page 554

A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of

Page 555

the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY          )
(98-126C)(Merow, S.J.)                  )
CONNECTICUT YANKEE ATOMIC POWER         )
COMPANY                                 ) Volume II
(98-154C)(Merow, S.J.)                  ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY)        Wednesday
(98-474C)(Merow, S.J.)                  ) May 8, 2002
               Plaintiffs,              )
          v.                            )
THE UNITED STATES,                      )
               Defendant.               )
- - - - - - - - - - - - - - - - - - - - -)
```

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 48

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

Page 49

CONTENTS

WITNESS EXAMINATION PAGE NO.
RONALD A. MILNER
By Mr. Skalaban 51

Afternoon Session 159

EXHIBITS

MILNER EXHIBIT NO. PAGE NO.
96 1992 Annual Capacity Report, Nos. HQ002314-352 61
97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 68
98 Letter, 4-20-94, No. YDK-005-0417 120
99 Letter, 9-29-92, and attachments, various MOF and MPA numbers 160
100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers 166
101 10 CFR 61.55, Waste

Page 50

EXHIBITS CONTINUED

MILNER EXHIBIT NO. PAGE NO.
Classification 186
102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 216
103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 221
104 Memorandum, Nos. HQR-058-0330-331 223
105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C 226
106 Letter, 7-15-98, Nos. HQR-041-0600-601 276
107 Memorandum, Nos. EL-115711-713 277
108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 283

Page 51

PROCEEDINGS

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SKALABAN:

Q. Okay. Hello, Mr. Milner. How are you today?
A. Morning. Fine.
How are you?
Q. And just before we begin this morning, the same ground rules that we discussed apply.
Is that okay?
A. Fine with me.
Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.
I mean, do you recall that exchange?
A. Yeah. My recollection was that

Page 208

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.
And perhaps I misunderstood your question, but --
BY MR. SKALABAN:
Q. Okay. I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU.
It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?
MR. SHULTIS: Asked and answered.
A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.
And if I can try to think of a hypothetical example.
If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand

Page 209

MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.
BY MR. SKALABAN:
Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.
A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.

Page 210

BY MR. SKALABAN:
Q. Well from the department's perspective, if there was no -- if it could be shown that there's no economic impact to other utilities, in other words, because of this grant of priority, the other utilities are not going to have to add some additional storage facilities, they're not going to have to incur those costs, what other adverse impacts would there be that the department would be concerned about?
MR. SHULTIS: Same objections, including asked and answered.
A. Well, to characterize adverse impacts that the department would be concerned about, I think our concern more related to the allocation in our view under the contract specified oldest fuel first. To change that really would require I think the agreement on certainly the bulk of the contract holders.
BY MR. SKALABAN:
Q. But can you think of any other adverse economic -- I mean, any other adverse impacts other than economics?
MR. SHULTIS: Same objections, asked and answered.

Page 211

A. Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.
BY MR. SKALABAN:
Q. Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR; is that correct?
We looked at that earlier?
A. Right.
Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?
A. Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR. Excuse me.
Q. Well, I'd like you to take a look at the contract section -- it's the page of the Federal

Page 212

Register 16601. And in the article five, part B, delivery commitment schedule, it says on the top of column three: The purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW that the purchaser wishes to deliver to DOE beginning 63 months thereafter.
Do you see that, sir?
A. I do, yes.
Q. What was your understanding of that part of this provision of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my personal interpretation is that they would in fact submit DCSs which were consistent with their allocation.
BY MR. SKALABAN:
Q. If it says that the purchaser shall submit DCSs which shall identify all the SNF and/or HLW the purchaser wishes to deliver -- if the purchaser is required to by the instruction to, say, only submit up to the level of their allocation in MTUs, they can't then provide or can't identify -- they can't -- or more specifically, they're precluded from identifying all of the SNF that they may wish to deliver?

Page 213

MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yeah. In my personal opinion, I would read that -- I don't know that you can read any provision of the contract separate and apart from other provisions of the contract. And I guess I would be reading that in conjunction with the prior article, which talks about DOE issuing an annual acceptance priority ranking and an annual capacity report, which delineates our receiving capacity.
And in reading those two together, in my personal opinion, I think you would not -- I can't see a reason why you would infer that you would submit a DCS which was greater than your allocation.
BY MR. SKALABAN:
Q. Well, the language, all SNF and/or HLW that they wish to deliver, that language in that provision is -- it's not tied to an ACR allocation, is it?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. In my opinion, it is. I mean, I guess if I were to read that provision -- you know, hypothetically if I were to read that provision separate and distinct from any other provision in the

Page 214

contract, I could conceivably read that as requiring the utility to deliver that fuel to the repository.
BY MR. SKALABAN:
Q. All the fuel that it wishes to deliver?
A. To the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:
Q. So it can conceivably be read to allow the utility to identify all the fuel that it wishes to deliver, aren't the DCS instructions in effect changing the terms of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion, mischaracterizes prior testimony.
A. Yeah, I think you are mischaracterizing my response.
I was saying a hypothetical that if you read that provision separate and apart from anything else in the contract, you could probably infer any number of things. But I think you read one provision in the contract in conjunction with other provisions. And to me you read that in conjunction with annual capacity report limitations and allocations.
BY MR. SKALABAN:
Q. Well, I guess what -- yeah, I definitely don't want to mischaracterize your prior answers.

Page 215

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and

Page 216

answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.
MR. SKALABAN: Thank you. January 11th, 1994.
BY MR. SKALABAN:
Q. Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose

Page 217

canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no. They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A. Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress.
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it

Page 218

essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q. And it references contingencies evaluated for the MPC system.
Can you tell me what this is about, what contingencies were evaluated for MPC?
A. My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall.
Q. Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

Page 219

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed, hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***



P R O C E E D I N G S

JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.
Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining



misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

memo to which the plaintiffs have referred that Mr. Rusch had – that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch – anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break



for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?



A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the



organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.

Q You said that you were responsible for management of the MRS process. What specifically were you doing?

A At that point in time, we were attempting to find a volunteer site to construct an MRS.

Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?

A Yes, he was.

Q Did you report to Dr. Bartlett?

A Yes.

Q After serving as the director of office – of storage and transportation, what position did you next hold?

A Director of the Office of Program Management and Integration.

Q And what were your responsibilities in that position?

A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.

Q Did you also have responsibility for regulatory interface with the NRC?

A Yes, uh-huh.

Q And then what position did you hold next after you were director of program management and integration?

A After that, I was appointed the acting deputy director of the program.

Q Do you recall approximately when that was?

A I believe that was 1996.

Q And how many times have you served as deputy director of the program?

A I was acting deputy two different times.

Q And what time periods were those?

A It was '96 through '99, roughly, and then 2001 through 2002, roughly.

Q What position did you hold in between these periods that you were data director?

A Chief operating officer.

Q And were your responsibilities as the chief operating officer then substantially the same as they are today?

A Substantially the same, yes.

Q And then in 2002, is that when you became

Page 4716

chief operating officer again?

A Yes, uh-huh.

Q Mr. Milner, prior to joining RW, where were you employed?

A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.

Q Prior to becoming a DOE employee, where were you employed?

A Prior to that, I served eight years as a Naval officer.

Q Mr. Milner, do you hold a Bachelor's degree?

A Yes, I do.

Q In what?

A Mechanical engineering.

Q Where did you obtain that degree?

A University of Mississippi.

Q When?

A 1966.

Q And do you also hold a Master's degree?

A I do.

Q In what subject?

A Also mechanical engineering.

Q When did you obtain that degree?

Page 4717

A 1967.

Q Was that also from the University of Mississippi?

A Yes.

Q Can we have Plaintiff's Exhibit 95, please?

MS. SULLIVAN: May I approach?

JUDGE MEROW: Sure.

MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.

JUDGE MEROW: All right.

MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.

BY MS. SULLIVAN:

Q Mr. Milner, do you have water there? Do you want a cup of water?

A Yeah, that would be great.

MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?

JUDGE MEROW: Of course.

BY MS. SULLIVAN:

Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4722

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?

A Yes, it did.

Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?

A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.

Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?

A Yes, it certainly was.

Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.

A That's correct.

Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?

A I believe there was, yes.

Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

Page 4723

to be the provision that sets forth the requirements of the mission plan?

A Yes, I do.

Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?

A I did not.

Q Why did DOE include acceptance rates in the mission plan?

A Well, one of the requirements for the mission plan was to provide an estimation of – of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the – the program might be operated.

Q Thank you. And that requirement, is that set forth on – as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?

A Yes.

Q Thank you. Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

Page 4724

reason our electronic copy – I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's – same information is there. I think the information just got squeezed. Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?

A Yes. That was an example of – of how the authorized system might operate.

Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?

A Two.

Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs? Mr. Milner, can you read that section, that highlighted material?

A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

Page 4725

A Yes, it does.

Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?

A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?

A That would be the schedules that DOE was committing to to accept the waste.

Q Did DOE publish, if I recall, waste acceptance schedules in 1991?

A Yes, it did.

Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?

A They were to utilize those to develop

Page 4726

their delivery commitment schedules, DCSs, for submittal to the department.

Q And which office within DOE prepared the 1991 ACR?

A The Office of Civilian Radioactive Waste Management.

Q And which office within RW?

A The Office of Storage and Transportation.

Q That was your office?

A Yes, it was.

Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?

A Yes, I have.

Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?

A Yes.

Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?

A It was a – an estimate at any given time of – of the total costs of – of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and – and ultimately decommissioning.

Page 4727

Q Decommissioning of what?

A Of the repository facilities.

Q What is a fee adequacy study?

A The fee adequacy studies using the – the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the – the costs.

Q Why is a TSLCC, or total system life cycle cost report, prepared?

A Well, one, it's – it's good to keep track of the estimate of the program costs but principally is – is input to the fee adequacy analysis.

Q And why are fee adequacy studies prepared?

A They're mandated by the act.

Q By the Nuclear –

A Waste Policy Act.

Q Are there assumptions made for the preparation of a TSLCC?

A Yes, there are.

Q What is the basis for those assumptions?

A They were the current program planning bases at the time.

Q Has DOE changed the assumptions that form the basis for TSLCCs over time?

A Yes.

Page 4728

Q Can we have Plaintiff's Exhibit 248, please?

Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?

A Yes, I do.

Q Could you tell the Court what the document is?

A Well, it – again, it's – the title basically says preliminary estimate of the restructured program, which was an addendum to a prior – prior TSLCC analysis.

Q Were you involved in the preparation of this document?

A No, I was not.

Q Okay. Are you familiar with this document based upon your work with other TSLCCs?

A Yes.

Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?

Mr. Milner, would you read the highlighted portion into the record, please?

A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data

Page 4729

necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.

Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.

Mr. Milner, the sentence that you read, does – just read, does that sentence accord with your understanding as to the purpose of the TSLCC?

A Yes, it does.

Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.

Mr. Milner, would you please read those – the highlighted material into the record?

A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in – specific point in time in order to develop comprehensive set of cost estimates for the system.

Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Page 4734

cycle.

Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?

A The viability assessment that was submitted to Congress.

Q Can we go to page little Roman numeral v, the introduction by – actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?

A Acting deputy director, yes.

Q Thank you. Could we highlight the second paragraph, bring up the second paragraph? Mr. Milner, could you read that portion, the highlighted portion into the record?

A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included. Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept

Page 4735

open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring. Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.

Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?

A No, it is not.

Q Why not?

A Well, you would issue a new one once the assumptions have changed, the program has evolved.

Q Does DOE prepare a test TSLCC every year?

A Not every year.

Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 – or the preparation of the 1991 ACR, correct?

A Yes.

Q Were you – was your office also responsible for the preparation of the 1990 ACR?

A Yes, it was.

Q Could I have Defendant's Exhibit 130,

Page 4736

please? Mr. Milner, do you recognize this document?

A Yes, I do.

Q Could you identify it for the Court, please?

A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.

Q Who was the director at the time you prepared this memo?

A Dr. John Bartlett.

Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?

A Yes, it is.

Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?

A Yes.

Q Or Dr. Bartlett, excuse me.

A Yes.

Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it? Mr. Milner, would you please read that, the highlighted portion, into the record?

A The ACR is required to project both the

Page 4737

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.

Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?

A Yes, it does.

Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?

A Yes, I do.

Q Would you identify it for the Court, please?

A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.

Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?

A Yes, at that time.

Page 4738

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from – letter from the department's contracting officer.
Q Thank you. Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.

Page 4739

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?
A Yes, it is.
Q Do you recognize the other signature to be that of Mr. – Dr. Bartlett?
A Yes.
Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?
A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.
Q Mr. Milner, what was your understanding as to the – about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?
A Well, if – if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

Page 4740

Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?
A Yes, I do.
Q Would you identify it for the Court, please?
A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.
Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?
A Yes.
Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?
A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

Page 4741

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.
Q Thank you. Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?
A It does, yes.
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.
Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?
A No.
Q During your tenure at DOE, are you aware of any planning basis by which – by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

Page 4742

A No, not that I'm aware.
Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?
A No.
Q Why not?
A At – at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.
Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?
A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.
Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?
A No.

Page 4743

Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?
A I – I would have, yes.
Q Mr. Milner, do you recall attending industry meeting – sorry, attending meetings with utility representatives with Dr. Bartlett?
A Yes.
Q Was attending utility meetings with Dr. Bartlett among your responsibilities?
A It was, yes.
Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?
A No.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.
MR. SHAPIRO: We have no objection, Your

Page 4744

Honor.
JUDGE MEROW: Plaintiff's 629 is admitted in evidence.
(PX Exhibit 629 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?
MR. SHAPIRO: Certainly.
JUDGE MEROW: Do you want to take a – sure. Return about – on the hour?
MR. SHAPIRO: 3 o'clock?
JUDGE MEROW: 3 o'clock.
MS. SULLIVAN: Thank you, Your Honor.
(Recess taken from 2:47 p.m. through 3:03 p.m.)
JUDGE MEROW: Mr. Shapiro?
MR. SHAPIRO: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q My name is Robert Shapiro.
A Uh-huh.
Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination. Now, if I understand correctly, the

Page 4745

Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for – for planning purposes, correct?
A Well, in the mission plan at – at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.
Q What about the mission plan amendment?
A Oh, I think that might have been suitable for some very early planning.
Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for – for meeting the – the legislative milestones, correct?
A True.
Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?
A Well, if you're talking about from – from

Page 4750

Q And that – that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.
Q And that's a reasonable rate?
A Yes, I think so.
Q Now, you testified, I believe it was about Defendant's Exhibit 23, the memorandum for approval of the 1991 annual capacity report.
A Uh-huh.
Q And there's one little aspect I wanted to ask you about that. Part of that annual capacity report – we have copies of that available if you need to review that. Part of that had a slow acceptance rate because of some of the limitations that were imposed by the alternative set. Do you recall that?
A Correct.
Q But you were asked to read part of that memorandum that said: Nonetheless, that lower rate was theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in – in 1998.
A Uh-huh.
Q Could you explain for us how – how that analysis was done, how you reached that conclusion?

Page 4751

A Well, if – if you took each utility, what its – its projected spent fuel discharges were, what its pool capacity was, its remaining pool capacity when it would run out of capacity and – and you did that for each utility, then you took the overflow, if I can call it that, from pool storage, in the aggregate, that would be the amount of – of dry storage that would be needed across the industry and our rate would have in the aggregate prevented the need for additional storage.
However, that – that didn't address the fact that – that where the utility that was running out of storage in the queue and at what time their – their waste would be accepted.
Q So that analysis ignored the oldest rule first priority scheme?
A No, it didn't ignore the oldest fuel first.
Q Well, how did it – I thought you just said that it didn't take into account where the utility was in the queue.
A Where the utility that was running out of the storage was in the queue.
Q So how would that acceptance rate be sufficient to help that utility that was running out

Page 4752

of space?
A I think I said that in the aggregate, it would prevent additional at-reactor storage but not necessarily for each specific utility and in fact, that was not the case.
Q So there – there would be utilities that would have to add additional at-reactor storage?
A Yes.
Q What about shutdown reactors? Would that lower rate contemplated in the 1991 annual capacity report do anything for shutdown reactors?
MS. SULLIVAN: Objection, vague.
BY MR. SHAPIRO:
Q Do you understand the question, Mr. Milner?
A No, I'm sorry. Repeat the question.
Q Would the lower rate contemplated in the 1991 annual capacity report, would that be sufficient to handle the spent fuel removal needs of shutdown reactors?
A Well, I'm not – I'm not sure in what sense you mean that, because we did base everything on oldest fuel first if – if a shutdown reactor had the oldest fuel, I suppose it could have handled it, but I don't suppose that was the case in all situations.

Page 4753

Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might – might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual – that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.
Q I'd like to ask you a few questions about monitor retrieval storage. You testified about that a little bit. We discussed also some of these limitations in Department of Energy's ability to accept spent fuel in light of the amendments passed in 1987 that provided linkages between monitored retrievable storage and progress in repository. Are you aware of that?
A Right.
Q It's the Department of Energy that requested those – that those linkages be put into the amendment set, correct?
A Well, no. I believe – as I recall, earlier in the program, the – the department was attempting to develop a – a MRS facility at a site in

Page 4754

Tennessee, the – the former Clinch River breeder reactor site. As I recall, discussions and negotiations with the host community at that time gave rise to those linkages, and Congress simply chose to carry forward those linkages when it authorized an MRS in the amendment side.

Q It wasn't the Department of Energy that requested those linkages?

A I don't recall that to be the case.

Q Let's go back to your – your deposition. I want to ask you about May – a statement you made at May 3rd. Do you want to follow along in your binder? Tab 3. If you could turn to page 554, and were you not asked the following question and gave the following answer starting on line 5? It's a little bit long.

I'd like to talk to you about page 12 now, in particular the last full paragraph, or actually the last paragraph which goes on to the next page under the heading MRS facilities. It says that on March 31, 1987, the DOE submitted to Congress the proposal for construction of an MRS facility to allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority. DOE asked Congress to limit the MRS

Page 4755

storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until the construction authorization for the repository has been received from the Nuclear Regulatory Commission.

Is this an accurate statement, that the DOE was the organization that requested the linkages between the repository and the MRS?

And there was an objection and you answered: Certainly, the DOE was the entity that requested Congress. My recollection of the origins of those linkages were at the time DOE was developing a site-specific proposal for an MRS facility, actually, the old Clinch River breeder reactor site in Oak Ridge, and I believe the local community had requested the department insert those linkages.

MS. SULLIVAN: Objection. The statement that's just been read into the record isn't inconsistent with what Mr. Milner testified to.

MR. SHAPIRO: That can be brought out in redirect. I certainly believe that he denied that it was the department that asked for those linkages.

THE WITNESS: If I could clarify.

JUDGE MEROW: Yes.

A I misunderstood your statement because I

Page 4756

thought you asked me if the department had requested those linkages be placed in the legislation. We had requested those linkages when we submitted an MRS proposal for the Clinch River breeder reactor site not to be placed in the amendment set.

Q Nevertheless, it was the Department of Energy that requested it.

A In its proposal for the Clinch River site.

JUDGE MEROW: Is that to satisfy community?

THE WITNESS: That was to satisfy community concerns, yes.

BY MR. SHAPIRO:

Q We're going back, Mr. Milner, to this 1987 time frame. It was the Department of Energy's plan to start accepting waste at a monitored retrievable storage facility in 1998 and to open a repository in 2003?

A In the '87 time frame, I believe that was correct.

Q And the MRS was intended to be an integral part of the whole waste acceptance system, correct?

A Yes, I believe so.

Q It wasn't intended to be a – a – a standalone system or as a permanent replacement for

Page 4757

storage and disposal?

A Correct.

Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the – the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?

A At a – at a repository?

Q At any facility.

A At any facility?

Q Linkages.

A Yes, I believe that was the case.

Q And as of November 1989 – and that was the time that report to Congress on reassessment of the program – it was the Department of Energy's position that a repository would not be available until 2010, correct?

A Correct.

Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not begin until 2007, correct?

A Correct.

Page 4758

Q And that's because that – that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

Page 4759

might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,

Page 4760

Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that – the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that – that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would – what would happen in that case and yeah,

Page 4761

I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

# Robert Rosselli

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

UNITED STATES,

DEFENDANT.

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.



APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM



BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov



Also Present:
Peter J. Skalaban

folks from within the department where we needed help. And we started interacting with utility representatives.
Q. Did the three of you work on the entire contract, or did you divide up the contract and each focus on a different portion or issue?
A. To the best of my recollection, we worked on the total -- totality of the contract. Although, saying that, clearly, Jay Cavanaugh had a focus on the terms and conditions of government contract and sales instruments, because that's where his expertise was.
Elliott Winneck had, you know, the broad band, you know, the legal aspects and how consistent were we with the legislative history and the statute.
And my focus was more, sort of, the bringing in the technical aspects and the programmatic aspects.
Q. You mentioned that you got input from various people within the department as part of this effort. Do you recall who?
A. No, I don't.
Q. If we go back to Exhibit 1, we could look at the chart showing the office of



management. Do you recall getting input from Mr. Yanoksi, or Mr. Head, or Mr. Brandt?
A. To the degree that I can recall, we certainly had interactions with Mr. Head and got input from his particular group.
Q. If we could turn back to the first page showing the organization of the office. Did you receive input from Mr. Bennett?
A. I don't recall specifically whether we got input from Mr. Bennett.
Q. Do you recall specifically whether you received any input from Mr. Bauer?
A. I don't recall specifically that either.
Q. Do you recall whether you received input from Mr. McElvey?
A. I do not recall that either.
Q. Mr. Lawrence?
A. You know, Mr. Morgan and Mr. Lawrence were my supervisors, you know. So certainly, it was probably discussions with them about the form and substance of the contract. Specifically, things we talked about, I could not recall.
Q. But you would have discussed the contract with them?
A. Yes. That would be fair to assume



that, yes.
Q. On numerous occasions? Would that be fair?
A. I cannot recall that.
Q. Sitting here today, can you recall anyone else within the department who was part of this process?
A. No, I can't.
Q. Now, you testified earlier that you recall beginning work on the contract after the act passed. And I'll represent to you that that occurred on January 7th, 1983. I'll also represent to you that the proposed contract was published for public comment in the federal register on February 4th of 1983.
Would that indicate to you that your group spent something less than a month in developing the initial draft of the contract that was published for public comment?
A. I don't recall.
Q. Sitting here today, do you recall spending more than a month on the initial draft?
A. I think it is fair to say that we spent more than a month in developing the standardized contract draft.



Q. The initial draft that was published?
A. Yes.
Q. Do you recall how much time was spent on that?
A. No, I don't.
Q. Can you describe the contract development process for me? How did you go about developing the first draft of the contract?
A. What I remember and the best of my recollection, there was an iterative process that occurred between the government and the utility industry and then -- and with them within the department, the team. So we would have iterations with the industry, and we'd come back and have iterations, you know, among ourselves. And that was the principal method that was used to development the contract.
Q. What was the basis for the first draft of the contract that was developed?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. No.
Q. In developing the first draft of the contract, did your group use anything as a



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr. Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.



Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading.
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my



recollection.
Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of --
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?



MR. LESTER: Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.

Q. Would Mr. Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did.
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract.
Q. Were these the most important issues?
A. Yes.
Q. And you included this in the briefing memorandum to the secretary so that the secretary



would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q. It was not an issue from the Government's standpoint?
A. Yes.
Q. Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.



Q. You say it wasn't an issue from the Government's standpoint. Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q. Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall.
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did



not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER: Objection. Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q. Can you answer my question, sir?
A. Yes, we did not have a view.
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either. Is that correct?
MR. LESTER: Objection, leading.
THE WITNESS: To the best of my knowledge, that is correct.
BY MR. NESLIN:
Q. Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund. Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A. It was a management audit.

and said we had to be ready.

Q. If we look down at the next to the last sentence, it states that, "1998 date is called for in the Act, and we believe it to be a realistic date." What's meant by "realistic date?"

MR. MILLER: Objection. Calls for speculation and a legal conclusion. Go ahead.

MR. NESLIN: You may answer.

THE WITNESS: That it's doable.

BY MR. NESLIN:

Q. Did you answer the 1998 date to be doable at that time?

A. Yes.

Q. Did DOE consider the 1998 date to be doable at that time?

A. To the best of my recollection, yes.

Q. What was meant by the statement that, "Our performance will be judged by meeting this date?"

MR. MILLER: Same objections.

THE WITNESS: Whether we would have a repository ready to receive high-level waste or spent nuclear fuel by January 31st



1998.

BY MR. NESLIN:

Q. And that would be the standard for determining whether DOE was complying with the contract?

MR. MILLER: Objection. Calls for speculation and a legal conclusion.

BY MR. NESLIN:

Q. In your opinion, sir?

A. Yes.

Q. And so to comply -- in your opinion to comply with the contract, DOE would have to be receiving spent nuclear fuel under the contract by the 1998 date?

MR. MILLER: Same objections.

THE WITNESS: Yes.

BY MR. NESLIN:

Q. Mr. Rosselli, what in your opinion was the purpose of the contract?

A. The purpose of the contract was to document the provisions of the statute, and basically, it was for the return for the utilities providing one mill per kilowatt hour. The Department would have a repository in place ready to receive spent nuclear fuel or high-level



waste by January 31st, 1998.

Q. And why was that important?

A. A question for clarity, why the date was important or the instrument?

Q. Why was the date important? Well, let me back up. Why was the receipt of spent nuclear fuel by the Department important?

MR. MILLER: Objection, vague.

THE WITNESS: First of all, it was a statutory date that we had to comply with.

Second of all, there was a growing concern within the utility community that they were running out or soon would be running out of space for on-site storage.

And thirdly, that could very well impact the continued utilization of nuclear energy.

BY MR. NESLIN:

Q. So would it be fair to say that one of the purposes of the contract was to prevent utilities from having to shut down?

MR. MILLER: Objection. Mischaracterizes his previous testimony and calls for a legal conclusion.



THE WITNESS: No.

BY MR. NESLIN:

Q. No. Well, you earlier testified that there was a growing concern that utilities were accumulating spent nuclear waste. Was there a concern that this may cause individual utilities to have to shut down because of the accumulation of waste?

A. No. There were other avenues available to the utilities to grow with their increased inventory of spent nuclear fuel, re-racking being an example of a potential option.

Q. Or on-site storage?

A. Or dry storage. On site would be another example.

Q. What's your understanding as to why congress decided to adopt this arrangement in which the utilities would provide delivery of the waste to the Department, and the Department would assess a fee in return for that?

MR. MILLER: Objection. Calls for speculation.

THE WITNESS: I wasn't a party to what was addressed, so I can't answer that.

BY MR. NESLIN:



**NAEGELI REPORTING CORPORATION**
Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?

MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.

THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.

BY MR. NESLIN:

Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?

MR. MILLER: Objection. Calls for speculation.

THE WITNESS: I don't know.

MR. LESTER: Lacks foundation.

THE WITNESS: I don't know the answer to that from a utility perspective.

BY MR. NESLIN:

Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?

MR. MILLER: Same objections.



THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing.

BY MR. NESLIN:

Q. There would be additional planning?

A. Right.

Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

MR. NESLIN: You may answer.

THE WITNESS: Yes.

BY MR. NESLIN:

Q. And isn't that, in fact, what the utilities were receiving in return for the fees



they were paying to the Department?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. NESLIN:

Q. And they were paying hundreds of millions of dollars to the Department. Correct?

A. Yes.

Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?

A. Yes.



Q. Was this document prepared as part of the fee-adequacy assessment?

A. I don't recall.

Q. Do you recall why it was prepared?

A. Yes.

Q. Why was it prepared?

A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera.

Q. How did that differ from the fee-adequacy assessment process?

A. I don't recall if there was much difference. I really don't.

Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?

A. Do I recall?

Q. Generally, the process that was followed?

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."
Was this letter and the attached report, in fact, forwarded to utility companies?
A. To the best of my knowledge, it was.
Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?
MR. MILLER: Objection -- withdrawn.
THE WITNESS: That was the stated intent, yes.
BY MR. NESLIN:
Q. Is that your recollection?
A. That was my recollection, yes.
Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson. The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."
Do you recall whether you and others in the Department had planning sessions to



work on the Mission Plan or the Mission Plan strategy?
A. I do not recall.
Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?
A. I do not recall.
Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?
A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no.
Q. Would there have been any documentation prepared regarding such meetings?
A. I don't recall.
(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management



Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?
A. Yes, I was.
Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?
A. No, I don't.
Q. Do you recall when the first draft of the Mission Plan was prepared?
A. No, I don't.
Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?
A. Only this Exhibit 13.
Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?
Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management,



storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
Was it your understanding that that was OCRWM's fundamental objective?
A. Yes.
Q. What do you mean by firm schedule?
MR. MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.
MR. NESLIN: You may answer.
THE WITNESS: Oh --
MR. MILLER: Oh, I'm sorry, yes. Please. Remember you can answer, except when I tell you don't answer that.
THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.
BY MR. NESLIN:
Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?
A. That's correct.
Q. The next sentence states that, "The waste acceptance schedule will initially preclude

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?

A. Yes.

Q Would you agree with that language?

A. Yes.



Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?

A. Yes.

Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?

A. Yes.

Q And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?

MR. MILLER: Objection. Calls for a legal conclusion, speculation.

THE WITNESS: What do you mean by the word "intent?"

BY MR. NESLIN:

Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?

MR. LESTER: Same objection.

THE WITNESS: The intent of congress was what?

BY MR. NESLIN:

Q In enacting the Act?



A. Was what?

Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?

MR. MILLER. Same objection, vague.

THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.

In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.

BY MR. NESLIN

Q. But it reflected the Department's intent at that point in time?



MR MILLER· Objection. Same --

BY MR NESLIN

Q. In administering the program?

MR. MILLER. Same objection.

THE WITNESS· Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.

BY MR. NESLIN.

Q. Let me back up That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time Do you understand my question?

MR. MILLER: Same objections.

THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their

generation rate and, you know, which would then preclude them from having to build additional on-site storage capacity. That's different from contractual intent.
BY MR. NESLIN:
Q. What do you mean by contractual intent?
A. What do I mean by contractual intent?
Q Yes, sir.
A. Contractual intent was, I guess, the quid pro quo between, you know, two parties that in exchange for the utilities paying us one mill per kilowatt hour, we would provide a disposal facility to receive and dispose of their spent nuclear fuel.
Q And what's the basis of that understanding? Where does that understanding come from, sir?
A. That understanding came out of the Department and negotiation of the contract.
Q So what was, in your mind, the contractual intent? Do you recall that issue?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR NESLIN:
Q. What were the utilities receiving in



return for paying the one mill? Making the one mill payment?
MR. MILLER: Objection. Asked and answered.
THE WITNESS. Disposal services.
BY MR. NESLIN.
Q. Disposal services beginning in January of 1998?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q Is that correct?
A. Yes
Q. And disposal of substantial amounts of spent nuclear fuel?
MR. LESTER: Same objections.
THE WITNESS: That doesn't talk about the amounts at all.
BY MR. NESLIN:
Q. Well, sir, you -- if we go back to Exhibit 14, second column.
A. Page?
Q. Page SNO69599. Mr. Morgan's testifying or a portion of Mr. Morgan's presentation in which he talks about the fact that he did not



believe that accepting one spent fuel element would meet the intent of the Act. Do you see that language?
A. Yes.
Q. And you would agree with that. Correct?
A. Based upon the plan I would agree with that
Q. Mr. Rosselli, did you discuss any of your prior testimony with your counsel during the last break?
MR. MILLER: Don't answer that Objection. Calls for privileged communication.
MR. NESLIN: I'm not asking what was said I'm simply asking whether he discussed his prior testimony.
MR. MILLER: The substance of our discussions with Mr. Rosselli are subject to attorney/client privilege, and don't answer that.
MR. NESLIN: You're instructing the witness not to answer?
MR. MILLER: That's correct.
(Whereupon, a document entitled Battelle, Human Affairs Research Centers was marked Exhibit-17.)
BY MR. NESLIN:



Q Mr. Morgan, Exhibit 17 is a memorandum from Thomas Overcast and Susan Carney at Battelle to Emmett Moore?
MR. LESTER. I think it's Mr Rosselli
MR. MILLER: Yeah, you misspoke and said Mr. Morgan.
MR. NESLIN: Mr. Rosselli. Excuse me. I'd like to direct you to page 2 of that document. PNL-117-3152 under heading 3.0, DOE Considers Temporary At-reactor Storage. Would you read those two paragraphs please?
BY MR. NESLIN:
Q. Mr Rosselli, in the first paragraph, it refers to you speaking at, "An Atomic Industrial Forum Conference in Atlanta." Do you see that?
A. Yes.
Q. Do you remember participating in such a conference?
A. No, I don't.
Q. Do you recall during the time that you were at OCRWM making any presentations to outside groups on the waste management program?
A. Yes, I do. I remember being in the the same forum as the conference that Mr. Morgan