**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DOMINION RESOURCES, INC.,**<br>**DOMINION NUCLEAR CONNECTICUT, INC.,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | Case No. 04-83C<br>Judge Bruggink |
| **DOMINION RESOURCES, INC.,**<br>**VIRGINIA ELECTRIC AND POWER COMPANY,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | Case No. 04-84C<br>Judge Bruggink |

**PLAINTIFFS' POST-TRIAL BRIEF**

Of Counsel:

Paul M. Bessette
David M. Kerr
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

June 18, 2008

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

DISCUSSION ........................................................................................................ 3

1. The North Anna ISFSI. ........................................................................................ 3

A. Early understandings on the part of Dominion confirm that no ISFSI was contemplated under circumstances of DOE contractual performance. ........................................ 3

B. DOE did not need to pick up at the industry discharge rate during the very first years of performance in order to preclude additional at-reactor storage: a reasonable "ramp- up" could have been accommodated. ........................................ 4

C. DOE's early planning reflected pick-up and "ramp-up" rates at which North Anna would never have lost full core reserve. ........................................ 6

D. Dominion's real world planning for the North Anna ISFSI assumed, reasonably, no DOE performance. ........................................ 7

E. No testimony or other credible evidence whatsoever supports the government's argument that North Anna would have built an ISFSI in response to the limited and temporary losses of full core reserve reflected in Dominion's primary damage calculation model. ........................................ 10

F. North Anna could, and would, have tolerated the limited and temporary losses of full core reserve potentially presented by some versions of DOE contractual performance. ........................................ 11

G. Other common, inexpensive options, short of an ISFSI, were available to Dominion if it were determined that full core reserve needed to be maintained at all times, and if DOE performance would have resulted in limited and temporary losses of full core reserve. ........................................ 15

H. The government should not benefit from uncertainties created by its own massive breach. ........................................ 16

I. The government in any event overstates the argued damage reduction for the North Anna ISFSI, because even under the government's theory the ISFSI would not be needed after 2003, and some $10 million in security-related costs were incurred after that date. ........................................ 17

J. Dominion should also recover the costs of certain plant modifications that were required to support the ISFSI. ........................................ 18

**TABLE OF CONTENTS**
(continued)

**Page**

2. Surry, North Anna and Millstone Fuel Characterization Charges. ..................... 19

3. The Millstone Unit 2 and 3 Cranes. ........................................................... 20

A. Dominion upgraded the Millstone Unit 2 and 3 cask cranes as a result of DOE's breach. ........................................................................ 20

B. The government has not established that Dominion would have upgraded the Millstone Unit 2 and 3 cask cranes to single failure-proof had DOE performed. ............................................................... 22

C. The government's assertion that the cranes were upgraded to remedy a historical lack of compliance is wrong. ................................ 25

4. Millstone Cask Loading Modifications. ......................................................... 27

A. The Millstone modifications were cask-specific. ................................. 27

B. It is impossible to know what modifications, if any, Dominion might have made at Millstone if DOE had performed. ........................... 28

5. Millstone Heat Load Calculations For License Amendment. ............................ 29

6. Millstone Cask Loading Mobilization and Demobilization Costs. ..................... 31

7. Offsets For Hypothetical DOE Loading Costs Argued To Have Been Avoided. ......................................................................................... 32

8. Overhead Costs. ........................................................................................... 34

9. Internal Labor Costs. ..................................................................................... 36

10. Allegedly "Unsupported" Costs. ...................................................................... 38

A. All of Dominion's claimed internal labor has been shown with reasonable certainty. ................................................................... 39

B. All other non-labor claimed Dominion costs have also been shown with reasonable certainty. ................................................................ 41

11. AFUDC. ........................................................................................................ 44

12. Pre-acquisition Millstone Damages. ................................................................ 45

A. The right to pursue and recover pre-acquisition Millstone damages was validly assigned to Dominion in this case. .................................... 45

B. The NWPA and the Standard Contracts unambiguously allow assignment of "rights and duties of" a party to the Standard Contracts, and not just, as the government argues, assignment of only "continuing" rights and duties, or only the Standard Contracts themselves. ........................................................................................... 46

**TABLE OF CONTENTS**
(continued)

**Page**


C. The government's anti-assignment arguments are wrong as matters of statutory interpretation and common sense. ..... 47

D. This Court's decisions in *Rochester Gas and Electric* and *Vermont Yankee* are squarely on point, and are persuasive. ..... 48

E. Properly considered, neither the *Ginsberg* case nor any other authority supports the government's anti-assignment position. ..... 49

CONCLUSION ..... 50

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*ACE-Federal Reporters v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000)............................. 17

*American National Bank & Trust Co. of Chicago v. United States*, 23 Cl. Ct. 542 (1991) .......................................................................................................... 46

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) .............................................. 48

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ....... 39

*Carolina Power & Light Company v. United States*, No. 04-37C, 2008 WL 2154103 (May 19, 2008) ......................................................................*passim*

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) ........................36, 37, 39

*Dominion Resources Inc. v. United States,* 77 Fed. Cl. 151 (2007) ...........................33, 49

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)..........6, 17, 22, 38

*First Heights Bank, FSB v. United States*, 422 F.3d 1311 (Fed. Cir. 2005) .................. 22

*Gevyn Construction Corp. v. United States*, 827 F.2d 752 (1987)................................. 40

*Ginsberg v. Austin*, 968 F.2d 1198 (Fed. Cir. 1992).................................................49, 50

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)............................. 2

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)..31, 39, 50

*Inhabitants of Montclair Township v. Ramsdell*, 107 U.S. 147 (1883) .......................... 47

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) .................................................... 17

*Lowe v. Securities & Exchange Commission*, 472 U.S. 181 (1985)............................... 47

*Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007) ......................... 2, 34

*Old Colony Trust Co. v. Omaha*, 230 U.S. 100 (1913).................................................... 3

*Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) ................ 2, 34

*Rigsbee v. United States*, 226 F.3d 1376 (Fed. Cir. 2000)............................................ 48

*Rivera Finance of Texas, Inc. v. United States*, 58 Fed. Cl. 528 (2003)......................... 46

**TABLE OF AUTHORITIES, Continued**

**Page**

*Rochester Gas and Electric Corporation v. United States*,
65 Fed. Cl. 431 (2005)....................48, 49, 50

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006)............. 34

*San Carlos Irrigation and Drainage Disrict. v. United States*, 111 F.3d 1557
(Fed. Cir. 1997).................... 39

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2006)...............*passim*

*Splane v. West*, 216 F.3d 1058 (Fed. Cir. 2000).................... 47

*System Fuels v. United States*, 79 Fed. Cl. 37 (2007)....................*passim*

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2005)........................*passim*

*Tuftco Corporation v. United States*, 614 F.2d 740 (Ct. Cl. 1980) ................................ 46

*United Int'l Investigative Service v. United States*, 26 Cl. Ct. 892, 898 n. 2 (1992) ........ 46

*United States v. Capital Sand Co.*, 466 F.3d 655 (8th Cir. 2006) .................................. 35

*Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236
(2006) ....................48, 49

*Wickham Contracting Co. v. Fisher*, 12 F.3d 1574 (Fed. Cir. 1994) .........................40, 44

*Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249 (2006)...................... 34

**FEDERAL STATUTES**

28 U.S.C. 2516(a) .................... 44

Assignment of Claims Act
31 U.S.C. § 3727.................... 46

Assignment of Contracts Act
41 U.S.C. § 15.................... 46

Nuclear Waste Policy Act, Section 302(b)(3)
42 U.S.C. § 10222(b)(3)....................46, 49

**TABLE OF AUTHORITIES, Continued**

**Page**

## CODE OF FEDERAL REGULATIONS AND FEDERAL REGISTER NOTICES

10 C.F.R. § 961.11 .......... 46

18 C.F.R.part 101 .......... 36

59 Fed. Reg. 53,442 (October 24, 1994) .......... 28

72 Fed. Reg. 31,353 (June 6, 2007) .......... 28

## MISCELLANEOUS

Corbin, *Corbin on Contracts* § 55.3 (2005) .......... 16

Restatement (Second) of Judgments, §§ 26(1) .......... 50

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DOMINION RESOURCES, INC., *et al.*** | ) | |
| Plaintiffs, | ) | Case Nos. 04-83C, 04-84C |
| v. | ) | Judge Bruggink |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

## PLAINTIFFS' POST-TRIAL BRIEF

Pursuant to the Court's direction at the close of trial, plaintiffs in Case No. 04-83C, Dominion Resources, Inc. and Dominion Nuclear Connecticut, Inc., and plaintiffs in Case No. 04-84C, Dominion Resources, Inc. and Virginia Electric and Power Company (also doing business as "Dominion Virginia Power") (collectively referred to for these purposes with its predecessors as "Dominion"), respectfully submit this Post-Trial Brief.

## INTRODUCTION

As suggested by the Court at the close of the trial on May 16, 2008, Dominion will not here attempt to marshal all of the evidence and legal authorities requiring rejection of the government's so-called "pick-up rate" defense. *See* Tr. 2964. The overwhelming weight of the pre-dispute contemporaneous evidence establishes that the Department of Energy ("DOE") planned to discharge its duty to accept spent nuclear fuel—derived of course from the Standard Contracts—at a rate "such that no utility will have to provide additional storage capacity after January 31, 1998." PX 34 at p. 2-1.[1] The government testimony adduced at trial,[2] and

[1] *See also, e.g.*, PX 32 at 1046; PX 30 at 00096; PX 37 at 11-12, 69599-69600; PX 39 at 1102; PX 44 at 1199, 1201-1202.

[2] *See, e.g.,* Morgan, Tr. 1171:4-1176:5; 1177:5-1181:15; 1183:3-1185:5; 1190:20-1191:4; 1198:10-24; 1214:10-22; 1236:6-1237:7; Lawrence, Tr. 1843:12-1844:12; 1851:4-18; 1856:14-1858:21; 1864:24-1866:10; 1870:4-

introduced into the record,[3] is to like effect. And the contemporaneous evidence on the Dominion side of the table, both documentary[4] and testimonial, [5] is fully consistent with the proposition that "additional storage capacity after [January 31, 1998] would not be required." (Smith, Tr. 129:8-24). The ever-increasing weight of on-point legal authority enforces these principles and confirms that the government's pick-up rate arguments are "not . . . at all persuasive." *Carolina Power & Light Company v. United States*, No. 04-0037, 2008 WL 2154103, at *19 (Fed. Cl. May 19, 2008).[6]

As the Court correctly observed, the DOE in this case has simply not performed at all. *See* Tr. 2965. Indeed, the DOE began an obvious and inexorable slide toward non-performance during the mid 1980s that continues to this day. The government's present effort to freeze its legal obligations, for damage calculation purposes, at a 1991 mid-point along that downward slide is "severely flawed." *System Fuels v. United States*, 79 Fed. Cl. at 56. The standard employed by Dominion, by contrast, is consistent with the pre-dispute expectations and intent of the parties, and is a "reasonable basis for calculating Plaintiffs' damages." *Carolina Power & Light Company*, 2008 WL 2154103, at *18. Application of the appropriate contractual standard and the controlling legal principles to the real-world mitigation activities of Dominion

---

1871:12; 1912:14-1914:14; 1930:8-17.

3 *See, e.g.,* Barrett, Lake H. 4/22/02 Deposition Tr. 51:17-52:17; Barrett, Lake H., 5/10/02 Deposition Tr. 1368:10-1369:14; Brownstein, Alan 4/10/02 Deposition Tr. 412:5-21; Milner, Ronald A. 5/1/02 Deposition Tr. 84:17-85:24; Rosselli, Robert M. 4/15/02 Deposition Tr. 140:6-10; Rosselli, Robert M. 4/15/02 Deposition Tr. 147:15-149:17; Trebules, Victor W. 4/17/02 Deposition Tr. 52:11-22.

4 *See, e.g.,* PX 16 at 60759; PX 20 at 35767.

5 *See, e.g.,* (Smith, Tr. 129:8-131:10, 134:8-136:19, 178:8-18); (Wakeman, Tr. 315:19-318:4).

6 *See also System Fuels v. United States*, 79 Fed. Cl. 37, 56 (2007); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 417-21 (2006); *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 462 & n.13 (2007); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99-100 (2003). *But see, contra*, *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) ("PG&E"). *PG&E* is the only case to hold to the contrary, and that case, along with *Southern Nuclear, System Fuels, and Northern States Power,* are currently on appeal. Dominion respectfully disagrees with the result reached by the trial court in PG&E, albeit on the different record then before it, and suggests that it is becoming increasingly apparent that the decision there is an aberration.

establishes that Dominion is entitled to all of the damages that it seeks, and that the government's various defenses must be rejected. We now turn to the particular activities challenged by the government and identified by the Court in its post-trial observations.

## DISCUSSION

### 1. The North Anna ISFSI.

There is no testimony or other credible evidence whatsoever that supports the government's argument that Dominion would have built an ISFSI at North Anna even if DOE had fully complied with its obligations under the Standard Contract. To the contrary, the evidence demonstrates that DOE's breach prompted Dominion to build the North Anna ISFSI.

A. *Early understandings on the part of Dominion confirm that no ISFSI was contemplated under circumstances of DOE contractual performance*. At the time the Standard Contract was signed, Dominion recognized that it was responsible for providing interim storage for fuel discharged from its reactor until the federal waste management program came online. (PX 16 at DOM00060757.) In a presentation on March 22, 1983, for example, Marvin Smith set forth how Dominion was planning to meet its spent fuel storage needs up to "1998" at North Anna and Surry. (Smith, Tr. 175:2-4; PX 16 at DOM00060759.) Dominion's planning was based on the belief that DOE would begin accepting spent fuel in 1998, and that after that point no additional at-reactor storage would be necessary. (Smith, Tr. 178:8-24.)[7]

In 1983, Dominion planned to install new spent fuel storage racks to increase the capacity of the North Anna spent fuel pool, ship some Surry fuel (by truck) to North Anna if necessary, and build a dry cask storage system at Surry. (PX 16 at DOM00060757-59; PX 20 at DOM00035755.) Dominion's 1983 planning included the desire to maintain full core reserve at

[7] And, these early conceptions of the parties' obligations are the most reliable. *E.g., Carolina Power & Light*, 2008 WL 2154103, at *14; *System Fuels*, 79 Fed. Cl. at 53; *see also Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913).

Surry and North Anna. (PX 16 at DOM00060755.) No dry cask storage system was planned for North Anna. (PX 16 at DOM00060755; Smith, Tr. 233:4-17.)

At this early juncture, it was not clear whether Dominion would need to transship fuel from Surry to North Anna, but if Dominion did not transship, Dominion "had enough storage at North Anna" to keep operating and maintain full core reserve until approximately 1998. (Smith, Tr. 233:4-17.) That is when Dominion believed that DOE would begin accepting fuel. (Smith, Tr. 177:8-21) Although Dominion obtained permission to do so, there were never any actual transshipments from Surry to North Anna. (Smith, Tr. 177:2-7.) A significant advantage to avoiding such transshipments was to be able to operate North Anna up until the 1998 time frame, when DOE performance would commence, without instituting dry storage or some other type of supplemental spent fuel storage. (Smith, Tr. 177:8-21.) Dominion ultimately did avoid transshipments by placing the Surry ISFSI into service by 1986. (Smith, Tr. 176:22-177:1.)

*B.* *DOE did not need to pick up at the industry discharge rate during the very first years of performance in order to preclude additional at-reactor storage: a reasonable "ramp-up" could have been accommodated.* During the early years of the program, DOE recognized that it must design a program that would eliminate the need for at-reactor storage after 1998. (*E.g.,* PX 34 at 1-1; *see supra* notes 1-3.) In April 1984 DOE released a draft mission plan, which projected a five year ramp-up period for the first repository starting in 1998: 400 MTU for the first three years, 900 MTU in the fourth year, 1800 MTU in the fifth year, and 3000 MTU per year thereafter. (PX 40 at 2-2, DOM2-00000152.)

Although Dominion would have preferred a higher initial acceptance rate, it could have tolerated a reasonable ramp-up and still avoided the need for additional at-reactor storage at North Anna after 1998. (Smith, Tr. 221:5-12.) The pick-up rate and ramp-up period as defined

in the 1984 Draft Mission Plan, therefore, did not prompt concerns about the storage capacities at North Anna after 1998 (Smith, Tr. 232:20-233:2), much less plans for an ISFSI.

In the prior 1983 Draft Mission Plan, DOE contemplated avoidance of additional utility at-reactor storage *in the aggregate:* "While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. . . . The use of . . . brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments." (PX 34 at 2-2 through 2-4.)

It was DOE's understanding that a brokering mechanism could be used to avoid the need for additional at-reactor storage during the ramp-up period. (Morgan, Tr. 1184:14-1185:4; Lawrence, Tr. 1880:2-1881:1; *see also* PX 26 at Art. V.E.) Dominion also understood at this point in time that it would be able to exchange DOE pick-up allocations, especially with other nuclear units that Dominion owned, such as Surry. (Smith, Tr. 252:4-13.) In addition, under the Standard Contract, Dominion had the right to increase the amount of spent fuel DOE would accept by 20%: "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." (PX 26 at 11.)

The extent to which the brokering and/or adjustment provisions, or other options,[8] would be needed depended upon the actual pick-up rate and performance of DOE, which of course never occurred. Dominion should not be penalized because of any resulting uncertainty. *E.g., Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). The point,

[8] Dominion might also have sought to invoke Federal Interim Storage, which was "incremental" storage DOE was authorized to provide under the NWPA "more or less on an emergency basis." (Lawrence, Tr. 1854:2-1855: 22.)

however, is that a functioning DOE program could have accomplished the core goal of precluding additional at-reactor storage after 1998—including the avoidance of an ISFSI at North Anna—and still accommodated some reasonable "ramp-up" in the early years. The record so reflects, and that was certainly Dominion's understanding. (Smith, Tr. 221:5-12.)

*C.* *DOE's early planning reflected pick-up and "ramp-up" rates at which North Anna would never have lost full core reserve.* Early conceptions of DOE performance reflected reasonable ramp-up rates—in many respects more aggressive than the rates ultimately used by Dominion to calculate its damages—which would have resulted in no losses of full core reserve at North Anna.

According to the initial 1983 Draft Mission Plan and to Mr. Morgan, for example, if DOE had performed in 1998 by utilizing a repository, one could assume that DOE would accept 1800 MTU per year in aggregate over the first five years. (Morgan, Tr. 1249:9-16; *see also* PX 34 at p. 2-3.) Mr. Morgan also stated that the Standard Contract required DOE to obtain "[t]he best performance that we could attain out of the facility." (Morgan, Tr. 1252:7-11.)

In the June 1987 OCRWM Mission Plan Amendment, DOE offered a revised waste-acceptance schedule that called for pick-up at an MRS starting in 1998. (PX 55 at DOM2-00000552.) The overall pick-up rate would be 1200 MTU per year for 5 years, then at 2000 MTU for one year, 2650 MTU for four years, and then 3000 MTU per year thereafter. (PX 55 at DOM2-00000552.) This pick-up rate was used in the June 1987 Annual Capacity Report ("ACR"). (PX 56 at 7.) Under this 1987 ACR rate, by simply exchanging priorities with Surry, Dominion would never have lost full core reserve at North Anna through the end of its licensed life. (Wakeman, Tr. 472:9-473:1; PX 223 at DOM00095958.)[9] There would have been no need

9 North Anna and Surry are clearly allowed to exchange allocations, as they are covered by the same Standard Contract. (PX 26; Smith, Tr. 253:2-4; Wakeman, Tr. 392:9-393:9; 416:10-22.) Sharing allocations between

at the 1987 ACR rate, therefore, for Dominion to reconsider its spent fuel management strategy, which did not include the construction of dry storage at North Anna. As Mr. Wakeman explained, "[i]f I could use an allocation at North Anna instead of Surry and prevent building of an ISFSI, then that's the best thing to do." (Wakeman, Tr. 393:12-15.)[10]

*D.* *Dominion's real world planning for the North Anna ISFSI assumed, reasonably, no DOE performance.* By 1993, the DOE program had been spiraling southward for some time, and meaningful performance by DOE could be characterized, charitably, as quite uncertain at best. For example, the expected date for a permanent repository had slipped to 2010. (Pollog, Tr. 1735:1-11, 1741:21-25; DX 65 at p. ix-x). The only hope for performance had been a Monitored Retrievable Storage Facility ("MRS"), but DOE had "give[n] up the ghost on the MRS" in response to the 1987 Amendments to the Nuclear Waste Policy Act. (Kouts, Tr. 2780:15-2781:5.) DOE's 1988 ACR had given up on a 1998 start date altogether. (PX 60 at 4; Pollog, Tr. 1737:19-23.) Although DOE soon reversed itself regarding the purported MRS strategy, *see* DX 65, the GAO had issued a report in 1991 entitled "Operation of a Monitored Retrievable Storage Facility Is Unlikely By 1998." (PX 73.) For DOE to have performed at all by 1998, Congress would have to have rescinded at least a part of the 1987 Amendments. (PX 74 at v; PX 68 at 5; Pollog, Tr. 1731:11-1733:4.) Further, the position of the Nuclear Waste Negotiator authorized by the 1987 Amendments, which had not been filled until 1990 (PX 68 at

---

North Anna and Surry is not, as the government has on occasion claimed, an assumption for the purposes of litigation based only upon hindsight. The DOE Contracting Officer testified that "the Department's position has been, as long as I've been aware of it, that a single utility entity could trade its allocations within its family as it saw fit." (Zabransky, Tr. 1499:7-13.) Dominion also understood from the very beginning of the program that it could exchange allocations with Surry. (Smith, Tr. 252:4-13.) It would have been inherently reasonable for Dominion to use Surry allocations at North Anna to avoid the $10 million plus cost of building an ISFSI at North Anna. (Wakeman, Tr. 470:13-471:7.)

10 Indeed, even the government's expert Dr. Neuberger agreed with Mr. Wakeman's conclusion regarding the use of Surry allocations at North Anna. (Neuberger, Tr. 2064:17-23.) Dr. Neuberger did not challenge Mr. Wakeman's 3000 MTU model, which assumes such sharing. (Neuberger, Tr. 2059:24-2061:1.)

p. 2492), was about to expire without concluding an agreement for an MRS or a repository (Kouts, Tr. 2800:19-25).

It was in this environment, in 1993, that Mr. Wakeman recommended that Dominion build an ISFSI at North Anna. (Wakeman, Tr. 538:12-22; PX 85.) At that point, Mr. Wakeman did not believe that DOE was going to begin performing in 1998, or at any point soon thereafter. (Wakeman, Tr. 547:5-8; Tr. 548:4-16; Tr. 540:11-19.) When analyzing how North Anna should manage its spent fuel, therefore, Mr. Wakeman assumed that DOE would not pick up any fuel from North Anna before the end of its operating license. (Wakeman, Tr. 549:3-550:1; Tr. 550:21-24; Tr. 555:12-15.)

Nonetheless, as a point of comparison, Mr. Wakeman prepared an illustration of DOE acceptance at the 900 MTU pick-up rate from the then-most recent DOE publication, the 1991 ACR. (Wakeman, Tr. 542:5-12.) DOE's performance at the 3000 rate, however, was *not* part of Mr. Wakeman's analysis.[11] (Neuberger, Tr. 2070:25-2071:2.) Assuming that there might be political considerations involved with using Surry allocations at North Anna, at one point Mr. Wakeman contemplated basing the comparative illustration of hypothetical DOE shipments from North Anna only on allocations arising from North Anna fuel. (Wakeman, Tr. 540:20-542:4; 650:5-17; PX 85, at DOM00010281.) In his final report, however, Mr. Wakeman did, in fact, use some Surry allocations at North Anna to illustrate one possible impact of DOE beginning performance in 1998 at the 900 MTU rate. (Wakeman, Tr. 540:20-542:4; PX 85 at DOM00010286.)

---

[11] There is simply no evidence to support the government's assertion that "plaintiffs own spent fuel planning studies, performed by the same person who will sponsor plaintiffs' causation models, contemplate the construction of an ISFSI at North Anna if DOE had accepted SNF at the 3,000 MTU rate." (3/17/08 Def. Memorandum of Contentions of Fact and Law at 57.) A 2006 decommissioning cost estimate (DX 212), created 12 years after the decision to build the ISFSI was made, is not to the contrary. The state regulatory agency requesting the models created for that report dictated artificial assumptions (such as no sharing of allocations) to be used. (Wakeman, Tr. 717:2-719:3.)

The assumptions and Dominion decision-making would, unquestionably, have been different if DOE had not breached. The Standard Contract effectively contemplated that DOE would have its facility designed by 1987: "[b]y 1987, we anticipated there would be a license application and that we would understand what the NRC requirements would be for the thing. In other words, the uncertainties of the program would be reduced," (Morgan, Tr. 1187:11-15) because DOE would have a design for the facility (Morgan, Tr. 1201:16-19). By either 1987 or 1991, then, the facility would be designed and DOE could provide a more reliable pick-up rate. (Morgan, Tr. 1193:9-12; Tr. 1201:3-14.)

If DOE's facility had been designed to pick up fuel at a rate similar to the 2004 ACR rate (PX 191 at 2), in 1993 Dominion would have faced limited and temporary losses of full core reserve. Specifically, North Anna would have had to manage a 5-assembly loss of full core reserve from the end of the fall 1998 Unit 1 outage through the point in 1999 when DOE would have picked up fuel from North Anna, and a loss of full core reserve by 52 assemblies from the end of the fall 1999 Unit 2 outage to the point in 2000 when DOE would have picked up fuel. (Wakeman, Tr. 429:13-430:16.) If the DOE facility had been designed to pick up fuel at rates reflected in the 1987 ACR, North Anna would not have lost full core reserve at all. (Wakeman, Tr. 472:9-473:1; PX 223 at DOM00095958.)

Mr. Wakeman confirmed that a 5-assembly gap in 1998 would be "fairly easy" to erase by regaining storage locations currently being used to store non-fuel materials. (Wakeman, Tr. 431:18-433:16.) With the 1998 loss of full core reserve by 5 assemblies easily resolved, the only potential issue is how Dominion would have managed a 1999 loss of full core reserve by 52 assemblies. There were "a number of options" to deal with a 52-assembly gap. (Wakeman, Tr. 433:17-434:5.) These options will be discussed further below, but, generally speaking, the issue

of how to accommodate the future temporary loss of full core reserve by 52 assemblies in the hypothetical world of DOE's performance is very different from what Dominion actually faced in 1993. In 1993 in the real world, DOE's performance was at best uncertain. Dominion therefore was looking only at long-term storage options to allow North Anna to operate through the year 2020. (Wakeman, Tr. 713:1-18.) Dominion, understandably, did not consider alternatives to resolve a short-term loss of full core reserve. (Wakeman, Tr. 713:19-714:4; Tr. 714:15-19.)

*E.* *No testimony or other credible evidence whatsoever supports the government's argument that North Anna would have built an ISFSI in response to the limited and temporary losses of full core reserve reflected in Dominion's primary damage calculation model.* As noted above, several early published "ramp-up" rates for DOE performance commencing in 1998 result in no loss of full core reserve whatsoever at North Anna. (Wakeman, Tr. 472:9-473:1; PX 56 at 7; PX 223 at DOM00095958.) For purposes of calculating its claimed damages for this case, Dominion used the data and 3000 MTU/year pick-up rate with the "ramp-ups" reflected in the most recent DOE Acceptance Capacity Report, the 2004 ACR. (PX 191; *see* PX 222; Wakeman, Tr. 372:19-343:13).[12] Had DOE performed at precisely those rates, and without Dominion's taking advantage of permissible exchanges or contractual increases in allocation by 20% (*see supra* Part 1.B.), North Anna would have had to address temporary losses of full core reserve by some 5 assemblies (which, again, was "easily addressed"), and by some 52 assemblies, both for periods of at most 15 months. (Wakeman, Tr. 429:13-430:16.)

If the future loss of full core reserve that Dominion had been anticipating in 1993 were a temporary loss by 52 assemblies for at most 15 months, Dominion clearly would *not* have built

[12] The rates in that 2004 ACR have specifically been held to be a "reasonable measure of DOE's performance absent the breach," and a "reasonable basis for calculating Plaintiffs' damages." *Carolina Power & Light*, 2008 WL 2154103, at *18.

an ISFSI. Both Mr. Wakeman and Mr. Basehore confirmed that a $10 million ISFSI would not be a cost effective way to store 52 assemblies, which would only require 2 casks, for only a short period of time. (Wakeman, Tr. 715:4-14; Basehore, Tr. 1113:7-19.) That testimony is uncontroverted.

Indeed, the following proposition cannot be emphasized too much: there is not a single snippet of testimony, not a single excerpt from a document, not a scintilla of evidence in the massive record created during this two week trial, either contemporaneous or after the fact, even from the government's retained experts, that the government will be able to point to that just comes right out and says—or, indeed, even fairly *suggests*—that Dominion would have built an ISFSI under an assumption of reasonable DOE performance at something like the 3000 MTU/year rate.[13] All that the government can do is *argue* that Dominion would have done so, by way of misdirected inference. That, respectfully, is not sufficient to support a finding on this record that Dominion is not entitled to the North Anna ISFSI costs.

*F. <u>North Anna could, and would, have tolerated the limited and temporary losses of full core reserve potentially presented by some versions of DOE contractual performance.</u>* The first, and most obvious, option for dealing with the short losses of full core reserve reflected in Dominion's primary damage calculation model is the approach Dominion actually employed on multiple occasions in the real world, *i.e.,* to prepare for contingencies, but ultimately to tolerate the circumstances.

13 Even Dr. Neuberger, who opines that Dominion would have expanded spent fuel storage at North Anna under the 3000 rate, does *not* assert that Dominion would have built an ISFSI to provide the storage. (Neuberger, Tr. 2114:2-6; 2112:4-24; 2063:16-20.) He agrees that this loss of full core reserve is temporary (Neuberger, Tr. 2109:12-14) and not particularly large (Neuberger, Tr. 2112:25-2113:3). Mr. Grillo did not opine about whether Dominion would have build an ISFSI at North Anna. (Grillo, Tr. 2280:20-2281:1.) And Mr. Johnson's assumption that at the 3000 MTU rate, "additional storage capacity would be yielded by the construction of an ISFSI at the North Anna facility" was based solely on instructions from government counsel. (Johnson, Tr. 2710:12-16; 2708:10-19; 2640:14-17.)

Dominion desires to maintain full core reserve "[b]ecause it gives [Dominion] the ability to offload an entire core should we need to for some unforeseen reason." (Brookmire, Tr. 25:22-26:2.) Having to unload the core between scheduled outages, however, is quite rare. In Mr. Grillo's 36-year career, for example, he has only been involved in two unplanned offloads, both at Yankee Rowe early in Mr. Grillo's career (in the 1970s). (Grillo, Tr. 2294:3-6; Tr. 2400:18-2401:1.)

For this reason, maintaining full core reserve, while certainly important to Dominion, is not a statutory requirement, a regulatory requirement, or even a formal Dominion "policy." (Brookmire, Tr. 25:13-26:8; Basehore, Tr. 1110:2-7.) One option for handling a limited and temporary loss of full core reserve, therefore, is to tolerate it. (Basehore, Tr. 1112:15-1113:6.) *See Southern Nuclear*, 77 Fed. Cl. at 427 ("Rather than build expensive dry storage, any loss of [full core reserve] would have been tolerated because DOE's continuing performance in the non-breach world would have restored [full core reserve] in a relatively short time.") After all, as Dr. Neuberger points out, "certainly there are limits to how much a company is willing to spend to deal with unexpected future events." (Neuberger, Tr. 2079:25-2080:2.) And Mr. Grillo concedes that there are situations in which loss of full core reserve would be acceptable. (Grillo, Tr. 2397:6-10.)

In fact, Dominion has tolerated temporary losses of full core reserve in the real world on multiple occasions. (Brookmire, Tr. 26:9-26:12; Basehore, Tr. 1110:8-25.) Specifically, Dominion has "lost full core reserve at Surry plants five times by up to nine months . . . and our Kewaune [*sic*] plant has a outage that started this month and when . . . they complete their refueling outage this month they will have lost full core reserve." (Wakeman, Tr. 421:12-18; Tr.

426:18-24.) Dr. Neuberger agrees that a rational manager would look to these past experiences as part of the decision-making process for a pending situation. (Neuberger, Tr. 2121:25-2122:7.)

To determine whether tolerating a loss of full core reserve would be acceptable, Dominion would look at several factors: How long the loss of full core reserve would be, by how many assemblies, the certainty of regaining full core reserve, the affect on future operations, possible contingencies, and their costs. (Basehore, Tr. 1111:25-1112:3; Wakeman, Tr. 426:25-427:11; Grillo, Tr. 2397:11-2398:1; Neuberger, Tr. 2123:3-21.)[14]

As explained above, in the hypothetical but-for world, the loss of full core reserve of 52 assemblies would last approximately 3 months, if DOE picked up spent fuel at North Anna at the first possible opportunity in the designated pick-up year, but no more than 15 months, if DOE picked up at the last possible opportunity in the designated year. (Wakeman, Tr. 429:13-430:16.) This is comparable to the occasions of loss of full core reserve in the real world, which include a loss for 8 months (PX 180 at DOM00044367), and Dominion is currently planning to be without full core reserve at Kewaunee for 12 months (Wakeman, Tr. 427:23-428:2). The extent of the loss, 52 assemblies (or fewer than 2 NUHOMS casks), is also comparable with that in the real world where the Surry events, for example, ranged from "two assemblies to approximately 30 to 40." (Wakeman, Tr. 427:14-20.)

If DOE were performing according to a set schedule developed from a design of an actual facility, and that schedule was based on a pick-up rate like that set forth in the 2004 ACR, Dominion would have been able to be comfortable in 1993 that, if it lost full core reserve in

[14] Another factor Dominion would look at is what, if any, maintenance might be affected by the loss of full core reserve. (Brookmire, Tr. 65:8-20.) For example, each reactor requires a ten-year inspection that involves removing all fuel from the reactor. (Grillo, Tr. 2398:2-18.) Such events, however, by their nature are predictable and thus, if necessary, Dominion could have managed around it. (Grillo, Tr. 2399:18-19.) Conducting the inspections early or later than scheduled would be an obvious solution.

1999, it would permanently regain full core reserve in 2000.[15] Indeed, the situation is very similar to Dominion's regaining loss of full core reserve at Surry by loading fuel into a dry storage cask that had been delayed (Brookmire, Tr. 82:9-24) and to what Dominion planned to do at Millstone to regain full core reserve if the ISFSI there was not ready in time (Wakeman, Tr. 428:20-429:2).

With advance notice, in the hypothetical world, Dominion had plenty of time to consider how to manage a possible loss of full core reserve. It also would have had time to consider whether to implement a contingency plan to accommodate a full core offload in the event it became necessary: "To the extent we knew about these events in advance, and we did, we would come up with a – we would discuss contingency plans and look at future operations in the future and how they might be affected by full core reserve, and in all of those five cases we did not implement any contingency plans. We just accepted the loss of full core reserve until it was regained." (Wakeman, Tr. 426:25-427:11.) In the real world, Dominion chose not to actually implement a contingency plan when it decided to tolerate a loss of full core reserve. However, if one were of the view that full core reserve must always be maintained, the evidence establishes that possible options—short of constructing a $10 million ISFSI for two casks for less than two years—could have been implemented.

15 Dr. Neuberger's opinion that Dominion would have been "[l]ooking forward in an environment that wasn't perfectly certain" and would have done "something" at North Anna (Neuberger, Tr. 2063:16-20) is thus contrary to Dominion's actions in the real world. The likelihood (or rather unlikelihood) of an "emergency at a plant" (Neuberger, Tr. 2079:25-2080:25) is the same in the hypothetical world as in the real world, when Dominion was waiting for a cask to regain full core reserve at Surry or was contemplating the loss of full core reserve at Millstone if the ISFSI was not licensed on time. In other words, the same "uncertain" environment that Dr. Neuberger described in the hypothetical world is what Dominion faced in the real world when it decided on several occasions to tolerate loss of full core reserve. The only difference was that, instead of tolerating a loss of full core reserve as it waited to send fuel to an ISFSI as Dominion did in the real world, in the hypothetical world of DOE's performance Dominion would have tolerated a loss of full core reserve as it waited to send spent fuel to the DOE's (assumed, by definition, to be operating) facility.

*G.* *Other common, inexpensive options, short of an ISFSI, were available to Dominion if it were determined that full core reserve needed to be maintained at all times, and if DOE performance would have resulted in limited and temporary losses of full core reserve.* To physically recover full core reserve for an outage (or in the event of an emergency shutdown) Dominion could accommodate 52 fuel assemblies by placing a temporary rack in the cask loading area, which is adjacent to the spent fuel pool. (Basehore, Tr. 1120:8-24; Wakeman, Tr. 433:17-434:5; Tr. 440:8-23; Tr. 714:5-14.) A temporary rack in the cask loading area could hold approximately 100 fuel assemblies (Wakeman, Tr. 433:17-434:5) and would have been a reasonable cost-effective alternative to the "large capital expenditure" required to build an ISFSI (Basehore, Tr. 1113:13-23).[16]

In addition, Dominion's desire to have full core reserve is at its highest just prior to a refueling: "Well, what we need to assess is during the refueling outage, where we need to do any type of activities, we'll have to address any maintenance activities that would have to be effected within the reactor building itself. But generally speaking, the one that we have to plan for is getting the new fuel assemblies into the reactor and preparing to do that activity." (Brookmire, Tr. 65:8-20.) If Dominion were to lose full core reserve for an extended period of time, and thus have to perform a refueling without having full core reserve in the pool, it could perform an "in-core shuffle," which does not require full core reserve. (Basehore, Tr. 1112:4-14.)[17] Indeed, Dominion routinely performs such a procedure at Millstone Unit 2 (Basehore, Tr. 1115:5-12),

---

16 *See Tenn. Valley Auth.v. United States*, 69 Fed. Cl. 515, 533 (2006) ("Overall, given the number of viable alternatives available to TVA, the court finds that TVA would have been able to avoid the need to build dry storage facilities.").

17 In most refueling outages, Dominion removes all assemblies from the reactor because, while only a third of the assemblies are actually replaced, the assemblies that are not replaced are put in a different pattern. (Basehore, Tr. 114:2-24.) There is tooling available, however, to "shuffle" the assemblies in the reactor so that only a third of the assemblies (those being replaced) must be discharged during the refueling. (Basehore, Tr. 1115:1-4.) This "in-core shuffle" technique is the routine practice at Millstone Unit 2. (Basehore, Tr. 1115:5-12.)

and acquiring the necessary tools to perform such procedures at North Anna would not be expensive or time consuming (Basehore, Tr. 1115:13-1117:2).

H. *The government should not benefit from uncertainties created by its own massive breach*. At the inception of the federal waste program, Dominion planned to maintain full core reserve at North Anna through the time of DOE's performance without building an ISFSI. Dominion was forced to depart from this course in 1993, when it reasonably decided that it was more prudent to base its spent fuel strategy on the assumption that DOE was not going to perform under the Standard Contract, at least through the end of the original North Anna operating license. The government now argues that even if DOE had performed, Dominion would still have departed from its course in 1993 because of "uncertainties in the nuclear utility environment." (3/17/08 Def. Memorandum of Contentions of Fact and Law at 57.) The government additionally argues that Dominion bears the burden to "recreate the world in which DOE has not breached" and thus account for the costs of options that Dominion may have taken to avoid argued losses of full core reserve. (3/17/08 Def. Memorandum of Contentions of Fact and Law at 59.)

The only relevant "uncertainties," however, were created by the government's breach. Had DOE been on track to perform, Dominion could have relied (and would have been entitled to rely) on DOE's planning and performance as Dominion considered in 1993 how to manage its spent fuel. There is no basis, therefore, for Dr. Neuberger's opinion that had DOE performed under the contract, Dominion's planning in the 1993 timeframe would have nonetheless been marked with uncertainties that preclude or reduce recovery. (Neuberger, Tr. 2075:5-19.) The generic possibility of "an emergency at a plant" is simply not enough to justify the expenditure required for a large capital project like an ISFSI. (Neuberger, Tr. 2079:20-2080:25.)

As a matter of law, the government misstates Dominion's burdens. "The position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve." Corbin, *Corbin on Contracts* § 55.3 (2005). The government seeks to require Dominion to recreate, and account for, a hypothetical world of DOE performance with absolute certainty, but the impediment to such an exercise is DOE's own massive breach. The law is clear that "the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages." *Energy Capital*, 302 F.3d at 1327; *see also ACE-Federal Reporters v. Barram,* 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960). To the extent that there is any uncertainty regarding whether Dominion would have constructed an ISFSI at North Anna had DOE performed (and we respectfully suggest that there is no such uncertainty, and Dominion would not have done so), the risk of that uncertainty must be borne by the government.

I. *The government in any event overstates the argued damage reduction for the North Anna ISFSI, because even under the government's theory the ISFSI would not be needed after 2003, and some $10 million in security-related costs were incurred after that date.* In addition to the fixed costs of building the ISFSI at North Anna, Dominion incurs annual costs, including primarily security, to maintain and monitor the facility. (Johnson, Tr. 2713:5-8.) Even if, contrary to all of the above, one were to conclude that Dominion would have built the North Anna ISFSI to accommodate a mere 52 assemblies (2 casks) for a few months, Dominion would not have maintained the ISFSI any longer than necessary, given the significant annual operating costs.

Dr. Neuberger confirmed that if Dominion placed 52 assemblies into the North Anna ISFSI, DOE's acceptance of fuel from North Anna would have created enough space in the pool

to allow the 52 assemblies to be offloaded from the ISFSI back into the pool by 2003. (Neuberger, Tr. 2110:6-2111:2.) Removing the spent fuel from the ISFSI at this point would mean that Dominion would avoid all ISFSI security monitoring costs from 2003 forward. (Neuberger, Tr. 2111:3-8.) As confirmed by the SAP cost report, all the security costs for the North Anna ISFSI, for a total of $10,720,545, were incurred after 2002. (PX 249 at DOM00000181-DOM0000448 (Object 288N.1.5); DX-D5 at 14.) If an adjustment is taken for the North Anna ISFSI, therefore, it should only be $12,195,605,[18] not the $22,916,150 claimed by the government. (DX-D5 at 61.)

*J.* *<u>Dominion should also recover the costs of certain plant modifications that were required to support the ISFSI</u>*. The government also challenged certain specific plant modifications that were required to support the North Anna ISFSI.[19] No such reductions, however, are warranted. The original cask handling system at North Anna was "based on an assumption that we would ship spent fuel on a regular basis for reprocessing or recycling." (Wakeman, Tr. 561:12-562:1.) When Dominion decided to build the North Anna ISFSI, it had to modify certain components to accommodate the far heavier storage casks designed for the ISFSI. (PX 117) The original facility was simply "not set up for or designed for the handling of a TN32 storage cask which by then was our chosen cask." (Wakeman, Tr. 561:21-562:1.)

For example, a work platform had to be built to accommodate the precise specifications of the TN32 cask. (Wakeman, Tr. 564:20-565:20.) A cask pedestal was also built to accommodate the height of the storage casks. (Wakeman, Tr. 572:25-574:10; Brookmire, Tr. 106:6-12.) The helium and vacuum drying system was designed particularly for the TN32 cask. (Wakeman, Tr. 562:6-563:18.) And certain equipment had to be demolished because the "TN32-

---

[18] $22,916,150 - $10,720,545 = $12,195,605.

[19] The government quantifies the costs of such modifications as $351,369. (DX 236 p. 37.)

cask was twice as large" as the transport cask that had been contemplated when the equipment was installed. (Wakeman, Tr. 567:24-568:21.)

It is impossible to say that these modifications would have been made if DOE had performed, because DOE has never identified what size, weight or capacity transport cask it would have used at any of Dominion's plants. (Wakeman, Tr. 574:11-575:18; 580:17-25.) Indeed, it is at least plausible that no modifications at all would have been necessary because, as explained above, the plant was designed for shipment of spent fuel on a regular basis, and under the Standard Contract DOE must provide casks that are casks "suitable for use" at the site. (PX 26, Article IV.B.2.) If significant modifications are needed to handle a cask, it probably is not "suitable" for the site. (Wakeman, Tr. 578:9-25.) In addition, support equipment such as rigs and drying systems would come with the casks and thus would be provided by DOE. (Wakeman, Tr. 581:2-16; PX 26, Article IV.B.2.) To the extent that the government will argue that certain North Anna ISFSI modification costs are separately unrecoverable, such arguments are unavailing.

**2. Surry, North Anna and Millstone Fuel Characterization Charges.**

Before putting fuel assemblies into dry storage, each assembly had to be visually inspected and its condition recorded in accordance with specific criteria defined by the Nuclear Regulatory Commission for each particular dry storage system. The costs of the inspections conducted at Surry, North Anna, and Millstone Unit 2, therefore, are recoverable. The government's argued adjustment for this cost should be rejected.

"NRC licensing documents require that [Dominion] note the condition of the fuel before it's put into dry storage and that requires certain inspections." (Wakeman Tr. 586:5-13.) The inspections being claimed were those directly associated with the fuel assemblies that went into dry storage. (Wakeman, Tr. 587:1-5.) Dominion would not have conducted these inspections if

it were not loading fuel into the dry fuel storage casks. (Wakeman, Tr. 588:16-19.) Further, most of the spent fuel assemblies currently in dry storage at Surry and North Anna will have to be removed from their current storage-only canisters in order to ship to DOE, and when these assemblies are removed from dry storage, they will very likely have to be inspected again prior to loading into a DOE transport cask, at additional cost to Dominion. (Wakeman, Tr. 587:9-14.)

The government disputes $76,040 in what it terms "Surry fuel inspection costs," solely upon the basis of Mr. Grillo's testimony. (DX-D5 at 61; Johnson, Tr. 2641:20-2642:6.) There is no basis, however, for Mr. Grillo's opinion that the fuel characterization inspections conducted at Surry and North Anna were conducted to determine the root cause of corrosion on the fuel assemblies. (Grillo, Tr. 2432:6-11.) As Mr. Wakeman explained, Dominion "knew there was a problem, and *in order to . . . put those fuel assemblies susceptible to that problem into dry storage*, we had to do this special inspection." (Wakeman, Tr. 588:8-14 (emphasis added).) Again, Dominion would not have conducted these inspections if it were not loading fuel into dry storage. There is also no basis whatsoever for Mr. Grillo's contention that Dominion is claiming costs for the inspection of 600 fuel assemblies at North Anna and 900 at Surry. (Grillo, Tr. 2431:14-2432:5.) The government's proposed adjustment for the costs Dominion incurred to inspect assemblies prior to placing them into dry storage should be rejected.

**3. The Millstone Unit 2 and 3 Cranes.**

*A. Dominion upgraded the Millstone Unit 2 and 3 cask cranes as a result of DOE's breach.* Dominion upgraded the Millstone Unit 2 and Unit 3 cask cranes to single failure-proof, and upgraded the actual capacity of the Millstone Unit 2 crane from 100 tons to 125 tons (Whitaker, Tr. 886:24-887:7; Dakers, Tr. 1541:22-1542:6), to support the planned Millstone inter-unit transfer project (Whitaker, Tr. 882:4-7; 935:11-15; 963:17-23; Dakers, Tr. 1541:15-21;

1618:12-21).[20] The inter-unit transfer project was never implemented; Dominion decided to pursue dry storage instead to address near term spent fuel storage needs at Millstone Unit 2. (Whitaker, Tr. 873:8-10, 877:19-880:8.) The upgraded cranes, however, would support the transfer of spent fuel using heavy casks to the Millstone ISFSI, as well. The costs to upgrade the Millstone Unit 2 and 3 cask cranes are thus recoverable because the government does not dispute that the Millstone inter-unit transfer or dry storage projects were required because of DOE's breach. (*E.g.,* Neuberger, Tr. 2130:5-2132:19 (confirming no challenge to Millstone costs even at government's "900 MTU/year" rate).)

To satisfy NRC regulations contained in NUREG-0612, any time a heavy load is moved using a crane within certain defined areas in a nuclear power plant, including the movement of loaded spent fuel casks from the Millstone Unit 2 spent fuel pool to the Unit 3 spent fuel pool (the inter-unit transfer project), the utility must either (i) prepare an analysis which assumes that the heavy load being moved is dropped, or (ii) upgrade to the associated crane to single failure-proof status, which eliminates the need to postulate a load drop. (Whitaker, Tr. 16-965:3; Grillo, Tr. 2346:3-16; Dakers, Tr. 1540:17-1541:21.) For Millstone Units 2 and 3, it was deemed prudent to upgrade the cask cranes to single failure-proof to support the inter-unit transfer project (which the government concedes was a result of its breach) instead of performing a drop analysis. (Whitaker, Tr. 881:13-882:3.) The cost associated with an analysis would have been less expensive (Whitaker, Tr. 932:18-993:15); however, for this project there were two factors supporting the more costly option.

First, the casks contemplated for the inter-unit transfer project were very heavy, approximately 100 tons. (Whitaker, Tr. 873:24-874:20.) Weight, not surprisingly, is one of the

---

[20] The inter-unit transfer project involved the planned shipment of approximately 288 Millstone Unit 2 spent fuel assemblies to Millstone Unit 3 using heavy spent fuel casks. (Whitaker, Tr. 872:2-23; 875:5-876:7).

major factors that must be considered in a cask drop analysis. (Whitaker, Tr. 884:18-885:8; Dakers, Tr. 1573:4-14.)

Second, there was a concern that the cask drop analysis would have been challenged by intervenors during the process of amending the NRC operating license for Millstone Unit 3 to allow for the storage of fuel from Millstone Unit 2. (Whitaker, Tr. 932:18-993:15.) "[T]here was a potential that NRC involvement would be required to transfer fuel between units, and the company was interested in making that approval process as smooth as possible." (Dakers, Tr. 1542:7-14.) As Mr. Whitaker explained, it was better to spend the money upgrading the crane than defending a drop analysis against potentially costly and lengthy public intervention. (Whitaker, Tr. 934:1-11.) Upgrading to single failure-proof was also an economical choice for Unit 2 because the capacity was being increased at the same time. (Whitaker, Tr. 934:12-23.) "So the strategy that was employed while we're upgrading the crane to take – to be able to update to 125 tons, we should increase it to single failure proof at the same time." (Dakers, Tr. 1575:11-15.)

B. *The government has not established that Dominion would have upgraded the Millstone Unit 2 and 3 cask cranes to single failure-proof had DOE performed*. If DOE had performed, it is true that Dominion likely would have had to either perform a load drop analysis or upgrade its cranes to single failure-proof to comply with NUREG-0612. (Rutkoske, Tr. 794:9-12; Tr. 811:22-813:18.) The government's position that Dominion would necessarily have chosen to upgrade to single failure-proof rather than merely performing an analysis, however, is based on pure speculation.[21] Had DOE performed, the two key factors prompting the more

[21] The government "bears a burden" in arguing reduction of plaintiffs' mitigation damages, namely to show such damages "were inappropriate or unreasonable." *Carolina Power & Light*, 2008 WL 2154103, at *13; *see also Energy Capital Corp*, 302 F.3d at 1375; *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316-17 (Fed. Cir. 2005). That burden cannot be met by the sort of speculation offered by the government in

costly option of upgrading the crane (which the government does not challenge as unreasonable, Grillo, Tr. 2396:11-16) would have been absent.

First, DOE has not identified what type of cask it would have used at Millstone. (Whitaker, Tr. 884:10-12.) When Dominion decided to upgrade the Millstone cranes, it did not and could not consider the size of future DOE casks. (Whitaker, Tr. 884:5-9.) Therefore, it would be speculation to say that DOE would have used a cask similar to that planned for the inter-unit transfer project. Indeed, Mr. Grillo hypothesizes that DOE uses a 25-ton cask at Millstone for portions of his analysis. (Grillo, Tr. 2415:5-8). A drop analysis based on a much lighter cask would likely be simpler to perform than on a 100-ton cask. (Rutkoske, Tr. 814:25-815:6.) But, because of DOE's breach, it is simply not known whether Dominion would have needed to single failure-proof its cranes had DOE arrived with a 25-ton cask. (Whitaker, Tr. 885:9-14; Tr. 888:4-8.) In his testimony on this point, Mr. Grillo's uses the word "might" ten times to discuss the different possible outcomes of a drop analysis. (Grillo, Tr. 2348:24-2354:21.)

Second, Dominion would not be required to obtain an NRC license amendment just to load DOE's casks.[22] The license amendment for the inter-unit transfer project was to allow Unit 2 fuel to be stored at Unit 3. (Dakers, Tr. 1569:25-1570:22.) Had DOE performed, therefore, intervenors would have had no formal opportunity to challenge a drop analysis supporting the DOE cask loading activity. Therefore, a primary driver for Dominion's decision to upgrade the

---

connection with the Millstone cranes, nor has the government met its burden to quantify the alleged reduction that it seeks.

[22] For this reason, the government's persistent efforts at trial to introduce evidence of prior regulatory concerns at the Millstone plant miss the mark. Whatever impact those issues might have had in the real world, they would not have been implicated had DOE performed.

Unit 2 and 3 cask cranes – the potential for costly public intervention – would have been absent in the hypothetical non-breach world of DOE performance.

The government's arguments regarding Dominion's single failure-proof mitigation activities at Millstone are so generic as to be meaningless. Mr. Grillo's analysis, for example, is simply a list of the advantages (known cost, removes need for drop analyses, removes cost uncertainty of drop mitigation actions, removes regulatory risks, removes potential recovery costs for drop accidents, positive public perception, and upgrade provides a tangible improvement) and disadvantages (perceived high cost and loss of crane availability during upgrade) of single failure proofing *in general*. (DX D4 at 41; Grillo, Tr. 2349:22-2354:13.) And Mr. Grillo states that he reached his opinion that Millstone's decision to upgrade the Unit 2 and Unit 3 cask cranes would have been the same if DOE had performed because "none of the issues that I just mentioned would have been different in the but-for world." (Grillo, Tr. 2354:2-13.) The problem, however, is that the issues identified by Mr. Grillo are so general that none would be different in *any* situation. Under Mr. Grillo's analysis, in other words, all utilities would upgrade to single failure-proof cranes in all circumstances. That, however, is just not the case. "[T]here are different people in the industry now that are using a mix, some have a single failure proof cranes, some have redundant cranes that reduce the possibility of a drop, some have impact limiters, it's a wide variety in the industry now." (Rutkoske, Tr. 812:19-813:2.) Indeed, the cask cranes at Dominion's North Anna and Surry sites, which support movement of 100+ ton spent fuel casks to dry storage, are not single failure-proof. (Wakeman, Tr. 720:16-20; Whitaker, Tr. 962:25-963:16.)

Moreover, the government overemphasizes the consequences of a load drop. The fact that a drop analysis assumes the worst will occur (Rutkoske, Tr. 874:9-15) does not make it

likely that the worst will occur: "Another important consideration in transshipping is the requirement to analyze the drop of a cask in the spent fuel pool during lifting. Because of design, operating and testing precautions, such an accident is *very unlikely*. Nevertheless, it must be evaluated and its potential consequences must be acceptable before the Nuclear Regulatory commission will allow spent fuel shipments out of Surry." (PX 16 at DOM00060758 (emphasis added).) Both the drop analysis and single failure-proofing options are safe, accepted by the NRC, and used in the industry today. (Whitaker, Tr. 933:23-934:23; Rutkoske, Tr. 812:19-813:2.) As noted above, Dominion relies on the drop analysis method at North Anna and Surry to move its spent fuel casks. Thus while Mr. Grillo is correct that performing a drop analysis does not eliminate the possibility of dropping a cask (Grillo, Tr. 2353:21-2354:1), there is simply no evidence to support the argument that a utility would automatically spend millions of dollars to make this upgrade rather than perform a simpler and less expensive drop analysis.

C. *The government's assertion that the cranes were upgraded to remedy a historical lack of compliance is wrong*. In its pre-trial brief, the government argued that "in October 2001, Dominion discovered that Millstone former operators had never complied with NUREG-0612" and thus "Dominion's decision to remedy this historical lack of compliance had nothing to do with DOE's partial breach of the Standard Contract." (3/24/08 Def. Memorandum of Contentions of Fact and Law at 65-68.) There is no evidence, however, that the Millstone Unit 2 or 3 cranes were upgraded to single failure-proof status to remedy a historical lack of compliance.

With regard to Unit 2, in December 2001, Dominion submitted a Licensee Event Report ("LER") to the NRC to report that a 50-ton reactor coolant pump was placed in the Unit 2 cask wash pit without first defining a safe load path. (PX 164.) This problem was resolved and the

50-ton reactor coolant pump was removed from the cask wash pit *without* the need to spend millions of dollars to upgrade the Unit 2 cask crane to single failure-proof. (Dakers, 1583:13-1585:2.) Dominion continued to move heavy loads with the non-single failure-proof Millstone Unit 2 cask crane between 2001 and the time the crane was upgraded in 2004. (Rutkoske, Tr. 816:2-16.) Further, the 2004 design change package prepared by Dominion to upgrade the Unit 2 crane to single failure-proof unequivocally states that '[t]he MP2 spent fuel cask crane meets the NRC requirements of NUREG 0612, Control of Heavy Loads at Nuclear Power Plants." (PX 185 at DOM00010087.) Even Mr. Grillo agrees that the upgrade of the Unit 2 cask crane in 2004 was not a corrective action associated with the 2001 LER. He testified that "[i]t was a separate issue." (Grillo, Tr. 2411:23-2412:3.) Mr. Dakers testified that he was not aware of any reason to think the Unit 2 crane was not in compliance with NUREG 0612. (Dakers, 1580:24-1581:6.) As of 2004, absent the inter-unit transfer project, which the government concedes was its fault, no further action was required to make the Unit 2 cask crane compliant with NUREG 0612. (Dakers, Tr. 1586:18-22.)

There were also no outstanding compliance issues with regard to Unit 3. (Dakers, Tr. 1555:5-7; Tr. 1564:19-2.) The 2001 LER applied only to events at Millstone Unit 2. (PX 164). In 2003, it was determined that "[t]he MP3 spent fuel shipping cask trolley meets the NRC requirements of NUREG-0612, Control of Heavy Loads at Nuclear Power Plants." (PX 182 at DOM00010117.) So again, absent the inter-unit transfer project, no action was required to make the Unit 3 crane compliant with NUREG 0612. (Dakers, Tr. 1563:8-12.) Dominion would not have upgraded the crane in 2004 had the inter-unit transfer project not required it. (Dakers, 1618:12-21.) And that inter-unit transfer project would not have occurred if DOE had not breached.

**4. Millstone Cask Loading Modifications.**

As part of the Millstone ISFSI project, Dominion made several plant modifications at Millstone Unit 2 in order to facilitate the loading and closure of the NUHOMS spent fuel dry storage casks. (Rutkoske, Tr. 746:3-21.) Mr. Grillo opines that many of these modifications would have been implemented by Dominion even if DOE had performed under the Standard Contract. (Grillo, Tr. 2358:3-8.) The evidence shows, however, that the modifications were made specifically to accommodate the particular dry storage cask system and loading sequence used at Millstone—no one knows what cask DOE would have used at Millstone, and no one knows what cask DOE might use in the future. Accordingly, the government's effort to reduce Dominion's damages claim (by $219,224) based on the unsupported presumption that Dominion would have undertaken these same modifications or loading sequences to support some unknown DOE-supplied transportation cask is speculative, and should be rejected.

A. *The Millstone modifications were cask-specific*. The modifications at Millstone Unit 2 were made to accommodate the dry storage NUHOMS cask. (Rutkoske, Tr. 766:3-4.) The height of the platform installed in the cask wash pit, for example, "was based on the dimensions of that particular cask to allow—to basically place the top of the cask, when the worker's standing on that platform, that they have good access to the top area of the cask." (Rutkoske, Tr. 757:12-19.) The opening in the platform in which the dry cask sits was designed specifically to allow room for the rigging used with that particular NUHOMS cask: "Not all dry fuel storage casks would use that same rigging." (Rutkoske, Tr. 758:3-20.) Four hundred eighty volt power was required for the welding system used to seal the NUHOMS cask, but not all casks are welded shut. (Rutkoske, Tr. 761:9-20.) Some casks, including those used at Surry and North Anna, are bolted shut. (Brookmire, Tr. 56:7-13.) Finally, a vacuum drying system and associated support equipment were needed for the NUHOMS system to remove all water from

the cask in order to store the cask on the ISFSI. (Rutkoske, Tr. 761:13-20.) As noted previously, support equipment such as drying systems would be provided by DOE. (Wakeman, Tr. 581:2-16.)

B. *It is impossible to know what modifications, if any, Dominion might have made at Millstone if DOE had performed.* The Standard Contract requires DOE to arrange for casks "suitable for use" at the site, and to provide "special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s)." (PX 28, Article IV.B.2.) This provision should have kept the need for plant modifications and support equipment to a minimum. Mr. Grillo, however, did not even take this contractual requirement into account in his analysis. (Grillo, Tr. 2404:1-4.)

Mr. Grillo admits that he does not know what cask DOE would have used had DOE performed on time. (Grillo, Tr. 2401:15-20; 2322:7-12.) He also admits that he does not know what cask DOE will use in the future (Grillo, Tr. 2401:21-23; 2410:24-2411:2), and Mr. Zabransky's testimony confirms that DOE has not identified a cask for Millstone (Zabransky, Tr. 1418:10-1419:10). Mr. Grillo's opinions on this point, therefore, are based on pure speculation. Mr. Grillo's claim that he has "bounded" the cask that DOE would have used is another way of arguing that DOE would have used one of the commercial cask designs that were in existence at the time they were obligated to perform. Putting aside the strong possibility that DOE would have sought the development of a new or modified cask for its unique transport and storage needs (which DOE actually pursued in the past and is currently pursuing)[23], the evidence shows that the precise specifications of the cask system must be known to determine what modifications, if any, Dominion would have been made at Millstone Unit 2 in the but-for world.

---

23 *See, e.g.,* 59 Fed. Reg. 53,442, 53,445 (October 24, 1994); 72 Fed. Reg. 31, 353 (June 6, 2007).

(Rutkoske, Tr. 746:11-18; 757:12-19; 758:3-20; 761:9-20; 765:25-766:4.) The government essentially argues that DOE would have used one of several commercially available options, and that similar modifications would have been made to accommodate those casks. That, however, does not address the fact that the *actual* modifications that were made at Millstone 2 were to precisely accommodate the specific design of NUHOMS cask, including its height, weight, diameter, capacity, closure, and rigging. (Rutkoske, Tr. 746:11-18; 765:25-766:4.)

When making the modifications at issue, Dominion did not (and could not) consider DOE-supplied casks. (Rutkoske, Tr. 765:25-766:4.) Instead, Dominion was focused on the precise requirements of the NUHOMS dry storage system used at Millstone 2, and it is highly unlikely that the transport system that DOE would have used, or will some day use, will have the same requirements.

**5. Millstone Heat Load Calculations For License Amendment.**

The evidence simply does not support the government's argument that Dominion's claim should be reduced by $427,909 because the revised heat load analysis prepared for the Millstone Unit 3 spent fuel pool was unrelated to the Millstone Unit 3 rack project. (3/17/08 Def. Memorandum of Contentions of Fact and Law at 64.)

The Millstone Unit 3 pool was originally licensed for approximately 756 assemblies. (Whitaker, Tr. 840:15-23.) To accommodate the actual and potential increases in the Millstone Unit 3 spent fuel capacity, Dominion prepared a revised heat load analysis that assumed storage of approximately 3,100 spent fuel assemblies. (Whitaker, Tr. 840:15-23.)[24]

---

[24] The original heat load analysis for the Millstone Unit 3 pool assumed storage of approximately 2,100 spent fuel assemblies. (Whitaker, Tr. 842:24-843:25; PX 141.) As a result of DOE's breach, new racks that could store approximately 1,100 additional assemblies were being added to the Millstone Unit 3 pool in or around 2000 to take advantage of available empty space in that pool. (Whitaker, Tr. 844:16-25; 852:24-853:6.) The full capacity of the pool after the rerack would be approximately 1860 assemblies. (Whitaker, Tr. 844:16-25.) Dominion was also considering potential further increases in the capacity of the Unit 3 spent fuel pool to approximately 3,100 assemblies. (Whitaker, Tr. 840:15-842:4.)

Mr. Grillo does not dispute that the addition of the new racks to the Millstone Unit 3 pool resulted from DOE's breach. (Grillo, Tr. 2420:24-2421:1.) Nor can he dispute that a new heat load analysis was required to store several thousand more fuel assemblies than the existing license allowed. (Grillo, Tr. 2420:8-23.) Rather, Mr. Grillo simply states as a conclusion that the revised heat load analysis was required to amend the Millstone Unit 3 license to allow full core offloads as a normal event. (Grillo, Tr. 2420:8-23.) The evidence, however, does not support this assertion.

"The work on the full core offload as normal license amendment and the work on the, adding additional storage racks was going on in basically parallel paths, with the license amendment for the full core offload as normal being ahead of it." (Whitaker, Tr. 853:10-19.) The "full core offload as normal" amendment by itself, however, did not increase the storage capacity of the Millstone Unit 3 spent fuel pool and, therefore, the existing heat load calculation, which assumed storage of 2169 spent fuel assemblies, was sufficient to support this amendment without revision. (Whitaker, Tr. 847:13-21; PX141.) Nevertheless, because the "full core offload as normal" was licensed first, it "was a convenient time to introduce a new analysis to the NRC." (Whitaker, Tr. 844:1-10.) The mere fact that the revised heat load analysis was submitted as part of the "full core offload as normal" license amendment, however, does not mean that it was necessitated by that amendment. Mr. Whitaker in fact stated multiple times, in no uncertain terms, that it was the actual and planned additional spent fuel storage capacity that created the need for the new heat load analysis, and not the full core offload amendment:

> Q. Mr. Whitaker, if Dominion was not planning on adding additional racks to the Unit 3 pool, was a heat load calculation required to support this license amendment?
>
> A. No, it was not.

(Whitaker, Tr. 847:13-21; *see also*, Tr. 842:24-843:3; 845:1-4; 849:21-850:3; 851:1-10).

Mr. Grillo's sole stated reason for disregarding Mr. Whitaker's explanation was that, in Mr. Grillo's view, Mr. Whitaker purportedly "waffled" in his answer. (Grillo, Tr. 2422:12-18.) But Mr. Whitaker's testimony on this issue at trial, and the supporting documents, are unequivocal. There is no reason for the Court not to credit that evidence or Mr. Whitaker's trial testimony. The government's argument that the heat load analysis was needed for the full core offload license amendment, and not because of the additional storage necessitated by DOE's breach, should be rejected.

**6. Millstone Cask Loading Mobilization and Demobilization Costs.**

Dominion incurred costs mobilizing people and equipment for campaigns to load fuel onto the Millstone ISFSI, and costs to demobilize these resources afterwards. In his calculations, Mr. Johnson has removed $680,427 of these costs from Dominion's claim, to reflect Mr. Grillo's opinion that these costs are of the same nature as costs that would have been incurred to load spent fuel into DOE casks in the but-for world. (Johnson, Tr. 2542:18-2543-10.) Mr. Grillo, in other words, opines that because Dominion would have loaded DOE's transportation casks in the but-for world, it should not recover costs incurred to load storage casks in the real world. (Grillo, Tr. 2384:25-2385:7.)

This adjustment should be rejected because Mr. Grillo's argument is completely divorced from the reality of this case. This is, necessarily, a case for partial breach. *Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1373-74 (Fed. Cir. 2005). Dominion is seeking damages for DOE's delay in picking up and removing spent fuel from the Millstone site, but DOE is still obligated to perform some day in the future. Loading fuel onto the Millstone ISFSI has not improved Dominion's position as far as turning the fuel over to DOE. Further, DOE has not committed to accept the NUHOMS dry storage casks stored on the Millstone

ISFSI. (Brookmire, Tr. 105:23-106:1; Wakeman, Tr. 583:8-13.) If DOE does not accept the loaded NUHOMS casks, Dominion must take the added steps of returning each loaded cask to the Millstone Unit 2 spent fuel pool and unloading the fuel back into the pool before reloading it into a DOE transport cask. These costs will likely be the subject of future claims or litigation because, like all the costs incurred loading the ISFSI, they would have been unnecessary had DOE performed on time. Further, the costs of mobilizing and demobilizing to load fuel onto the Millstone ISFSI, which were incurred in the past, are simply not the same costs as mobilizing and demobilizing to load DOE's transportation casks, which will be incurred in the future, and thus this adjustment by the government must be rejected.

**7. Offsets For Hypothetical DOE Loading Costs Argued To Have Been Avoided.**

Unlike the government's other argued adjustments, which assert that real world costs that Dominion actually spent are not recoverable, this proposed offset is based on hypothetical costs that Dominion has allegedly avoided because of DOE's breach. Had DOE performed in a timely manner, Dominion would have incurred costs to load DOE's casks at Surry, North Anna and Millstone and thus, the government argues, Dominion's damages must be reduced by this hypothetical loading cost. (3/17/08 Def. Memorandum of Contentions of Fact and Law at 65-68.)

The problem with the government's argument, however, is again that this is a case for partial breach. Dominion is seeking damages for DOE's delay in picking up its spent fuel, but Dominion still retains its right to insist that DOE come one day and take its fuel away. Accordingly, Dominion did not "avoid" the costs of loading DOE's casks as a result of DOE's delay in picking up the fuel. These costs have only been deferred until the time that DOE finally performs. At that point in time, Dominion will incur additional costs loading spent fuel from its pools into DOE casks and will also, at a minimum, incur costs unloading all of its storage-only

casks at Surry and North Anna into DOE casks. (Johnson, Tr. 2646:9-22.) If Dominion's claim is reduced by the cost of hypothetical loading of DOE casks in the but-for world, when DOE arrives to pick up spent fuel in the real world, Dominion will in effect pay twice for loading DOE casks. (Wakeman, Tr. 584:13-585:18.)

The Court's prior observations in this case about alleged benefits in connection with the government's argued one-time fee offsets are fully applicable here. The government argued that reductions in damages should be taken because a utility avoided having to pay the "one time fee" due to DOE's failures – precisely the same argument it makes with respect to allegedly avoided DOE loading costs here. The Court held:

> That observation is true, but irrelevant, because it ignores what actually happened. Plaintiffs still have the SNF, the government still has the obligation to pick it up, and plaintiffs still have to pay the one-time fee when it becomes due. The only thing that is different from the contract scenario is that plaintiffs claim to have been forced to absorb unnecessary interim storage costs. If the government reimburses such costs, it hardly puts plaintiffs in a better position.

*Dominion Resources Inc. v. United States,* 77 Fed. Cl. 151, 156 (2007). Likewise, plaintiffs here "still have to" load DOE casks when DOE performs. The logic of the Court's prior decision is compelling and correct, and requires rejection of the government's arguments regarding the alleged damage reductions.

Future loading costs were purportedly not part of Mr. Grillo's analysis. (Grillo, Tr. 2432:14-2433:8.).[25] Not knowing what the future will bring, Mr. Grillo reverted to his imagination to dream up ways in which DOE's delay may ultimately allow Dominion to avoid those future loading activities. (Grillo, Tr. 2436:24-2437:17; 2439:7-12.) Even if it were possible, as Mr. Grillo imagined, that "magical fairy dust" would be used to make Dominion's

[25] Indeed, Mr. Grillo purported to not know whether Dominion or DOE was responsible for loading costs. (*See* Grillo, Tr. 2437:19-2438-18.)

spent nuclear fuel disappear (thus eliminating the need for Dominion to ever load its fuel into DOE's casks), an offset for hypothetical on-time DOE loading should still be rejected. The government cannot show with reasonably certainty how much Dominion would have incurred to load DOE's casks because DOE never identified the type or size or capacity of the cask that it would have used at Dominion's plants. (Grillo, Tr. 2401:15-20.)

In other spent fuel damage cases, this Court has uniformly rejected the government's efforts to reduce damages due to allegedly avoided DOE loading costs.[26] These rulings are eminently correct, and the present record does not warrant a departure from the Court's consistent holdings.

**8. Overhead Costs.**

There is simply "no basis in law or logic" for Mr. Johnson's claim that Dominion should not be compensated for overhead expenses. *Carolina Power & Light Co.,* 2008 WL 215403, at *28. "Overhead, by definition, is the cost of doing business and for a time part of [plaintiff's] 'business' was mitigating DOE's partial breach." *Id.*

There is no dispute that the warehouses and executive services were necessary to complete the breach projects. (Jenkins, Tr. 1061:10-17; Johnson, Tr. 2653:8-10.) Nor can there be any dispute that Dominion incurred real costs maintaining and operating the warehouses and providing nuclear management services. Overhead costs, therefore, represent a "true cost" of the

---

[26] *See Carolina Power & Light Co.,* 2008 WL 215403, at *33; *System Fuels, Inc.*, 79 Fed. Cl. at 70-71 (*citing Tennessee Valley Authority*, 69 Fed. Cl. at 542; *Northern States Power Company*, 78 Fed. Cl. at 468-69; *Southern Nuclear*, 77 Fed. Cl. at 450-51; *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. at 416; *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)). "Any benefit inhering in TVA because of delayed loading costs would be entirely speculative." *Tennessee Valley Auth.*, 69 Fed. Cl. at 542; *see also Sacramento Mun. Utility Dist.,* 70 Fed. Cl. at 372 ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative.").

breach projects. (Katz, Tr. 1695:9-21.) Projects found to be substantially caused by DOE's breach, therefore, should be allocated a fair and reasonable portion of the overhead expenses.

In analogous situations where the government seeks compensation for work it has performed, the government recovers its own overhead as part of the "fair and reasonable charge for the repairs" and what was "necessary to complete the job." *See, e.g.*, *United States v. Capital Sand Co.*, 466 F.3d 655, 658 (8th Cir. 2006) (suit in admiralty to recover cost to repair lock and gate on the Mississippi River). And this Court "previously has determined that loader costs may be included in a claim for mitigation damages." *System Fuels*, 79 Fed. Cl. at 799 (citing *Tenn. Valley Auth.*, 69 Fed. Cl. at 530); *Carolina Power & Light Co.,* 2008 WL 2154013, at *28 ("Overhead recovery is necessary to compensate Plaintiff fully.").

Mr. Johnson concedes that it is appropriate to allocate overheads to specific projects "for either regulatory or contract purposes." (Johnson, Tr. 2585:10-13.) Yet, he opines that these costs should not be included as damages in this case because the costs are "not incremental." (Johnson, Tr. 2581:22-2582:1.) Mr. Johnson, however, is not seeing the forest for the trees. These costs are recoverable because they are true costs incurred to conduct activities that were proximately caused by DOE's breach. The fact that overhead pools may not be seen to increase as a result of DOE's breach or that Dominion would have used its warehouse services on other projects is not relevant. Once a project is found to have been caused by DOE's breach, Dominion should recover the full cost for that activity. This includes overhead costs.

If no overhead or nuclear management services charges are allocated to the breach projects, Dominion's other projects would assume a disproportionate amount of these expenses. (Johnson, Tr. 1063:22-1064:14; 2583:9-2584:21; 2652:7-14.) Mr. Johnson's explanation that this shift is appropriate because "[a]ll you've done is redistribute a fixed cost" (Johnson, Tr.

2583:25-2484:1) is nonsensical. The very problem with his position is that he is redistributing the true costs of the breach projects. As stated above, Mr. Johnson recognizes that it is appropriate to allocate overhead costs for "regulatory or contract purposes," but such purposes explicitly require that the applied overhead be reasonably applicable to the project and that each job bears its equitable proportion of overhead costs. *See, e.g.*, 18 C.F.R. part 101, Electric Plan Instructions 4(a). If six projects make use of a warehouse but the warehouse costs are, as Mr. Johnson opines, "redistributed" among only five of those projects, the overhead charge would no longer represent an equitable proportion of the overhead costs for regulatory or contract purposes.

The overhead charges claimed by Dominion are real costs that were incurred and are properly attributable to mitigation activities. The government's proposed offset should be rejected.

**9. Internal Labor Costs.**

As with overheads, the government's arguments regarding internal labor fail because whether a cost is "fixed" is not relevant to the issue of whether it is recoverable. *TVA,* 69 Fed. Cl. at 539 ("That TVA would have paid its employees in all events is not material to this inquiry."). In reaching this conclusion, the Court in *TVA* was persuaded by cases like *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982), in which the "fixed cost" analysis was rejected: "The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for." *Id.* at 785. Under this correct analysis there is no logical minimum threshold of amount of time a particular employee must spend on a breach project. If the government's breach deprived Dominion of *any* of the services it paid for, that amount should be recoverable. And Dominion was deprived of *all* the time that its employees spent on breach activities.

It is clearly a commercially reasonable decision to pull resources from throughout the company to work on a project. Absent the breach project, the same approach would have been taken and thus the same resources would have been used to work on other projects that have been backlogged. (Basehore, Tr. 1126:4-1128:4.)[27] Indeed, Dominion must frequently augment its staff with contractors to get required work completed when internal resources are otherwise engaged. (Basehore, Tr. 1128:5-1129:17.) Clearly, there was work at Dominion not getting done when Dominion employees were redirected to work on breach projects. (Basehore, Tr. 1130:4-7; Tr. 1132:10-1134:14.) The government's argument that specific internal labor costs are not recoverable has been dealt with extensively in prior decisions by the Court, which provide persuasive guidance here. *See generally Carolina Power & Light*, 2008 WL 2154103, at *26-27*, System Fuels*, 79 Fed. Cl. at 66-67; *TVA*, 69 Fed. Cl. at 539; *Southern Nuclear*, 77 Fed. Cl. at 442.

In addition, Mr. Johnson's approach to screening Dominion's labor costs is clearly arbitrary. Under Mr. Johnson's made-up "1000-hours-in-a-year" rule,[28] none of Rajinderbir S. Harnal's time spent as project manager of the Millstone dry spent fuel project was "incremental" to DOE's breach and therefore recoverable. (Rutkoske, Tr. 734:8-18.) Mr. Harnal worked 997 hours in 2002 on the Millstone ISFSI, just three hours shy of having all of his time (over 1800 hours in a three-year period) being "incremental" and recoverable under Mr. Johnson's rule. (DX

---

[27] Moreover, the time that Dominion's employees spent on various projects was accurately recorded and allocated. In *Convoy* the Ninth Circuit awarded costs, despite the contention that employee estimates (ten years after the event) of how much time was spent on the relevant activities were too speculative. Although the evidence in *Convoy* was sufficient, Dominion's evidence is far better. An employee's time was billed to particular projects contemporaneously, in the normal course of business. (Jenkins, Tr. 1017:11-1018:14; Brookmire, Tr. 65:21-69:4.) Dominion, therefore, has complete and accurate business records, which the government does not challenge, establishing that the challenged time was spent on mitigation activities. The government's attempts to limit recovery of Dominion's claim for internal labor should be rejected.

[28] Mr. Johnson persisted in trying to refer to his position as the "one-and-a-half hours per week" screen, which is a misleading characterization, until the Court forced an acknowledgment and clarification of Mr. Johnson's actual 1000-hours-in-a-year position. (Johnson, Tr. 2672:22-2674:22.)

249, at 41.) *See Carolina Power & Light*, 2008 WL 2154103, at *26. ("[T]he Court finds [Mr. Johnson's] '50 percent rule' to be arbitrary and without support in the law."). Indeed, one of the government's other experts, Mr. Grillo, supplied estimates for argued damage reductions that included all internal labor costs, without application of reductions (to those argued reductions) on the basis of Mr. Johnson's 1000-hours-in-a-year screen. (Grillo, Tr. 2439:13-2440:14.) The government's position regarding internal labor is not consistent ot well founded, and efficiency and common sense dictate that the government's argued reductions be rejected.[29]

**10. Allegedly "Unsupported" Costs.**

The government erroneously argues that Dominion's claim should be reduced by $6,916,369 associated with costs that the government claims are supported by "inadequate documentation." (3/24/08 Def. Memorandum of Contentions of Fact and Law at 74-75.)[30] The government does not state what standard it used to evaluate whether Dominion's claimed damages are adequately supported. *Id.* Instead, the government's expert, Mr. Johnson, appears to offer what is in effect an absolute certainty standard for determining whether a specific claimed cost is supported by "adequate documentation." Mr. Johnson suggests that a specific cost is "adequately supported" only if he is able to review and verify every piece of accounting related paper that may have existed when Dominion incurred that cost. (Johnson, Tr. 2699:14–2670:2).[31] That, however, is not the legal standard.

---

[29] As the Court noted in *Southern Nuclear*, the government's position creates a perverse incentive. If the rule in these spent nuclear fuel cases were that a company employee's time under a certain hour threshold is not recoverable, the natural consequence by a rational utility would be to prohibit its employees from undertaking tasks associated with mitigation activities involving spent fuel, and to instead utilize outside contractor or supplemental labor. Such outside labor, however, would almost surely be more expensive than utilization of internal resources, and the resulting damages in subsequent proceedings would accordingly increase. *Southern Nuclear*, 77 Fed. Cl. at 442.

[30] Of that amount, $5,166,607 is associated with allegedly unsupported internal labor (*See* DX 252 at DXR007000581 to DXR007000620) and $1,749,762 is associated with other allegedly unsupported claimed costs (*See* DX 303 at DXR015 000011 to 0000015; *see also* DX 305 at DXR015 000031 to DXR015 000034).

[31] Despite Mr. Johnson's offer to "show us the invoice, and I'll shut up" (Johnson, Tr. 2699:24-25),

The applicable legal standard is that the damages are "shown with reasonable certainty." *Indiana Michigan,* 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed.Cir.2002)). The amount of damages need not be "ascertainable with absolute exactness or mathematical precision" *Id. (quoting San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (citation omitted)). No particular type of documentation, such as an actual invoice, is required. Once a "reasonable probability of damage" is established, this Court can "make a fair and reasonable approximation of the damages." *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) (citation omitted); *see also Southern Nuclear*, 77 Fed. Cl. at 408. Under this standard, the Court may rely on "a document regularly prepared in the normal course of business" even if the sponsoring witness is "unable to fully explain the basis for all the costs set out in it." *Bluebonnet Savings Bank*, 266 F.3d at 1357. *See also System Fuels*, 79 Fed. Cl. at 59-60 (relying on evidence "derived from [the plaintiff utility's] accounting system, which the court finds to be reliable indicator of incurred costs"). Courts have also found that internal labor costs can be based on estimates rather than actual payroll information. *Convoy*, 672 F.2d at 786. Finally, this same standard applies to both plaintiffs' claimed damages and defendant's claimed offsets.[32]

A. *<u>All of Dominion's claimed internal labor has been shown with reasonable certainty.</u>* The government challenges $5,166,607 in internal labor charges as allegedly unsupported. (*See* DX 252 at DXR007000581 to DXR007000620.) The government, however, has not disputed the fact that all claimed Dominion internal labor costs are based on

---

approximately $400,000 worth of contested costs listed on DX 305 are, in fact, supported by invoices.

32 *System Fuels*, 79 Fed.Cl. at 71 ("Correlatively, any 'benefits' the government seeks to offset must be shown to a reasonable certainty, or they must be denied as too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan* [*Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)]*."*); *see also Tennessee Valley Auth.,* 69 Fed.Cl. at 543.

contemporaneous Dominion business records. (Wakeman, Tr. 532:5-9; Tr. 702:14-22; Jenkins, Tr. 1017:11-1018:14.) The Dominion procedures for recording labor were described at some length. (*E.g.,* Brookmire, Tr. 66:24-73:7.) Those procedures have not been challenged by the government, nor did the government's massive and intrusive pre-trial audit process uncover evidence of any systematic discrepancies or irregularities in time recording practices at the company. Additionally, the government has not argued that any of these internal labor costs are unreasonable. (*E.g.,* Grillo, Tr. 2396:6-10.)

In fact, the government has actually used some of these *same* internal labor costs as the basis for claimed offsets, *i.e.,* the DOE loading offset (discussed *supra* Section 7).[33] As the reasonable certainty standard is the same for both plaintiffs' claimed damages and defendant's claimed offsets, the government, by invoking those costs in an effort to reduce Dominion's damages, has conceded that they are shown with the requisite reasonable certainty.

Moreover, when applying the reasonable certainty standard to internal labor, there is no material difference between the approximately $25 million of internal labor that Mr. Johnson found sufficiently "supported" and the approximately $5 million of internal labor that Mr. Johnson asserts lacks "adequate documentation." The only real difference between the available documentation is that Mr. Johnson cannot apply his 1000-hour-per-year internal labor "screen" to the allegedly unsupported labor, for example, because the individual employee names are no longer available in the accounting records. As demonstrated in Section 9 above, however, that

[33] Johnson, Tr. 2678:24-2679:17. All pre-January 1, 2002 Surry and North Anna internal labor is challenged as "not supported by adequate Details or Documentation" because Dominion's accounting systems did not retain the employee's name. Before January 1, 2002, the first eleven claimed casks at North Anna were loaded onto the North Anna ISFSI and the first four claimed casks were loaded onto the Surry ISFSI. The government's DOE loading cost offset uses the allegedly "unsupported" cost information in an effort to estimate the DOE loading offset cost. Specifically, DX 304 shows the government's DOE Loading offset calculations and includes the first eleven casks at North Anna (6,10,12,13,14,16,19,20,21,23 and 24) (DXR015 000018) and the first four claimed casks at Surry (17, 18, 22 and 25) (DXR015 000021).

"screen" is "arbitrary and without support in the law." *Carolina Power & Light*, 2008 WL 2154103, at *26.

Of the $5,166,607 in internal labor charges challenged by Mr. Johnson as "unsupported," (1) $2,845,617 is from the SAP system associated with the North Anna and Surry ISFSI costs,[34] (2) $2,015,894 is from the CAFR system associated with the North Anna ISFSI,[35] and (3) $305,096 is from the NFA system associated with the North Anna ISFSI.[36] As set forth in the footnotes above, the documentation and testimony in the record comfortably allow a "fair and reasonable approximation" of these internal labor damages. *Bluebonnet,* 266 F.3d at 1357.

B. *<u>All other non-labor claimed Dominion costs have also been shown with reasonable certainty.</u>* The government asserts that an additional $1,749,762[37] in other, non-internal labor costs are not supported by adequate details or documentation. (*See* DX 303, Exhibit II at DXR015 000011 to 0000015); *see also* DX 305 at DXR015 000031 to DXR015 000034.) First, all of these costs are supported by Dominion's contemporaneous business records, *i.e.* the voluminous and detailed cost reports submitted with the claim and admitted at trial, and by the supporting testimony establishing the reliability and genesis of those business

---

34 Of the $2,845,617 from the SAP system, PX 249, the only difference between the "unsupported" and "supported" internal labor is that the "supported" internal labor contains the employee name or names. (Wakeman, Tr. 534:14-535:4; Tr. 607:23-609:10.)

35 Of the $2,015,894 from the CAFR system, PX 252, Mr. Johnson erred in contending at trial that each line in DX 252 is a single entry from the CAFR system (Johnson, Tr. 2676: 16-18), and represented the totality of the evidence supplied by Dominion. The information contained in DX 252 is a summary of much more information in the actual Dominion source report, which was provided to the government. For example, the first line that Mr. Johnson referred to is actually a summary of *ten pages* of supporting data, including the month of the charge, what type of payroll was charged, whether the charge was salaried (monthly) or hourly (bi weekly or semi-monthly). *See* PX 252 at DOM00001710 to DOM00001719. That supporting data also indicate what group did the work (*e.g.,* civil engineering, electrical engineering, nuclear engineering, etc.). (Wakeman, Tr. 604:25-605:5.)

36 The information available for the $305,096 from the NFA system, PX 253, is similar to that derived from the CAFR system. (Wakeman, Tr. 606:8-607:4.) *See supra* note 35.

37 Dominion withdrew $32,763 of allegedly unsupported costs on April 16, 2008 (*See* DX 306; *see also* DX-D5, Johnson Demonstrative 58.) Accordingly, the total amount of other costs still challenged is $1,749,762 (*i.e.,* ($1,782,525 total shown on DX 303) - $32,763).

record cost reports. (PX 249; PX 250; PX 252; PX 253; Jenkins, Tr. 970:19-971:23; Nunez, Tr. 1633:9-1636:1; 1648:22-1656:13; Wakeman, Tr. 502:10-503:15; 511:20-512:15; 526:1-15.) That evidence alone is sufficient under the applicable standards. *E.g., System Fuels*, 79 Fed. Cl. at 59-60. Second, virtually all allegedly unsupported costs shown on DX 305 are additionally supported by at least an invoice.[38] Finally, additional testimony was provided for the majority of the challenged costs listed on DX 303. For simplicity, below is a table summarizing the supporting information for the challenged costs, as listed in DX 303:

| **Dominion Financial Rec.** | **Total Amount** | **Testimony Support** | **Invoice in PX 260** | **DX 303 Exhibit II Location(s)** |
|---|---|---|---|---|
| ***Allegedly Unsupported Millstone MIBS Costs (PX 250), as listed on DXR015 000012 to 000013 of DX 303:*** | | | | |
| PX 250 | $11,550 | | No | Lines 542 and 544 (Vendor Raytenco) |
| PX 250 | $181,811 | Whitaker, Tr. 904:18-910:21 | No | Lines 547, 536, 541, 370, 590, 410, 566, 392, 570, 394, 572, 397, 556, 381, 565, 389, 600, 421, 551, 375, 607, 429, 617, 440, 567, 571, 569, 545 and 372 (Yankatel) |
| PX 250 | $45,199 | Whitaker, Tr. 900:23-903:7 | No | Lines 113, 115, 117, 116, 109, 106 and 119 (Vendor Protpoco) |
| PX 250 | $26,000 | Whitaker, Tr. 912:13-913:8 | No | Line 623 (Vendor Holtec) |
| PX 250 | $36,412 | Whitaker, Tr. 903:8-904:17 | Yes | Lines 111, 69, 107, 66, 114, 72, 108, 67, 110, 68, 112 and 71 (Vendor Protpoco) |
| PX 250 | $93,081 | Whitaker, Tr. 910:22-912:12 | No | Lines 563, 388, 558, 383, 585, 405, 535, 328, 593, 414, 543, 371, 574, 398, 608, and 431 (Vendor Raytenco) |
| PX 250 | $334,304 | Whitaker, Tr. 910:22-912:12 | Yes | Lines 582, 402, 591, 412, 606, 428, 588, 409, 587, 408, 594, 415, 604, 425, 596, 417, 603, 424, 618, 441, 597, 418, 568, 393, 612, 437, 601, 422, 609, 434, 554, 377, 561, 385, 621, 452, 611, 436, 602, 423, 605, 426 (Raytenco) |
| PX 250 | $6,047 | Whitaker, Tr. 913.9-914:17 | No | Lines 770 and 737 (Vendor Nortgese) |
| PX 250 | $8,064 | Whitaker, Tr. 913:9-914:17 | Yes | Lines 771 and 738 (Vendor Nortgese) |
| PX 250 | $13,314 | | No | Lines 772 (Vendor Nortgese) |
| PX 250 | $115,345 | | No | Lines 667-673 and 583 (Adj Chgs) |
| PX 250 | $18,863 | | No | Lines 548, 553 and 2007 (Cl. Error Suspense) |
| PX 250 | $12,480 | | No | Line 2251 (UVL Automated Transactions) |
| PX 250 | $22,207 | | No | Line 674 (Dist 10710 Payroll to W/O's) |
| | **$924,677** | **Millstone MIBS Subtotal** | | |

[38] On DX 305, "Starting Bastes [*sic*] No." indicates the starting Bates number of the invoice or additional supporting documentation. All but the last three items listed in DX 305 are supported by invoices, and most of those invoices are provided in PX 260.

| | | | | |
|---|---|---|---|---|
| *Allegedly Unsupported Surry SAP Costs (PX 249), as listed on the bottom of DXR015 000013 of DX 303:*[39] | | | | |
| PX 249 | $8,224 | | Yes[40] | Posting Date 6/22/05 |
| PX 249 | $7,927 | Wakeman, Tr. 523:13-524:10 | No | Posting Date 3/22/04 |
| | **$16,151** | **Surry SAP Subtotal** | | |
| *Allegedly Unsupported North Anna SAP Costs (PX 249), as listed on the top of DXR015 000014 of DX 303:* | | | | |
| PX 249 | $23,781 | Wakeman, Tr. 589:4-590:10 | No | Objects 288N32.4, 288N42.2, 288N43.4 |
| PX 249 | $5,354 | Wakeman, Tr. 590:11-20 | No | Object 288N53.4 |
| PX 249 | $5,502 | Wakeman, Tr. 590:21-591:8 | No | Object 288N.1.1 |
| PX 249 | $5,139 | Wakeman, Tr. 591:9-592:1 | Yes[41] | Object 4609.1 1 |
| | **$39,776** | **North Anna SAP Subtotal** | | |
| *Allegedly Unsupported North Anna CAFR Costs (PX 252), as listed on DXR015 000014 to 000015 of DX 303:* | | | | |
| PX 252 | $6,098 | Wakeman, Tr. 592:2-593:7 | No | Work Unit C00087404001 (Contract Labor) |
| PX 252 | $85,000 | Wakeman, Tr. 593:8-594:4 | No | Work Unit C00874040004 (NA Dose Analysis/Spent Fuel Storage) |
| PX 252 | $296,758 | Wakeman, Tr. 594:5-595:11 | No | Work Unit C00874043210 (CCS Charges) |
| PX 252 | $48,936 | Wakeman, Tr. 595:13-22 | No | Work Unit C00874043210 (Link, Intrusion Microwa) |
| PX 252 | $18,026 | Wakeman, Tr. 595:23-596:8 | No | Work Unit C00874043210 (Generator, Diesel Stand) |
| PX 252 | $21,375 | Wakeman, Tr. 596:9-20 | No | Work Unit C00874043210 (Detector, Helium Leak) |
| PX 252 | $12,511 | Wakeman, Tr. 596:21-597:15 | No | Work Unit C0087404001 (Eng 94 004 Labor) |
| PX 252 | $19,822 | Wakeman, Tr. 598:3-21 | No | Work Unit C0086906001 (Geologic Investigation) |
| PX 252 | $57,305 | Wakeman, Tr. 598:22-599:21 | No | Work Unit C0086906004 (Mylar plots, boring and testing, prof. services) |
| PX 252 | $68,170 | Wakeman, Tr. 599:22-600:12 | No | Work Unit C01201883970 (Last three on table, digital microwave/security systems) |
| PX 252 | -$218,186 | | No | CAFR Reversals for $9,345, $203,455 and $5,386 |
| | **$415,815** | **North Anna CAFR Subtotal** | | |
| *Allegedly Unsupported North Anna NFA Costs (PX 253), as listed on DXR015 000014 of DX 303:* | | | | |
| PX 253 | $29,619 | Wakeman, Tr. 600:13-601:3 | No | Posting Date 04/30/98 (09126) |
| PX 253 | $77,603 | Wakeman, Tr. 601:4-602:24 | No. | Posting Dates 03/31/98, 05/31/98 and 06/30/98 (Stores Issues) |
| PX 253 | $246,121 | | No | PRO/AP Distribution |
| | **$353,343** | **North Anna NFA Subtotal** | | |
| **Grand Total** | **$1,749,762** | | | |

39 The totals for the Surry and North Anna SAP Costs on this chart do not match the DX 303 Surry and North Anna SAP totals because of the $32,763 that Dominion withdrew on April 16, 2008. DX 306.

40 The invoice was produced to the government, but is not included in PX 260.

41 The invoice was produced to the government, but is not included in PX 260.

As demonstrated above, all of the costs alleged by the government as "unsupported" have been shown with reasonable certainty.

**11. AFUDC.**

The government erroneously argues that Dominion's claim for AFUDC and Capitalized Interest costs is barred by 28 U.S.C. § 2516(a) as a claim for interest. (3/24/08 Def. Memorandum of Contentions of Fact and Law at 72-74.) The government's assertion is erroneous because there is a distinction between interest *on* a claim and interest *as* a claim. *See Tenn. Valley Auth.*, 69 Fed. 541 (citing *Wickham Contracting Co. v. Fisher*, 12 F.3d 1574, 1582 (Fed. Cir. 1994)).[42] In an attempt to counter *Wickham*, the government argues that Dominion must show that specific debt was issued to raise money for the specific projects caused by DOE's breach. (3/24/08 Def. Memorandum of Contentions of Fact and Law, at 72-74). That, however, is not how utilities such as Dominion do business, nor is there any reasoned basis for imposition of such a rule.

As discussed above, Dominion's claim for AFUDC and Capitalized Interest costs is interest as a claim. This can be seen a number of ways: (1) the costs are no longer incurred when the project is available for its intended use (Jenkins, Tr. 1063:3-8); (2) the costs were charged to the projects contemporaneously with the other project costs (Jenkins, Tr. 1060:18-21); and (3) the costs are based on actual debt (and, in some cases, equity) costs (Jenkins, Tr. 1673:13-25).[43]

---

[42] *But see, contra, System Fuels,* 79 Fed. Cl. at 70, *citing Wickham* and *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (1987); *Carolina Power & Light*, 2008 WL 2154103, at *34. For the reasons stated above, we respectfully disagree with *System Fuels* (and agree with *TVA*), and believe that the proper rule of law should not penalize Dominion for simply utilizing more efficient general, rather than specific, debt instruments. It is also important to note that, unlike in *System Fuels*, Dominion is not seeking "Cost of Capital" costs or after-the-fact calculations of interest expense, based upon hurdle rates and expert opinions, of the sort rejected by the Court in *System Fuels* and *Southern Nuclear.*

[43] Capitalized Interest is similar to AFUDC, but is for non-regulated entities. (Jenkins, Tr. 1080: 13-19.) Capitalized Interest contains no equity costs. (Jenkins, Tr. 1092:2-4.) *See also* Financial Accounting Standard

**12. Pre-acquisition Millstone Damages.**

Prior to trial, the government filed a motion for partial summary judgment regarding so-called pre-acquisition damages at Millstone. (Docket items 64, 65, No. 04-83C). The government's arguments regarding such damages,[44] which are purely legal, are based upon misinterpretations of the NWPA and of the Standard Contracts. Those arguments should therefore be rejected.

A. *The right to pursue and recover pre-acquisition Millstone damages was validly assigned to Dominion in this case*. The Purchase and Sale Agreement for Millstone ("Millstone PSA") was executed on August 7, 2000 (PX 149), and the transaction closed on March 31, 2001. (PX 156, 157, 158.) Under the Millstone PSA, title to all spent nuclear fuel at the Millstone site was transferred to Dominion. (PX 149 at DOM2-00000569, Section 2.1(b).) As noted by the government in its pre-trial motion, the Millstone PSA assigned, subject to several exceptions not relevant here, "all rights of the Sellers under . . . the DOE Standard Contracts (including all rights to any claims of Sellers related to DOE defaults thereunder)." (PX 149 at DOM2-00000570, Section 2.1(f).)[45] Consistent with Article XIV of the Standard Contracts, the Sellers timely notified DOE of the assignment to Dominion of the "rights and duties of 'Purchaser'" under the three Millstone DOE Standard Contracts, and confirmed that Dominion was authorized

---

Board ("FASB") Statement No. 34. The post-acquisition Millstone Capitalized Interest costs total $953,717.

44 Dominion seeks $12,066,611 in such costs, and at trial provided documentation and testimony regarding the specific nature and amounts of those damages. (*E.g.,* Whitaker, Tr. 826:21-830:19; Nunez, Tr. 1636:25-1638:12; PX 241 at DOM2-00001967.) For $10,431,562 of those costs, the government disputes entitlement to recovery only upon the basis of the legal anti-assignment argument addressed above. (*See* DX D5 at 61.) The remaining amounts are challenged by the government on anti-assignment grounds and also pursuant to its arguments regarding internal labor screens, AFUDC, and overheads.

45 Def. Mot. at 3, n. 3 (Docket item 64, No. 04-83). Excluded from the assets conveyed to Dominion were (1) "any claims of [Sellers] in connection with Pre-1983 Spent Nuclear Fuel . . ."; (2) contractual rights under certain contracts other than the DOE Standard Contracts, and (3) rights to payments under a "Transition Support Agreement." (PX 149 at DOM2-00000570, Section 2.1(f).) The Millstone Sellers retained ultimate liability for the "one time fee" related to Pre-1983 Spent Nuclear Fuel, and, with respect to any claims regarding such fuel, appointed Dominion as their "agent and attorney in fact" to prosecute such claims. (*See* PX 149 at DOM2-00000635, Section 5.18.)

to "prosecute or settle any claims against the Department of Energy in connection with the Contract." (PX 156, 157, 158.)

B. *The NWPA and the Standard Contracts unambiguously allow assignment of "rights and duties of" a party to the Standard Contracts, and not just, as the government argues, assignment of only "continuing" rights and duties, or only the Standard Contracts themselves*. In the Nuclear Waste Policy Act, Congress expressly provided that *"[t]he rights and duties of a party to a contract* entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high level radioactive waste involved." 42 U.S.C. § 10222(b)(3) (emphasis added). Similarly, the Standard Contracts themselves provide that "[t]he rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved. . . ." (PX 27, p. 33; PX 28, p. 33; PX 29, p. 33; 10 C.F.R. § 961.11, Art. XIV.) The right to pursue pre-acquisition damages is, of course, nothing if not a "right" of a party to the Standard Contract, and thus is freely assignable under the statute and contracts themselves.

For its defense the government invokes two interrelated statutes, the Assignment of Contracts Act, 41 U.S.C. § 15, and the Assignment of Claims Act, 31 U.S.C. § 3727. The government admits, as it must, that the NWPA acts as a waiver of the Assignment of Contracts Act (*see* Def. Mot. at 10 (Docket item 64, No. 04-83)), but erroneously argues that the Assignment of Claims Act should be treated differently. Both Anti-Assignment Acts can, however, be waived,[46] and the unambiguous terms of the NWPA and of the Standard Contract itself implement such a waiver. In virtually every case that has discussed the application of the two statutes, courts have interpreted the two acts together, cited cases involving the two acts interchangeably, and confirmed that "the legal concepts involved in their applicability are the

46 *E.g., Tuftco Corp. v. United States*, 614 F.2d at 740, 745-46 (Ct. Cl. 1980); *Rivera Fin. of Texas, Inc. v. United States*, 58 Fed. Cl. 528, 532 (2003); *American Nat'l Bank & Trust Co. of Chicago v. United States*, 23 Cl. Ct. 542, 546 (1991).

same." *Tuftco Corp. v. United States*, 614 F.2d 740, 744 n.4 (Ct. Cl. 1980); *see also, e.g., United Int'l Investigative Service v. United States*, 26 Cl. Ct. 892, 898 n. 2 (1992). While the particulars and remedies of the two statutes do differ, there is nothing to support the notion that the Assignment of Claims Act has an applicability to these circumstances separate and apart from the Assignment of Contracts Act, or, more to the point, that the NWPA trumped one statute but not the other.

C. *The government's anti-assignment arguments are wrong as matters of statutory interpretation and common sense*. At bottom, the government's anti-assignment arguments necessarily depend upon the proposition that the NWPA only allowed the assignment of what the government now characterizes as "*continuing* 'rights and duties' under the Standard Contracts." Def. Mot. at 10 (Docket item 64, No. 04-83) (emphasis in original). But that is not what the NWPA says. The NWPA does not include, or even imply, the "continuing" term upon which the government now admittedly relies. Rather, the NWPA broadly allows for assignment of "rights and duties" of a party to a Standard Contract, without limitation, along with transfer of title to spent nuclear fuel.

There are only two possible interpretations of the NWPA by which the government can arrive at the position it currently asserts. Either the government (i) must effectively insert a "continuing" term that is *not* in the statute (as in its pre-trial motion in this case), or (ii) it must effectively edit out the "rights and duties of a party" terms that *are* in the statute, leaving only the contracts themselves as assignable. Neither approach is permissible. A statute should not be construed so as to leave some of its terms as meaningless or superfluous, *e.g., Splane v. West*, 216 F.3d 1058, 1067 (Fed. Cir. 2000), and the Court "must construe a statute, if at all possible, to give effect and meaning to all its terms." *Id., citing Lowe v. Securities & Exchange Commission*,

472 U.S. 181, 207-08 n.53 (1985); *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147 (1883). The government's position fails these elemental tests. In all statutory construction cases, the first step is to determine whether the language at issue has a plain and unambiguous meaning, *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002), and the inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent. *Rigsbee v. United States,* 226 F. 3d 1376, 1379 (Fed. Cir. 2000). That is the case here—there are no qualifiers or limitations on the "rights and duties" of a party to a Standard Contract that are assignable. It is those "rights and duties," and not just the contracts themselves, or just "continuing" rights and duties under those contracts, that are assignable. Assignment of the "right" to pursue pre-closing damages is plainly allowed.

Moreover, the government's position would turn the anti-assignment statutes on their heads. As these circumstances confirm, if the government were to prevail, the result would be two potential claimants for breach damages instead of one. It is hard to imagine a result more at odds with the fundamental and oft-recited purposes of the anti-assignment statutes.

D. <u>*This Court's decisions in Rochester Gas and Electric and Vermont Yankee are squarely on point, and are persuasive*</u>. The government's arguments in this case have been thoroughly and persuasively rejected by the Court on the two prior occasions in which they have been raised, namely in *Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005) and *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 241-43 (2006). Contrary to the assertions in its pretrial motion, the precise arguments regarding pre-acquisition damages that the government makes here were vigorously advocated by the government in both of those cases, and the Court in those cases did not merely "proceed to address" the government's claims regarding pre-acquisition damages in dicta or in circumstances

that are in any way distinguishable from those here.[47] The fact that the Court in this case separately addressed the so-called "one time fee" defenses, *see Dominion,* 77 Fed. Cl. 151, 156 (2007), does not somehow render the issue of assignability of the right to pursue pre-acquisition damages different in this case than it was in *Rochester Gas and Electric* and *Vermont Yankee*. There is no reason in these circumstances to depart from the Court's prior correct rulings regarding the assignability of the right to pursue pre-acquisition damages.

E. *Properly considered, neither the Ginsberg case nor any other authority supports the government's anti-assignment position*. Most of the authorities cited by the government in its pretrial motion merely recite general sovereign immunity principles and/or the purposes of the Anti-Assignment Acts, and cannot be argued specifically to apply to or control the situation here.[48] However, as it did unsuccessfully in both *Rochester Gas and Electric* and *Vermont Yankee*, the government again argues that *Ginsberg v. Austin*, 968 F.2d 1198 (Fed. Cir. 1992) supports the result that it seeks. *Ginsberg* did not involve an analysis of issues regarding the scope or applicability of Assignment of Claims Act or Assignment of Contracts Act, and, other than noting that the Board below held both acts to have been waived, the court did not mention those statutes. *Ginsberg* also, of course, did not involve the NWPA. *Ginsberg* instead addressed the standing of an assignor and turned upon common law presumptions of the running of discrete, severable claims for back rent, where there was *not* an "express intention" between the parties to transfer such claims for accrued rent to the assignee. *Ginsberg*, 968 F.2d at 1200. Here, as the terms of the Millstone PSA confirm, there *was* an "express intention" to transfer the

47 *E.g., Rochester Gas and Electric*, 65 Fed. Cl. at 440 ("The government claims that such an assignment [of pre-existing claims] violates the Assignment of Claims Act, which, as the government would have it, is left unaffected by Section 302(b)(3) of the NWPA, unlike the Assignment of Contracts Act."); *Vermont Yankee*, 73 Fed. Cl. at 242.

48 *See* Def. Mot. at 7, 14 (Docket item 64, No. 04-83).

rights and claims under the Standard Contract to Dominion, "including, all rights to any claims of Sellers related to DOE defaults [under the Standard Contracts] . . . ." PX 149 at DOM2-00000570, Section 2.1(f). The Court correctly noted this dispositive distinction in *Rochester Gas and Electric*, 65 Fed. Cl. at 441. Indeed, if the law were as the government now contends, the Federal Circuit's extended discussion of common law presumptions in *Ginsberg* would have been unnecessary, as the Assignment of Claims Act would have simply barred the assignment of the pre-existing claims for back rent. The Federal Circuit did not, however, so hold, and *Ginsberg* fails to provide any support for the government's position here.

## CONCLUSION

Judgments should be entered for Dominion for those costs incurred as a result of DOE's breaches through June 30, 2006, in the amount of $174,605,091. Specifically, an award of $52,001,303 should be entered in the "Connecticut" action, No. 04-83, and an award of $122,603,788 should be entered in the "Virginia" action, No. 04-84. In its order, the Court also should confirm Dominion's right to pursue in subsequent proceedings damages incurred after June 30, 2006, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan*, 422 F.3d at 1377.

Respectfully submitted,

Of Counsel:

Paul M. Bessette
David M. Kerr
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

s/ Brad Fagg
Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

June 18, 2008

CERTIFICATE OF FILING

I hereby certify that on this 18th day of June, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg