IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>DOMINION NUCLEAR CONNECTICUT, INC.,<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 04-0084<br>(Judge Bruggink) |
| DOMINION RESOURCES, INC., and<br>VIRGINIA ELECTRIC & POWER COMPANY,<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 04-0083<br>(Judge Bruggink) |

**DEFENDANT'S POST-TRIAL BRIEF**


GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

LISA L. DONAHUE
Commercial Litigation Branch
U.S. Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-9498
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
Office of General Counsel
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Attorney

ANDREW P. AVERBACH
CHRISTOPHER J. CARNEY
SCOTT SLATER
Trial Attorneys
Commercial Litigation Branch


July 10, 2008

Attorneys for Defendant

TABLE OF CONTENTS

PAGE

ARGUMENT. . . . . . . . . . 2

I. CONTROLLING LEGAL PRECEDENT REQUIRES THIS COURT TO PUT PLAINTIFFS IN THE POSITION THEY WOULD HAVE BEEN HAD DOE PERFORMED IN 1998 . . . . . . . . 2

II. THIS COURT MUST AWARD DOMINION ITS DAMAGES BASED UPON THE DOE'S ACTUAL OBLIGATIONS PURSUANT TO THE STANDARD CONTRACT. . . . . . . . . 5

III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE DOE'S DELAY CAUSED THEM TO CONSTRUCT ADDITIONAL SPENT FUEL STORAGE AT THE NORTH ANNA FACILITY. . . . . . . . 10

A. Dominion's Primary Goal In Spent Fuel Planning Is To Maintain Full Core Reserve At All Times. . . . . . . . . 10

B. VEPCO's Projected Loss Of FCR At North Anna In 1999 Would Have Revealed A Need To Construct Additional Storage, Even Absent DOE's Delay. . . . . . . . . 13

C. The Evidence Suggests That VEPCO Preferred An ISFSI To Other Spent Fuel Storage Options. . . . . . . . . 17

D. VEPCO's Early Spent Fuel Planning Contemplated The Need For Additional Spent Fuel Storage At North Anna After 1998, Absent DOE's Delay . . . . . . . . . 19

E. VEPCO Has Not Provided Viable Evidence Of Alternative Storage Options, Upon Which This Court Can Determine Damages. . . . . . . . . . 21

IV. THE EVIDENCE SHOWS THAT PLAINTIFFS WOULD HAVE UPGRADED THE UNITS 2 AND 3 CRANES AT THE MILLSTONE FACILITY, EVEN IF DOE HAD BEGUN ACCEPTING SNF IN 1998 . . . . . . . . . 24

A. Millstone Management Would Have Chosen To Upgrade The Unit Two and Three Cranes, Even If DOE Had Begun Accepting SNF In 1998. . . . . . . . . 24

TABLE OF CONTENTS (Cont'd)

PAGE

B. Regulatory Concerns at Millstone Would Have Influenced Dominion's Decision To Upgrade The Millstone Cranes . . . . . . . . . . . . . 29

V. DOMINION NUCLEAR CONNECTICUT CANNOT RECOVER PREACQUISITION COSTS INCURRED AT MILLSTONE, AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI. THE HEAT LOAD ANALYSIS PERFORMED IN SUPPORT OF THE MILLSTONE UNIT THREE FULL CORE OFFLOAD LICENSE AMENDMENT WAS NOT CAUSED BY DOE'S DELAY. . . . . . . . . . . . . . . . 32

VII. DOMINION HAS AVOIDED THE COSTS ASSOCIATED WITH LOADING FUEL TO DOE WITHIN THE CLAIM PERIOD . . . . . . . . . . . . . . . . 33

VIII. DOMINION HAS NOT ESTABLISHED THAT THE CASK LOADING MODIFICATIONS PERFORMED AT ITS SITES WERE CAUSED BY DOE'S DELAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. Mr. Grillo Has Provided Sufficient Information Upon Which The Court Can Rely To Determine What Modifications Would Have Been Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. The Modifications Performed At The Millstone Facility Would Have Been Performed To Load Fuel To DOE.. . . . . . . . . . . . . . . . 38

C. The Modifications Performed At The North Anna Facility Would Have Been Performed To Load Fuel To DOE.. . . . . . . . . . . . . . . 39

D. Dominion Would Have Incurred Spent Fuel Characterization Charges Absent DOE's Delay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IX. PLAINTIFFS WILL RECEIVE A WINDFALL IF THEYARE AWARDED THEIR NON-INCREMENTAL OVERHEAD COSTS.. . . . . . . . . 41

X. DOMINION CANNOT RECOVER ITS NON-INCREMENTAL INTERNAL LABOR COSTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XI. PLAINTIFFS CANNOT RECOVER AFUDC, AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

TABLE OF CONTENTS (Cont'd)

PAGE

XII. DOMINION CANNOT RECOVER THOSE COSTS THAT ARE UNSUPPORTED. . . . . 47

CONCLUSION. . . . . 50

# TABLE OF AUTHORITIES


CASES PAGE(S)

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978). .......... 44

Bluebonnet Savings Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001).......... 4

Bluebonnet Savings Bank v. United States,
466 F.3d 1349 (Fed. Cir. 2006).......... 35

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003).......... passim

Bluebonnet v. United States,
67 Fed. Cl. 231 (2005). .......... 35

Carolina Power and Light Co. v. United States,
82 Fed. Cl. 23 (2008). .......... 47

Citizens Federal Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007).......... 3

Dep't of the Army v. Blue Fox, Inc.,
525 U.S. 255 (1999).......... 31

England v. Contel Advanced Sys.,Inc.,
384 F.3d 1372 (Fed. Cir. 2004).......... 46

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984).......... 31

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001).......... 3

Hughes Communications Galaxy v. United States,
271 F.3d 1060 (Fed. Cir. 2001).......... 21

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996). .......... 7

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005).......... 2, 3, 47

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Jackson Construction Co. v. United States,
62 Fed. Cl. 84 (2004). .......... 42

Koby v. United States,
53 Fed. Cl. 493 (2002). .......... 9

Northern States Power Co. v. United States,
78 Fed. Cl. at 449 (2007) appeal pending,
No. 2008-5037, 2008-5041 (Fed. Cir. docketed Feb. 11, 2008). .......... 47

Northern States Power Co. v. United States Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997). .......... 5

PSEG Nuclear, L.L.C. v. United States, ,
465 F.3d 1343 (Fed. Cir. 2006). .......... 3

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending,
No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007). .......... passim

Precision Pine and Timber, Inc. v. United States,
81 Fed. Cl. 235 (2007). .......... 42

Rochester Gas and Electric Corporation v. United States,
65 Fed. Cl. 431 (2005). .......... 30

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006). .......... 24, 41

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1989). .......... 24

Southern Nuclear Operating Co. v. United States,
77 Fed. Cl. 396 (2007) appeal pending,
No. 2008-5029, 2008-5035 (Fed. Cir. docketed Jan. 9, 2008). .......... 47

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007) appeal pending,
No. 2008-5029, 2008-5035 (Fed. Cir. docketed Jan. 9, 2008). .......... 46, 47

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Tennessee Valley Auth. v. United States,
69 Fed. Cl. 515 (2006). ........ passim

United States v. Capital Sand Co.,
466 F.3d 655 (8th Cir. 2006). ........ 42

United States v. Shannon,
342 U.S. 288 (1952). ........ 31, 32

Vermont Yankee Nuclear Power Corporation v. United States,
73 Fed. Cl. 236 (2006). ........ 30

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002). ........ 2

Wilner v. United States,
23 Cl. Ct. 241 (1991). ........ 44

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980). ........ 44

STATUTES

10 C.F.R. 50.59. ........ 30

28 U.S.C. §2516. ........ 46, 47

31 U.S.C. § 3727. ........ 30

41 U.S.C. § 15. ........ 30

42 U.S.C. § 10161. ........ 7

42 U.S.C. § 10168. ........ 8

42 U.S.C. § 10222. ........ 31

MISCELLANEOUS

Restatement (Second) of Contracts §347(d). ........ 33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>DOMINION NUCLEAR CONNECTICUT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0083<br>(Judge Bruggink) |

| | | |
|---|---|---|
| DOMINION RESOURCES, INC., and<br>VIRGINIA ELECTRIC & POWER COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0084<br>(Judge Bruggink) |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the Court's order dated May 20, 2008, defendant, the United States, respectfully submits the following post-trial brief. In this brief, we attempt to focus upon the particular topics identified by the Court at the close of trial. In support of our position, we rely upon our pretrial brief, our motion for partial summary judgment on AFUDC, our motion for partial summary judgment on pre-acquisition claims, and the trial record. For detailed cost information and for a complete calculation of damages, we respectfully refer the Court to the

testimony of Mr. Larry Johnson and the accompanying exhibits in the trial record. Johnson, Tr. 2456:5-2637:21; DX-D5; DX 236; DX305.[1]

## ARGUMENT

### I. CONTROLLING LEGAL PRECEDENT REQUIRES THIS COURT TO PUT PLAINTIFFS IN THE POSITION THEY WOULD HAVE BEEN HAD DOE PERFORMED IN 1998

The fundamental goal in awarding expectation damages is to "place the injured party in as good a position as it would have been had the breaching party fully performed." Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). "[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (emphasis added) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) (same). When evaluating damages in a spent nuclear fuel ("SNF") context, "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by [the plaintiff] to store its SNF recompensable; [plaintiff] must prove foreseeability, causation, and reasonableness." Indiana Michigan, 422 F.3d at 1376. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its conclusion that the

[1] As an initial matter, plaintiffs appear to have inadvertently misstated the amount of claimed damages as $174,605,091 in their post-trial brief. Pls.' Br. at 50. The total amount of damages claimed at trial by the plaintiffs total $173,917,029. PX 241.

utility could not show its actions would not have been necessary in the absence of a partial breach. Id. at 1376.

Requiring plaintiffs, Dominion Resources, Inc., Virginia Electric And Power Company ("VEPCO"), and Dominion Nuclear Connecticut ("DNC") (collectively, "Dominion" or "plaintiffs") to depict an accurate non-breach world is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. Bluebonnet Savings Bank v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003).[2] This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) ("PG&E"), recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible non-breach world against which to measure causation. Specifically, "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had the defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 406 ("[t]o derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet, 339 F.3d at 1345)). Dominion's damages can only be measured by reference to a world where DOE performed and, without reference to the performance world, the measure of plaintiff's damages is "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any,

[2] Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), permits the trial court to utilize a substantial causal factor test, but as we explained in our pretrial brief, the substantial causal factor test does not eliminate plaintiffs' obligation to show that it would not have incurred its claimed costs in the absence of a breach. Gov't.'s Pretrial Br. at 29-32.

and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

The Bluebonnet cases are illustrative of the type of analysis this Court must perform in awarding plaintiffs damages. In Bluebonnet Savings Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001) ("Bluebonnet I"), the Federal Circuit overturned the trial court's determination that the plaintiffs' claimed damages were too speculative and remanded for a determination of damages. Id. at 1358. On remand, the trial court determined plaintiffs' damages, but failed to deduct the plaintiff's non-breach costs from the damage amount. Bluebonnet, 339 F.3d at 1345 (Fed. Cir. 2003) ("Bluebonnet II"). On appeal, the Federal Circuit remanded again, and ordered the trial court to deduct the plaintiff's non-breach costs, including any costs avoided, from its determination of damages. Id. In so doing, the Federal Circuit recognized that "[w]hile [the] issue may be difficult to resolve, it is necessary for the trial court to make such a determination in order to ensure that the [damages] do[ ] not represent an overstatement of the loss fairly attributable to the breach." Id. at 1345 (emphasis added). Even if this amount is difficult to determine, the trial court must address this "complex" issue by making "as accurate an assessment as possible" of the plaintiff's non-breach costs. Id. at 1346. Dominion cites Bluebonnet I in its brief in support of its position that it need only make a fair and reasonable approximation of its damages. Pls.' Brief at 39. However, in ignoring Bluebonnet II, Dominion leaves out a critical component of the damages analysis, without which this court cannot properly measure plaintiffs' damages.

## II. THIS COURT MUST AWARD DOMINION ITS DAMAGES BASED UPON THE DOE'S ACTUAL OBLIGATIONS PURSUANT TO THE STANDARD CONTRACT

We are mindful of the Court's preliminary determination, expressed at the close of trial, with respect to the rate of acceptance required by the Standard Contract. For that reason, we rely largely upon the arguments that we raised in our pretrial brief, as supported by the evidence introduced at trial, to demonstrate that the proper means of identifying the rate is to adopt the terms of the Standard Contract and employ the mechanism set forth in the Standard Contract by which the rate was to be identified. See Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 399 (2006) ("[The Delivery Commitment Schedule] process – provided in the express terms of the Standard Contract, intended by the parties eventually to engender a firm acceptance rate and schedule by which DOE would collect the utilities' spent fuel, and substantially carried out by the parties in this case – is the best and most appropriate mechanism by which to enforce defendant's performance obligation to accept PG & E's spent fuel under the Standard Contract."), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007).[3] Therefore, we limit our comments here to a few salient points.

The Court indicated at the close of trial that the mechanism set forth in the Standard Contract to set the rate of acceptance might have been infected by DOE's delay, resulting in a rate that is inconsistent with the parties' obligations. Respectfully, we disagree. If, as plaintiffs assert, the "essence of the deal" was that utilities would not be responsible for additional at-

---

[3] As this Court is aware, the Government has been specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. See Northern States Power Co. v. United States Dept. of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997). The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable, as set forth in footnote two to the Government's pretrial brief in this matter.

reactor storage costs after 1998, Pls.' Pretrial Mem. at 47, one would expect to see that language in the Standard Contract itself. However, Loring Mills, who spearheaded the industry's effort to require DOE to accept spent fuel at a particular rate (one that obligated DOE to accept fuel at an annual rate that exceeded the industry's generation rate and would work off the backlog), testified that, although he believed the parties had reached an "understanding" during the contract formation process concerning the rate of acceptance, he was "surprised" that DOE chose not to include language in the Standard Contract endorsing the rate that he advocated. Mills, Tr. 2228:18-22. The only plausible explanation for Mr. Mills's "surprise" is that DOE rejected the rate that the utility industry proposed and that the parties' fully integrated agreement did not contain the understanding that plaintiffs espouse. Morgan, Tr. 1200:13-1208:24; 1242:1-1247:9. Compare PX 14 at ADM002.0281 with PX 26 at DOM0070918.

Similarly, if the essence of the deal was the rate that plaintiffs advocate today, one would have expected plaintiffs to have supplied some contemporaneous objection to the rate of acceptance that DOE promulgated in 1991. Plaintiffs participated in the DCS process, yet never complained about the rate that was contained in the 1991 Annual Capacity Report ("ACR"). Wakeman, Tr. 634:15-635:3, Hill, Tr. 2000:7-2001:9. On one occasion, in submitting Delivery Commitment Schedules ("DCSs") to DOE, Northeast Utilities even voiced its concerns about being "shorted by one or more assemblies over two or three years" because of DOE's policy of not permitting utilities the opportunity to carry over unused portions of their allocations to subsequent years. See DX 97 at COF0350495. Yet, despite being armed with a forum to air its grievances, neither plaintiff complained to DOE about the rate contained in the 1991 ACR until after the time for spent fuel acceptance had come and gone. Northeast Utilities did not complain

about the 1991 rate until after the company had, in consultation with its attorneys, already provided notice to DOE that the it was "entitled to compensation for any cost it has incurred or will incur as a result of [DOE's] failure to fulfill its obligations." PX 133, 139; Hill, Tr. 1995:8-2001:9.

The litigation-inspired position that plaintiffs adopt also ignores the parties' understanding, reflected in the Standard Contract and the Nuclear Waste Policy Act ("NWPA"), that DOE could have commenced accepting fuel in 1998 through the use of a monitored retrievable storage ("MRS") facility. Indeed, among the suggestions to the proposed Standard Contract that the utilities made (and that DOE accepted) during the contract negotiation process was a recognition, in the definition of the term "DOE Facility," of "the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository." PX14; PX 26 at DOM00070921 (Art. I, Sec. 10). Given that DOE's obligation to begin accepting SNF was not conditioned upon the existence of a repository, see Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996), any determination that DOE was required to accept fuel at the rate advocated by plaintiffs is, essentially, a determination that performance at an MRS would have to be at least as great a rate as performance at a repository.

Such a conclusion is, respectfully, untenable. DOE's ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982). It surely was not outside the parties' contemplation – including the contemplation of the utilities when they suggested that DOE be permitted to accept fuel at an MRS – that future authorization of an MRS might be accompanied by restrictions, to be enacted

during the congressional authorization process, that would prevent the MRS from becoming a de facto repository. Morgan, Tr. 1281:20-1282-12 ("And we had not designed an MRS or gone in for authorization to Congress for an MRS, so there was no way we could commit to an acceptance rate for the MRS."); 1243:14-17. Indeed, even the December 1983 statements of Robert Morgan, upon which plaintiffs so heavily rely, confirm his trial testimony that the MRS was backup facility at which DOE would be able to meet its obligation to begin accepting fuel on or before January 31, 1998 if a repository was not yet available. PX 37 at SN069600; Morgan, Tr. 1249:17-1250:2.

The rate that ultimately was promulgated in the 1991 ACR was fully consistent with the path that had been foreshadowed in 1983. In 1987, in the course of authorizing an MRS, Congress imposed restrictions (the so-called "linkages") that were stricter than those proposed by DOE and that prevented DOE from receiving fuel at an MRS until receipt of construction authorization for a repository. 42 U.S.C. § 10168(d)(1),(3); PX 54 at DOM2-00000474. Nothing in the NWPA or the Standard Contract barred Congress from imposing such a limitation. Although the linkages did not immediately limit the contemplated acceptance rate – because DOE believed at the time that it would receive construction authorization for a repository in 1998 (and would begin accepting fuel at the repository in 2003) – the effect of the slippage of the repository opening date to 2010 (as announced in 1989) was to limit the amount of fuel that DOE could accept at an MRS during the initial years of the program. DX 60 at HQR-003-1688; DX 65 at EDB-001-1449; Kouts, Tr. 2869:20-2873:16; 2903:25-2904:3. As a result, the rates contained in the 1991 ACR, which were premised upon the acceptance at an MRS during the early years of the program (before a repository was to be available), were

circumscribed by the limitations imposed upon an MRS by Congress, PX 74 at HQR-002-0806, and reflect precisely the type of uncertainties that, as Mr. Morgan testified, were apparent to the parties in 1983.

This is not to say that the rate that DOE promulgated in 1991 for the first ten years of the program (the length of the time frame that the Contract requires DOE to project, PX 26 at DOM00070927 (Art. 4, Sec. B.5(b)) was incompatible with a rate of acceptance that ultimately exceeded the industry's generation rate. Indeed, the assumptions that DOE used in 1990 to estimate the costs of the program (contained in its Preliminary Estimate of Total System Costs ("PETSC")) employed a rate of acceptance that virtually mirrored the rates contained in the 1991 ACR and, following the commencement of operations of a repository in 2010, increased to a 3,000 MTU annual rate by 2015. PX 67 at FOI-001-4125; Kouts, Tr. 2910:2-2914:3. This rate simply reflects the contingency, recognized by the parties themselves in 1983, that the repository might be delayed and that resort to an MRS with limited receipt capability might be necessary during the early years of the program. It does not reflect, as plaintiffs would have it, a concerted effort by DOE to evade its responsibility to accept, as expeditiously as practicable upon the commencement of operation of a repository, all of the spent fuel that the utilities have produced. When DOE issued the 1991 ACR, it planned to reach the steady-state rate that plaintiffs advocate. It just did not plan to do so as quickly as plaintiffs would have liked. However, damages are not measured against the option that the utilities most prefer. They are measured against the baseline obligations of the breaching party. See Koby v. United States, 53 Fed. Cl. 493, 496-97 (2002). For that reason, the only inquiry that the Court need undertake in measuring damages in this case is whether plaintiffs have plausibly demonstrated what expenditures they

would have incurred had DOE begun accepting spent fuel in 1998 at an MRS, pursuant to the Standard Contract, at the rate contained in the 1991 ACR.

## III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE DOE'S DELAY CAUSED THEM TO CONSTRUCT ADDITIONAL SPENT FUEL STORAGE AT THE NORTH ANNA FACILITY[4]

### A. Dominion's Primary Goal In Spent Fuel Planning Is To Maintain Full Core Reserve At All Times

Dominion's policy with respect to Full Core Reserve ("FCR") is "to plan and conduct interim spent fuel storage activities, such that the Surry and North Anna power stations maintain at a minimum full core discharge capability or full core reserve for one unit in their spent fuel pools at all times," PX 172 at DOM00041732 (emphasis added); see Brookmire, Tr. 24:24-25:11; 88:21-90:7; Basehore, Tr. 1136:4-13; Wakeman, Tr. 645:7-16; 642:19-23; 644:17-25 (FCR is "always needed"); see also, Hill, Tr. 1970:15-19; 1970:25-1971:10 (the policy at Millstone is to maintain FCR at all times). In actuality, Dominion strives to maintain FCR because it does not want to be caught in a situation where it has nowhere to put its fuel if it needs to offload the core. Brookmire, Tr. 86:15-20; Basehore, Tr. 1137:19-23. The directive from Dominion station management for Dominion's spent fuel group is to maintain full core reserve at all times (Wakeman, Tr. 645: 7-16), and Mr. Wakeman's primary objective in spent fuel planning is to maintain full core reserve in the safest manner. Wakeman, Tr. 674:22-675:3. FCR is also necessary for reactor in-service inspections that are conducted every five years and may be necessary at other times to inspect critical reactor components, including those linked to the

[4] Based upon the Court's instruction at the close of trial, we focus our discussion upon a 3,000 MTU rate of acceptance. Should the Court determine that the 900 MTU rate meets DOE's obligations, or if this rate is otherwise determined to meet DOE's obligations, we respectfully request the opportunity to fully brief our position at the 900 MTU rate.

reactor's primary coolant system. PX 172 at DOM00041732; Brookmire, Tr. 28: 8-29:12; 86:1-14 (FCR was necessary to repair cladding defect).

In its post-trial brief, Dominion contends that its management could simply suffer a loss of FCR. However, this decision would be inconsistent with how Dominion actually manages its plants. The times when Dominion has lost FCR in the past have resulted from circumstances beyond its control, rather than by choice. See e.g., Brookmire Tr. 81:23-82:8 (contingency plan in case Connecticut siting counsel did not give permission to put Millstone ISFSI in service); Brookmire, Tr. 82:9-83:21 (loss of FCR related to a delay in the delivery of an older spent fuel cask not being claimed by Dominion as damages in this case); Basehore, Tr. 1147:8-1148:14 (describing loss of full core reserve at Keuwanee plant because of unavoidable delay in licensing of ISFSI).[5] Mr. Brookmire, the supervisor of the spent fuel group, is personally aware of only one instance when either of the Virginia plants lost FCR, and in that instance the loss of FCR was for a short duration, on the order of weeks to months. Brookmire, Tr. 82:22-83:14. FCR has been required at Surry in the past to "perform necessary maintenance and repairs," and a loss of FCR would render VEPCO unable to defuel its reactors and require it to discontinue operations. PX 16 at DOM00060755. As the supervisor of spent fuel, Mr. Brookmire has never recommended that the company go below full core reserve. Brookmire, Tr. 84:11-16. In fact, Mr. Brookmire tries to maintain space in the pool above full core reserve, so that new fuel can be

[5] Dominion did not acquire Kewaunee until 2005 and had no responsibility for any spent fuel management decisions prior to that time. Wakeman, Tr. 689:4-14. Because planning for dry fuel storage should begin five years in advance of when it is needed (DX238 at DXR00400213; Wakeman, Tr. 646:14-16; Basehore, Tr. 1146:25-1147:7; see also Rutkoske, Tr. 767:18-768:20), Dominion would not have had sufficient time to incorporate a spent fuel planning strategy to avoid a loss of FCR at Kewaunee within these years of the acquisition.

placed in the pool before refueling. Brookmire, Tr. 94:20-95:19 (Mr. Brookmire tries to maintain two refuelings, or 128 spaces, above full core reserve).

Maintaining FCR has economic implications, too, because doing so decreases the amount of time the fuel needs to be handled during an outage, thereby potentially shortening an outage. Brookmire, Tr. 96:8-97:14; Basehore, Tr. 1138:4-1139:6. Any increase in outage time is a cost to Dominion because an extended outage would require the company to purchase replacement power. Basehore, Tr. 1140:1-4. Mr. Grillo estimates that an outage extension could cost up to $1 million per day. Grillo, Tr. 2299:2-2300:12; DX 238 at DXR004000211; DX-D4 at 7. For this reason alone, Dominion's assertion that it would choose to suffer a 15-month long loss of FCR defies logic. If an emergency arose that required a full core offload, Dominion could face costs of $1 million per day, for as long as 450 days. Such a cost would quickly exceed the cost to construct additional storage.

Lastly, Dominion's assertion that it could perform an in-core shuffle to refuel is suspect. VEPCO has represented, in response to concerns raised by the NRC about potential loss of shut down margin during refueling operations, that "in-core shuffles are not used in refueling operations at Surry or North Anna, and that compliance with the current fuel on load sequence procedures precludes an in-core shuffle." DX 307 at DOM00038027 (emphasis added); Basehore, Tr. 1142:3-1145:14. Dominion does not refuel its Virginia reactors using an in-core shuffle, and to do so, VEPCO may need to purchase tools that it does not currently possess. Brookmire, Tr. 92:6-94:17. Further, using an in-core shuffle, rather than a full core offload, increases the likelihood of fuel assembly damage. Brookmire, Tr. 92:6-94:17; Grillo 2296:8-

2297:20; DX-D4 at 6. These individual fuel assemblies are expensive—costing approximately three quarters of a million dollars each. Brookmire, Tr. 92:6-94:17.

B. VEPCO's Projected Loss Of FCR At North Anna In 1999 Would Have Revealed A Need To Construct Additional Storage, Even Absent DOE's Delay

Even if DOE had announced that it intended to perform at a 3,000 MTU rate of acceptance within the first ten years of the waste acceptance program, VEPCO would have projected a loss of FCR beginning in 1999. Because North Anna had no spent fuel shipping allocations until 2002, this loss of FCR potentially could last for years, and result in a loss of pool capacity. Dominion's assertion that VEPCO would not have constructed additional spent fuel storage at North Anna presumes that VEPCO would have made spent fuel planning decisions under the assumption that contingent events would have unfolded in a manner most advantageous to it. In reality, and as supported by VEPCO's own documents and analyses, VEPCO would have used conservative assumptions in its spent fuel planning to protect its assets, and it would have constructed additional storage at North Anna to alleviate its concerns.

In 1993, VEPCO recognized that it would suffer a loss of full core reserve at North Anna by up to 52 assemblies after the spring outage in 1999. Wakeman, Tr. 556:19-557:4; 646:2-8; PX 85 at DOM00010284, DOM00010324. Because of this impending loss of FCR, Mr. Wakeman performed a study for VEPCO to evaluate spent fuel storage options for the North Anna facility. Wakeman, Tr. 648:14-649:1. In his study, Mr. Wakeman considered multiple spent fuel storage models, not simply the best case scenario. PX 85. VEPCO's goal was to have completed whatever spent fuel alternative it chose by summer of 1998, because VEPCO did not want to be "right up against the edge" of losing full core reserve in 1999. Wakeman, Tr. 661:1-15; PX 85 at DOM00010325. In his study, Mr. Wakeman recommended that VEPCO construct

an Independent Spent Fuel Storage Installation ("ISFSI") at North Anna. PX 85 at DOM00010324.

VEPCO began loading the North Anna ISFSI in July 1998. Wakeman, Tr. 473:18-20. This timing is significant because VEPCO would not have received any spent fuel shipping allocations until year two of the program, or 1999, and the only allocations that VEPCO would have received in the early years of the program would have been for the Surry facility. PX 191 at KRONSP03644; PX 74 at A.5.[6] Based upon the 2004 Annual Priority Ranking & Annual Capacity Report ("APR/ACR"), which Dominion used to support its claim, North Anna would not have received its first allocation until year five, or 2002. PX 191 at KRGNSP03654. Based upon the 1991 ACR, North Anna would not have received its first allocation until 2004. PX 74 at HQR-002-0833.[7]

In 1993, when Dominion decided to construct the North Anna ISFSI, Mr. Wakeman contemplated that sharing of allocations might not be possible, because residents of Surry County were likely to express concern over the use of Surry allocations to remove North Anna fuel.

---

[6] The 2004 APR/ACR published spent fuel shipping allocations for performance at a repository, beginning in 2010. PX 191 at KRGNSP03600; Wakeman, Tr. 361:18-362:3. Pursuant to the 2004 APR/ACR, plaintiffs would not have received any allocations until year two of the program, or 2011. If we superimpose these allocations upon performance in 1998, VEPCO would have received its first shipping allocation in 1999 for the Surry facility.

[7] Dominion also modeled the 1987 APR/ACR rate. At this rate, VEPCO would have received a shipping allocation in 1998 for the Surry facility, but VEPCO would not have received its first allocation at North Anna until year five, 2002. PX 56 at DOM00032010, DOM00032024. As explained at trial, Mr. Wakeman used the 2004 ACR/APR for Dominion's primary damage model, because those rates closely matched what Dominion believed DOE was obligated to do. Wakeman, Tr. 373:3-8. VEPCO never used the 1987 rate in any spent fuel planning, and only provided this alternative model in response to questions raised during oral argument before the United States Court Of Appeals for the Federal Circuit. Wakeman, Tr. 711:10-712:3.

Wakeman, Tr. 649:14-650:17; 654:10-25; PX 85 at DOM0010281. VEPCO had experienced similar political impediments to its spent fuel storage plans in the past. Mr. Smith testified that local ordinances in Louisa County, Virginia, where North Anna is located, prevented the storage of Surry spent fuel at North Anna. Smith, Tr. 139:14-22, PX 16 at DOM00060757. According to Mr. Smith, in order to store Surry fuel at North Anna, VEPCO needed to change that local law. Smith, Tr. 139:14-22. Mr. Smith further acknowledged that VEPCO had to assure the local community in Surry that VEPCO did not plan to ship North Anna fuel to Surry, because the local communities were not willing to store fuel from reactors that were not located in that county. Smith, Tr. 142:12-143:9; Wakeman, Tr. 660:14-25. With these "equities" in mind, Mr. Wakeman planned for only limited sharing in his 1993 study. Wakeman, Tr. 649:14-18, PX 85 at DOM00010281. If DOE had performed at a 3,000 MTU rate, there is no reason to believe that Surry's concerns about giving its allocations to North Anna would have dissipated. Had VEPCO not used Surry allocations at North Anna, North Anna would have suffered a sustained loss of FCR from 1998 through at least 2001, and would have lost pool capacity. Wakeman, Tr. 686:19-687:4, PX 222 at DOM00085998.

Even assuming that VEPCO would use Surry allocations at North Anna, DOE was under no obligation to accept VEPCO's fuel at the most optimal time of the year for North Anna. The exact time of the year in which DOE would arrive to accept VEPCO's fuel is one of the contingencies for which utilities would have been required to plan in the non-breach world. Neuberger, Tr. 2075:20-2076:16. In 1993, Mr. Wakeman projected that, absent DOE performance, North Anna would have lost FCR by a projected 116 assemblies (more than can be stored in a temporary rack) prior to the fall outage in 1999. PX 85 at DOM00010234. However,

the same would be true if DOE did not arrive to accept North Anna's fuel until after the fall outage in 1999. In 1993, when Dominion would have been required to begin its spent fuel planning for North Anna, it would not have known at what point during the year DOE would have come to accept North Anna's fuel. Wakeman, Tr. 639: 3-12. For this reason, when faced with an impending loss of FCR, the most prudent option for Dominion would have been to construct additional spent fuel storage, instead of jeopardizing its North Anna asset by suffering a loss of FCR and, potentially, pool capacity. Neuberger, Tr. 2062:12-20; Neuberger, Tr. 2063:3-20; DX 237 at DXR008 000023-000026.[8] This conclusion is consistent with Mr. Wakeman's statement to the trade publication Nuclear Fuel that even if the DOE began accepting fuel in 1998, that North Anna would need additional spent fuel storage, (Wakeman, Tr. 667:8-16, DX 108), and with VEPCO's contemporaneous spent fuel planning.

In the "causation models" that Mr. Wakeman prepared for this litigation, Dominion assumes that North Anna uses all of Surry's allocations from 1999 through 2001. Wakeman, Tr. 392:9-22, 684:10-13, PX 222. Only this full sharing of allocations permits Dominion to avoid a prolonged and large loss of FCR. Wakeman, Tr. 683:19-687:4. However, no contemporaneous evidence or testimony suggests that Dominion would have used all of its Surry allocations at

---

[8] At the 900 MTU rate, VEPCO would have chosen to construct dry storage to store SNF at the North Anna site. Based on the ramp-up rates in the 1991 APR/ACR, Mr. Wakeman determined that VEPCO would have needed storage for approximately 500 assemblies of SNF, and that a dry storage facility was the most prudent option. Wakeman, Tr. 653:3-6; 663:11-15; PX 85 at DOM00010281, DOM00010320 . Such a determination is consistent with the models prepared by Dr. Neuberger. DX 237 at DXR008-000041 - 000043. The only reason that Dominion's 900 MTU "causation model" comes to a different result is through the use of allocations from Millstone. Wakeman, Tr. 678:24-679:16; DX 237 at DXR008 000019-22; PX 224 at DOM00090477. As Dr. Neuberger explained, neither Northeast Utilities nor VEPCO would have known in the mid-1990s that Dominion would acquire the Millstone facility in 2001, and neither utility could have made spent fuel management decisions based on that assumption prior to the acquisition. Neuberger, Tr. 2127:18-2128:14.

North Anna. The only document in the record that assumes the use of all Surry's allocations at North Anna are the "causation models" that Mr. Wakeman prepared for the purpose of this litigation. Dominion never submitted any DCSs for the acceptance of North Anna fuel, and even when it actually submitted DCSs, it did so for the acceptance of fuel at Surry in 1999. Wakeman, Tr. 642: 4-14; PX 84. If Dominion had not used Surry's early-year allocations at North Anna, North Anna would have needed to store 305 more spent fuel assemblies onsite at North Anna than Mr. Wakeman's model shows, resulting in not only a sustained loss of FCR at North Anna from 1998 through at least 2000, but a loss of pool capacity. Wakeman, Tr. 686:10-15; 686:19-687:4; PX 222 at DOM00085998. Even in the best case scenario that Dominion modeled for North Anna, VEPCO loses FCR in two years, for as long as 15 months. Wakeman, Tr. 418:21-419:3, PX 222 at DOM00085998; Neuberger, Tr. 2040:14-2041:13. Dominion's contention that any loss of FCR would only be for a few months at a time relies entirely upon DOE arriving at the most optimal time of the year for North Anna (Wakeman, Tr. 680:20-682:1), an obligation not found in the Standard Contract. Faced with these realities, the most prudent choice for VEPCO in the mid-1990s would have been to plan for contingencies and protect its assets. Neuberger, Tr. 2083:13-2084:15.

### C. The Evidence Suggests That VEPCO Preferred An ISFSI To Other Spent Fuel Storage Options

In its brief, Dominion argues that not one "scintilla" of evidence exists that VEPCO would have chosen to construct an ISFSI had DOE performed at a 3,000 MTU rate. Contrary to Dominion's allegations, the only evidence of the type of storage option that VEPCO would have chosen suggests that it would have constructed an ISFSI. The models that Mr. Wakeman prepared for the 2006 Decommissioning Cost Estimate for the Commonwealth of Virginia show

that VEPCO would have constructed an ISFSI at North Anna, even if DOE had performed at the ramp-up contained in the 2004 APR/ACR. Wakeman, Tr. 694:17-695:9; DX 212 at DOM00013816. Dominion implies that dry storage was the most prudent option in the actual world because, in 1993, Dominion did not believe that DOE was going to perform. However, in 2006, the same year during which Dominion produced its "causation models" to the Government, Dominion told its ratemaking body that it would have constructed an ISFSI, absent DOE's delay. According to Mr. Wakeman, Virginia wanted Dominion to compare "what the real world is going to cost versus what the hypothetical world with deliveries in 1998 would cost." Wakeman, Tr. 717:13-23 (emphasis added). To estimate those non-breach world costs, Mr. Wakeman modeled a scenario in which DOE began accepting spent nuclear fuel in 1998 at the 2004 APR/ACR ramp-up rate. Wakeman, Tr. 689:25-695:9, DX 212 at DOM00013799. In this study, Dominion did not model sharing between Surry and North Anna and, instead, told Virginia that, had DOE begun accepting SNF from the industry in 1998 at a 3,000 MTU rate, VEPCO would have constructed a one-pad ISFSI to store 320 spent fuel assemblies in 10 casks from 1998 through 2001. DX 212 at DOM00013816, -13837.[9] As result, Dominion's assertion that the 2006 Decommissioning Estimate models are based on artificial assumptions is unsupported. Pls.' Br. at 8, n 11. In any event, such a request would only support the inference that local counties in Virginia would have frowned upon VEPCO sharing its allocations.

[9] VEPCO does not claim as part of its damages any casks loaded at the Surry facility until the year 2000, taking the position that those casks would have been loaded even if DOE had performed. Wakeman, Tr. 387:7-21. However, if VEPCO were not sharing allocations with North Anna, then VEPCO would have been required to load fewer casks at its Surry facility from 1999 through 2000, and more casks at the North Anna facility. See e.g., Neuberger, Tr. 2067:9-2068:2 (describing that giving Surry's allocations to North Anna affects storage needs at Surry at the 900 MTU rate); DX 212 at DOM00013837(modeling the loading of 10 casks between 1998 and 2001).

In the 1980s and 1990s, the preferred method of incremental, additional spent fuel storage was the modular approach. Smith, Tr. 229:16-230:13. One of the benefits of a modular approach to spent fuel storage is that it allows a utility to add storage space in small modules, as that space becomes necessary. Smith, Tr. 183:8-25, 188:1-21. In 1993, Mr. Wakeman recommended that VEPCO construct a dry storage facility to alleviate its spent fuel storage concerns because, out of all the alternatives he considered, dry fuel storage was the least costly and most technically viable.[10] PX 85 at DOM00010324.

Finally, Dominion suggests that Mr. Johnson's adjustment for the costs of the North Anna ISFSI is overstated, because VEPCO could have returned the fuel that was stored on the ISFSI to the pool by 2003. Pls.' Br. at 18. Tellingly, in support of this assumption, Dominion relies solely upon the testimony of Dr. Neuberger who did not testify as to the desirability of such an action, and who merely agreed that, based upon counsel's hypothetical, VEPCO would have had available space in its pool in 2003. Moreover, VEPCO has not identified any of the costs that it inevitably would have incurred to move fuel back into the pool.

D. VEPCO's Early Spent Fuel Planning Contemplated The Need For Additional Spent Fuel Storage At North Anna After 1998, Absent DOE's Delay

Dominion spends a good portion of its post-trial brief documenting VEPCO's anticipated spent fuel needs as of 1998 through the eyes of Marvin Smith. Dominion's reliance on Mr.

[10] Mr. Wakeman also considered a rerack for 314 spaces in his 1993 Alternative Spent Fuel Storage Study and estimated that such a rerack would cost approximately $9 million. Wakeman, Tr. 657:20-23; 659:3-9; 662:9-18; PX 85 at DOM00010312. In the 1993 study, Mr. Wakeman indicated that a rerack was one option to store North Anna's fuel; however, no evidence in the record establishes that the rerack was actually technically feasible, and the only cost information in the record is the budget estimate performed by Mr. Wakeman. At trial, Mr. Wakeman dismissed reracking as an option, saying that the major, technical problem with a rerack is that VEPCO can only get a limited number of storage cells, "for an awful lot of work." Wakeman, Tr. 657:24-658:2.

Smith's testimony as proof that VEPCO would not have needed additional spent fuel storage at North Anna after 1998 is misplaced for two reasons. First, Mr. Smith's primary involvement with the Standard Contract was for planning at Surry. Smith, Tr. 120:2-7; 236:11-13. Second, Mr. Smith admitted that, in 1985, VEPCO was not in a position to determine whether it would need additional spent fuel storage at North Anna after 1998 absent the DOE's delay, because sufficiently precise inventory of spent nuclear fuel was not available 15 years in advance. Smith, Tr. 254:13-255:11. In fact, Mr. Smith can only say that he believed that North Anna had "about enough" storage capacity to last until 1998. Smith, Tr. 137:13-138:25.

Even assuming that the DOE was obligated to begin accepting fuel from the industry at a rate like the ones published in the 1985 Mission Plan, VEPCO acknowledges that some additional spent fuel storage may have been necessary after 1998 at North Anna. See, e.g., Smith, Tr. 216:13-17 (VEPCO would hopefully "not need very much" additional storage); Wakeman, Tr. 319:14-16 (acknowledging that in 1983, VEPCO was unsure of whether it would need additional spent fuel storage at North Anna after 1998). In 1983, VEPCO estimated that it would lose FCR at North Anna in 1997 (PX 20 at DOM00035754) and, at the time that VEPCO signed the Standard Contract, Mr. Smith recommended that VEPCO's spent fuel planning emphasize "providing a storage capacity consistent with the spent fuel inventory that will be present in the year 2000," so as to "provide a little cushion in planning." Smith, Tr. 180:21-181:18; PX 20 at DOM00035767; Wakeman, Tr. 326:4-11. VEPCO understood that DOE's acceptance rate would be subject to a ramp-up, that the Government would not remove all of VEPCO's fuel as of 1998 (Smith, Tr. 136: 11-15), and that some utilities would be required to add dry storage after 1998 because spent fuel pickup allocations were provided in a queue.

Wakeman, Tr. 319:6-16. VEPCO was disappointed with the early rates published in the 1985 Mission Plans, because it would have liked to see a faster ramp-up. Smith, Tr. 220:19-221:3.[11] In fact, for VEPCO's spent fuel storage concerns to have been completely allayed, DOE would have had to begin picking up SNF from the industry at a rate in the range of 3,000 MTUs. Smith, Tr. 216:18-217:18.

E. VEPCO Has Not Provided Viable Evidence Of Alternative Storage Options, Upon Which This Court Can Determine Damages

At trial and in its post-trial brief, Dominion hypothesizes that a number of "inexpensive" storage options were available to VEPCO, apparently arguing that it should be allowed to recover all of its ISFSI costs, because other spent fuel storage options were relatively inexpensive. This argument is indefensible. Having failed to present any evidence of the estimated costs of any of its proposed options, Dominion cannot rely upon the unsupported assertion that these options would be less expensive than the construction of an ISFSI. Even if the Court were to agree that Dominion would employ one of Dominion's suggested alternative storage options in the non-breach world, at most, VEPCO would only be entitled to recover the cost of the construction of the ISFSI at North Anna, less the cost of whatever spent fuel management option Dominion would have employed. See Hughes Communications Galaxy v. United States, 271 F.3d 1060, 1066-68 (Fed. Cir. 2001) (limiting a plaintiffs' damage award to "only increased costs," rather than all incurred costs). To do otherwise would impermissibly put Dominion in a better position than it would have occupied absent DOE's delay. Bluebonnet, 339 F.3d at 1344-45. However,

[11] VEPCO's disappointment with the ramp-up in the 1984 Draft Mission Plan is salient, because the ramp-up in that plan is somewhat slower than the ramp-up contained in the 2004 APR/ACR, upon which Dominion relies to calculate damages. A slower ramp-up potentially would reduce the amount of fuel DOE would have accepted from VEPCO in the early years of the program. PX 191 at KRGNSP03600; PX 48 at HQR003-1479.

Dominion inexplicably asserts that it would incur no costs at its North Anna facility absent DOE's breach. Jenkins, Tr. 1050:11-16; PX 225; Jenkins, Tr.1053:17-25; PX 270.

Further, no evidence suggests that these options were even available to VEPCO in the late 1990s. Mr. Wakeman's 1993 spent fuel storage alternatives study evaluated all the spent fuel storage options that he considered at the time. Wakeman, Tr. 657:5-11. Notably, he did not evaluate the use of a temporary rack in this study. Wakeman, Tr. 657:5-11. Dominion interprets this omission to imply that, in 1993, Mr. Wakeman knew DOE would not perform and, therefore, a temporary rack would not provide enough spaces. This interpretation is suspect because Mr. Wakeman considered the use of rod consolidation in his study, though he admitted at the time that rod consolidation was not technically viable. Wakeman, Tr. 659:10-16; PX 85 at DOM00010312 (excluding a cost estimate for rod consolidation, because it is not technically viable). The more plausible interpretation is that the use of a temporary rack was not, and would not have been, considered as a storage alternative by VEPCO in the mid-1990s.

At trial, Mr. Wakeman alluded that the use of temporary racks were uncommon and admitted that he has no familiarity as to how long it would take to license a temporary rack for use in the North Anna cask loading pit. Wakeman, Tr. 688:6-689:3. According to Mr. Brookmire, the North Anna plant does not have any space for a temporary rack for the storage of fuel (Brookmire, Tr. 100:14-22) and, while he is aware of some plants installing temporary racks inside a canal or in cask loading areas, at the Virginia plants those spaces are reserved for other activities, not for storing fuel. Brookmire, Tr. 97:15-100:17. Temporary racks can pose operational problems, too, because the setting of a temporary rack in the cask pit would prevent

the loading of casks while the temporary rack was in the cask loading area. Wakeman, Tr. 436:11-16.

Dominion also contends that it could have obtained a few unavailable spaces in the pool to store additional fuel. However, there would be costs associated with making those spaces available which Dominion has not identified. Wakeman, Tr. 687:5-688:2.

Lastly, Dominion contends that VEPCO could have employed the exchanges provision of the Standard Contract to obtain sufficient SNF shipping allocations to maintain FCR at North Anna. In addition to the highly speculative nature of this proposal, Dominion has not quantified the cost that it would incur to acquire additional spent fuel shipping allocations, nor has it identified the utility with which it planned to exchange. Spent fuel shipping allocations were valuable, and any agreement to exchange those allocations with another utility could result in a cost to VEPCO. See, e.g. Smith, Tr. 303:11-19; see also Zabransky, Tr. 11496:8-1497:22 (trading up in the queue was a benefit, any utility moving down would expect to be compensated). In fact, when Yankee Atomic approached VEPCO to exchange allocations, Mr. Smith suggested that Yankee Atomic pay VEPCO $100,000 per MTU. Smith, Tr. 303: 1-7. Even assuming that a utility was willing to exchange its allocations with VEPCO for a fee, VEPCO would have faced a hefty cost to acquire those allocations. Further, Dominion's reference to these contractual provisions fails to take into account its potential effect upon other purchasers' place in the DOE acceptance queue.

Further, although exchanges of approved DCSs are permitted under the Standard Contract, such exchanges are expressly subject to DOE's approval, "in its sole discretion." PX 26 at DOM00070929, Art. V.E; Zabransky, Tr. 1495:4-21. Similarly, pursuant to Article V.B.2

of the Standard Contract, purchasers have the right, subject to DOE approval, to adjust the quantities of SNF identified in an approved DCS by plus-or-minus 20 percent. The fact that DOE has the discretion to disapprove exchange requests renders VEPCO's exchanges claim speculative. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The Court in Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 n.40 (2006) ("SMUD"), recently rejected an identical claim that an SNF plaintiff would have been able to advance its place in the DOE acceptance queue through the use of exchanges, concluding that such a claim was "highly speculative."

## IV. THE EVIDENCE SHOWS THAT PLAINTIFFS WOULD HAVE UPGRADED THE UNITS 2 AND 3 CRANES AT THE MILLSTONE FACILITY, EVEN IF DOE HAD BEGUN ACCEPTING SNF IN 1998

### A. Millstone Management Would Have Chosen To Upgrade The Unit Two and Three Cranes, Even If DOE Had Begun Accepting SNF In 1998

Dominion decided to upgrade its Millstone Unit Two and Three cranes because the upgrades were "required for any fuel cask handling evolutions and [to] support normal operations." PX 166 at DOM00015603 (emphasis added). Dominion does not dispute that, had DOE performed, Millstone Units Two and Three would have had to either upgrade their cask cranes to single failure proof or perform load drop analyses and implemented mitigation measures. Pls.' Post-trial brief at 22; Whitaker Tr. 883:25-884:3; Rutkoske Tr. 795:8-14. Without providing any cost estimates for the load drop analyses, Dominion simply contends that it could have performed load drop analyses instead of upgrading its cranes. Dominion's position misses the point. Absent DOE's delay, Dominion undoubtedly would have incurred costs to comply with NRC requirements regarding heavy loads. Further, all evidence suggests that the most prudent decision for Dominion's management would have been to upgrade the cranes.

Mr. Grillo's opinions concerning the advantages and disadvantages of upgrading the cask cranes reflect those factors that would be considered by a senior plant manager in making a decision to upgrade the cranes to single failure proof, and make clear that it would have been prudent for Dominion to have made the same decision absent DOE's delay. See generally Grillo, Tr. 2346:3-2352:4; Grillo, Tr. 2353:21-2354:21; DX-D4 at 36-43.[12] To satisfy NRC requirements contained in NUREG 612, any time that a heavy load is moved using a crane within certain defined areas in a nuclear power plant, the utility must either (1) prepare an analysis which assumes that the heavy load being moved is dropped, or (2) use a single failure proof crane. Grillo, Tr. 2346:3-16; DX 238 at DXR 004000220-22; Rutkoske Tr. 793:16-794:14, 794:8-14. Because a heavy load is defined as the weight of a single spent fuel assembly plus its lifting device (approximately 1800 lbs, or less than one ton), these NRC requirements apply to the movement of heavy plant equipment or any spent fuel cask, regardless of weight. Whitaker Tr. 925:5-926:9; Rutkoske Tr. 791:14-792:23; Grillo Tr 2346:18-2347:16; DX-D4 at 38; DX 238 at 14 & n. 39. Based upon the consequences of a load drop analysis, the plant may be required to implement mitigation measures (such as plant modifications or operating restrictions) to limit the consequence associated with the drop, so that no damage to safety related equipment occurs and that release of radioactive material does not jeopardize the health and safety of the public. Grillo, Tr. 2347:17-2349:21; DX-D4 at 39-40; DX 238 at 14-16; Rutkoske Tr. 794:25-795:7. The decision to upgrade the Millstone Unit Two and Three cask cranes to single failure proof

[12] Dominion did not offer any opposing opinion by Dominion senior management, but relied upon the testimony of utility personnel who were not decision makers, and who only provided technical input to the Dominion management that made the decision. Rutkoske, Tr. 784:24-785:7, 799:2-20, Dakers, Tr. 1575:18-23, 1567:11-16, 1591:21-1592:5, Whitaker, Tr. 964:9-965:3.

eliminated the need to perform these complex load drop analyses and to implement mitigation measures as appropriate. Whitaker, Tr. 932:18-933:15; Grillo, Tr. 2349:22-2350:11; DX-D4 at 42; DX 238 at 14-16; Rutkoske, Tr. 791: 2-6, 794:25-795:7, 807:13-25.

Dominion's own witnesses, along with the Government's technical expert Joseph Grillo, have testified to the complexity of performing load drop analyses. Each load drop analysis must account for the characteristics of the load being lifted, including the weight, size, shape, structural properties, surface area, angles, drop height, and what plant equipment could be impacted if it were to drop. Rutkoske, Tr. 795:15-799:1, Whitaker Tr. 927:21–928:6, Dakers 1611:21-23; Grillo, Tr. 2347:17-2348:15; DX-D4 at 39. These drop analyses require rigorous documentation and input from multiple engineering disciplines. Whitaker, Tr. 930-931:17; Rutkoske Tr. 798:12-15. If the characteristics of the load being lifted change, existing load drop analyses are obsolete and a new load drop analysis must be performed. Dakers, Tr. 1611:25-1612:7; Grillo, Tr. 2349:22-2350:11; DX-D4 at 42. Both the crane upgrades and the analyses cost money. Whitaker, Tr. 931:18-22; Grillo, Tr. 2349:2-2352:3; DX-D4 at 41-42; DX 238 at DXR0040000220-22. In fact, the cost to perform the load drop analyses may well have exceeded the cost to upgrade the cranes. Rutkoske Tr. 797:6-799:1; Grillo, Tr. 2348:24-2352:3; DX-D4 at 41-42. Moreover, if the load drop analyses had been performed, obtaining NRC approval of those analyses might have been difficult, and it was possible that Dominion would have been required to upgrade its Millstone Unit Two and Three cranes anyway. Wakeman, Tr. 710:14 - 711:6.[13] Upgrading these cask cranes was the most prudent decision, because it resulted in a

[13] With respect to Millstone Unit Three, Mr. Rutkoske identified at least two challenges that Dominion would have encountered at Millstone Unit Three had it chosen to perform load drop analyses in lieu of upgrading its crane. First, if Dominion were to drop a cask, it could potentially damage the spent fuel pool wall. Rutkoske, Tr. 800:12-802:2. Second, in the event

(continued...)

permanent plant improvement that reduced regulatory risks, bolstered public perception of safety, and required only a one-time fixed cost. Whitaker Tr. 933:16-19; Grillo, Tr. 2349:22-2350:11; DX-D4 at 42; DX 238 at DXR004000220-22; Rutkoske Tr. 799: 22-800:11; Dakers, Tr. 1613:12-1615:21.

Millstone's past record of noncompliance with NUREG 612 while moving heavy loads over safety-related equipment at Millstone Unit Two provides further proof to both the need and the motivation to upgrade the Millstone cranes. Prior to 2001, Millstone Unit Two had operated its cask crane without the required load drop analyses and required mitigation measures, which necessitated the filing of a Licensee Event Report ("LER") with the NRC. PX 164. Prior to completing the crane upgrade, the Millstone spent fuel group discovered a reactor coolant pump motor, weighing approximately 50 tons, on the floor of the Millstone Unit 2 cask wash pit. Whitaker, Tr. 952:14-25; Dakers, Tr. 1582:12-1583:5; DX 238 at DXR004000220. In the late 1990s, Northeast Utilities had moved that pump over safety-related equipment and placed it in the cask wash pit, without using a single-failure proof crane, or performing load drop analyses. Whitaker, Tr. 952:5-954:21; PX 164 at DXR012-010000; DX 238 at DXR004000220. In fact, "[h]istorically, loads such as new fuel, spent resin casks, and other items [were] lifted from the railroad access bay . . . over a safety related pipe trench," "using a crane [CRN] that is not single failure proof as described in NUREG-0612." PX 164 at DXR012-010000. If a drop had

[13](...continued)
of a cask drop, radioactive material could be released into the truck bay which is outside the plant ventilation system. Rutkoske, 802:3-802:16. Dominion would have been required to take both of these possibilities into account when conducting load drop analyses and seeking approval of those analyses from the NRC. Rutkoske, Tr. 801:22-802:2.

occurred, "[t]he ability to safety shutdown the plant under these circumstances would have been a significant challenge." PX 164 at DXR012-010000; Whitaker, Tr. 960:3-961:24.

Dominion relies upon testimony from Mr. Dakers that the Millstone Unit Two crane was in compliance with the requirements of NUREG-0612. However, Mr. Dakers was unaware that, in 2001, Millstone had reported that the Unit Two cask crane had historically been operating outside the compliance of NUREG-0612. Dakers, Tr. 1596:13-1599:16. Moreover, Mr. Dakers had conducted only a limited review of documents associated with the Millstone Unit Two crane upgrades, in the course of his work with respect to Unit Three. Dakers, Tr. 1578:8-19, 1579:8-12. The documents that Mr. Dakers reviewed were related to theoretical compliance and the plant's licensing basis, not the operation of the cranes. Dakers, Tr. 1604:22-1605:21.

To temporarily alleviate its noncompliance, Dominion installed a "dance floor" over the opening to the cask wash pit to prevent dropping heavy loads into the cask wash pit at Millstone Unit Two. Rutkoske, Tr. 803:25-804:7; 816:2-7. The installation of the "dance floor" over the cask wash pit prevented Dominion from placing any heavy loads into the cask wash pit, which would have rendered the cask wash pit useless for loading casks to DOE. PX 189 at DOM00010081.[14] Dominion claims that, upon discovering the violation, it took specific compensatory steps, pending the completion of the crane upgrades. However, if the same situation had arisen again, Dominion would have been required to upgrade its crane or perform a

[14] The inability to use the cask wash pit for cask loading would have been inconvenient, because the only other plant location identified to perform cask closure activities was the truck bay. Rutkoske, Tr. 749:8-750:15. In order to load the NUHOMS dry storage casks in the truck bay, Millstone had to download the casks onto a trailer to provide enough space in the truck bay for loading activities. Rutkoske, Tr. 749:22-750:6. Had DOE performed, Dominion personnel would have been required to download a DOE cask onto the truck trailer to allow the cask to be transported horizontally over the roadways, creating the same condition that resulted in Dominion's decision to conduct cask closure and decontamination activities in the cask wash pit. Grillo, Tr. 2339:7-18.

load drop analysis. Whitaker, Tr.: 965:18-966:17. By performing the crane upgrades, Dominion has avoided incurring costs for load drop analyses in the future. Whitaker, Tr. 936:14-20; Whitaker, Tr. 966-7-17; Rutkoske, Tr. 791:2-6, 807:13-25; Grillo, Tr. 2348:24-2352:3; DX-D4 at 40-42; DX 238 at DXR004000220-222.

### B. Regulatory Concerns at Millstone Would Have Influenced Dominion's Decision To Upgrade The Millstone Cranes

Adding to Dominion's concerns with respect to the decision to upgrade the Millstone crane was public perception and the risk of public intervention. Whitaker, Tr. 932:18-933:15; see also Rutkoske Tr. 797:23-798:11, 799:22-800:11. If a cask loaded with spent fuel were to drop from one of Millstone's cranes, there would likely be significant interest and serious regulatory repercussions by the NRC. Whitaker, Tr. 939:21-940:2, 940:7-9. To complicate matters, for a period of time in the mid-1990s and early 2000s, all three of the Millstone reactors were shutdown, because the NRC had concerns about the management of the station. Wakeman, Tr. 450:19-451:3; Whitaker, Tr. 947:8-949:19. Because of the NRC's concerns, the Millstone facility operated in a very different regulatory environment than North Anna. Dakers, Tr. 1620:4-10. As Mr. Whitaker explained at trial, Dominion preferred to spend the money to upgrade its crane rather than defend a drop analysis against potentially costly and lengthy intervention. Whitaker, Tr. 933:23-934:11.

Without any citations to the trial record or other legal support, Dominion contends in its post-trial brief that it would not have been required to obtain a license amendment to load DOE casks. Pls.' Brief at 23 & n. 22. Therefore, public intervenors would have had no formal opportunity to challenge the drop analysis supporting DOE cask loading activities. However,

Federal regulations require that a utility obtain a license amendment "prior to implementing a[ny] proposed change, test, or experiment" under certain circumstances. See 10 C.F.R. § 50.59. Had Dominion not chosen to upgrade the Millstone cask cranes, it would have been required to evaluate each load drop analysis performed and each mitigation measure employed in accordance with the criteria of 10 C.F.R. 50.59, before it could determine that a license amendment was not required.

## V. DOMINION NUCLEAR CONNECTICUT CANNOT RECOVER PREACQUISITION COSTS INCURRED AT MILLSTONE, AS A MATTER OF LAW

Northeast Utilities incurred the costs associated with the entire Millstone Unit Three Rack project and a portion of the costs associated with the Interunit Transfer Project before Dominion purchased the Millstone facility in March 2001. Whitaker, Tr. 915:11-916:7; 916:17-917:3. Therefore, Dominion's recovery of those costs is barred by the Assignment of Claims Act, 31 U.S.C. § 3727, and any costs incurred by Northeast Utilities must be removed from Dominion's claim. Johnson, Tr. 2605:4-24, DX-D5 at 54, DX 303 at DXR015000010, -16.

As we explained in our motion for partial summary judgment on Pre-Acquisition Claims, filed on March 17, 2008 and incorporated by reference herein, neither the NWPA nor the Standard Contract authorizes the assignment of pre-acquisition SNF claims against the Government. Dominion's reliance upon Rochester Gas and Electric Corporation v. United States, 65 Fed. Cl. 431 (2005), and Vermont Yankee Nuclear Power Corporation v. United States, 73 Fed. Cl. 236 (2006), to overcome the Assignment of Claims Act is unavailing. The Court's decision in both of those cases conflate the Assignment of Claims Act, 31 U.S.C. § 3727, with the Assignment of Contracts Act, 41 U.S.C. § 15. To the extent that the NWPA waives the latter, it has not waived the former. The NWPA only provides for the assignment of the "rights

and duties of a party to a contract," 42 U.S.C. § 10222(b)(3) -that is, the right to have Millstone's SNF accepted by DOE in exchange for the payment of fees pursuant to the Standard Contract. Nowhere does the NWPA explicitly grant an assignor the right to assign its pre-existing claims against the United States. Such a waiver of the Assignment Of Claims Act must be explicit, because traditional privity of contract principles make the United States immune from contract claims asserted by those who were not in privity with the Government when the claims arose. Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984); Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999).

Dominion misguidedly contends that, because the NWPA does not expressly exclude prior claims from those that are assignable, the NWPA waives the Assignment of Claims Act. Plfs' Brief at 48. However, the nature of sovereign immunity requires the NWPA explicitly to include the right to assign pre-existing claims to override the Assignment of Claims Act. By not including a reference to pre-existing claims in the assignment provisions of the NWPA, its drafters preserved the Government's sovereign immunity with respect to pre-acquisition claims when brought by the contract's assignee. In so doing, its drafters intended to protect the United States from the "possible multiple payment of claims." United States v. Shannon, 342 U.S. 288, 283 (1952). Where, as here, the assignor (Northeast Utilities) has chosen not to bring suit, the Assignment of Claims Act serves to prevent the United States from dealing with parties "who were strangers to the damage." Id. at 293.[15] Respectfully, this Court should not be persuaded by

[15] When Dominion developed its claim, it relied upon Northeast Utilities financial data, as recorded by Northeast Utilities, but no representative from Northeast Utilities sponsored any financial summaries at trial. Jenkins, Tr. 1069:12-17. Moreover, Dominion asserts that Northeast Utilities added racks to the Millstone Unit Three fuel pool as a result of DOE's delay, but Dominion cannot say what Northeast Utilities would have chosen to do to manage spent fuel at the Millstone facility prior to the acquisition. Wakeman, Tr. 678:10-13.

Dominion's implication that, by bringing a suit for damages incurred by Northeast Utilities, it simplifies litigation by providing only one claimant. "[T]o hold the Act inapplicable because all possible claimants are before the court would be to draw a distinction on the basis of a purely fortuitous factor"-whether Northeast Utilities had chosen to file suit. Shannon, 342 U.S. at 284. Such a theory "would not only subvert the purposes of the Act but flood the courts with litigation by permitting them to recognize assigned claims which . . . the Government would be obliged to reject." Id.

## VI. THE HEAT LOAD ANALYSIS PERFORMED IN SUPPORT OF THE MILLSTONE UNIT THREE FULL CORE OFFLOAD LICENSE AMENDMENT WAS NOT CAUSED BY DOE'S DELAY

In 1999, Northeast Utilities submitted a full core offload license request to the NRC. PX 141.[16] In this submittal, Northeast Utilities sought approval from the NRC to remove the restriction on the number of full core offloads allowed, so that Northeast Utilities could fully offload the core when refueling. Whitaker, Tr. 829:25-830:11; PX 141. To obtain this license amendment, Northeast Utilities was required to prove to the NRC that the full core offload procedure would be safe. Whitaker, Tr. 842:18-23. By conducting a new heat load analysis, Northeast Utilities intended to prove to the NRC that it was proceeding in a safe manner. Whitaker, Tr. 842:18-23.

To complete the heat load analysis required for this license request, Northeast Utilities made the conservative assumption that all the fuel in the pool would be the youngest, hottest fuel that could possibly be placed in the pool. Whitaker, Tr. 839:6 -940:14. Northeast Utilities also

[16] The costs associated with the Millstone Unit Three Full Core Offload Amendment heat load analysis were incurred by Millstone's prior owner, Northeast Utilities. Whitaker, Tr. 919:3-919:19; Johnson, Tr. 2543:11-24; DX-D5 at 26. Because they were not damages incurred by plaintiff, they are not recoverable.

made the conservative assumption that every available space in the pool would be filled with fuel. Whitaker, Tr. 839:6-17. In addition to removing the restriction on the number of full-core offloads allowed, this license amendment reduced the time after shutdown that Millstone Unit Three could begin discharging fuel assemblies from the reactor to as early as 132 hours (5.5 days) after reactor shutdown. PX 141 at DXR 011 010299. Prior to approval of this amendment, Millstone Unit Three could not begin spent fuel offload until 11 days (264 hours) after reactor shutdown. Whitaker, Tr. 924:1-11; PX 141 at DXR 011 002596, 2614-2615. The ability to place spent nuclear fuel into the spent fuel pool 5.5 days (132 hours) earlier means that the spent nuclear fuel is generating significantly more heat. Grillo, Tr. 2375:12-2376:5, Whitaker, Tr. 835:25-836:9. As a result, the heat load analysis was necessary to support the full core offload license amendment. Grillo, Tr. 2373:21-2376:19; DX-D4 at 54; DX 238 at DXR004000230; PX 141; PX 150.

## VII. DOMINION HAS AVOIDED THE COSTS ASSOCIATED WITH LOADING FUEL TO DOE WITHIN THE CLAIM PERIOD

The Standard Contract explicitly provides that utility plaintiffs are legally responsible for assuming the costs associated with loading their SNF into casks provided by DOE when DOE arrives to accept such fuel. PX 26 at Art. III.A.2(a). There is no dispute that loading fuel into the casks that DOE provides pursuant to the Standard Contract would have required the plaintiffs to incur costs. Plaintiffs have avoided these costs as a result of DOE's breach, and the costs should be deducted from any award of damages. Restatement (Second) of Contracts § 347(d); Bluebonnet II, 339 F.3d at 1345.

Based upon information received from plaintiffs' documentation, our experts were able to determine that the actions plaintiffs took to load SNF into dry storage casks in the actual world

would be substantially similar in time, effort, and cost as the actions that would have been necessary to load fuel into any cask provided by DOE absent any delay. Specifically, the Government's technical expert, Mr. Grillo, described at length how, because of the unique nature of nuclear fuel, he was able to bound the dimensions of any casks that might have been used by DOE to remove SNF from the nuclear industry beginning in 1998. See e.g. Grillo, Tr. 2313:6-2316:8; DX-D4 at 10-19; DX 238 at DXR004000213-218. In particular, Mr. Grillo described how casks used to transport SNF are based upon the physical characteristics of the fuel that is to be transported. By taking into account the physics of nuclear fuel assemblies, the NRC regulations that govern their storage and transport, and the plant site design and management, Mr. Grillo was able to bound the types of casks that would have been used had DOE begun removing fuel from the Dominion plants in 1998. Grillo, Tr. 2321:16-2322:25; DX-D4 at 11-12; DX 238 at DXR004000213-218.

Mr. Grillo then offered his expert opinion that the actions taken by Dominion to load to dry storage in the actual world offer the best estimate for the costs that Dominion would have incurred to load to DOE beginning in 1998. Grillo, Tr. 2379:9-2380:4, 2384:11-2390:2; DX-D4 at 57-59; DX 238 at DXR004000244-48. As Mr. Grillo described, loading a cask from the spent fuel pool involves virtually the same activities, regardless of whether the fuel is ultimately bound for an ISFSI or shipment off-site. Grillo, Tr. 2334:6-2342:19; DX-D4 at 20-29; DX 238 at DXR004000244-48. This is confirmed by Dominion's own testimony and exhibits. Mr. Wakeman testified that the technical implications of transhipping fuel from North Anna to Surry were very similar to those required for dry fuel storage at North Anna. Wakeman, Tr. 660:3-22; PX 85 at DOM00010308 - 10310. In fact, the list of required plant modifications to the North

Anna Decontamination Building for loading fuel into a shipping cask and a dry storage cask were the same. PX 85 at DOM00010308 - 10310.

After determining the type of casks that would have been used by Dominion to load fuel to DOE, Mr. Grillo used Dominion's own analysis of the shipments that it would have made to DOE under the 3,000 MTU rate of acceptance to determine the number of casks that Dominion would have loaded to DOE. Grillo, Tr. 2388:5-2395:21; DX-D4 at 60-64; DX 238 at DXR004000248-251.[17] Based upon Mr. Grillo's opinion that the activities required to load to DOE were nearly identical to those required by Dominion to load to dry storage, Mr. Johnson was able to reasonably approximate the loading costs that Dominion would have incurred to load fuel to DOE beginning in 1998. Johnson, Tr. 2546:11-2563:23; DX-D5 at 29-34, 62; DX303 at DXR015000007.

Dominion contends that the costs associated with loading casks to DOE in the non-breach world are too speculative to determine because DOE never identified the cask in which it would accept SNF from the plaintiffs. However, a close look at the Bluebonnet cases contradicts plaintiffs' position. In Bluebonnet v. United States, 67 Fed. Cl. 231, 241 (2005), the Court of Federal Claims determined and deducted plaintiffs' non-breach costs from their damage claim, even when it was not satisfied that those non-breach costs had been shown with 100 percent certainty. This Court used expert testimony to estimate plaintiffs' non-breach costs, so as not to put plaintiffs in a better position than they would have been absent the breach. Id. The Federal Circuit affirmed that decision. Bluebonnet Savings Bank v. United States, 466 F.3d 1349, 1356 (Fed. Cir. 2006) (Bluebonnet III). Here, the Government has gone one step further and provided

[17] Mr. Grillo performed a similar analysis at the 900 MTU rate, using the allocations contained in Dr. Neuberger's models. Grillo, Tr. 2388:5-2395:21; DX-D4 at 60-64; DX 238 at DXR004000248-251.

the Court with expert testimony that estimates plaintiff's DOE loading costs to a reasonable degree of certainty.

Plaintiffs also contend that their damages should not be reduced to account for DOE loading costs, because they will incur costs to transfer fuel to DOE in the future. This argument is unavailing. The only issue now before the Court is the calculation of the difference between the amounts that plaintiffs have actually spent on fuel storage through June 30, 2006, and the amount they would have had to spend (including any costs they have actually avoided) had DOE timely commenced performance. If, as plaintiffs contend, they will incur costs in the future to load casks to DOE, that expenditure can be included in the calculation of damages in future litigation. However, if the Court does not deduct these costs at this time, its decision will be made in contravention of Bluebonnet II, 339 F.3d at 1345. Moreover, the technology that DOE uses to accept Dominion's SNF in the future, and the costs associated with the use of that technology likely will be different from the technology and the costs that would have been incurred in the late 1990s. For example, Dominion is currently loading NUHOMS casks, which are licensed for transport, at its Millstone facility. Brookmire, Tr. 50:1-5; 75:5-19. It is possible that DOE could accept those casks without plaintiffs being required to repackage the fuel, thereby reducing or eliminating any future loading costs. Lastly, there is no mechanism that guarantees the right of the Government to recover an offset in the future for costs that plaintiffs have unquestionably avoided. In that situation, plaintiffs will have every incentive to decide not to bring a subsequent lawsuit – leaving the Government with no ability to require plaintiffs properly to account for the costs they have avoided.

## VIII. DOMINION HAS NOT ESTABLISHED THAT THE CASK LOADING MODIFICATIONS PERFORMED AT ITS SITES WERE CAUSED BY DOE'S DELAY

### A. Mr. Grillo Has Provided Sufficient Information Upon Which The Court Can Rely To Determine What Modifications Would Have Been Required

As described above, Mr. Grillo was able to bound the types of casks that could have been used to load SNF to DOE, based upon the unique physical characteristics and regulatory requirements that pertain to all such fuel. See DX238 at DXR0004000244-251. In other words, because SNF is standard in size, highly radioactive in composition, and subject to strict regulation by the NRC, there is not a smorgasbord of options available for transporting this ultra-hazardous material. Dominion's protest that no one knows exactly what cask DOE would have brought to Dominion's plants, is therefore irrelevant. See Pl. Br. at 19. Enough is known about the equipment that would have been necessary to load SNF to DOE that an expert can fairly determine what modifications would have been necessary without knowing the specific cask involved.

Further, Dominion's argument that certain modifications are recoverable as damages because they were made specifically to accommodate the particular cask that it chose to use for dry storage, i.e., the TN-32, and might not accommodate a specific DOE cask is premised upon faulty reasoning. See Pl. Br. at 18-19 (North Anna), 27-29 (Millstone). Mr. Grillo's uncontroverted testimony that similar modifications would have been needed to accommodate a DOE cask leaves the Court with one of two possibilities. The first possibility is that Dominion would have constructed dry storage at a particular plant, and therefore would have needed to make the modification it now claims as damages, to accommodate the loading of the particular dry storage cask it chose, i.e., the TN-32. The second possibility is that Dominion would not

have needed to construct dry storage at a particular plant and therefore, the nearly identical modification would have been made to fit the specifications of the particular cask brought by DOE, rather than the TN-32. Either way, Dominion would have incurred the costs it now claims to make the same or very similar modifications. As such, these costs are not recoverable.

B. The Modifications Performed At The Millstone Facility Would Have Been Performed To Load Fuel To DOE

In addition to the Millstone Unit Two and Three crane upgrades, Mr. Grillo identified the following Millstone plant modifications that Dominion would have performed absent DOE's delay:

- Work platform, stairs, and ladder relocation in the cask wash pit area
- Archway access into the cask wash pit area
- Piping to remove cask water
- Supply piping for required gases
- Installation of electric power and computer connection.

Grillo, Tr. 2343:13-2346:2, 2357:24-2363:1; DX-D4 at 31-35, 46; DX238 at DXR004000222-29.

Mr. Grillo explained why these modifications would have been needed regardless of the type of cask used by DOE to remove SNF from Millstone. Id. For instance, given the slight variation in size among the various casks, a modification such as the work platform could easily accommodate casks of varying dimensions. Grillo, Tr. 2345:9-2346:2; DX-D4 at 31-35; DX 238 at DXR004000222-230. Second, given that all SNF casks require virtually identical preparation, piping to remove water and to supply gases for inerting and welding, would have been needed no matter what cask was brought by DOE. Grillo Tr. 2357:24-2363:1; DX-D4 at 46; DX 238 at DXR004000222-230.

C. The Modifications Performed At The North Anna Facility Would Have Been Performed To Load Fuel To DOE

Mr. Grillo identified the following plant modifications as modifications that Dominion would have performed absent DOE's delay:

- Installation of a Work Platform
- Addition of a Cask Pedestal
- Installation of Vacuum Drying Support Equipment
- Modification of Cask Loading Pit Gate
- Additional Radiation Shielding in Decontamination Building
- Demolition of Cask Area Pumpdown Equipment
- Removal of Equipment for Work Laydown Area
- Floor Upgrades
- Addition of Radio Control for Cask Handling Crane.

All of these modifications were performed in support of ISFSI construction in the actual world and are, therefore, unrecoverable because Dominion would have needed to construct an ISFSI at North Anna even if DOE began accepting fuel at the 3,000 MTU rate. Further, even if the Court determines that Dominion can recover its ISFSI related costs at North Anna, the costs of these modifications are not recoverable because, like the Millstone modifications discussed above, these modifications would have been needed to accommodate a cask brought by DOE.

For example, as Mr. Grillo testified, a similar work platform would have been needed at North Anna to load DOE casks. Grillo, Tr. 2366:15-24; DX-D4 at 49; DX 238 at DXR004000232-233. Like at Millstone, equipment would have been needed to remove and inert casks brought by DOE. Grillo, Tr. 2366:15-2367:5; DX-D4 at 49; DX 238 at DXR004000233-234. North Anna also made modifications to the cask preparation area to support loading operations, including modification of the cask loading pit gate, demolition of cask area pumpdown equipment, removal of equipment in the work laydown area, and an upgrade to a folding door used to store ancillary equipment. As Mr. Grillo testified, these modifications were

necessary to perform cask loading and closure operations, and would have been needed, even if Dominion were loading to DOE instead of an ISFSI. Grillo, Tr. 2367:6-232368:15; DX-D4 at 50; DX 238 at DXR004000234, -236-237.

Other modifications performed by Dominion at North Anna include the installation of additional radiation shielding in the decontamination building. As Mr. Grillo described, this shielding was needed because of high background radiation detected during initial cask loadings. Grillo, Tr. 2368:16-2369:7; DX-D4 at 50; DX 238 at DXR0040002235. Because casks used for transportation allow dose rates greater than those used for storage at North Anna, Mr. Grillo testified that background radiation would be an even greater problem when loading to DOE and, therefore, this shielding would have been needed to load to DOE. Grillo, Tr. 2368:16-2369:7; DX 238 at DXR004000235.

Dominion also installed a cask pedestal in the cask loading pit to facilitate loading casks at North Anna. Specifically, Dominion installed the pedestal to accommodate the use of a nozzleless handling tool. Grillo, Tr. 2369:17-2371:9; DX-D4 at 50; DX 238 at DXR004000238-240. This tool was purchased to handle certain defective fuel assemblies, and the costs of the tool were removed from the claim by Dominion. Id. As Mr. Brookmire testified, the impetus for installing the cask pedestal was to make-up the difference in height between the nozzleless handling tool and the bottom of the cask loading pit. Brookmire, Tr. 78:5-81:4. Mr. Grillo has offered his uncontroverted expert opinion that this pedestal (similar to the one already in use at Surry) would have been installed at North Anna to facilitate shipment of those defective fuel assemblies to DOE. Grillo, Tr. 2369:17-2371:9; DX 238 at DXR004000238-240.

Finally, Dominion has included in its claim costs to enhance its cask crane at North Anna by installing a radio remote control. Grillo, Tr. 2369:8-16; DX-D4 at 50; DX 238 at

DXR004000236. As Mr. Grillo testified, Dominion had earlier made such an upgrade at its Surry plant, a cost which is not included in the claim. This enhancement made the crane safer and more efficient to use, and there is no reason to believe that Dominion would not have chosen to perform this enhancement to safely operate its crane when loading to DOE.

### D. Dominion Would Have Incurred Spent Fuel Characterization Charges Absent DOE's Delay

The Standard Contract requires that utilities characterize their fuel prior to determining whether the fuel properly can be loaded for delivery to DOE. PX 26 at Art. VI(A) & App. E, § B.6. As Mr. Grillo testified, Dominion had problems with defective fuel assemblies that required special inspections. Dominion would have been required to perform these inspections, whether DOE was accepting fuel or not and, therefore, the costs associated with the inspections are not recoverable as damages. Grillo, Tr. 2371:10-25; DX-D4 at 50; DX238 at DXR004000240.

## IX. PLAINTIFFS WILL RECEIVE A WINDFALL IF THEY ARE AWARDED THEIR NON-INCREMENTAL OVERHEAD COSTS

This Court has rejected claims for overhead costs in other SNF cases where the plaintiff failed to show any relationship between the costs and the Government's delay in SNF acceptance. See Tennessee Valley Auth. v. United States, 69 Fed. Cl. 515, 542 (2006) (rejecting claimed "capital support" overhead expenses reflecting management allocations where plaintiff failed to show any relationship between the claimed cost to the dry storage project) ("TVA"); SMUD, 70 Fed. Cl. 332, 377 (2006) (rejecting claimed overhead where plaintiff failed to meet burden of proving that costs were incremental to DOE's delay in SNF acceptance), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007). Dominion contends that the Government's ability to recover overheads in admiralty cases should be instructive here, citing

United States v. Capital Sand Co., 466 F.3d 655, 658 (8th Cir. 2006). Pls.' Brief at 35. However, as that case makes clear, the Army Corps of Engineers is able to recover overhead pursuant to statutory authority. Capital Sand Co., 466 F.3d 655 at 659. Such cases are not at all analogous to the present situation in which no statute or regulation permits Dominion to recover its nonincremental overhead costs. Instead, Dominion can only recover those overheads that it establishes are incremental to the breach. See e.g., Precision Pine & Timber, Inc. v. United States, 81 Fed. Cl. 235, 287-88 (2007) (in a case for lost profits, finding that fixed overheads are not avoided as a result of a breach of contract and should not be taken into account when calculating expectation damages).

Dominion believes that a cost is properly recorded as a damage as long as it is properly accounted for in its financial systems. Jenkins, Tr. 1071:25-1072:4. However, cost accounting methodologies that are appropriate for compiling a company's financial statements are not the proper measure of damages. Johnson, Tr. 2576:1-2578:14; Jenkins, Tr. 1071:21-24. Dominion's theory of recovery with respect to its overhead costs implies that, if Dominion were not permitted to recover the overheads allocated to the breach related projects, the other projects undertaken at Dominion would be "burdened" by additional overhead. Such a theory is associated with construction cases in which Government contractors are permitted to recover damages under the Eichleay method and is not applicable here. In construction cases, a court can award fixed overhead to a Government contractor when delay on the part of the Government interrupts a contractor's steady stream of income and the contractor cannot find replacement work. See, e.g, Jackson Construction Co. v. United States, 62 Fed. Cl. 84, 96-97 (2004). This case is not a construction case, and Dominion has not argued that its ability to produce income was affected by DOE's delay. Unlike a contractor whose sole source of income is the work that it performs

for the Government, Dominion's source of income is the generation of electricity. Johnson, Tr. 2580:17-2582:1. Moreover, Dominion has argued that it was required to forego projects as a result of DOE's delay, not that it was unable to find replacement work. If DOE had performed in 1998, its overhead cost would simply have been allocated to other projects, at no additional expense. Johnson, Tr. 2582:22-2586:9; DX-D5 at 44-46.

Here, Dominion has not presented any evidence that its overhead costs increased as a result of DOE's delay. Mr. Katz does not know whether the company's overheads increased because of the projects it is claiming as damages in this case. Katz, Tr. 1701:16-25; 1706:14-17. For example, the total costs of running the warehouse (including the salaries of the persons who work in the warehouse, office supplies used in the warehouse, property taxes on inventory in the warehouse, shipping charges for general items stored in the warehouse, and write-offs of obsolete materials), which are allocated to Dominion's various projects through the material overhead, have remained consistent over time. Jenkins, Tr. 1080:20-1081:5-1082:13; 1083:6-9. Dominion's other claimed overheads, like the G&A Surcharge overhead, allocate the total costs associated with corporate support activities (including the salary of the vice-president of Dominion and the salaries of the persons who work in the corporate security) and represent costs that benefit the entire company. Jenkins, Tr. 1088:1-4; Jenkins, Tr. 1088:17-1089:1. Dominion currently has approximately 80 to 100 ongoing projects in the nuclear department alone. Jenkins, Tr. 1089:11-20. Common sense dictates that the termination of one of those projects would not have a significant impact upon company-wide corporate support costs.

A fixed cost should not be included in damages because, unlike variable costs, fixed costs have no economic impact upon the incremental cost of a particular project. Johnson, Tr. 2577:17-2580:144; DX-D5 at 40-42; Katz, Tr. 1705:20-1706:17 (one accepted approach to accounting for

overheads on a construction project is to only allocate those overhead costs that are incremental to the project). Here, there has been no showing that Dominion's overhead costs are variable. Johnson, Tr. 2580:5-16. Where the addition or deletion of a project does not change the amount of overhead costs incurred, these costs do not cause injury to the plaintiffs and are not properly claimed as a damage. Johnson, Tr. 2582:22-2586:9; DX-D5 at 44-46.

## X. DOMINION CANNOT RECOVER ITS NON-INCREMENTAL INTERNAL LABOR COSTS

Dominion cannot recover its non-incremental internal labor costs for the same reason that it cannot recover its overheads. Plaintiffs should not be able to recover work performed by salaried employees at no additional cost to the company. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Compensating plaintiffs for the cost of these hours would pay them for labor costs that would have been incurred in the absence of any breach by DOE, and would impermissibly place them in a better position than they would have occupied even had DOE commenced performance in 1998.

There is no evidence in the record that there were any additional hires as a result of any breach-related project. Wakeman, Tr. 696:6-9; Johnson, Tr. 2599:1-25. Dominion maintains a steady level of engineering staff to cover basic engineering requirements, because hiring and

firing engineers on an as-needed basis is expensive. Wakeman, Tr. 695:23-696:4. Dominion asserts that the company has been damaged because, by working on breach-related projects, its employees forewent other opportunities. This argument fails for several reasons. First, Dominion cannot name any specific projects that were put on Dominion's backlog because of its work on the ISFSI project, only that there were projects on which it could have been working. Basehore, Tr. 1150:13-23. Second, for purposes of convenience in the auditing process, the Government has elected not to challenge here that the work of employees who spend a majority of their time in any one year working on a project is incremental. Johnson, Tr. 2593:10-2594:1; 2601:4-21. In addition, Mr. Johnson considers all hourly employees and all overtime work to be incremental. Johnson, Tr. 2589:24-2590:18. However, not every dollar spent on a damages-related project is properly classified as damages. Johnson, Tr. 2587:13-2589:12. Dominion can assign one engineer to spend two hours doing one project without affecting the staffing of any other project in any material way. Johnson, Tr. 2595:1-21; Basehore, Tr. 1132:18-19. In fact, when a salaried employee of Dominion spends only a few hours on a project, in addition to his regular work, Dominion does not pay that employee any extra money, even if those couple of hours are allocated to the project. Basehore, Tr. 1157:1-1158:16. The adjustment that Mr. Johnson proposes only eliminates from damages the work of those employees who were required to spend, on average, an hour or two a week on breach-related projects. Johnson, Tr. 2590:19-2592:10; DX236 at 20 & n.67. Requiring employees to perform this work does not adversely impact Dominion in any economic sense.

## XI. PLAINTIFFS CANNOT RECOVER AFUDC, AS A MATTER OF LAW

As we explained in our pretrial motion, Allowance For Funds Used During Construction ("AFUDC") is an accounting mechanism, established by regulation, that Dominion uses to

account for the time value of money associated with its capital expenditures, and to allocate its interest charges to its capital projects. Jenkins, Tr. 1056:13-1057:7; Jenkins, Tr. 1057:14-17.[18] Dominion bills a project for AFUDC costs, until that project becomes in-service, at which point Dominion can begin to recover its AFUDC costs from the ratepayer. Jenkins, Tr. 1063:3-8; Jenkins, Tr. 1077:1-7. Dominion did not issue specific debt instruments for its capital projects, and when it borrows, Dominion borrows money for the entity as a whole. Jenkins, Tr. 1058:9-19; Jenkins, Tr. 1059:17-1060:1; 1079:2-1080:8.

At bottom, AFUDC is designed to permit plaintiffs an opportunity to obtain compensation for the loss of the time value of money expended upon construction projects, which is precisely the sort of interest that is not recoverable against the Federal Government absent a waiver of sovereign immunity, see 28 U.S.C. § 2516(a) (1976); England v. Contel Advanced Sys.,Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004), and no accounting regulation alters that conclusion. Plaintiffs' reliance upon this Court's decision in TVA, 69 Fed. Cl. 515, 541-42 (2006) (Lettow, J.) is misplaced, because it conflicts squarely with governing precedent and has not been followed in other spent fuel cases. See System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 70 (2007) (Lettow, J.), appeal pending, Nos. 2008-5029,-5035 (Fed. Cir. docketed Jan. 9, 2008) (denying plaintiff's claims for cost of capital, cost of debt, and AFUDC, where it failed to show that its claimed financing costs were "directly related to required borrowing through specific debt instruments"). Here, there is no direct link between Dominion's borrowings and its capital construction costs. Jenkins, Tr. 1079:10-1080:3. As this Court has held in other spent fuel cases, generalized evidence of borrowings is insufficient to make a claim for interest

[18] Dominion also includes costs for capitalized interest. Capitalized interest is conceptually similar to AFUDC and is used to record the interest charges for nonregulated businesses. Jenkins, Tr. 1080:9-19.

recoverable. See System Fuels, Inc.. 79 Fed. Cl. at 70; Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 396, 449 (2007) (denying plaintiff's claim for cost of capital where plaintiffs could not point to any specific or general debt or actual costs incurred as a result of borrowing), appeal pending, Nos. 2008-5020, -5028 (Fed. Cir. docketed Jan. 3, 2008); see Northern States, 78 Fed. Cl. at 471-72 (plaintiff's claim for its cost of capital is barred by 28 U.S.C. 2516, "[a]bsent proof of any borrowings with which the interest claim can be causally identified"); Carolina Power & Light Co., v. United States, 82 Fed. Cl. 23, 54 (2008) (denying AFUDC recovery where "plaintiffs failed to provide any evidence tying any borrowed money to specific projects").

## XII. DOMINION CANNOT RECOVER THOSE COSTS THAT ARE UNSUPPORTED

As plaintiffs note, the Government conducted a comprehensive review of plaintiffs' claims. However, the Government's review was not unduly "intrusive." Other than charges for internal labor, we only reviewed those charges that exceeded $5,000. Johnson, Tr. 2482:21-2484:15. Further, it was only because we conducted this review that we could stipulate to the accuracy of the majority of the costs that plaintiffs identified. Finally, the net result of the process was that plaintiffs removed $3,442,797 from the amount identified as damages in their initial disclosures. Johnson, Tr. 2495:19-2496:14; DX-D5 at 8.

With respect to the $6,916,370 that we identified as unsupported, plaintiffs bore the burden at trial not only of demonstrating the amount of costs that they incurred, but also of demonstrating that these costs were incurred because of DOE's delay in accepting fuel. Indiana Michigan, 422 F.3d at 1376. Where a party shows that particular costs were incurred but fails to demonstrate what goods or services were procured, it has failed to meet its burden of demonstrating that the costs should be included as damages. See, e.g., TVA, 69 Fed. Cl. 515,

540 (2006) (costs not allowed where ledgers introduced into evidence "set out charge backs in terms of costs, but they did not contain a breakdown by hour on an employee-by-employee basis" and "[did] not indicate the actual services provided").

The charges that we have identified as unsupported suffer from this fatal flaw. With respect to the unsupported labor charges (which comprise $5,166,607 of the $6,916,370 classified as unsupported and, importantly, only a small portion of the labor charges included in plaintiffs' claim), plaintiffs failed to identify the name of the individual employee who performed the work, what specific tasks were being performed, how many employees were performing the work, or whether a particular employee spent all or some of his time working on a damage-related project. DX 252; Wakeman, Tr. 701:12-704:8. Because of these omissions, plaintiffs provided the Court with no means of discerning whether the hours charged to a particular project were caused by DOE's delay, either because the employee only spent a small portion of his or her time on breach-related projects, because the particular task performed would have been incurred irrespective of the breach, or because the number of hours spent upon a particular task was unreasonable. Johnson, Tr. 2609:1-10; 2618:4-2620:1; 2682:10-2683:16 ("If you don't know the who, how can you be satisfied with the what?"). As in TVA, the mere fact that certain employees charged their time to a damages project does not mean, as plaintiffs would have it, that this time is properly included in their damages calculation.

In addition to internal labor charges, Mr. Johnson originally identified in his expert report $2,062,526 in costs that he considered to be unsupported. DX 236 at DXR005000029-30. By letter dated January 4, 2008, plaintiffs identified documentation that, in their view, provided support for $785,320 of this amount, leaving $1,277,207 unaddressed. DX-D5 at 58. Mr. Johnson agreed that, based upon plaintiffs' response, adequate documentation existed for

$280,001 of the previously unsupported charges and, as a result, prepared an addendum to his expert report in which he reduced the amount of unsupported charges to $1,749,763. Johnson, Tr. 2609:21-2612:17; DX 303 at DXR0150001; DX-D5 at 58. As set forth in DX 306, Mr. Johnson also identified to plaintiffs the reasons he considered the documentation provided for some of the charges plaintiffs believed to have addressed to be inadequate.[19] With respect to virtually all of these charges, he requested a release, which would describe the nature of the charge (beyond merely language on an invoice such as "Engineering Services"), but never received it. Johnson, Tr. 2690:6-2691:6.

At trial, plaintiffs continued to assert that the costs they previously claim to have addressed (but for which they never supplied the requested release) were adequately supported. See, e.g., Nunez, Tr. 1655:19-1656:1 (relying solely upon an invoice, contained within PX 260 at 88199, referring to "engineering services" as proof that an entry listed on DX 305 is properly included in damages claim). Given that Dominion spends tens of millions of dollars in engineering services every year, it is hardly surprising that Mr. Nunez admitted at trial that "a release for a purchase order is necessary to provide enough detail to know what work is being done on a project" and that, "[w]ithout the release or releases, it's going to be hard for the government to determine what work is occurring here." Nunez, Tr. 1675:6-14, 1669:1-1670:9.

In an effort to recover the non-labor costs that the Government has determined are unsupported, Dominion has also provided a chart, intending to summarize supporting cost information for the costs originally identified in the addendum to Mr. Johnson's report, DX 303. Pls.' Br. at 42-43. By plaintiffs' own admission, the vast majority of these charges were not

[19] By letter dated April 16, 2008, Dominion agreed to eliminate, among other things, $32,763 of the non-labor costs identified as unsupported from its claim. DX 306; DX-D5 at 58.

accompanied by invoices. Nine entries, the value of which totals $229,918, were unsupported by any testimony whatsoever. In many cases, including for some of the largest items that the Government considers unsupported, Dominion provided no specificity. For example, the second largest charge on the list, $296,758 in "CCS" charges, consists of charges for various craft laborers – such as welders, pipe fitters, and riggers – who were included in the claim solely because the hours were "charged to the dry storage project using the correct number." Wakeman, Tr. 595:2-3. Plaintiffs have not identified the work that was performed by these laborers, and thus have precluded any determination of whether specific tasks performed would still have been required in the absence of a delay by DOE or whether the amount of time worked was unreasonably large. Similarly, the only proof supplied for the fourth-largest item on the list, $181,811 in services provided by Yankatel, is the testimony of Carl Whitaker, who admitted that he could not tell "directly" what kind of work was being performed by Yankatel, but stated that, based upon the accounting system in place at Millstone, he was confident that the work "would have been reviewed by the project manager for being a valid charge." Whitaker, Tr. 908:4-13. Particularly in the absence of contemporaneous documentation describing the service performed, this "confidence" does not provide a basis for supporting plaintiffs' damages claim. Johnson, Tr. 2615:10-2618:3; TVA, 69 Fed. Cl. at 540.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court eliminate from plaintiffs' damage claim all costs that plaintiffs have failed to demonstrate were directly caused by the Government's breach, foreseeable, and proven to a reasonable certainty, and all costs that otherwise not recoverable as a matter of law.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Lisa L. Donahue
LISA L. DONAHUE
Commercial Litigation Branch
U.S. Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-9498
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
Office of General Counsel
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Attorney

ANDREW P. AVERBACH
CHRISTOPHER J. CARNEY
SCOTT SLATER
Trial Attorneys
Commercial Litigation Branch

July 10, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 10th day of July, 2008, a copy of this "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Lisa L. Donahue