**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DOMINION RESOURCES, INC.,**<br>**DOMINION NUCLEAR CONNECTICUT, INC.,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | Case No. 04-83C<br>Judge Bruggink |

| | |
|---|---|
| **DOMINION RESOURCES, INC.,**<br>**VIRGINIA ELECTRIC AND POWER COMPANY,**<br>Plaintiffs,<br>v.<br>**UNITED STATES OF AMERICA,**<br>Defendant. | Case No. 04-84C<br>Judge Bruggink |

**PLAINTIFFS' POST-TRIAL REPLY BRIEF**

Of Counsel:

Paul M. Bessette
David M. Kerr
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

July 21, 2008

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DOE'S BREACH WAS A "SUBSTANTIAL CAUSAL FACTOR" OF DOMINION'S CONSTRUCTION OF THE NORTH ANNA ISFSI | 5 |
| III. | THE GOVERNMENT FAILED TO ESTABLISH THAT DOMINION WOULD HAVE UPGRADED THE UNIT 2 AND 3 CRANES AT MILLSTONE IF DOE HAD PERFORMED IN A TIMELY MANNER | 9 |
| IV. | THE RIGHT TO PURSUE AND RECOVER PRE-ACQUISITION MILLSTONE DAMAGES WAS VALIDLY ASSIGNED TO DOMINION | 13 |
| V. | THE MILLSTONE HEAT LOAD ANALYSIS WAS REQUIRED TO STORE ADDITIONAL FUEL IN THE SPENT FUEL POOL | 14 |
| VI. | DOE LOADING COSTS HAVE BEEN DEFERRED, *NOT* AVOIDED | 14 |
| VII. | THE EVIDENCE SHOWS THAT THE CASK LOADING MODIFICATIONS WERE CAUSED BY DOE'S DELAY | 16 |
| VIII. | DOMINION SHOULD NOT BE PENALIZED FOR USING INTERNAL RESOURCES, THE COSTS OF WHICH WERE CAPTURED AS OVERHEAD, TO MITIGATE DOE'S BREACH | 18 |
| IX. | DOMINION SHOULD NOT BE PENALIZED FOR USING INTERNAL LABOR TO MITIGATE DOE'S BREACH | 19 |
| X. | AFUDC IS A RECOVERABLE COST INCURRED TO BUILD A CAPITAL PROJECT | 20 |
| XI. | DOMINION IS ENTITLED TO RECOVER ALL OF ITS COSTS, INCLUDING THOSE THE GOVERNMENT ERRONEOUSLY CONTENDS TO BE "UNSUPPORTED" | 21 |
| CONCLUSION | | 23 |

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ........... 3

*Bluebonnet Savings Bank, FSB v. United States*, 339 F.3d 1341 (Fed. Cir. 2003) ........ 2, 3

*Bluebonnet Savings Bank, FSB v. United States*, 466 F.3d 1349 (Fed. Cir. 2006)........................................3, 4, 13, 15

*Carolina Power & Light Company v. United States*, 82 Fed. Cl. 23 (2008) ....4, 16, 18, 19

*Citizens Federal Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)......................... 4

*Dominion Resources Inc. v. United States*, 77 Fed. Cl. 151 (2007) ............................... 15

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)..................... 5, 11

*First Heights Bank, FSB v. United States*, 422 F.3d 1311 (Fed. Cir. 2005) ...................... 4

*Franconia Associates v. United States*, 61 Fed. Cl. 718 (2004)....................................... 4

*Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976) ........................19, 20

*Indiana Michigan Power Company v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)..........................................2, 6, 9, 23

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ....................... 9

*Northern States Power Company*, 78 Fed. Cl. 449 (2007) ............................................ 16

*Old Stone Corporation v. United States*, 450 F.3d 1360 (Fed. Cir. 2006)......................... 4

*Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333 (2006).......................... 5, 16

*Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005)......... 13

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006)............. 16

*Southern Nuclear Operating Company v. United States*, 77 Fed. Cl. 396 (2007) ..........................................5, 16, 20

*System Fuels v. United States*, 79 Fed. Cl. 37 (2007).....................................5, 13, 16, 19

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) .............5, 15, 16, 20

**TABLE OF AUTHORITIES, Continued**

**Page**

*United States v. Capital Sands Co.*, 466 F.3d 655 (8th Cir. 2006).................................. 18

*United States v. Peavy Barge Line*, 748 F.2d 395 (7th Cir. 1984) ................................. 19

*Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236 (2006) ........................................................................................................ 13

*White v. Delta Construction International, Inc. v. United States*, 285 F.3d 1040 (Fed. Cir. 2002)........................................................................................... 3

*Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249 (2006)...................... 16

**FEDERAL REGISTER NOTICES**

59 Fed. Reg. 27,007 (May 25, 1994) ....................................................................... 6

**MISCELLANEOUS**

Corbin, *Corbin on Contracts* § 57.10 ............................................................... 15

*Restatement (Second) of Contracts* § 347 cmt. c (1981)................................................... 2

*Restatement (Second) of Judgments*, § 26(1) ................................................................ 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DOMINION RESOURCES, INC.,** ***et al.*** | |
| Plaintiffs, | Case Nos. 04-83C, 04-84C |
| v. | Judge Bruggink |
| **UNITED STATES OF AMERICA,** | |
| Defendant. | |

**PLAINTIFFS' POST-TRIAL REPLY BRIEF**

Pursuant to the Court's May 20, 2008 Order, plaintiffs in Case No. 04-83C, Dominion Resources, Inc. and Dominion Nuclear Connecticut, Inc., and plaintiffs in Case No. 04-84C, Dominion Resources, Inc. and Virginia Electric and Power Company (also doing business as "Dominion Virginia Power") (collectively referred to for these purposes with its predecessors as "Dominion"), respectfully submit this Post-Trial Reply Brief.

## I. INTRODUCTION

The government, as described further below, has in many respects not met or addressed the evidence presented by plaintiffs in our initial post-trial brief. To pick but one example: with respect to the major portion of the costs that the government contends were "unsupported" by sufficient documentation, we noted in our initial brief that the government itself, by invoking those same costs for purposes of defenses and argued damage reductions, had conceded the sufficiency of Dominion's evidentiary support. *See* 6/18/08 Pl. Br. at 40 & n.33. In response, the government says not one word about that concession. In the balance of our reply in the sections below, we will further explain how the government's failure to address the evidence we cited confirms that Dominion's claimed damages should be awarded, and how the evidence and arguments cited by the government fail to cast doubt upon those claimed damages.

In its response the government does, however, devote significant effort to its untenable arguments regarding the so-called "pick up rate" defense, and to assertions regarding argued burdens on the part of Dominion, the non-breaching party. Consistent with the Court's suggestion at the close of trial, and as we noted in our opening brief, we will not here address the "pick-up rate" matters further. *See* 6/18/08 Pl. Br. at 1-2. Because the allocations of burdens and risks of uncertainty occasioned by DOE's breach potentially touch upon several of the contested issues in the case, however, Dominion believes it useful to respond, briefly, regarding those matters.

Dominion's claims are unquestionably for "mitigation" damages, and it cannot be seriously disputed that Dominion has established (i) foreseeability, (ii) reasonable certainty, and (iii) that DOE's breach was a "substantial causal factor" for each of the claimed mitigation activities. *Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). In short, that is *all* that is required of the victim of a partial breach in a spent nuclear fuel damages case, and "all losses, however described, are recoverable." *Restatement (Second) of Contracts* § 347 cmt. c (1981). The government errs by contending that a spent nuclear fuel plaintiff bears an additional burden in order to recover mitigation damages, namely to make an affirmative showing that no possible collateral benefit might be said to arise from the mitigation activities claimed, so as to avoid an unjustified windfall to the plaintiff—an argued burden the government terms "depict[ing] an accurate non-breach world." 7/10/08 Govt. Br. at 3.

The government's burden arguments start off with the proposition—fair enough in the abstract—that damages should not place a non-breaching party in a better position than if the contract had been performed. 7/10/08 Govt. Br. at 2, citing *Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed. Cir. 2003); *White v. Delta Constr. Int'l, Inc. v. United States*,

285 F.3d 1040 (Fed. Cir. 2002). From that, however, the government then leaps to the incorrect assertion that Dominion bears an additional burden of *disproving* every hypothesized possible benefit that might have been realized by the mitigation activity, and that Dominion's alleged failure to carry such an additional burden reduces, or indeed even defeats, recovery. Neither the cases nor the theory of partial breach mitigation damages supports the imposition of such an additional burden upon the innocent non-breaching party.

The *Bluebonnet* cases, upon which the government primarily relies for its assertions, are not to the contrary.[1] To the extent they are applicable, those cases, properly read, fully support the placement of the burden of establishing any argued damage reduction squarely upon the government (once, as here, a plaintiff has shown foreseeability, reasonable certainty, and that the breach was a substantial causal factor in the mitigation activity). First, while acknowledging and applying the rule that an ultimate damage award should not place a plaintiff in a better position than if the contract had been performed, the *Bluebonnet* cases do *not* stand for the proposition that it is the plaintiff's burden to affirmatively disprove any and all allegedly unwarranted benefits. To the contrary, those cases confirm that that burden of establishing any damage reduction rests fully upon the government. In *Bluebonnet V*, for example, the Federal Circuit held that the starting point for the damages analysis was the total cost of an alternative financing arrangement. On remand the trial court was to treat the "entire [cost of] surrendered equity as a cost resulting from the breach," 339 F.3d at 1346, with the burden of reducing that award clearly upon the government. In the subsequent appeal by the government after the remand, the Federal

---

1 *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ("*Bluebonnet III*"); *Bluebonnet Savings Bank, FSB v. United States*, 339 F.3d 1341 (Fed. Cir. 2003) ("*Bluebonnet V*"); *Bluebonnet Savings Bank, FSB v. United States*, 466 F.3d 1349 (Fed. Cir. 2006) ("*Bluebonnet VII*"). In these *Winstar* cases, the Federal Circuit reversed the trial court's finding of no reasonable certainty of claimed damages in *Bluebonnet III*, reversed the trial court's failure to re-open the record on remand in *Bluebonnet V*, and affirmed an award of $96 million in response to the government's appeal in *Bluebonnet VII.*

Circuit denied the government's effort to substantially reduce the trial court's damage award, in large part because "the government does not provide any calculation of its own" regarding the argued reduction. *Bluebonnet VII*, 466 F.3d at 1365.[2] The government therefore obviously failed to meet *its* burden to reduce the damages in the manner claimed.

Second, and importantly, the *Bluebonnet* cases did not involve mitigation damages. Those cases instead involved the "jury verdict" method for determining total breach damages, where the inquiry is quite different from the situation where, as here, actual mitigation costs are readily ascertainable. That was a critical distinction for the court in *Bluebonnet VII*, where the court of appeals noted that the claimed damages were not "actual costs," but instead "can be determined only by using hypothetical modeling." 466 F.3d at 1359. There is no "hypothetical modeling" required to ascertain the "actual costs" that Dominion spent in the real world here. This distinction between mitigation and other forms of damages has been underscored by the Federal Circuit and by this Court, and the importance of placing the burden of any argued reductions in mitigation damages upon the government has been emphasized on multiple occasions. *E.g., Old Stone Corporation v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (rejecting argued reduction in mitigation damages because "government has not shown" that mitigation activities were unreasonable); *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007); *First Heights Bank, FSB v. United* States, 422 F.3d 1311, 1316-17 (Fed. Cir. 2005); *Franconia Associates v. United States*, 61 Fed. Cl. 718, 749-751 (2004). Accordingly, the principle that the government bears a "concomitant burden" to establish any reduction in actually incurred mitigation damages has been widely applied in spent nuclear fuel damages cases. *E.g., Carolina Power & Light Company v. United States*, 82 Fed. Cl. 23, 36

[2] The government's arguments here fail for the same reason—the government, for example, provided no "calculation of its own" regarding alleged Millstone load drop analyses costs that would have been incurred if DOE had performed.

(2008); *Southern Nuclear Operating Company v. United States*, 77 Fed. Cl. 396, 403-04 (2007); *Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333, 406 (2006); *System Fuels v. United States*, 79 Fed. Cl. 37, 52, 71 (2007); *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 523 (2006).

Finally, the additional burdens upon plaintiffs urged by the government here are inconsistent with the sensible admonition that a plaintiff should not suffer, nor should the government benefit, from the uncertainty created by the government's own massive breach. *E.g., Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). Whether some hypothesized benefit conjured by the government might be realized twenty years hence when DOE hopefully performs clearly cannot be shown today with the requisite "reasonable certainty," and it is only proper that the risk of that uncertainty fall upon the breaching party, rather than the innocent victim of the breach. In this case, that innocent victim is Dominion, which has paid *nearly a billion dollars* to the government, and received nothing.

We now turn to the specific issues addressed by the government at pages 10-50 of its response, in the order discussed by the government.

## II. DOE'S BREACH WAS A "SUBSTANTIAL CAUSAL FACTOR" OF DOMINION'S CONSTRUCTION OF THE NORTH ANNA ISFSI

The government's arguments regarding the North Anna ISFSI, 7/10/08 Govt. Br. at 10-24, suffer from at least three fatal flaws. First, the government fails to appreciate that Dominion's planning was conducted in the real (i.e., breach) world. Second, the government's position that there would be no sharing of allocations between North Anna and Surry if DOE had performed is quite incorrect. Third, the government's argument that Dominion would have spent $12 million to avoid a limited and temporary loss of full core reserve is unsupported and implausible in the extreme.

A. In our initial brief we described some of the uncertainties that existed in the fall of 1993, when Mr. Wakeman recommended that Dominion build an ISFSI at North Anna. 6/18/08 Pl. Br. at 7-8. Five years earlier, for example, DOE had "given up the ghost" on the 1998 start date and on a Monitored Retrievable Storage ("MRS") facility, only to reverse itself with a renewed MRS strategy that, by 1991, was nevertheless officially viewed by the General Accounting Office as "unlikely."[3] Congressional amendment of the 1987 Amendments, which the Clinton administration threatened to veto, would have been necessary for any performance at all by 1998, and was nowhere on the horizon. DOE was only months away from officially and "unequivocally" announcing that "it would not meet its contractual obligations beginning in 1998." *Indiana Michigan*, 422 F.3d at 1375; *Notice of Inquiry*, 59 Fed. Reg. 27,007 (May 25, 1994). In this environment Mr. Wakeman therefore prudently, and in retrospect correctly, looked at long-term storage options to store substantial amounts of spent fuel indefinitely until DOE picked it up, and chose an ISFSI as the best option for North Anna. (PX 60 at 47-49.)

The government argues that Dominion's real world actions are evidence that an ISFSI is "the least costly and most technically feasible" option not just for the specter of likely long-term storage of substantial amounts of spent fuel occasioned by DOE's breach (which came to pass), but for *all* circumstances. 7/10/08 Govt. Br. at 17-19. The storage needs faced by Dominion when anticipating the lengthy delay by DOE in the real world, however, were of course completely different from any temporary, limited storage needs that Dominion might have faced in the hypothetical world of DOE performance.[4] And the evidence regarding Dominion's

---

[3] *See* 6/18/08 Pl. Br. at 7; Kouts, Tr. 2780:15-2781:5; PX 60 at 4; PX 73.

[4] Significantly, it is impossible to determine whether in 1993 Dominion would, in fact, have even faced a loss of full core reserve, because of the uncertainty occasioned by DOE's utter breach. As we established in our initial brief, several early proposed DOE ramp-up rates would have enabled Dominion to maintain full core reserve at North Anna at all times. 6/18/08 Pl. Br. at 6-7; 16-17. This is yet another point not addressed by the government at all in its response.

evaluation of storage options so reflects. A temporary rack to be used only in an outage or emergency and for relatively limited amounts of spent fuel would not address the long-term and significant storage issues that Dominion was actually facing in 1993. It is therefore not surprising that Mr. Wakeman did not evaluate interim measures such as the use of temporary racks in his 1993 study. That unsurprising fact, however, does not support the government's argument that Dominion would have built the North Anna ISFSI no matter what.

B. Similarly, the 2006 Decommissioning Cost Estimate for the Commonwealth of Virginia does not, as the government argues, "show" what Dominion would have done in the year 1993 if it were anticipating DOE's performance at the acceptance rate reflected in the 2004 APR/ACR. 7/10/08 Govt. Br. at 17-18. As explained in our initial brief, that decommissioning document was created 12 years after the decision to build an ISFSI had been made, it is not a spent fuel storage planning document, and—perhaps most significantly—the state regulators dictated artificial assumptions, and in particular no sharing of pick-up allocations between North Anna and Surry for purposes of creating a baseline. (6/18/08 Pl. Br. at 8 n.11; *see* Wakeman, Tr. 718:19-719:3 (2006 document "assumes no sharing of allocations between Surry and North Anna . . . and that kind of assumption is generally dictated by the regulator when he asked for these models.").)

In connection with this last point, the government asserts that sharing of pick-up allocations between Surry and North Anna would, in fact, have been constrained, and in so doing contradicts its own expert,[5] the contracts,[6] the testimony of the DOE contracting officer,[7] all of

---

5 Dr. Neuberger agreed with Mr. Wakeman's conclusion regarding the use of Surry allocations at North Anna. (Neuberger, Tr. 2064:17-23.) Dr. Neuberger did not challenge Mr. Wakeman's 3000 MTU model, which assumes such sharing. (Neuberger, Tr. 2059:24-2061:1.)

6 PX 26 at 12, Article V.E. ("Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE. . . ").

the other evidence in the record,[8] and common sense. All of the vague "political impediments" cited by the government involved concerns about physically moving fuel from one plant to another—where, it must be added, the fuel would have been stored indefinitely because of DOE's massive breach. *See* 7/10/08 Govt. Br. at 14-15. There is no basis on this record, or in fact, to conclude that Dominion would not have used its pick-up allocations based upon Surry spent nuclear fuel at North Anna, under its single DOE Standard Contract covering those two sites, in order to avoid a $12 million expense.[9]

C. The government's position that Dominion would spend $12 million to avoid a limited loss of full core reserve also makes no economic or common sense. When asked whether Dominion would spend that much money for temporary storage, the government's economic expert Dr. Neuberger said "no," he would not go that far. (Neuberger, Tr. 2114:2-6.) As explained at some length in our initial brief, full core reserve is certainly important to Dominion, but, depending upon the circumstances, Dominion has tolerated losses of full core reserve on several occasions in the past. 6/18/08 Pl. Br. at 12-13. The government's argument that these prior occasions "resulted from circumstances beyond [Dominion's] control," 7/10/08 Govt. Br. at 11, misses the mark, because Dominion always has some control over its options. The historic losses of full core reserve did not happen suddenly or out of the blue. If, as the government argues, Dominion were willing to spend $12 million to avoid any loss of full core reserve at all, Dominion would have spent equally exorbitant sums well in advance of the past occurrences to

---

7 Zabransky, Tr. 1499:7-13 ("the Department's position has been, as long as I've been aware of it, that a single utility entity could trade its allocations within its family as it saw fit.").

8 PX 78 at 1 ("[o]nce a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery."); Smith, Tr. 252:4-13; 253:2-4; Wakeman, Tr. 392:9-393:9; 416:10-22.

9 Indeed, Mr. Wakeman did, in fact, utilize such sharing of allocations in presenting his comparison of DOE performance at the 900 MTU/year rate. (Wakeman, Tr. 540:20-542:4; PX 85 at DOM00010286.)

avoid even getting close to losing full core reserve. It did not do so, and one cannot correctly conclude that it would have done so under the hypothetical assumption of DOE performance.[10]

In our initial brief, we challenged the government to point to even a scintilla of evidence that just came right out and said—or even fairly suggested—that Dominion would have built an ISFSI at North Anna under an assumption of reasonable DOE performance at something like the 3000 MTU/year rate. 6/18/08 Pl. Br. at 11. With all due respect, the government has failed to do so. There is no basis on this record to deny Dominion's recovery of the claimed North Anna ISFSI costs.

## III. THE GOVERNMENT FAILED TO ESTABLISH THAT DOMINION WOULD HAVE UPGRADED THE UNIT 2 AND 3 CRANES AT MILLSTONE IF DOE HAD PERFORMED IN A TIMELY MANNER

In opposing Dominion's recovery of the costs to upgrade the cranes at Millstone Units 2 and 3, the government relies upon an incorrect allocation of the burdens in this case for mitigation damages. To establish entitlement to recovery of the actual costs of upgrading the Millstone cranes to single-failure proof, Dominion must show foreseeability (which is not disputed or argued to be absent here), reasonable certainty (which is again not disputed here), and that DOE's breach was a "substantial causal factor" in the decision to upgrade the cranes. *Indiana Michigan*, 422 F.3d at 1373. At that point, the burden then shifts to the government to try to show that Dominion's actions were unreasonable or that Dominion would have incurred this expense even if DOE had performed. *See, e.g., Lisbon Contrs., Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) (affirming that the burden was on the government to establish

[10] In our initial brief we established that even if the government prevailed with regard to its North Anna arguments the government had overstated the amount of the argued damage reduction (*i.e.,* by contending that damages should be reduced by $23 million, rather than the $12 million established by the evidence and conceded by the government's expert). *See* 6/18/08 Pl. Br. at 17-18. In response to that proposition, the government notes that we cite Dr. Neuberger's testimony in support, 7/10/08 Govt. Br. at 19, but does not substantively refute our point at all. There is absolutely no basis for the government to seek a $23 million damage reduction in connection with North Anna.

entitlement to, and amount of, a setoff to plaintiff's damages); *see* pages 2-5 above. When disputing mitigation damages established by a plaintiff, it is the government's burden to show that what was necessitated by its breach would have also been necessitated if the government had performed. With respect to the Millstone crane upgrades, Dominion has met its burden, and the government has not.

A. It is clear that DOE's breach was a "substantial causal factor" in Dominion's decision to upgrade the cranes. The upgrades were undertaken to support the planned Millstone inter-unit transfer project (Whitaker, Tr. 882:4-7; 935:11-15; 963:17-23; Dakers, Tr. 1541:15-21; 1618:12-21), which the government concedes was required because of DOE's breach. (*E.g.,* Neuberger, Tr. 2130:5-2132:19 (confirming no challenge to Millstone costs even at government's "900 MTU/year" rate).) To the extent the government is now asserting the contrary by citing PX 166, *see* 7/10/08 Br. at 24, such an assertion must be rejected. PX 166 is a presentation entitled "Millstone Power Station Inter-unit Transfer of Spent Nuclear Fuel." That whole project was driven by the fact that Millstone Unit 2 was expected to "lose Full Core Offload Capability," PX 166 at DOM00015601, which the government concedes would not have occurred at Millstone if DOE had performed (at any pick-up rate). The presentation clearly states that the crane upgrades are within the "scope of work" necessary for the "inter-unit transfer of spent nuclear fuel." (PX 166 at DOM00015604.) There is no evidence from this document, or from anywhere else in the record, that establishes that Millstone contemplated upgrading the cranes in connection with general plant needs or operations, separate and apart from what was required to implement the inter-unit transfer project.

Similarly, the government's extended discussion of Millstone's purported "past record of non-compliance with NUREG 0612," 7/10/08 Govt. Br. at 27-29, is simply irrelevant. As we

established in our initial brief: (a) the event giving rise to the 2001 Licensee Event Report (LER) was satisfactorily addressed, by removing the 50 ton pump from the Millstone Unit 2 cask wash pit, *without* the Millstone 2 crane being upgraded;[11] (b) Dominion continued to move heavy loads for three more years without a Unit 2 crane upgrade;[12] (c) the government's expert admitted that the upgrades were a "separate issue" from corrective actions in response to the LER;[13] and (d) there were in any event no compliance issues at all involving Millstone Unit 3.[14]

B. The real thrust of the government's argument is not a challenge to the fact that DOE's breach was the cause of Dominion's decision to upgrade the Unit 2 and 3 cranes in the real world—it plainly was—but, rather, that the crane upgrades would have been necessary in the but-for world to support loading operations if DOE had performed. *See* 7/10/08 Govt. Br. at 24-30. As noted above, it is the government's burden to so establish with the requisite reasonable certainty in order for Dominion's damages to be reduced, and the government has failed to do so. The government's arguments are obviously based on speculation and conjecture. For example, the government argues that approval of the load drop analyses "might have been difficult," costs of load drop analyses "may well have exceeded" upgrades, and "it is possible" that upgrades would have been required anyway. 7/10/08 Govt. Br. at 26. Such conjecture may well be unavoidable given the inherently speculative nature of determining the specifics of non-existent DOE performance, but that is not a circumstance for which Dominion should be penalized. *E.g., Energy Capital,* 302 F.3d at 1327.

---

11 Dakers, Tr. 1583:13-1585:2.

12 Rutkoske, Tr. 816:2-16.

13 Grillo, Tr. 2411:23-2412:3. Significantly, Mr. Grillo's acknowledgement directly contradicts the government's suggestion that the compensatory actions taken for the LER were somehow related to the crane upgrades, or put in place "pending the completion of the crane upgrades." 7/10/08 Govt. Br. at 28.

14 Dakers, Tr. 1555:5-7, 1564:19-1565:2; PX 164.

Moreover, as explained in our initial brief, the government ignores the factors that would have been different had DOE performed, *see* 6/18/08 Pl. Br. at 22-25, and essentially advocates in favor of upgrading to single failure-proof cranes in all circumstances. For example, the government asserts that Dominion would have upgraded the cranes to accommodate loading DOE's casks due to the "complexity" of drop analyses: "These drop analyses require rigorous documentation and input from multiple engineering disciplines." 7/10/08 Govt. Br. at 24. This sort of complexity, however, is what Dominion's engineers face every day, and what they faced at North Anna and Surry where load drop analyses were performed to support dry storage at those locations. Moreover, a load drop analysis had DOE performed with a 25-ton truck cask (Grillo, Tr. 2415:5-8) would have been much less complicated than for the 100+ ton casks planned for the inter-unit transfer project. (Rutkoske, Tr. 814:25-815:6; Whitaker, Tr. 797:6-17.)

The government attempts to downplay the fact that the cranes at North Anna and Surry support dry storage projects without having been upgraded to single failure-proof, because that fact confirms the availability of viable options for moving fuel other than the real-world single failure-proof upgrades undertaken at Millstone, and therefore defeats the government's argument that the upgrades would have been undertaken no matter what. Specifically, the government asserts that "[b]ecause of the NRC's concerns, the Millstone facility operated in a very different regulatory environment than North Anna." 7/10/08 Govt. Br. at 29. The alleged "different regulatory environment," however, is again irrelevant. There is no evidence, for example, that the NRC applies NUREG 0612 differently to Millstone than to North Anna or Surry. The fact that Millstone may have had unrelated regulatory compliance issues in the past simply has no bearing on whether it must comply with NUREG 0612 with a drop analysis or an upgrade. Both are acceptable to the NRC. Indeed, as we established in our initial brief, if anything the historic

regulatory issues at Millstone underscore that the actual crane upgrades were driven by real-world concerns about potential intervention in regulatory proceedings, which would *not* have been present if DOE had performed. *See* 6/18/08 Pl. Br. at 23-24.

Just as the government was unsuccessful in securing the reduction of damages that it sought in *Bluebonnet VII* because it did not "provide any calculation of its own," 466 F.3d at 1365, the government here cannot merely aver that Dominion would have incurred some unspecified and unquantified crane upgrade or load drop analysis costs if DOE had performed, and thereby reduce or defeat recovery for the actual mitigation dollars—"substantially caused" by DOE's breach—that Dominion spent in the real world. Indeed, the precise arguments regarding single failure-proof crane upgrades that the government makes in this case were correctly rejected by the Court in *System Fuels*, 79 Fed. Cl. at 61, where, as here, the government's expert conceded that the utility's real world actions were not "unreasonable." (Grillo, Tr. 2396:11-16). That is the end of the inquiry. The government has not met its burden to establish a reduction in actual mitigation dollars spent by Dominion, and the Millstone crane upgrade mitigation costs are recoverable.

## IV. THE RIGHT TO PURSUE AND RECOVER PRE-ACQUISITION MILLSTONE DAMAGES WAS VALIDLY ASSIGNED TO DOMINION

In its response, the government reiterates its contention that the "right" to bring a claim for pre-existing damages is not a "right" of a party to the Standard Contract made expressly assignable by the Nuclear Waste Policy Act. 7/10/08 Govt. Br. at 30-31. That is not a tenable position, and was correctly rejected by the Court in *Rochester Gas and Electric Corporation v. United States*, 65 Fed. Cl. 431 (2005) and *Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236, 241-43 (2006). The principles of sovereign immunity may not be applied so strictly so as to trump the plain language of a statute, in this case the NWPA. For the

reasons described in our initial brief at pages 45-50, and by the Court in *Rochester Gas* and *Vermont Yankee*, the government's legal challenge to pre-acquisition Millstone damages should be rejected.[15]

## V. THE MILLSTONE HEAT LOAD ANALYSIS WAS REQUIRED TO STORE ADDITIONAL FUEL IN THE SPENT FUEL POOL

In our initial brief we explained at some length that while the full-core-offload-as-normal license amendment and revised heat load analysis proceeded in parallel and were submitted to the NRC together as one package, the heat load analysis itself (for which $427,909 is claimed) was required only because Dominion, as result of DOE's breach, needed to store several thousand additional fuel assemblies in the pool. (6/18/08 Pl. Br. at 29-31; Whitaker, Tr. 840:15-842:4.) The government offers no substantive response. Nor does the government even attempt to address the unequivocal and substantial testimony from Mr. Whitaker that the heat load analysis would not have been necessary if Dominion had not needed to store additional fuel in the pools. (*See* 6/18/08 Pl. Br. at 30-31; Whitaker, Tr. 847:13-21; *see also* Tr. 842:24-843:3; 845:1-4; 849:21-850:3; 851:1-10; PX 141 at DXR011010287.)[16] Based on the unrebutted evidence cited in our initial brief and in the record, the cost of the heat load analysis should be part of Dominion's recovery.

## VI. DOE LOADING COSTS HAVE BEEN DEFERRED, *NOT* AVOIDED

The government argues that there should be an offset for the costs that Dominion would have incurred to load DOE's casks had DOE begun performance in 1998. 7/10/08 Govt. Br. at 33. DOE's delay, however, did not make the loading of DOE's casks unnecessary, it only

---

[15] Dominion seeks $12,066,611 in such costs, and at trial provided documentation and testimony regarding the specific nature and amounts of those damages, including documents from Northeast Utilities and testimony by former Northeast Utilities project personnel. (*E.g.,* Whitaker, Tr. 826:21-830:19; *see also* Nunez, Tr. 1636:25-1638:12; PX 241 at DOM2-00001967.)

[16] PX 141 confirms that the existing heat load analysis assumed "2169 assemblies," which was more than sufficient to handle the 756 assemblies that could be stored in the pool prior to rack additions.

deferred the costs to a later date. There are no costs "avoided," only deferred. When DOE arrives to pick up spent fuel, Dominion will be responsible for loading DOE's casks. Only costs "made unnecessary" by the breach should be deducted. Corbin, *Corbin on Contracts* § 57.10. *See also Dominion Resources Inc. v. United States,* 77 Fed. Cl. 151, 156 (2007).

The government cannot now show that Dominion has avoided future loading costs, and a present offset should not be based on the possibility, which is clearly speculative, that the government might be able to show some savings in the future. 7/10/08 Govt. Br. at 36. Any uncertainty regarding whether Dominion will incur costs in the future to load DOE's casks was, of course, created by the government's massive breach. The government, therefore, should not be allowed to benefit from that uncertainty.[17] Unlike the circumstances in the *Bluebonnet* cases, which involved assessment of "jury verdict" damages that could "be determined only by using hypothetical modeling," 466 F.3d at 1359, the government here seeks a present reduction to actual mitigation dollars spent, based upon unquantifiable costs that are merely deferred. Neither *Bluebonnet* nor any other authority supports such a position.

Moreover, any benefit derived from deferring this cost is, in fact, truly speculative. *See, e.g., Tenn. Valley Auth.*, 69 Fed. Cl. at 542. The government's assertion that "the costs associated with the use of [future] technology likely will be different from the technology and costs that would have been incurred in the late 1990s" (7/10/08 Govt. Br. at 36) is obviously conjecture. Mr. Grillo's imagined "magical something" may never come to pass (Grillo, Tr. 2437:11-14), and loading costs are just as likely to increase as to decrease. Mr. Grillo admitted

[17] The government's argument that Dominion should bear the risk of reconciling future loading costs with present offsets in subsequent proceedings, 7/10/08 Govt. Br. at 36, is unjustified. If the Court imposes an offset against Dominion and then, as is likely, Dominion incurs costs to load DOE casks, Dominion would, at a minimum, face obstacles to recovery of its actual future DOE cask loading costs, because Dominion has the responsibility to load those casks under the contract. So, Dominion would then face the prospect of being left without a remedy, or, alternatively, trying to reopen a court judgment regarding the offsets that might be decades old by that point.

that there is no reasonable certainty about how DOE will pick up fuel that is now in dry storage: "I don't know what the process is going to be whenever, whenever we get rid of the fuel that's in the ISFSI." (Grillo, Tr. 2437:15-17.) While DOE *could* perhaps pick up Dominion's loaded casks, DOE has not committed to doing so. (Brookmire, Tr. 105:23-106:1; Grillo, Tr. 2401:21-23.) It is thus "wholly speculative to assume that DOE would use the same type of cask and loading arrangement as that employed for dry storage." *Tenn. Valley Auth.*, 69 Fed. Cl. at 534. As we pointed out in our initial brief, such offset claims by the government have been rejected in every single spent fuel case to date,[18] and the present record does not warrant a departure from those correct holdings.

## VII. THE EVIDENCE SHOWS THAT THE CASK LOADING MODIFICATIONS WERE CAUSED BY DOE'S DELAY

As explained in our initial brief, plant modifications were designed to accommodate specific casks. 6/18/08 Pl. Br. at 18-19; 27-29. The government's argument that one size fits all, 7/10/08 Govt. Br. at 37-41, is an unjustified simplification of a very precise activity. For example, the government argues that there is only a "slight variation" in the sizes of various casks. 7/10/08 Govt. Br. at 38. But on cross-examination Mr. Grillo agreed that this "slight variation" would mean that the platform installed for technicians to work on the TN-32 cask at waist level would potentially place another cask at nose level. (Grillo, Tr. 2406:2-24.) And the variation between a 50,000 pound truck cask and a 285,000 pound rail cask is of course not "slight" at all. (Grillo, Tr. 2409:23-2410:3.) The government's assertion that all casks involve

[18] *See Carolina Power & Light Co.*, 82 Fed. Cl. at 52-53*; System Fuels, Inc.*, 79 Fed. Cl. at 70-71 (*citing Tennessee Valley Authority*, 69 Fed. Cl. at 542; *Northern States Power Company v. United States*, 78 Fed. Cl. 449, 468-69 (2007); *Southern Nuclear*, 77 Fed. Cl. at 450-51; *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. at 416; *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)). "Any benefit inhering in TVA because of delayed loading costs would be entirely speculative." *Tennessee Valley Auth.*, 69 Fed. Cl. at 542; *see also Sacramento Mun. Utility Dist.,* 70 Fed. Cl. at 372 ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative.").

"virtually identical preparation" ignores factors such as the fact that some casks are welded and some are bolted. *See* 6/18/08 Pl. Br. at 27. Also, the government simply does not address the fact that the original handling system at North Anna was based on the expectation that spent fuel would be shipped in transfer casks for reprocessing, and the plant thus had to be modified to accommodate the much heavier storage casks. (6/18/08 Pl. Br. at 18; Wakeman, Tr. 561:12-562:1.) The modifications at the Millstone and North Anna plants plainly were made to accommodate the specific casks used in the mitigation projects at those sites. These modifications, therefore, were reasonable mitigation measures substantially caused by DOE's breach. The government's argument that the same modifications would have been necessary if DOE had performed is speculative—DOE never identified what cask it would have used (or developed) to pick up spent fuel at Dominion's plants. (6/18/08 Pl. Br. at 28-29; Grillo, Tr. 2401:15-20; 2322:7-12; Tr. 2401:21-23; 2410:24-2411:2; Zabransky, Tr. 1418:10-1419:10.) The government has not established that a reduction in damages is warranted.

Finally, the government simply does not respond at all to the evidence supporting Dominion's recovery of fuel characterization costs. *See* 7/10/08 Govt. Br. at 41. As set forth in our initial brief, Dominion had to inspect the fuel before placing it into dry storage *and* Dominion will have to inspect the fuel again when it is removed from dry storage to be transferred to DOE. (6/18/08 Pl. Br. at 19-20; Wakeman Tr. 586:5-13; 587:1-5; 587:9-14; 588:16-19.) These original storage-driven inspection costs, as well as all the modification costs to accommodate specific casks used by Dominion, are clearly recoverable.

## VIII. DOMINION SHOULD NOT BE PENALIZED FOR USING INTERNAL RESOURCES, THE COSTS OF WHICH WERE CAPTURED AS OVERHEAD, TO MITIGATE DOE'S BREACH

In our initial brief we explained that there was "no basis in law or logic" for the government's claim that Dominion should not be compensated for overhead expenses. *Carolina Power & Light Co.,* 82 Fed. Cl. at 48. The government has not provided any persuasive rebuttal. In attempting to distinguish *United States v. Capital Sands Co.*, 466 F.3d 655 (8th Cir. 2006), in which the government *itself* secured overhead recovery, the government errs by claiming that statutory authority to recover overheads in that case constituted a material distinction between those circumstances and these. The Eighth Circuit in *Capital Sands* explained that the government was obligated by statute to recover its overheads in order to reimburse a revolving fund. *Id.* at 659. That obligation, however, did not create entitlement for the government to recover incurred costs that were not already legitimately compensable. The authority for the government (and others) to recover overheads is based on the principle that a party should recover all of its expenses, including a reasonable portion of its overheads, if it decides to remedy an injury itself. This rule is especially sensible when one considers that if the same work was contracted out, overheads would be included in the charge:

> Overhead expenses include those expenses that are necessary to keep a company or organization functioning as a going concern and that cannot be easily identified with any individual product or repair project. By its very definition, overhead serves to reimburse a party for its general operating expenses, which are composed of costs that are not directly allocable to a particular project. Furthermore, reasonable overhead charges can be included in the cost of repairs even if the injured party makes the repairs itself since such charges would be billed by any outside firm selected to complete the repairs.

*United States v. Peavy Barge Line*, 748 F.2d 395, 399 (7th Cir. 1984) (citations omitted) (cited in *Capital Sands*, 466 F.3d at 658-59); *see also Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976) ("The costs of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action. . . . The district court properly concluded that Freeport was entitled to recover its in-house engineering costs.").

As this Court held in *Tenn. Valley Auth.*, internal charge-backs are fully recoverable. 69 Fed. Cl. at 535-36 ("The court refuses to penalize TVA for its thrift and cost-effective operations."). *See also System Fuels*, 79 Fed. Cl. at 799; *Carolina Power & Light Co.,* 82 Fed. Cl. at 48 ("Overhead recovery is necessary to compensate Plaintiffs fully.") To recover overheads, of course, a party must "show the utility of these costs to the project," 69 Fed. Cl. at 542, but benefiting a project does not, as the government suggests, mean that the overhead pool itself must be shown to increase or be "incremental" to the breach. If the DOE's breach was a "substantial causal factor" of the project, then all of the costs of the project, including proper shares of overhead costs, are recoverable. As set forth in Dominion's post-trial brief and as not contested by the government, the services underlying the overhead costs claimed by Dominion benefited the mitigation projects at issue in this case. (6/18/08 Pl. Br. at 34-36; Jenkins, Tr. 1061:10-17; Johnson, Tr. 2585:10-13 (conceding overhead charges appropriate for "regulatory or contract purposes.").) These overhead charges, therefore, were actual costs Dominion incurred to mitigate the damages caused by DOE's breach, and are recoverable.

## IX. DOMINION SHOULD NOT BE PENALIZED FOR USING INTERNAL LABOR TO MITIGATE DOE'S BREACH

The government's argument that Dominion would have incurred some of its internal labor costs even absent the partial breach is based upon the same flawed "fixed cost" theory as its overheads argument. (Johnson, Tr. 2596:5-24.) The fact that Dominion "would have paid its

employees in all events is not material to this inquiry." *Tenn. Valley Auth.*, 69 Fed. Cl. at 569; *see also, e.g.*, *Southern Nuclear*, 77 Fed. Cl. at 442 (ruling that "plaintiffs made an appropriate showing of the amount of time spent by internal personnel on breach-related projects -- efforts for which those employees were not hired."). The government does not dispute that the time for which Dominion is claiming its labor costs was spent on mitigation activities. Dominion was clearly deprived of the value of that time. Dominion, therefore, should be compensated for the full cost of its mitigation activities.

Moreover, the government's offset is speculative. The government basically argues that the employees it deems as "non-incremental" would have had idle time if they had not been working on mitigation projects. But, as we noted in our post-trial brief, the evidence is that "there were other [plaintiff] projects that would have been worked on by [plaintiff's] internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm." *Freeport Sulphur*, 526 F.2d at 303. (*See* Basehore, Tr. 1126:4-1128:4; 1128:5-1129:17; 1130:4-7; Tr. 1132:10-1134:14.) In fact, the only basis for the government's offset is a completely arbitrary "screen" created by Mr. Johnson, which admittedly results in "imperfection" and an "anomaly" in its application. (Johnson, Tr. 2656:2-2657:13.) As we described in our initial brief, efficiency and common sense require that the government's argued internal labor deductions be rejected. 6/18/08 Pl. Br. at 36-38.

## X. AFUDC IS A RECOVERABLE COST INCURRED TO BUILD A CAPITAL PROJECT

For the reasons discussed in our initial brief, Dominion's position is that AFUDC and Capitalized Interest (which does not include any equity component) are interest *as* a claim – not interest *on* a claim – and recoverable under the applicable authorities. *See* 6/18/08 Pl. Br. at 44.

## XI. DOMINION IS ENTITLED TO RECOVER ALL OF ITS COSTS, INCLUDING THOSE THE GOVERNMENT ERRONEOUSLY CONTENDS TO BE "UNSUPPORTED"

In its arguments opposing Dominion's recovery of certain costs, the government demands detailed cost information that is simply not required under the applicable legal standard of "reasonable certainty." 7/10/08 Govt. Br. at 47-50; *see* 6/18/08 Pl. Br. at 39 (discussing standards). Moreover, the government focuses exclusively on the cost documentation provided during the audit process, and ignores the trial testimony regarding additional cost information details, as well as the trial testimony regarding the overall reliability of the underlying cost documentation introduced into evidence.

First, with regard to Dominion's $5,166,607 of allegedly "unsupported" internal labor, and as we noted in our initial brief, the government has conceded that these costs are supported. Specifically, the government does not quarrel with the proposition that the same "reasonable certainty" legal standard applies to Dominion's claims and to the government's claimed offsets, and the government affirmatively uses the allegedly "unsupported" internal labor as part of its argued offset calculations. *See* 6/18/08 Pl. Br. at 40. Accordingly, the government has conceded that these internal labor costs are, in fact, sufficiently supported. In its response, the government has not disputed that concession.

Second, with regard to Dominion's $1,749,762 of other allegedly "unsupported" non-labor costs, the government acknowledges that all but $229,918 of those costs are, in fact, supported by trial testimony and/or additional invoice or other documentation, in addition to the general ledger documentation contained at PX 249, 250, 252, and 253. 7/10/08 Govt. Br. at 50. The government also has not taken issue with the summary of that additional evidence that we supplied at pages 42-43 of our initial brief. Instead, the government complains about the level of

detail of some of that additional information, but those complaints are misguided. For example, the government cites Mr. Nunez's testimony regarding the need for a specific purchase document (*i.e.,* a release) to evaluate the work done under a specific purchase order. This complaint misses the mark, however, because: (1) it takes Mr. Nunez's testimony out of context, in that Mr. Nunez testified regarding the information that could be obtained from within the four corners of the accounting records, without regard to the other sources of information, such as knowledge of operational personnel involved in the actual activities; and (2) Mr. Nunez did not (and could not) take into account all of the testimony from Dominion's other witnesses (*e.g.*, Mr. Whitaker, who specifically described the work done under each purchase order).

Finally, regarding the $229,918 of allegedly "unsupported" costs for which the only documentation is Dominion's general ledger entries, the government fails to address or acknowledge the extensive testimony provided at trial that established the reliability of the figures contained in those documents (*see, e.g.,* Jenkins, Tr. 970:19-971:23; Nunez, Tr. 1633:9-1636:1; 1648:22-1656:13; Wakeman, Tr. 502:10-503:15; 511:20-512:15; and 526:1-15). Those general ledger business records, and the supporting testimony adduced by Dominion, comfortably meet the applicable "reasonable certainty" standard even with respect to the $229,918.

## CONCLUSION

Judgments should be entered for Dominion for those costs incurred as a result of DOE's breaches through June 30, 2006, in the amount of $173,917,029.[19] Specifically, an award of $52,001,303 should be entered in the "Connecticut" action, No. 04-83, and an award of $121,915,726 should be entered in the "Virginia" action, No. 04-84. In its order, the Court also should confirm Dominion's right to pursue in subsequent proceedings damages incurred after June 30, 2006, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan*, 422 F.3d at 1377.

Respectfully submitted,

s/ Brad Fagg
Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

Of Counsel:

Paul M. Bessette
David M. Kerr
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

July 21, 2008

19 The government is correct that the amount of damages stated in Dominion's initial post-trial brief inadvertently failed to reflect an adjustment made just prior to trial. The correct and final claimed damages are as stated in PX 241, and in the corrected Conclusion above.

CERTIFICATE OF FILING

I hereby certify that on this 21st day of July, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg