IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **DOMINION RESOURCES, INC., *et al.*** Plaintiffs, v. **UNITED STATES OF AMERICA,** Defendant. | Case Nos. 04-83C, 04-84C<br>Judge Bruggink |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**

Pursuant to the Court's August 8, 2008 Order, Plaintiffs Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc., and Virginia Electric and Power Company (also doing business as "Dominion Virginia Power") (collectively referred to for these purposes with its predecessors as "Dominion"), respectfully submit this Supplemental Brief.

**INTRODUCTION**

On August 7, 2008, the United States Court of Appeals for the Federal Circuit issued decisions in *Yankee Atomic Electric Co. v. United States*, No. 2007-5025, *et al.*, *Pacific Gas & Elec. Co. v. United States*, No. 2007-5046, and *Sacramento Mun. Util. Dist. v. United States*, No. 2007-5052, *et al.* The effect of those decisions is to confirm that Dominion is entitled to all of the damages that it seeks in these lawsuits.

First, the central holdings of the Federal Circuit were the rejection of the government's position regarding the so-called "pick-up rate," and the identification of rates reflected in 1987 DOE documentation as the contractual legal obligations for DOE performance. At trial, Dominion produced detailed evidence regarding its incurred damages under precisely such assumptions of DOE performance. That evidence established that even if one were to postulate—contrary to the historical facts and the evidence we cited at pp. 10-16 of our brief

dated June 18, 2008—that full core reserve must under no circumstances ever be even temporarily lost, North Anna (and Surry) would *still* have been able to easily avoid all such losses of full core reserve, with a maximum possible reduction in claimed damages of $3,607,507. However, more reasonable assumptions, consistent with the compelling evidence regarding sensible and historic real-world decision-making and availability of post-acquisition pick-up allocations from the Millstone site, more accurately result in no deduction at all to Dominion's claimed damages.

Second, the Federal Circuit in *Sacramento* emphatically rejected the government's arguments—identical to those made in this case—regarding argued deductions for certain internal labor costs, as a matter of law. *Sacramento,* slip op. at 10. That ruling compels a similar result here, and all of Dominion's claimed internal labor costs should be awarded.

Third and more generally, the Federal Circuit's application of the burdens of proof in the three recent decisions was entirely consistent with the position Dominion has urged, and entirely inconsistent with the government's persistent efforts to impose "additional requirements" of proof upon spent nuclear fuel plaintiffs. *E.g., Sacramento*, slip op. at 11. Proper allocation of the respective burdens confirms that the government has not established entitlement to any of the argued offsets and deductions that it seeks in this case.

***1.*** ***"PICK-UP RATE."*** Dominion produced substantial evidence regarding its damages under the specific "pick-up rate" identified in 1987 DOE documentation and held by the Federal Circuit in *Pacific Gas and Electric Company,* slip op. at 18, to be controlling. (PX 56 at 7; PX 55 at DOM2-00000552; Wakeman, Tr. 453:5-478:14; PX 223 at DOM00095958; PX 270.) That evidence requires rejection of all of the government's arguments regarding deductions to damages relating to the North Anna ISFSI.

Dominion's primary method of calculating damages utilized an oldest-fuel-first queue and "pick-up rates" reflected in the 2004 DOE Annual Capacity Report ("ACR").[1] As an alternative, Dominion presented unchallenged testimony and documentation regarding a scenario based upon "pick-up rates" reflected in the 1987 ACR and the incorporated 1987 Mission Plan Amendment, which have now been identified by the Federal Circuit as controlling.[2] In that alternative scenario, certain allocations based upon Surry spent fuel would be used for pick up by DOE of North Anna fuel, which would completely eliminate any loss of full core reserve at either plant. (Wakeman, Tr. 472:9-473:1; PX 223 at DOM00095958).[3] Such a scenario would result in Dominion loading two additional casks at the existing Surry ISFSI (PX 223 at DOM00095957; Wakeman, Tr. at 465:4-8), with a resulting deduction in claimed Surry damages (versus the calculation based upon the 2004 ACR rates) of $3,607,507. (PX 270).[4] That is the *maximum* possible deduction of Dominion's actual incurred mitigation damages in this case, giving the government every possible credit and unjustified benefit.

But, even that deduction is not warranted. Indeed, the government itself did not seek such a deduction (a factor observed by the Federal Circuit to be "notable" in *Sacramento*, slip op. at 12), but instead took the extreme all-or-nothing position that no North Anna ISFSI costs at all,

---

[1] Namely, an industry aggregate of 400 MTU in 1998, 600 MTU in 1999, 1,200 MTU in 2000, 2,000 MTU in 2001, and 3,000 MTU/year thereafter. (PX 191 at KRGNSP03600; *see also* Wakeman, Tr. 372:19-343:13; PX 222.)

[2] The 1987 ACR rates were 1,200 MTU/year from 1998-2002, 2000 MTU for 2003, 2,650 MTU/year for 2004-2007, and 3,000 MTU/year thereafter. (PX 56 at 7; PX 55 at DOM2-00000552).

[3] As we explained at length in both of our post-trial submissions and at closing argument, there can be no serious dispute that Dominion could, and would, have so used Surry allocations for pick up of North Anna fuel (or vice versa) if circumstances so warranted. *See* 6/18/08 Pl. Br. at 6-7 n.9; 7/21/08 Pl. Br. at 7-8; Smith, Tr. 252:4-13; Wakeman, Tr. 392:9-393:9; Zabransky, Tr. 1499:7-13; Neuberger, Tr. 2064:17-23, 2059:24-2061:1; PX 26 at 12, Article V.E.; PX 78 at 1.

[4] These two additional casks, holding 32 assemblies each, would have been loaded one each in 2000 and 2001. PX 223 at DOM00095957. This would have left at least a 7 assembly margin over full core reserve at all times at Surry, and at least a 23 assembly margin over full core reserve at North Anna, at the 1987 ACR rates. These margins can be seen in the "Margin Over FCR" columns on the Surry and North Anna pages of PX 223 at DOM00095957-58.

an alleged $23 million in total, are recoverable. 7/10/08 Govt. Br. at 19. The compelling record evidence in this case, however, is that Dominion would have tolerated the sort of limited and temporary losses of full core reserve presented by reasonable pick-up rate assumptions such as those reflected in either the 2004 or 1987 ACR—as, significantly, it has in the real world in the past. *See,* 6/18/08 Pl. Br. at 11-14 and evidence cited therein.

In particular, if Dominion chose not to add the above-noted two casks to the Surry ISFSI, the loss of full core reserve at Surry under the 1987 ACR rates would never have exceeded 24 assemblies, the losses would have occurred during portions of only two years, and full core reserve would have been fully regained after those two years.[5] Such losses are of the same general magnitude and duration as losses of full core reserve actually tolerated, historically, by Dominion in the real world *at the Surry plant itself*. (*See* 6/18/08 Pl. Br. at 12-13; Brookmire, Tr. 26:9-12; Basehore, Tr. 1110:8-25; Wakeman, Tr. 421:12-18; 426:18-24; 427:23-428:2; PX 180 at DOM00044367). Indeed, because there was already an ISFSI in existence at Surry, a temporary loss of full core reserve would have been quite manageable (as it was in the real world), because casks could be loaded to the ISFSI in short order if circumstances necessitated expeditious recovery of full core reserve. There is simply no basis for the government to contend that the sort of losses of full core reserve actually tolerated by Dominion on multiple occasions in the real world at Surry without extraordinary expenditures would, for some reason, *not* have been tolerated by Dominion in the but-for world at Surry without extraordinary

---

[5] To achieve a goal of completely avoiding losses of full core reserve at North Anna and minimizing losses of full core reserve at Surry without loading additional casks, the scenario reflected on PX 223 at DOM00095957-58 (which, again, illustrated the loading of two additional casks at Surry in order to completely eliminate losses of full core reserve at both plants) would be altered in the following ways: (1) Dominion would not use 10.2 MTU of Surry allocations for North Anna fuel in 2001; and (2) Dominion would use a total of 15.8 MTU of allocations from North Anna fuel for pick-up of Surry fuel in 2003. With those two minor changes, North Anna would never lose full core reserve and Surry would only lose full core reserve by 24 assemblies in 2002 and 21 assemblies in 2003.

expenditures. No deduction in actual mitigation damages at either Surry or North Anna is therefore warranted.

Moreover, even if Dominion had initially determined to use allocations based upon Surry fuel to ship North Anna fuel to DOE, and add two casks to its Surry ISFSI rather than tolerate the temporary loss of full core reserve at Surry, the acquisition of the Millstone plant in 2000 would have significantly altered the calculus and given Dominion additional no-cost options. (PX 149, Purchase and Sale Agreement, dated August 7, 2000.) In 2000 at the 1987 ACR rates, Millstone Units 2 and 3 had a 185 and 242-assembly margin over full core reserve, respectively.[6] This is a tremendous margin and would have been a useful asset to Dominion in the but-for world. When Dominion became aware of the full core reserve margins available at Millstone Units 2 and 3, therefore, the additional ability to use allocations from Millstone fuel at Surry to avoid losses of full core reserve in 2002 and 2003, as well as the expense of loading additional casks at the Surry ISFSI, would have been available.[7] This alternative underscores the fact that the government has not borne its burden to establish any reduction in damages.

In sum, had DOE performed at the 1987 ACR rate, the record evidence establishes that Dominion would have avoided the same mitigation activities (and thus incurred the same measure of damages) as established by Dominion's 2004 ACR rate damage calculation.

---

[6] As seen in the "Margin Over FCR" columns on pages DOM00095960-61 of PX 223.

[7] The government, though its expert Dr. Neuberger, criticized the sharing of allocations between Millstone and North Anna (at the 900 MTU/year rate) because of the time it would have taken to plan and construct an ISFSI at North Anna. (Neuberger, Tr. 2048:9-2048:11.) The situation at Surry under the 1987 ACR rates, however, would have been different because there would have already been an ISFSI in existence. Plans to load additional casks to an existing ISFSI obviously do not require the same lead time as design and construction of the ISFSI itself. The basis for the government's objection to Dominion's use of Millstone allocations at the Virginia plants would therefore not exist, and, as the DOE Contracting Officer testified, "the Department's position has been, as long as I've been aware of it, that a single utility could trade its allocations within its family as it saw fit." Zabransky, Tr. 1499:7-13.

Dominion has shown that, under the 1987 ACR rate mandated by the Federal Circuit, DOE's breach was a "substantial causal factor" in all of its claimed damages.

*2.* ***INTERNAL LABOR.*** It is hard to imagine a more decisive rejection of the government's arguments regarding internal labor costs than that contained in the *Sacramento* decision. The trial court in *Sacramento* denied recovery for "internal labor costs for any employee who spent less than the majority of his time on that project," *Sacramento*, slip op. at 10, which is virtually the same argument regarding internal labor that the government makes in this case. *See*, 7/10/08 Govt. Br. at 44-45. The Federal Circuit first confirmed that a utility "can recover mitigation damages so long as it establishes that the claimed expenses were caused by the breach," slip op. at 11, *citing Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005), and that requires only that a utility show that it "did in fact use its own employees in its mitigation efforts, and the number of hours those employees spent on mitigation related projects." *Sacramento,* slip op. at 11. The Federal Circuit then held that the argued imposition of "an additional requirement—namely, that [a plaintiff] must demonstrate that it would have eliminated or reassigned the employees who spent time on mitigation-related projects to collect damages," to be "unprecedented," and the distinction drawn by the government to be "a false one." *Sacramento,* slip op. at 11, 12. Because of this "misapprehension of [plaintiff's] burden of proof," the Federal Circuit reversed the trial court's reduction in damages. The identical internal labor damage reductions sought by the government here must similarly be rejected.

*3.* ***BURDENS, GENERALLY.*** Finally, proper application of the correct burdens of proof described in the internal labor discussion above—and more particularly the Federal Circuit's rejection of the government's efforts to impose "additional requirements" beyond the

foreseeability, reasonableness, and substantial causal factor elements identified in *Indiana Michigan*, 422 F.3d at 1373—have broader implications for the various damages reductions sought by the government in this case. In order to discharge its burden, a spent nuclear fuel plaintiff need only "prove the contractual acceptance rate and apply that rate" to show that its real-world mitigation activities were "substantially caused" by DOE's performance failures. *Yankee Atomic*, slip op. at 6-7. It then becomes the government's burden to prove, and if necessary quantify, any argued damage reductions. To require a plaintiff to disprove every argued deduction or offset, alleged collateral benefit, or potential alternative mitigation measure would represent an impermissible imposition of "additional requirements" upon such a plaintiff, and constitute a misapprehension of the burdens of proof. *Sacramento*, slip op. at 11, 12.

These principles apply to most of the deductions that the government seeks in this case. Indeed, the government acknowledges that it seeks overhead charge damage reductions "for the same reasons" as the internal labor deductions discussed above and specifically rejected in *Sacramento*. 7/10/08 Br. at 44. The principles also control the government's speculative arguments about the Millstone Unit 2 and 3 cranes, plant modifications undertaken in connection with ISFSI's, and heat load calculations for the Millstone license amendment. For all of these activities, there can be no serious dispute that the real-world costs were incurred as a result of DOE not performing at the 1987 ACR rates. Dominion has no further burden under the recent Federal Circuit decisions, and the government has not established that deductions are warranted.

## CONCLUSION

The three recent opinions by the Federal Circuit confirm that Dominion is entitled to all of the damages that it seeks in these lawsuits.

Respectfully submitted,

Of Counsel:

Paul M. Bessette
David M. Kerr
D. Bruce McPherson
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

s/ Brad Fagg
Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

September 2, 2008

CERTIFICATE OF FILING

I hereby certify that on this 2nd day of September, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg